## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————————————————    :
JESUS M. CHRISTIAN, Individually and        :
as Personal Representative of the Estate of   :
CARLOS ENRIQUE CHRISTIAN REY,          :
Deceased,                                      :
Calle El Retiro, #5B                          :    Case No._____
Torre Juan Antonio XVI, Apt. 802             :
Piantini, Santo Domingo, Dominican Republic   :
                                              :
And                                           :
                                              :
CAMILA ALEXIA SELMAN TRONCOSO,       :
Ava Bolivar 1005                              :
Torre Boliva, Apt. 9                          :
La Esperilla                                  :
Santo Domingo, DN, Dominican Republic        :
                                              :
       Plaintiffs                             :
                                              :
       v.                                     :    COMPLAINT
                                              :    and JURY DEMAND
                                              :
UBER TECHNOLOGIES, INC.                      :
1515 3d Street                                :
San Francisco, CA 94158                       :
       Serve:                                 :
       CT Corporation System                  :
       1015 15th Street, NW                   :
       Washington, DC 20005                   :
                                              :
       And                                    :
                                              :
RASIER, LLC                                   :
1515 3d Street                                :
San Francisco, CA 94158                       :
       Serve:                                 :
       CT Corporation System                  :
       1015 15th Street, NW                   :
       Washington, DC 20005                   :
                                              :
       And                                    :
                                              :
KHALINMANDAKH ICHINKHOROL             :
1201 South Courthouse Rd                      :

1

Apt. 314                                    :
Arlington, VA 22204                         :
                                            :
    And                                     :
                                            :
**REGINALD ROLAND JOHNSON**                 :
**# 88308-510**                             :
**Fort Dix FCI**                            :
**P.O. Box 2000**                           :
**Joint Base MDL, NJ 08640**                :
                                            :
        Defendants.                         :
_____    :

## COMPLAINT FOR DAMAGES
### (Wrongful Death; Survival Act; Negligence; *Respondeat Superior*; Negligent Hiring, Training and Supervision)

## INTRODUCTION

On the evening of January 15, 2023, 24-year-old Carlos Enrique Christian Rey requested an Uber ride to visit a public art exhibit near the Georgetown waterfront in the District of Columbia. He and his girlfriend of eight years, Camila Alexia Selman Troncoso, also 24 years old, entered the back seat of an Uber vehicle driven by Khalinmandakh Ichinkhorol (hereinafter also referred to as "Ichinkhorol") as they set out to Georgetown. They never made it.

Around 6:10 pm, Ichinkhorol drove the Uber vehicle into the intersection of Massachusetts Avenue, N.W. and 15th Street, N.W. He attempted to make a left turn across oncoming traffic, failed to yield to cars with the right-of-way, and collided with an oncoming vehicle operated by Reginald Roland Johnson (hereinafter also referred to as "Johnson").

Johnson was driving under the influence of alcohol as he sped through the intersection at more than twice the legal speed limit and slammed into the side of the Uber vehicle. Johnson pled guilty to involuntary manslaughter, admitting his negligence in causing the collision.

Ichinkhorol, while driving for, and as an agent of, Uber and its wholly owned subsidiary, Rasier, was operating his vehicle illegally and in an unsafe manner. He was not wearing the corrective glasses required by the restriction on his driver's license. His tires were excessively worn, and he was distracted by Uber's requirement that he monitor and engage with the Uber App. As he approached the intersection and then attempted the fatal left turn, he violated numerous District of Columbia traffic rules and regulations—failing to effectively observe traffic conditions, to yield to oncoming traffic, and to heed the dangers to his passengers presented by Johnson's visible oncoming vehicle.

Uber Technologies (hereinafter also referred to as "Uber"), operating in the District of Columbia through Rasier, is liable for Ichinkhorol's negligence as well as its own negligence in hiring and failing to train and supervise him. As discussed herein, the negligence of all defendants—Johnson, Ichinkhorol, Uber, and Rasier—proximately caused fatal injuries to Carlos and severe and permanent injuries to Camila. Thus, each defendant is liable for damages to the Plaintiffs, who were blameless throughout.

## **JURISDICTION**

1.    This court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) and (c). The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Decedent Carlos Enrique Christian Rey was a citizen of the District of Columbia at the time of his death. Plaintiff Camila Alexia Selman Troncoso is a citizen of the Dominican Republic. Defendants Uber and Rasier are both incorporated in Delaware and both have their principal place of business in California. Defendant Johnson is a citizen of Pennsylvania in the custody of the Bureau of Prisons and currently incarcerated at Fort Dix Federal Correctional Institution.

2.      Venue is proper pursuant to 28 U.S.C. § 1391 as the injuries and death for which the plaintiffs seek damages occurred in the District of Columbia.

### THE PARTIES

3.      Plaintiff Jesus Christian is a citizen of the United States, residing in the Dominican Republic. He is the father of Decedent Carlos Enrique Christian Rey (hereinafter also referred to as "Carlos" or "Carlos Christian"), who, at the time of his death, was a citizen of the United States and resident of the District of Columbia enrolled in the MBA program at The George Washington University. On January 3, 2024, Jesus Christian was appointed as Personal Representative of the Estate of Carlos Enrique Christian Rey (Superior Court of the District of Columbia, Probate Division, No. 2023-ADM-001540). Carlos is survived by his father, Jesus Christian, his mother, Noelia Rey, and two brothers.

4.      Plaintiff Camila Alexia Selman Troncoso (hereinafter also referred to as "Camila" or "Camila Selman") is an adult citizen and resident of the Dominican Republic. She and Carlos knew each other since childhood and planned to be married. At the time of the collision, Camila was residing in the District of Columbia and pursuing a master's degree at Georgetown University.

5.      Defendant Uber Technologies, Inc. is a Delaware corporation with a principal place of business in San Francisco, CA. Uber utilizes an on-demand digital network and smartphone application in a business that provides drivers to customers in cities around the world, including the District of Columbia, where it is licensed to conduct business as a foreign corporation and derives substantial revenue.

6.      Defendant Rasier, LLC is a Delaware limited liability corporation with a principal place of business in San Francisco, CA. Rasier is a wholly owned subsidiary of Uber and is

licensed to conduct business as a foreign corporation in the District of Columbia, where it conducts the Uber car service business.

7.     Defendant Khalinmandakh Ichinkhorol is an adult citizen of Mongolia, presently residing in Arlington, VA. At the time of the collision described in this Complaint, he was an employee, agent and/or servant of Uber and acting within the scope of his employment.

8.     Defendant Reginald Roland Johnson is an adult resident of Philadelphia, PA, presently in the custody of the federal Bureau of Prisons and incarcerated at Fort Dix Federal Correctional Institution.

## FACTS

### UBER AND RASIER ("UBER")

9.     Uber, through its wholly owned subsidiary, Rasier (hereinafter collectively referred to as "Uber"), provides drivers to customers in cities throughout the world through its smartphone application (the "Uber App").

10.     Uber dominates the global market for ride-hailing, has more than five million drivers across 10,000 cities, and earns billions of dollars annually.

11.     The only way to access Uber's services is to register on the Uber App, which is free to download and install on a smartphone.

12.     A customer who has downloaded the Uber App can use it to request a ride to a specific location. Upon receipt of the request, Uber sends one of its drivers to the customer's location to provide the requested transportation.

13.     Uber selects, hires, compensates, and discharges its drivers. Uber has the power to—and does—exercise substantial control over its drivers' conduct when they are acting within

the scope of Uber's business. As such, Uber is the employer-in-fact of Uber drivers, including Ichinkhorol, and is responsible for their negligent acts and omissions.

14.     Uber unilaterally sets and controls fares.

15.     Uber sets the rules for driver compensation and pays its drivers the aggregate of all weekly earnings by direct deposit.

16.     Uber prohibits its drivers from seeking compensation from passengers even when the payment technology fails. In such cases, drivers must seek reimbursement from Uber.

17.     Uber sets a compensation plan that depends on the number of rides drivers accept; the more rides the driver accepts, the more money the driver and Uber earn. Thus, Uber provides incentives, including monetary rewards, to complete trips quickly.

18.     Uber decides when and if prices surge to higher levels.

19.     Uber can alter payment to a driver if a customer complains to Uber about the driver.

20.     Uber sets rules on how long a driver can provide rides before taking a break.

21.     Uber selects which drivers are dispatched for which ride requests. A customer cannot choose between drivers.

22.     Uber imposes restrictions on what drivers are allowed to say to customers.

23.     Uber handles and adjudicates any rider disputes; in resolving disputes, Uber has the power to reduce a rider's fare in its sole discretion and thereby reduce the driver's income.

24.     Uber requires that its drivers utilize the Uber GPS-enabled map function that, among other things, directs Uber drivers to the starting points and destinations of their assigned rides.

25.     Uber monitors the routes its drivers follow. If Uber is not satisfied with the routes selected, it will reduce the driver's compensation.

26.     The Uber App shows Uber drivers real time "heat maps" of where demand for rides is highest at a given time.

27.     Uber requires that its drivers actively engage with the Uber App while driving in order to accept or decline additional assigned rides, and routinely alerts Uber drivers to new assigned rides.

28.     Uber monitors the rate at which drivers accept new rides on the Uber App.

29.     Uber uses various financial inducements, as well as other techniques, to influence and incentivize drivers in selecting the duration, time of day, and location of their shifts in conformity with the companies' desired outcomes. For example, Uber provides additional privileges and benefits to drivers who maintain an acceptance rate of over 85%.

30.     Uber imposes a range of other detailed requirements on its drivers, who are rated and subject to termination, deactivation, or restriction of access to the Uber App based on their failure to adhere to these requirements, which include, but are not limited to, the following:

- Drivers in D.C. must drive four-door vehicles that are consistent with Uber requirements;

- Drivers must display the logo provided by Uber on their vehicles;

- Drivers must maintain their vehicles in a safe condition;

- Drivers must keep their vehicles in clean condition;

- Drivers must respond to ride requests, pick up customers, and take customers to their destinations within a timeframe acceptable to Uber;

- Drivers must not call passengers who are waiting to be picked up with a frequency that Uber determines is excessive;

- Drivers may not have any post-trip contact with Uber passengers;

- Drivers may not decline rides to any destinations; and

- Drivers must maintain a passenger review rating under Uber's "star rating" review system that is acceptable to Uber.

31.    Uber provides its drivers with paid liability and comprehensive collision insurance, as well as the right to participate in health insurance for which Uber has negotiated group rates.

**UBER'S SAFETY REPRESENTATIONS**

32.    Uber makes a number of representations to consumers who use its service, including, but not limited to:

- Users can rely on Uber to provide "safe, reliable" rides;

- All Uber drivers are subject to a comprehensive, multi-step screening process before they are allowed to drive for Uber, and repeat screening at least once a year thereafter;

- Uber uses "technology to look for issues in between" scheduled driver screenings;

- Uber strives to make its service the safest way to go anywhere;

- Uber expects each of its drivers to know and be responsible for knowing and adhering to "relevant laws and regulations, including traffic laws";

- Uber provides its drivers with education materials and courses on road safety; and

- Uber supports drivers and riders with "empathy and care" in times of need.

33.    Uber did not subject Ichinkhorol to the kind of comprehensive screening that could reasonably be expected to identify a driver who would be unlikely to provide "safe, reliable" rides.

34.    Uber knew or should have known before hiring and during its employment of Ichinkhorol that he does not adhere to relevant laws and regulations because he does not wear the corrective lenses required by the restriction on his driver's license.

35.     Uber knew or should have known that Ichinkhorol had driving offenses in 2019 in Virginia involving safety,  including one (May 20, 2019) where he had a "violation of highway sign – no left turn" which may have been caused either by his poor vision or his disregard for traffic rules and regulations; and another (June 7, 2019) where he failed to yield to oncoming traffic while making a left turn, as occurred here.

36.     Uber knew or should have known that Ichinkhorol was driving a vehicle with unsafe, excessively worn tires.

37.     Uber knew or should have known before hiring and during its employment of Ichinkhorol that due to his difficulty communicating in English, he would be unable or limited in his use of audio instructions and his ability to receive and benefit from any Uber educational materials, courses, or instruction on road safety.

38.     Upon information and belief, Uber did not take adequate steps to ensure that Ichinkhorol was a safe driver or to provide him with appropriate road safety training or supervision.

39.     Uber did not provide safe services to Carlos and Camila.

40.     Uber did not offer either "empathy" or "care" to Carlos' family or Camila.

## RELEVANT DISTRICT OF COLUMBIA TRAFFIC RULES, REGULATIONS, AND RESTRICTIONS

41.     While driving for Uber and transporting Carlos and Camila in the District of Columbia, Ichinkhorol was subject to numerous road safety rules and regulations designed to prevent accidents and protect him, Carlos, and Camila, other drivers and vehicle occupants, and pedestrians. These include:

- A duty to keep a proper lookout, meaning that Ichinkhorol was obligated to reasonably observe traffic, pedestrians, and other conditions that confronted him;

- A duty to look observantly and effectively, in an intelligent and careful manner, and see what is plainly there to be seen. One who looks and does not see what is plainly there to be seen is as negligent as one who never looked at all;

- A duty to look effectively before entering an intersection controlled by a traffic signal, observe all moving traffic, and give the right of way to an approaching vehicle that would present an immediate hazard;

- When intending to turn left at an intersection, a duty to yield the right-of-way to any vehicle approaching from the opposite direction that is so close as to constitute an immediate hazard and wait until it is safe to turn;

- When intending to turn left at an intersection, a duty not to block the intersection while waiting for oncoming traffic to clear;

- A duty to be aware of and responsive to potential dangers and risks to all occupants of the car;

- A duty to obey the District of Columbia's prohibition against operating a motor vehicle in the District of Columbia without wearing the corrective lenses required by the restriction on his driver's license;

- A duty to afford full time and attention to one's driving and not drive while distracted; and

- A duty to foresee the possibility of a dangerous situation and mistakes by other drivers, especially when entering intersections.

42.    Johnson was subject to numerous road safety rules and regulations designed to prevent accidents, including:

- A duty to keep a proper lookout, meaning that he reasonably observe traffic and other conditions that confronted him;

- A duty to comply with posted speed limits;

- A duty to not operate a vehicle while intoxicated; and

- A duty to avoid distractions.

**DISTRACTED DRIVING IS BUILT INTO THE UBER BUSINESS MODEL**

43.     Uber drivers like Ichinkhorol are among the worst distracted driving offenders. They are more than twice as likely as other drivers to engage in some distracting activity, and nearly four times as likely to use smartphone apps regularly while driving.

44.     Uber requires its drivers, like Ichinkhorol, to use a smartphone or similar electronic device when providing rides to Uber customers and to have the Uber App open on their smartphones or similar devices to be notified of ride requests, accept work, perform ride services, and generally be actively working for Uber.

45.     Uber communicates directly with its drivers by sending electronic messages, alerts, and notifications through the open Uber App on their smartphones.

46.     Uber sends electronic messages, which are frequently time-sensitive, such as notifications to pick up subsequent riders. Uber also sends notification of receipt of payment or tips from past rides while Uber drivers are transporting current Uber customers.

47.     The Uber driver must continually monitor the Uber App to see the levels of demand and where customers will pay surge prices in various parts of the city, indicated by a variety of colors which the driver must interpret.

48.     The Uber driver must continually monitor the Uber App for ride requests, indicated by a flashing blue button meant to capture the driver's attention while driving.

49.     The Uber driver has approximately 15 seconds to respond to the flashing blue light indicating a ride request. Failing to respond in time reduces the driver's immediate income and can reduce his acceptance rate, which can result in a suspension and loss of future income. As a consequence of this requirement, drivers must pay close attention to their Uber App, even while driving, and be prepared to respond quickly.  That is, Uber drivers must operate their phones while driving lest they lose immediate and future income.

50.     Uber conditions and incentivizes its drivers to monitor and respond to notifications in their Uber App while driving and completing other trips with customers by offering promotions for accepting and completing consecutive rides and other similar tasks or requests, as well as by monitoring the acceptance rates of Uber drivers and providing privileges and benefits to those with the highest acceptance rates.

51.     Uber's requirements that drivers actively engage with the Uber App while driving and be alert and responsive to pings, as well as the driver's financial incentive to identify locations of surge pricing and accept as many rides as possible, create substantial distractions far greater than those that occur in normal driving, thereby increasing the danger of an accident and injury.

52.     These Uber App distractions are compounded when the driver is also engaging with his personal smartphone and apps.

**THE COLLISION**

53.     On January 15, 2023, at approximately 5:50 pm, Carlos used his Uber account to request that Uber send a driver to his residence at 443 New York Avenue, N.W. He and Camila planned to travel to an outdoor art event beginning on M Street in Georgetown and proceeding along the Georgetown waterfront.

54.     Ichinkhorol responded to Uber's prompt. Carlos and Camila entered the back seat of the car, with Carlos next to the passenger side window. Both were wearing their seatbelts. Prior to that evening, neither Carlos nor Camila knew or had any dealings with Ichinkhorol.

55.     They did not know that Ichinkhorol was driving illegally because he was not wearing the corrective lenses required by his Virginia license.

56.     Virginia imposed that restriction on Ichinkhorol's license to drive because his vision and ability to drive safely would be impaired without corrective lenses. Nevertheless, Ichinkhorol routinely ignored the restriction and drove without his corrective lenses, including on the evening of January 15, 2023. Thus, on that evening, he was driving in violation of District of Columbia Municipal Regulations, Title 18 § 1100.9, which prohibits any person not in compliance with a license restriction from driving in the District of Columbia.

57.     With Carlos and Camila in the back seat, Ichinkhorol began the Uber trip, proceeding west along Massachusetts Avenue, N.W. It was the night before the Martin Luther King Jr. holiday, and the traffic was relatively heavy.

58.     Ichinkhorol was driving a vehicle that was unsafe, with tires that were excessively worn, with little or no tread.

59.     Meanwhile, Reginald Johnson, who had spent approximately four hours drinking alcoholic beverages at a bar in the District of Columbia, got into his car with six other people and began driving to another bar. Johnson drove east on Massachusetts Avenue N.W.

60.     Ichinkhorol followed a route that created a needless and dangerous left turn at the intersection of 15th Street, N.W. and Massachusetts Avenue, N.W.  Left turns, particularly at night and without the protection of a traffic arrow, are visually demanding, taxing the brain more than turning right or driving straight. A driver must be able to perceive traffic controls, oncoming traffic

with headlights, and pedestrians. Indeed, in October 2022, Uber issued a press release, advising that a left turn at a busy city intersection is one of the most dangerous things its drivers can do. Claiming to have improved "safety in the driver's seat," Uber announced the modification of its in-app navigation to help its drivers avoid such turns. Here, there were safer, alternate routes.

61.     The fact that Ichinkhorol followed a route that required a dangerous left turn indicates that he failed to follow the safer route provided by the Uber App, or that Uber failed to follow through with its stated intent to modify the in-app navigation to avoid what it acknowledged to be a dangerous maneuver.

62.     As Ichinkhorol entered the intersection from a westbound lane of Massachusetts Avenue, N.W. and began his left turn onto 15th Street, N.W., Johnson's vehicle was approaching the intersection in an eastbound lane, speeding at approximately 60 miles per hour, with headlights on and clearly visible.

63.     No impediments were keeping either car from observing the other, and Johnson had a green light and the right of way.

64.     As the driver of the turning vehicle, Ichinkhorol was required to yield to eastbound traffic on Massachusetts Avenue.

65.     But instead of yielding and making sure that it was safe to complete a left turn, Ichinkhorol moved into the intersection, trying to navigate through oncoming traffic. Immediately prior to crossing into the eastbound Massachusetts Avenue, N.W. lanes, Ichinkhorol observed or should have observed at least three vehicles entering or approaching the intersection. One of these three vehicles was Johnson's vehicle.

66.     As Johnson approached the intersection, the traffic light was green and he observed the Uber vehicle proceeding slowly through the intersection, nearly at a stop. Johnson accelerated,

believing that he could get through the intersection without striking the Uber vehicle. But Ichinkhorol, having gambled with his passengers' safety by turning into the eastbound lanes of oncoming vehicles, also accelerated. The speeding Johnson vehicle struck the Uber vehicle broadside, including at the back seat location where Carlos and Camila were seated.

67.     Ichinkhorol paid a relatively small price for his gamble, sustaining comparatively minor injuries.  Not so for the Uber passengers in the back seat.  For Carlos and Camila, the result of Ichinkhorol's decision was a catastrophic and deadly collision.

## THE DEFENDANTS' NEGLIGENCE

68.     Johnson failed to exercise reasonable care by operating a vehicle after consuming alcohol and with a blood alcohol level above the legal limit, and by speeding through the intersection as Ichinkhorol was maneuvering his vehicle through it. On June 30, 2023, Johnson entered a plea of guilty to involuntary manslaughter, and on November 17, 2023, he was sentenced to eight years imprisonment. By his guilty plea, Johnson has admitted liability for damages resulting from the collision.

69.     Ichinkhorol knew or should have known that making a left turn at the busy intersection of 15th Street, N.W. and Massachusetts Avenue, N.W. at night without the protection of a left turn arrow, without his required corrective lenses, while engaged with smartphone apps and in an unsafe vehicle, substantially increased the danger of a collision causing injury to Carlos and Camila. Thus, he had a duty to act more carefully and with more caution than might be the case with less dangerous conditions.

70.     Had Ichinkhorol exercised reasonable care to avoid causing injuries to his passengers, including increased caution as he attempted a dangerous left turn, without his required corrective lenses, while engaged with smartphone apps and in an unsafe vehicle, after sunset and

facing oncoming headlights, he would not have attempted the left turn or proceeded as he did upon entering the intersection.

71.    Ichinkhorol is also liable for the damages resulting from the collision for failing to exercise the care required of a driver for hire making a left turn at a busy city intersection, and for violating his duty to exercise reasonable care to avoid harming Carlos and Camila by:

- Not complying with his license restriction requiring him to wear his corrective lenses, causing him to drive with impaired vision. Ichinkhorol's failure to wear corrective lenses impaired his ability to observe and safely react to the traffic conditions at the intersection, including the immediate threat of oncoming vehicles that had a green light to proceed across the intersection. Because Ichinkhorol failed to comply with his license restriction and drove illegally in the District of Columbia, he is presumed negligent.

- Failing to keep a proper lookout and carefully and effectively observe traffic conditions at the intersection;

- Failing to exercise the appropriate level of care when engaging in a traffic maneuver that substantially increased the danger of injury to his passengers;

- Failing to yield to visible oncoming traffic that had a green light to proceed through the intersection and was an immediate threat to his passengers;

- Recklessly attempting to "thread the needle" by navigating the Uber vehicle through oncoming traffic;

- Operating a front wheel drive vehicle on front tires so excessively worn as to be dangerous and an impediment to any attempt to accelerate;

- Driving while distracted by apps and communication devices; and

- Proceeding with a left turn when it was not reasonably safe to do so.

72.    Uber knew that Ichinkhorol was required to wear corrective lenses while driving and that if he did not wear them, his vision would be impaired and his passengers at risk of injury.

73.    Uber is liable for all acts of negligence by Ichinkhorol.  Uber was also negligent in hiring, failing to train or supervise, and continuing to employ Ichinkhorol as a driver.

74.    The Plaintiffs were blameless of any conduct or actions leading to and during the collision.

## DAMAGES AND INJURIES TO CARLOS AND CAMILA

75.    As a result of the negligence of the Defendants, Carlos Christian suffered catastrophic physical injuries, causing excruciating pain and suffering as he waited to be extracted from the Uber vehicle and while he was being transported to George Washington University Hospital, where he later died from his injuries.

76.    At the time of his death, Carlos was a graduate of Syracuse University, where he received a merit scholarship and graduated with honors. Thereafter, he was granted a merit scholarship to The George Washington University, where he was studying for his MBA. He was an intelligent, sincere, inspiring, charming, generous, and determined young man, beloved by his family and many friends.  Carlos had demonstrated business acumen and planned on a long, prosperous, and rewarding career in finance. As he entered the Uber vehicle that night, he was looking forward to marrying and raising a family with Camila, whom he first met when they were young children.

77.    As a result of the negligence of the Defendants, Camila Selman sustained serious and permanent physical injuries, including four pelvic fractures, a displaced lumbar vertebra, a lung contusion, splenic hematoma, and concussion. She underwent major surgery followed by a

long and painful period of physical therapy. She will require further surgeries, follow up care, physical therapy, and mental health treatment. Because of her injuries, Camila will have difficulties with pregnancies. She faces a life of pain, physical limitations, severe mental and emotional distress, and a long and painful road to recovery. Most significantly, she has lost Carlos and the life they planned together, with all the implications of such a profound loss.

78.    When the collision occurred, Camila was an active athlete who ran half marathons and engaged in various physical activities. A graduate of Emory University, where she received a merit scholarship, she had decided to pursue a master's degree at Georgetown University and was considering various career options. Camila and Carlos were in the happiest stage of their life together and dreamed of a future spent side by side.

79.    Camila has been forced to incur medical and related expenses that are ongoing as she seeks to restore her ability to participate in the activities of daily life and to regain her once promising career. The injuries Camila suffered prevent her from engaging in her usual and customary activities, limit her ability to earn income in the future, and will cause difficulties with pregnancies.

## <u>COUNT I</u>

**(Wrongful Death Act Against all Defendants – Negligence; *Respondeat Superior*)**

80.    Plaintiff Jesus Christian incorporates by reference the allegations set forth above and makes claim against the Defendants for all damages recoverable pursuant to the Wrongful Death Act, D.C. Code §16-2701.

81.    As a result of the negligent acts and omissions of the Defendants, Carlos Christian sustained and suffered catastrophic injuries causing conscious pain and suffering and his death, and substantial lost future earnings.

82.     As a result of the negligent acts and omissions of the Defendants, the parents of Carlos Christian have lost, and will continue to lose, the pecuniary and emotional support and financial contributions, together with the reasonable value of services, consortium, education, training, guidance, personal advice, society, companionship, protection, care, and attention that they would have received but for the premature death of Carlos Christian.

83.     Ichinkhorol was acting within the scope of his employment with Uber at the time of his negligent acts and omissions.  As the employer-in-fact of Ichinkhorol, Uber is responsible for his negligent acts and omissions.

WHEREFORE, plaintiff Jesus Christian demands judgment against all Defendants, jointly and severally, for Wrongful Death Act damages in the amount of $50 million plus interest and costs.

## COUNT II

### (Wrongful Death Act Against Uber and Rasier – Negligent Hiring, Training and Supervision)

84.     Plaintiff Jesus Christian incorporates by reference the allegations set forth above and makes claim against Defendant Uber for all damages recoverable pursuant to the Wrongful Death Act, D.C. Code §16-2701.

85.     Uber had a duty but failed to use reasonable care in the selection, hiring, and training of Ichinkhorol.

86.     Uber claims to screen potential drivers for safety issues in their driving records. Here, Uber knew or should have known that there were "red flags" that signaled Ichinkhorol was not a competent or safe driver, including his refusal to wear the glasses required by his license to correct his impaired vision, and his earlier traffic violations involving a failure to heed a no left turn sign and making an improper left turn.  On information and belief, evidence (*e.g.*, a syringe in the

Uber vehicle's glove compartment) suggests Ichinkhorol may have had health or other problems that could have affected his driving and could have been detected with adequate screening. Uber knew or should have known of Ichinkhorol's license restriction and, had it conducted adequate screening before hiring him, would have known that he did not comply with it when driving, that he was of the view that he did not have to comply with the law, and therefore that he was not fit to drive for Uber and should not have been hired.

87.    After hiring Ichinkhorol, Uber failed to provide adequate in-service safety training and follow-up safety screening of him. Had it done so, Uber would have been aware that Ichinkhorol only wore his corrective lenses for reading and refused to wear them while driving for Uber, meaning that Ichinkhorol was illegally transporting Uber customers in the District of Columbia and should not have been allowed to drive for Uber.

88.    Had Uber provided adequate in-service safety training and follow-up safety screening of Ichinkhorol, Uber would have been aware that Ichinkhorol was endangering Uber customers by driving on unsafe excessively worn tires, and that Ichinkhorol should not have been allowed to drive for Uber.

89.    Alternatively, had Uber provided adequate in-service safety training and follow-up safety screening, it could have taken steps to make sure that Ichinkhorol was in compliance with his license restriction, was properly trained in making left turns in busy city intersections and avoiding such turns when possible, was not driving Uber customers around the city on unsafe tires, and would not have tried to execute the fatal left turn at the time and in the manner he did.

90.    Uber knew or should have known that because of language limitations, Ichinkhorol was not able to engage with audio instructions or to benefit in any meaningful way from the

necessary road safety educational materials and courses that Uber claims to provide for its drivers. Yet Uber negligently allowed him to continue to drive customers, including Carlos and Camila.

91.     As a result of Uber's failure to use reasonable care in the selection, hiring, training, and supervision of Ichinkhorol, Carlos Christian sustained and suffered catastrophic injuries causing conscious pain and suffering and his death, and substantial lost future earnings.

92.     As a result of Uber's failure to use reasonable care in the selection, hiring, training, and supervision of Ichinkhorol, the parents of Carlos Christian have lost, and will continue to lose, the pecuniary and emotional support and financial contributions, together with the reasonable value of services, consortium, education, training, guidance, personal advice, society, companionship, protection, care, and attention that they would have received but for the premature death of Carlos Christian.

WHEREFORE, Plaintiff Jesus Christian demands judgment against Defendants Uber and Rasier, jointly and severally, for Wrongful Death Act damages in the amount of $50 million plus interest and costs.

## COUNT III

### (Survival Act Against all Defendants- Negligence, *Respondeat Superior*)

93.     Plaintiff Jesus Christian incorporates by reference the allegations set forth above and makes claim against the defendants for all damages recoverable pursuant to the Survival Act, D.C. Code §12-101.

94.     As a result of the negligent acts and omissions of the Defendants, Carlos Christian sustained and suffered catastrophic injuries causing conscious pain and suffering and his death, and his estate sustained the loss of the net earnings that would have accumulated absent his premature

death.  At the time of his death, Carlos Christian was a top student in the Master of Business Administration Program at The George Washington University, preparing for a career in finance.

95.    Ichinkhorol was acting within the scope of his employment with Uber at the time of his negligent acts and omissions.  As the employer-in-fact of Ichinkhorol, Uber is responsible for his negligent acts and omissions.

96.    Plaintiff Jesus Christian makes claim for all damages suffered by Carlos Christian and also makes claim for all losses to his estate.

WHEREFORE, Plaintiff Jesus Christian demands judgment against all Defendants, jointly and severally, for Survival Act damages in the amount of $50 million, plus interest and costs.

<u>COUNT IV</u>

**(Survival Act Against Uber and Rasier – Negligent Hiring, Training and Supervision)**

97.    Plaintiff Jesus Christian incorporates by reference the allegations set forth above and makes claim against Defendant Uber for all damages recoverable pursuant to the Survival Act, D.C. Code §12-101.

98.    As a result of Uber's failure to use reasonable care in the selection, hiring, training, and supervision of Ichinkhorol, Carlos Christian sustained and suffered catastrophic injuries causing conscious pain and suffering and his death, and his estate sustained the loss of the net earnings that would have accumulated absent his premature death.

99.    Plaintiff Jesus Christian makes claim for all damages suffered by Carlos Christian and also makes claim for all losses to his estate.

WHEREFORE, Plaintiff Jesus Christian demands judgment against Uber and Rasier, jointly and severally, for Survival Act damages in the amount of $50 million, plus interest and costs.

## COUNT V

### (Negligence, *Respondeat Superior* Against All Defendants)

100.   Plaintiff Camila Selman incorporates by reference the allegations set forth above.

101.   As a result of the negligent acts and omissions of Ichinkhorol and Johnson, Camila sustained serious and permanent physical injuries, suffered severe pain and mental and emotional distress, and will lose substantial future income.  She will require further surgery and physical therapy and faces a life of pain, physical limitations, and mental and emotional distress. As a result of her injuries, Camila will have difficulties with pregnancies.

102.   Ichinkhorol was acting within the scope of his employment with Uber at the time of his negligent acts and omissions.  As the employer-in-fact of Ichinkhorol, Uber is responsible for his negligent acts and omissions.

WHEREFORE, Plaintiff Camila Selman demands judgment against all Defendants, jointly and severally, in the amount of $50 million, plus interest and costs.

## COUNT VI

### (Negligence Against Uber and Rasier – Negligent Hiring, Training and Supervision)

103.   Plaintiff Camila Selman incorporates by reference the allegations set forth above.

104.   As a result of Uber's failure to use reasonable care in the selection, hiring, training, and supervision of Ichinkhorol, Camila sustained serious and permanent physical injuries, suffered severe pain and mental and emotional distress, and will lose substantial future income.  She will require further surgery and physical therapy and faces a life of pain, physical limitations, and mental and emotional distress. As a result of her injuries, Camila will have difficulties with pregnancies.

WHEREFORE, Plaintiff Camila Selman demands judgment against Uber and Rasier, jointly and severally, for damages in the amount of $50 million, plus interest and costs.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated:                                        Respectfully Submitted,

_____
Robert F. Muse (D.C. Bar No. 166868)
Juliana M. Andonian (D.C. Bar No. 90006115)
Ronald Kovner (D.C. Bar No. 166124)