## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JESUS M. CHRISTIAN, Individually and as Personal Representative of the Estate of CARLOS ENRIQUE CHRISTIAN REY, Deceased, et al., | : : : : : |
| **Plaintiffs** | : : |
| v. | : : : |
| UBER TECHNOLOGIES, INC. et al., | : : : |
| **Defendants.** | : : : |

**CASE NO. 24-cv-304**

## PLAINTIFFS' OPPOSITION TO UBER'S MOTION TO COMPEL ARBITRATION AND REQUEST FOR HEARING

Plaintiffs Jesus M. Christian and Camila Alexia Selman Troncoso, by counsel, hereby oppose Defendant Uber's Motion to Compel Arbitration on the grounds set forth in the accompanying Plaintiffs' Memorandum of Law in Opposition.

Plaintiffs request a hearing on Uber's Motion to Compel Arbitration and this Opposition.

Dated:        April 26, 2024        Respectfully Submitted,

/s/ Robert F. Muse
Robert F. Muse (D.C. Bar No. 166868)
Juliana M. Andonian (D.C. Bar No. 90006115)
Ronald Kovner (D.C. Bar No. 166124)
Kevin P. Crenny (D.C. Bar No. 1765044)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JESUS M. CHRISTIAN, Individually and as Personal Representative of the Estate of CARLOS ENRIQUE CHRISTIAN REY, Deceased, et al.,** | : | |
| **Plaintiffs** | : | **CASE NO. 24-cv-304** |
| **v.** | : | |
| **UBER TECHNOLOGIES, INC. et al.,** | : | |
| **Defendants.** | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO UBER'S MOTION TO COMPEL ARBITRATION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ………………………………………………………….. 1

FACTUAL BACKGROUND …………………………………………………. 4

  I.  PLAINTIFFS' UBER ACCOUNTS …………………………………………. 4

  II.  PLAINTIFFS' CLAIMS ……………………………………………………… 5

  III.  UBER'S ARBITRATION PROVISION ………………………………………... 6

LEGAL STANDARD …....………………………………………………………. 7

ARGUMENT ………………………………………………………………….. 9

  I.  THE FAA DOES NOT APPLY HERE SO THE COURT CANNOT COMPEL ARBITRATION UNDER THE FAA ……………………………………………. 9

      A.  The Arbitration Provision in Uber's Terms Purports to Cover Disputes with No Connection to the Terms of Use and Thus the FAA Does Not Apply …. 10

      B.  Plaintiffs' Claims Do Not Arise Out of Uber's Terms of Use and Thus the FAA Does Not Apply …………………………………………………. 13

          1.  *Plaintiff Jesus Christian's Claims for Wrongful Death Are Based on the Injuries He and His Wife Suffered as a Result of His Son's Death and Do Not Arise Out of His Use of Any Uber Platform* ……………. 14

          2.  *Carlos Christian's Purported Contract with Uber Does Not Bind Jesus Christian to Arbitrate the Wrongful Death Claims* …………… 15

          3.  *Plaintiff Camila Selman's Claims Are Based on Injuries She Suffered as a Passenger and Do Not Arise Out of Any Use of Her Uber Account.....……………………………………………….* 17

          4.  *The Survival Claims Provide a Contrast with Plaintiffs' Other Claims—But Are Still Not Arbitrable……………………………….* 17

      C.  Uber Is Not Entitled to Relief Under Sections 3 and 4 of the FAA ……….. 18

      D.  The Delegation Clause Does Not Remove the Court's Authority to Determine Whether Section 2 Applies …………………………………… 18

i

II. UBER HAS NOT MET ITS BURDEN TO ESTABLISH THAT PLAINTIFFS
OR CARLOS CHRISTIAN ASSENTED TO UBER'S TERMS OF USE ………        19

  A. Uber Bears the Burden of Establishing That Its In-App Pop-Up Page Put the
     Plaintiffs and Carlos Christian on Inquiry Notice Regarding Uber's Terms
     of Use……………………………………………………………………..        20

  B. Uber Fails to Establish that the Plaintiffs Entered into a Contract With Uber
     When They First Signed Up for Uber in 2016………………………………        21

  C. Uber's "Updated Terms" Pop-Up Did Not Create an Enforceable Online
     Adhesion Contract Because It Did Not Put Plaintiffs on Inquiry Notice…..        24

III. AS A MATTER OF D.C. CONTRACT LAW, UBER'S TERMS ARE
UNENFORCEABLE…………………………………………………………...        27

  A. Because Uber's Delegation Clause is Itself Unconscionable, the Court Must
     Not Yield Any Questions of Arbitrability to an Arbitrator…………………..        27

  B. Plaintiffs and Uber Did Not Form an Agreement to Arbitrate Claims
     Unrelated to the Uber Terms of Use………………………………………        29

  C. An Agreement to Arbitrate Claims Unrelated to a Plaintiff's Own Terms of
     Use Would Additionally be Unconscionable and Unenforceable…………..        31

IV. THERE IS NO REASON TO STAY CLAIMS THAT ARE NOT SUBJECT TO
ARBITRATION, INCLUDING THOSE BROUGHT AGAINST
DEFENDANTS ICHINKHOROL AND JOHNSON……………………………..        32

CONCLUSION ………………………………………………………………...        34

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88 (4th Cir. 1996).... 34

*An v. Mayorkas*, No. 21-cv-385, 2022 WL 522970 (D.D.C. Feb. 22, 2022) ……………..... 6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 247 (1986) …………………………………….. 9

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986) …………………... 28

*Brooks v. Rosebar*, 210 A.3d 747 (D.C. 2019) …………………………………………….. 29

*Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204 (11th Cir. 2021) …………………….... 10, 11

*Camara v. Mastro's Restaurants LLC*, 952 F.3d 372 (D.C. Cir. 2020) ……………………. 19

*Campbell v. Gen. Dynamics Gov't Sys.*, 407 F.3d 546 (1st Cir. 2005) …………................ 23

*Capriole vs. Uber Techs., Inc.*, No. 19-cv-11941, 2020 WL 1536648 (D. Mass. Mar. 31, 2020) …………………………………………………………………………………….. 26

*Chilutti v. Uber Techs., Inc.*, 300 A.3d 430, 449 (Pa. Super. Ct., 2023) ………………..... 22

*Contra Oldacre v. ECP-PF CT Operations*, 673 F. Supp.3d 294 (W.D.N.Y. 2023) …........ 19

*Cruz v. Jimenez Constr. LLC*, No. 20-cv-1978, 2023 WL 3040443 (D.D.C. Apr. 21, 2023)……………………………………………………………………………………... 9

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018) ……………………………… 22

* *Davitashvili v. Grubhub*, No. 20-cv-3000, 2023 WL 2537777 (S.D.N.Y. Mar. 16, 2023) ……………………………………………………………………………………… *passim*

*District No. 1, Pac. Coast Dist., Marine Eng's' Beneficial Assoc., AFL-CIO v. Liberty Maritime Corp.*, 998 F.3d 449 (D.C. Cir. 2021) …………………………………............... 8

*DLY-Adams Place, LLC v. Waste Mgmt. of Md., Inc.*, 2 A.3d 163 (D.C. 2010) …….......... 29

*Doe v. Roman Catholic Diocese of Greensburg*, No. 20-cv-1750, 2021 WL 12137383 (D.D.C. Feb. 12, 2021) ……………………………………………………………………. 6

*El Jen Medical Hosp., Inc. v. Tyler*, 535 P.3d 660 (Nev. 2023) ………………….............. 16

*Erikson v. Hawley*, 12 F.2d 491 (Ct. App. D.C. 1926) …………………………………….. 27

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ……………………........... 20

*Gambo v. Lyft*, 642 F. Supp. 3d 46 (D.D.C. 2022) …………………………………………. 20, 23

*Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) …………………….................. 8

*Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287 (2010) ………………... 8, 19, 28

*Hearn v. Comcast Cable Comms., LLC*, 415 F. Supp.3d 1155 (N.D. Ga., 2019) …………. 14

*Imperial Valet, Inc. v. Woodard*, No. 14-cv-01585, 2015 WL 13158506 (D.D.C. Mar. 24, 2015) ……………………………………………………………………………………….. 22

*Jacobsen v. Oliver*, 555 F. Supp. 2d 72 (D.D.C. 2008) ............................................... 27

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp.2d 1253 (S.D. Cal. 2012).......... 32

*Kauders v. Uber Techs., Inc.*, 159 N.E.3d. 1033 (Mass. 2021) .................................. 22, 25, 26

*Keepseagle v. Perdue*, 856 F.3d 1039, 1047 (D.C. Cir. 2017) .................................. 29

*Lamps Plus, Inc. v. Valera*, 587 U.S. 176, 184 (2019) ............................................ 19

*McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264 (S.D.N.Y. 2021) ......................... *passim*

*Mero v. City Segway Tours of Washington DC, LLC*, 826 F. Supp. 2d 100 (D.D.C. 2011).. 20

*Mey v. Directv, LLC*, No. 5:17-cv-179, 2021 WL 973454 (N.D.W. Va. Feb. 12, 2021)....... 11

*Mikes v. Strauss*, 889 F. Supp. 746 (S.D.N.Y. 1995) ............................................... 13

*Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022) .................................................... 8

*Moritz v. Universal City Studios*, LLC, 54 Cal.App.5th 238 (2020) ............................ 11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ................... 18

*Nat'l R.R. Passenger Corp. v. ExpressTrak, L.L.C.*, 330 F.3d 523 (D.C. Cir. 2003) ............ 8

*National Indus. for the Blind v. Dep't of Veterans Affairs*, 296 F. Supp. 3d 131 (D.D.C. 2017) ............................................................................................................. 34

*Nelson v. Am. Nat'l Red Cross,* 26 F.3d 193 (D.C. Cir. 1994) .................................. 16

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) .................................................. *passim*

*Off. & Pro. Emps. Int'l Union, Loc. 2 v. Washington Metro. Area Transit Auth.*, 724 F.2d 133 (D.C. Cir. 1983) ......................................................................................... 10

*Okereke vs. Uber Techs., Inc.*, No. 16-cv-12487, 2017 WL 6336080 (D. Mass. June 13, 2017) .............................................................................................................. 26

*Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1 (D.D.C. 2021) ........................................... 19, 20

*Pisano v. Extendicare Homes, Inc.,* 77 A.3d 651 (Pa. Super. Ct. 2013) ....................... 16

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) ........................ 8

*Proctor v. First Premier Corp.*, No. 20-cv-2162, 2021 WL 131447 (D.D.C. Jan. 13, 2021) .............................................................................................................. 9

*Ramos v. Uber Techs., Inc.*, 77 N.Y.S.3d 296 (N.Y. Sup. Ct. 2021) ............................ 22

*RDP Techs., Inc. v. Cambi AS*, 800 F. Supp.2d 127 (D.D.C. 2011) ............................ 19

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2019) ........................................... 9, 19, 28

*Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020) ........................................ 10, 11, 30

*Rittmann v. Amazon. com, Inc.*, 971 F.3d 904 (9th Cir. 2020) .................................. 18

*Robinson v. District of Columbia*, 130 F. Supp. 3d 180 (D.D.C. 2015) ....................... 15

*Runyon v. D.C.*, 463 F.2d 1319 (D.C. Cir. 1972) ................................................... 15

iv

*Sarchi v. Uber Techs., Inc.*, 268 A.3d 258 (Me. 2022) ……………………….................  22, 26

*Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021) …………………………………  20, 23, 24

*Selden v. Airbnb, Inc.*, 16-cv-00933, 2016 WL 6476934 (D.D.C. Nov. 1, 2016) ................  20

*Semler v. Psychiatric Institute of Washington, D.C.*, 575 F.2d 922 (D.C. Cir. 1978) ……...  16

*Simon v. Smith*, 273 A.3d 321 (D.C. 2022) ………………………………….............  31

*Singh v. Uber Techs., Inc.*, 235 F. Supp. 3d 656 (D.N.J. 2017) …………………………  26

*Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003) …………………………………………  14

*Sobelsohn v. Am. Rental Mgmt. Co.*, 926 A.2d 713 (D.C. 2007) …………………………..  30

*Strother v. D.C.*, 372 A.2d 1291 (D.C. 1977) …………………………………………………  2, 15, 16

*Urban Investments, Inc. v. Branham*, 464 A.2d 93 (D.C. 1983) …………………………...  31

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468 (1989) …….  8

*Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016) …………………………….....  30

*Williams v. Walker-Thomas Furniture*, 350 F.2d 445 (D.C. Cir. 1965) …………..............  29

*Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873 (N.D. Ill. 2020) ................  23

**STATUTES**

9 U.S.C. § 1 …………………………………………………………………………  2, 27

9 U.S.C. § 2 …………………………………………………………………………  *passim*

9 U.S.C. § 3 …………………………………………………………………………  *passim*

9 U.S.C. § 4 …………………………………………………………………………  8, 17

D.C. Code § 16-2701 …………………………………………………………………  2, 14

D.C. Code § 16-2702 …………………………………………………………………  14

D.C. Code § 12-101………………………………………………………………………  15

## INTRODUCTION

On January 15, 2023, Defendant Khalinmandakh Ichinkhorol, driving for Uber and entrusted with the safety of his passengers, Decedent Carlos Christian and Plaintiff Camila Selman, failed to yield to visible oncoming traffic that had a green light and made a left turn resulting in a collision and devastating consequences for Plaintiffs and their families. Plaintiff Jesus Christian and his wife, Noelia, lost their son, Carlos, who died from his injuries, and Camila Selman sustained serious and permanent injuries. J. Christian Decl. ("Ex. A") ¶ 1, N. Rey Decl. ("Ex. B") ¶ 1, C. Selman Decl. ("Ex. C"), ¶ 1.

When Ichinkhorol made the fatal turn, his vision was impaired because he refused to wear corrective lenses as required by his driver's license and District of Columbia law, and he, like all Uber drivers, was distracted by the need to monitor the Uber App and financial incentives to complete the trip quickly. Ichinkhorol gambled that he could make it through the intersection.  He was wrong, and Plaintiffs are paying an unthinkable price for his reckless and negligent driving. The evidence of Ichinkhorol's negligence is overwhelming, as he violated multiple traffic laws, regulations and standards governing driver responsibility at an intersection. J. Luong Decl. ("Ex. D") at D-4. Nevertheless, Defendants Uber Technologies Inc. and Rasier LLC (collectively, "Uber") have chosen to ignore the facts and portray Ichinkhorol as an innocent victim. Defs.' Mem. (ECF 18-1) ("Uber Mem.") at 1-2.   The opposite is true: he was reckless and is responsible. Ex. D *et seq.*

Uber does not want the public to know about accidents and safety issues with its drivers, particularly such flagrant safety violations as pervade this case, and it wants to avoid any lawsuits setting legal precedents that bind it in future disputes. To accomplish this, it has imposed an unreasonable and unconscionably broad arbitration clause, known as an "infinite arbitration

clause," on users and non-users to maintain secrecy.  That arbitration clause is not enforceable on Plaintiffs, and the Court should deny Uber's motion to compel arbitration.

Uber is wrong in claiming that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, requires this Court to compel arbitration. Uber Mem. at 5-23 (citing the FAA no less than 33 times). In drafting its arbitration provisions, Uber simply ignored section 2 of the FAA limiting enforcement of arbitration agreements to those "arising from" the underlying agreement—here, Uber's Terms of Use (also referred to herein as "Terms"). Instead, Uber seeks to impose a form of arbitration servitude on anyone who opens an Uber account, as well as family members and various third parties, giving them no choice but to accept an unconscionably broad arbitration clause purporting to include claims and disputes, like those of the Plaintiffs, that do not "arise from" and are unrelated to Uber's Terms of Use. 9 U.S.C. § 2. Courts have found that because Section 2 of the FAA does not apply to such "infinite arbitration clauses," they are unenforceable under the FAA, and courts have likewise found such clauses to be unconscionable and thus unenforceable.

A prime example of Uber's overreaching is its assertion that Jesus Christian must arbitrate his Wrongful Death claims, even though these do not "arise from" any agreement that Jesus may have had with Uber. Those Wrongful Death claims arose when Carlos was using his Uber account and have nothing to do with Jesus's Uber account. The statutory claims belong to Jesus and his wife, Noelia, as next of kin, to compensate them for their loss, and are independent of any claim by the estate. D.C. Code § 16-2701. *See, e.g., Strother v. D.C.*, 372 A.2d 1291, 1296 n.10 (D.C. 1977).

Uber cannot avoid the consequences of its aggressive drafting by pointing to a delegation clause. This Court, and only this Court, can determine whether Uber can invoke the FAA to enforce Uber's infinite arbitration clause, and Uber cannot use a delegation clause to deprive the Court of

its authority. If the Court determines that the FAA does not apply to the contract as a whole, which it does not, then the Delegation Clause cannot be separately considered and enforced. And if the Court determines that the FAA does not apply, as seems obvious from the absurdly broad scope of Uber's arbitration clause and the nature of Plaintiffs' claims, then Uber cannot rely, as it repeatedly tries to do, on what has been described as the FAA's strong presumption of arbitrability.

Additionally, Uber has failed to meet its burden to prove that Plaintiffs had sufficient notice of and assented to Uber's Terms of Use. Uber purposely ignores the process in place to notify users of and obtain assent to its Terms of Use in 2016 when Plaintiffs opened their accounts. This is because, as courts have held, that process had flaws that prevented the creation of an agreement to arbitrate. Moreover, Uber does not argue that Plaintiffs actually read or even scrolled through its Terms of Use, and fails to explain, let alone prove, how "updated terms" can create a contract with Plaintiffs where none existed before.

Finally, even if the FAA did apply to Uber's purported arbitration agreement and even if Uber had met its burden to establish that the Plaintiffs assented to an agreement to arbitrate their claims, Uber's unconscionable delegation clause and infinite arbitration clause would remain unenforceable under District of Columbia law as contrary to public policy.

Uber's motion to compel arbitration in this case, and virtually every other dispute with users, passengers and drivers, is motivated by an insatiable need for secrecy. It is reasonable to believe that Uber accounts for the largest group of drivers in the District of Columbia – more than the Metropolitan Police Department, Fire Department, and local government combined. But Uber defiantly protects any and all information that the citizens of D.C who drive and walk along its roads have a right to know, including information regarding accidents, injuries, and safety violations and risks. K. Wells Decl. ("Ex. E") ¶¶ 12-16, 19-20.  As Dr. Wells observes in her

declaration, "Uber has a consistent policy of secrecy and deception." *Id.* ¶ 18. Uber does this by unilaterally imposing arbitration on every user and driver and employing effective lobbyists who persuaded District of Columbia officials to exempt information on Uber from the Freedom of Information Act. *Id.* ¶ 14. As Dr. Wells notes, "Uber's policies of secrecy and nondisclosure limit the research of academics and harms public transparency, including efforts to evaluate Uber's impact on public safety, in the District of Columbia." *Id.* ¶ 19.

The effect of this secrecy is to prevent a range of Article III trials and their positive impact on public safety, to negate the Seventh Amendment right to a jury trial and leave victims with the most grievous losses without the ability to hold bad actors publicly accountable. A father has lost his son and is now told that the story of his tragic death must be hidden.

Jesus cannot have his son back and no amount of money will compensate for the loss, but he could attain some solace and peace from a jury trial that gives him the opportunity to seek accountability – a constitutional right that Jesus has not knowingly waived. Uber should not be allowed to deny him that right to a public trial by jury by hiding the facts of this case in a secret arbitration proceeding.

For all of the foregoing reasons, as set forth more fully below, Uber's Motion to Compel Arbitration should be denied.

## FACTUAL BACKGROUND

### I.   PLAINTIFFS' UBER ACCOUNTS

Plaintiff Camila Selman opened her Uber account in the Dominican Republic in 2016. Ex. C. ¶ 10. Camila was able to create an account without reading or even scrolling through any terms and conditions of use. *Id.* ¶ 11. Plaintiff Jesus Christian had the same experience. Ex. A. ¶ 9. Both plaintiffs only interacted with the Uber App to request transportation. Ex. A ¶ 11, Ex. C ¶ 13. If a pop-up screen blocked their progress while ordering a ride, they would click whatever was

necessary in order to proceed and schedule a ride. Ex. A ¶ 12, Ex. C ¶ 14. Both plaintiffs were able

to use the Uber App to order rides without reading terms and conditions of use embedded

somewhere within the Uber App. Ex. A ¶ 13, Ex. C ¶ 15.

Neither Camila nor Jesus understood the term "updated" to mean that they were accepting

a new contract with binding terms. Ex. A ¶ 15, Ex. C ¶ 17. Instead, "updated" meant to each of

them that there were some changes in how rides were provided and paid for, such as added options

for picking a vehicle, new pricing, etc., which they would learn as they used the app. Ex. A ¶ 16,

Ex. C ¶ 18. Both plaintiffs were allowed to obtain a ride without reading or scrolling through

updated terms and conditions. Ex. A ¶ 17, Ex. C ¶ 19. It never occurred, to either Camila or Jesus,

that their use of the Uber App would foreclose their access to a court of law, and they never

intended to waive their Seventh Amendment rights. Ex. A ¶ 19, Ex. C ¶ 21.

On January 15, 2023, Carlos Christian requested an Uber ride using the Uber App on his

phone and his Uber account. Ex. C ¶ 8. Neither Camila nor Jesus utilized their Uber accounts that

day or night. A. O'Connor Decl. ("Uber Decl.") Ex. J (Dkt. 18-13) at 4; *Id.* Ex. I (Dkt. 18-12) at

34. Carlos and Camila rode as passengers in the Uber vehicle driven by Defendant Ichinkhorol,

which collided with another car. Ex. C ¶ 1. In the collision, Carlos was killed, and Camila was

severely injured. *Id.*

## II.     PLAINTIFFS' CLAIMS

On February 1, 2024, Plaintiffs commenced this action with the filing of a Complaint and

Jury Demand against Defendants Uber Technologies Inc., and Rasier LLC ("the Uber

Defendants"), Reginald Roland Johnson, and Khalinmandakh Ichinkhorol. Dkt. 1 ("Compl.").

Plaintiff Jesus Christian brought claims under the District of Columbia Wrongful Death Act

against all defendants for negligence and *respondeat superior* and against the Uber Defendants for

negligent hiring and supervision. Compl. ¶¶ 80-92 (Counts I and II). Jesus also brought claims under the District of Columbia Survival Act. Compl. ¶¶ 93-99 (Counts III and IV). Plaintiff Camila Selman brought claims of negligence and *respondeat superior* against all defendants, and against the Uber Defendants for negligent hiring and supervision. Compl. ¶¶ 100-104 (Counts V and VI).

On February 26, 2024, Ichinkhorol filed an Answer and Cross-Claim against Johnson, also demanding a jury trial. Dkt. 8. On March 15, 2024, Defendants Uber Technologies Inc. and Rasier LLC, in lieu of an Answer, filed a Motion to Compel Arbitration and Dismiss. Dkt. 18.

### III.    UBER'S ARBITRATION PROVISION

According to Uber, "[i]n order to utilize Uber's platforms," and thus to use its rideshare services, "a user must register for an account and agree to the Terms of Use." Uber Decl. ¶ 7. Uber does not explain when or how Plaintiffs registered for Uber accounts but says that their records show that each of them started using the Uber App in 2016. *Id.* ¶¶ 34–36. Uber does not explain what set of Terms those individuals purportedly agreed to in 2016, nor how they were notified of and expressed their assent to the Terms.

Despite the run-of-the-mill tone and quality[1] of Uber's briefing, the Arbitration Provision it hopes to enforce is anything but: it is unusually broad. Uber updated its Terms in December

---

[1]    Uber's briefing is perfunctory and provides no indication of what Uber's actual arguments in favor of arbitration of Plaintiffs' specific claims will be. Uber seems to have given no thought to the facts of this case in briefing its motion. The motion twice states that Uber has filed an Answer and a Partial Motion to Dismiss, Uber Mem. at 14, 15, when in fact Uber has filed no such documents. This is a strong indication that large sections of Uber's briefing here were copied and pasted from its briefing in another matter.

Uber should not be permitted to game the Court in this manner, waiting to level new arguments in its Reply that were not present in its opening brief. *An v. Mayorkas*, No. 21-cv-385, 2022 WL 522970, at *3 (D.D.C. Feb. 22, 2022) ("[T]he precedent in this Circuit is that courts should not address arguments raised for the first time in a reply brief[.]"). If Uber does so, Plaintiffs will request leave to file a Surreply. *See Doe v. Roman Catholic Diocese of Greensburg*, No. 20-cv-1750, 2021 WL 12137383, at *2–3 (D.D.C. Feb. 12, 2021) (setting out the standard for when a surreply is appropriate and granting one where a movant had introduced new arguments in its reply brief).

2021, *e.g. id.* ¶ 14, and claims to have presented these new Terms to each Plaintiff in the first few months of 2022 through an "in-app blocking pop-up screen with the header '*We've updated our terms*,'" which also displayed links to the Terms and a Privacy Notice. Uber Mem. at 3; *see also id.* ¶¶ 9, 15, 21, 27. The "updated" Terms contain an arbitration agreement ("the Arbitration Provision"). Section 2(a)(1) of the Terms states:

> <u>Covered Disputes</u>: Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to the Terms and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law. This Arbitration Agreement survives after your relationship with Uber ends.

Dkt. 18-6 ("Uber Terms") at 3–4; *see also* Uber Mem. at 5 (quoting same). Section 2(a)(4) of the Terms ("the Delegation Clause") states in part:

> <u>Delegation Clause</u>: Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel.

Uber Terms at 6–7; *see also* Uber Mem. at 6.

## LEGAL STANDARD

"While a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional." *New Prime v. Oliveira*, 586 U.S. 105, 110 (2019). "[A]

court's authority under the Arbitration Act to compel arbitration . . . doesn't extend to *all* private contracts, no matter how emphatically they may express a preference for arbitration." *Id.* (emphasis in original)."Instead, antecedent statutory provisions"—namely, Sections 1 and 2 of the FAA—"limit the scope of the court's powers under §§ 3 and 4." *Id.* Where an agreement is beyond the purview of these provisions, a court cannot "invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration." *Id.*

      Where the FAA applies, it merely "place[s] agreements [to arbitrate] 'upon the same footing as other contracts.'" *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022); *see also id.* ("The policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). It therefore "does not require parties to arbitrate when they have not agreed to do so," *Nat'l R.R. Passenger Corp. v. ExpressTrak, L.L.C.*, 330 F.3d 523, 529 (D.C. Cir. 2003) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989)), or where the arbitration provision is not enforceable for other reasons. *See Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 301 (2010); *see also Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126–28 (2d Cir. 2019) (declining to enforce arbitration provision on grounds that it was unconscionable under state law).

      The question of whether a particular dispute is subject to an arbitration agreement is, by default, "an issue for judicial determination." *District No. 1, Pac. Coast Dist., Marine Eng's' Beneficial Assoc., AFL-CIO v. Liberty Maritime Corp.*, 998 F.3d 449, 457 (D.C. Cir. 2021). Even where an arbitration agreement "clearly and unmistakably" delegates the issue of arbitrability to the arbitrator, the court *still* must first determine whether the agreement is subject to the FAA at all. *See New Prime*, 586 U.S. at 112 ("[A] court may use [FAA,] §§ 3 and 4 to enforce a delegation

clause only if the clause appears in a 'written provision in . . . a contract evidencing a transaction involving commerce' consistent with [FAA,] § 2."). And "[i]f a party challenges the validity" of the delegation clause itself, "the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2019).

In deciding a motion to compel, a court applies a standard similar to that applicable for a motion for summary judgment, in which "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Proctor v. First Premier Corp.*, No. 20-cv-2162, 2021 WL 131447, at *4 (D.D.C. Jan. 13, 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 247, 255 (1986)). A court will compel arbitration only "if the pleadings and the evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Cruz v. Jimenez Constr. LLC*, No. 20-cv-1978, 2023 WL 3040443, at*2 (D.D.C. Apr. 21, 2023) (internal citations omitted).

## ARGUMENT

### I.  THE FAA DOES NOT APPLY HERE SO THE COURT CANNOT COMPEL ARBITRATION UNDER THE FAA.

No matter the terms of the purported agreement, the Court—not an arbitrator—must assess whether the agreement is, in fact, governed by the FAA. *Rent-A-Ctr.*, 561 U.S. at 71 (2010). Uber's motion purports to be "governed by the Federal Arbitration Act" and Uber argues that its Arbitration Provision is "[c]ontrolled by the FAA." Uber Mem. At 7, 9. This premise—that the FAA applies to Uber's Arbitration Provision—is incorrect, as explained in the sections that follow. For the same reasons, the FAA does not apply to the Delegation Clause, and thus the Court cannot compel arbitration of the issue of arbitrability pursuant to the FAA.

Uber's Terms of Use, purporting to require arbitration of disputes "in any way arising out of *or relating to . . . your relationship* with Uber," Uber Terms at 3–4, is unenforceable under the FAA, because Plaintiffs' claims do not "arise out of" the Terms in which the arbitration provision is contained. FAA, § 2.  In fact, one court has already found *this exact arbitration provision* to be unenforceable as applied to claims, like Plaintiffs', that do not arise out of the contract in which the arbitration provision is contained. *Davitashvili v. Grubhub*, No. 20-cv-3000, 2023 WL 2537777, at *11 (S.D.N.Y. Mar. 16, 2023).

**A. The Arbitration Provision in Uber's Terms Purports to Cover Disputes with No Connection to the Terms of Use and Thus the FAA Does Not Apply.**

The Court's authority to compel arbitration under the FAA is expressly limited to disputes "arising from" the underlying contract and does not extend to claims like those made by Plaintiffs that do not have the required nexus with the underlying contract – in this case, Uber's Terms of Use. *McFarlane*, *v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 278–79 (S.D.N.Y. 2021) (The FAA "applies only to '[a] written provision in any [maritime transaction, or a] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of such a contract or* [*maritime*] *transaction.*'") (quoting 9 U.S.C. § 2) (emphasis and first alteration in original); *see also Off. & Pro. Emps. Int'l Union, Loc. 2 v. Washington Metro. Area Transit Auth.*, 724 F.2d 133, 139 (D.C. Cir. 1983) ("Section 2 of [the FAA] limits the Act's application to 'written provision[s] in a . . . contract . . . to settle a controversy thereafter *arising out of* such contract or transaction.'") (emphasis added). The clear text of Section 2 "confines the FAA's application to the arbitration of controversies with a sufficiently close 'relationship' to the underlying contract." *Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1213 (11th Cir. 2021). Accordingly, "when the dispute is wholly unrelated to the contract" containing the arbitration clause, the clause is outside

the scope set by Section 2 and "federal courts have no power to compel arbitration" under the Act. *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 723–24 (9th Cir. 2020) (O'Scannlain, J., concurring).

Uber's Arbitration Provision goes well past the language of the FAA because it purports to apply to claims that merely *relate*, in an undefined and unconstrained way, to the user's relationship with Uber, *even if the user's claims have nothing at all to do with the Terms*. Specifically, it purports to require arbitration of "any dispute, claim, or controversy in any way arising out of or relating to" the Terms, which falls within Section 2 of the FAA, but it also purports to require arbitration of "any dispute, claim, or controversy in any way arising out of or relating to" the user's "relationship with Uber" or "use of [Uber] Services at any time," Uber Terms at 3–4, which falls far outside the scope of Section 2 of the FAA. *See Moritz v. Universal City Studios*, *LLC*, 54 Cal.App.5th 238, 248 (2020) (noting that "the FAA requires no enforcement of an arbitration provision with respect to disputes unrelated to the contract in which the provision appears."). This broad category of claims well outside the scope of section 2 is what Uber hopes to force to arbitration here, purporting to rely on the FAA but conveniently ignoring its limitations. *See* Uber Mem. at 5 ("Plaintiffs agreed they were 'required to resolve *any claim [they] may have against Uber* on an individual basis in arbitration[.]'").

There is a growing body of case law attesting to the unenforceability of such "infinite arbitration clauses"—so named because they are "limited only by the requirement that the dispute involve [the defendant], which is, of course, no limit at all." *E.g. McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021) (describing this "'relatively new and untested' species of arbitration clause"); David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633 (2020); *Calderon,* 5 F.4th at 1213-14 (citing Horton and explaining that "the FAA's 'arising out of' language means that it applies only when the dispute has a sufficient 'nexus' to the underlying

contract," and holding that neither the FAA nor the canon of construction favoring arbitration governed the dispute because it did not arise out of the relevant terms of use); *Revitch*, 977 F.3d at 720–21 (refusing to enforce an AT&T Customer Agreement for wireless services purporting to obligate the plaintiff to arbitrate a claim unrelated to wireless services against a non-signatory affiliate); *Mey v. Directv, LLC*, No. 5:17-cv-179, 2021 WL 973454, at *11 (N.D.W. Va. Feb. 12, 2021) (on remand from 971 F.3d 284) (denying motion to compel because "[t]he [AT&T] Mobility arbitration provision is overbroad, absurd and unconscionable, and far exceeds anything contemplated by Congress in enacting the FAA").

Uber's Arbitration Provision is just such an "infinite arbitration clause," and as such is unenforceable. Uber aptly points out that its Terms of Use apply to "any claim that [the user] may have against Uber," Uber Mem. at 5, and that is precisely the problem. In concluding that an identical arbitration clause was unenforceable, the Southern District of New York explained that Uber and its co-defendant were using arbitration clauses that "[i]f enforced according to their terms . . . would require arbitration of *any* claims between defendants and [Uber and its co-defendant], including claims without any nexus to the agreements containing the clauses." *Davitashvili,* 2023 WL 2537777 at *10 (emphasis in original). Uber's Terms go so far as to include the claims of non-signatories to Uber's Terms of Use. Its Arbitration Provision purports to "be binding upon . . . any claims brought by or against any third parties, including but not limited to [the user's] spouses, heirs, third-party beneficiaries and assigns, where their underlying claims arise out of or relate to your [the user's] use of [Uber] Services." Uber Terms at 7.[2]

---

[2]    Uber has not referenced this provision in its opening brief, and thereby has waived any argument that this language in Carlos Christian's purported agreement with Uber might apply to any claims brought by his father or by Ms. Selman.

Because the Arbitration Provision purports to apply to disputes that do not arise out of the Terms of Use, it exceeds the scope of Section 2 of the FAA, the FAA does not apply, and is not a basis for enforcing the Arbitration Provision.

**B.   Plaintiffs' Claims Do Not Arise Out of Uber's Terms of Use and Thus the FAA Provides No Basis for Compelling Arbitration Here.**

In addition, the FAA provides no basis for enforcing the Delegation Clause or Arbitration Provision in this case because Plaintiffs Jesus Christian and Camila Selman have brought claims "wholly unrelated" to their contracts with Uber, which Uber tells users "govern your access or use . . . of the Uber Marketplace Platform and any related content or services." Uber Terms at 2. Their claims relate to injuries they personally suffered as a result of the crash on January 15, 2023—a day that neither Jesus, at home in the Dominican Republic, nor Camila, a passenger, accessed or used the Uber App. Uber Decl. Ex. J (Dkt. 18-13) at 4; *Id.* Ex. I (Dkt 18-12) at 34.

Each could have brought the exact same claims even if they had *never* used Uber services or agreed to Uber's Terms. *See Mikes v. Strauss*, 889 F. Supp. 746, 754-55 (S.D.N.Y. 1995) (declining to compel arbitration of qui tam claims under employment agreement, where plaintiff "would still be able to bring a suit" even if she "had never been employed by defendants"). Each Plaintiff has well-pleaded claims that make no reference to their own use of the Uber app, because it has no relevance and because their claims do not "arise out of" their supposed contracts with Uber or their use of Uber services. Their past use of Uber is "purely coincidental" and does not create the nexus between claims and an underlying agreement to arbitrate that must be present for Section 2 of the FAA to apply, and before Sections 3 or 4 can be invoked. *Davitashvili*, 2023 WL 2537777, at *10 (applying state contract law, rather than compelling arbitration pursuant to the FAA, where "the claims at issue lacked any nexus to the agreement containing the [arbitration]

clause" but were instead "completely unrelated to [plaintiffs'] use of [Uber's and its co-defendant's] platforms").

Enforcing an Arbitration Provision like Uber's by its literal terms—as Uber asks the Court to do here—yields absurd results. The distinguished jurist Judge Richard A. Posner posited that, if an infinite arbitration clause with a payday loan company were read literally, it would mean that the loan company could murder or steal from its customers and demand that any tort claims by the customers (or their survivors) would have to be arbitrated. *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003). Hypotheticals like this have been formulated by a number of courts to highlight their absurdity, but some are disturbingly similar to the facts of this case, where Uber has, in fact, caused the death of an account holder and then demanded that the account holder's father and partner arbitrate their independent claims in secret. *E.g.*, *Hearn v. Comcast Cable Comms., LLC*, 415 F. Supp.3d 1155, 1162 (N.D. Ga., 2019) ("[A]ny claim that the Plaintiff has or might ever have against the Defendant falls within [the] unbounded scope [of a Comcast Service Agreement]. For example, if the Plaintiff was run over by a Comcast truck, he would be required to submit his personal injury claim to arbitration."), *reversed and remanded*, 992 F.3d 1029 (11th Cir. 2021); *see also McFarlane*, 524 F. Supp. at 277 ("If a [cable] subscriber purchased the stock of [the cable company's] affiliate and the price of that stock dropped due to corporate malfeasance, [the subscriber's] securities fraud claim would be forced into arbitration" pursuant to the infinite arbitration clause in her contract for cable service).

### 1. *Plaintiff Jesus Christian's Claims for Wrongful Death Are Based on the Injuries He and His Wife Suffered as a Result of His Son's Death and Do Not Arise Out of His Use of Any Uber Platform.*

Jesus Christian's claims for wrongful death arise out of the injuries he, and his wife, Noelia, personally suffered when their son was killed. *See* Compl. ¶¶ 80–92 (Counts I and II). Wrongful death claims are damages actions brought by a "personal representative of the deceased person"

over an "injury done or happening within the limits of the District." D.C. Code § 16-2701(a); *id.*
§ 16-2702. The fact that Plaintiff Jesus Christian happened to have an Uber account is irrelevant,
as his claims have no connection to that account, and they do not "arise out of" the Terms of Use
that he purportedly agreed to. If he had never in his life used any Uber services, his pleading in
this matter would be entirely unchanged.

### 2. Carlos Christian's Purported Contract with Uber Does Not Bind Jesus Christian to Arbitrate the Wrongful Death Claims.

Nor does Carlos Christian's purported agreement with Uber—even if it were valid—
govern his parents' wrongful death claims. This is because those claims belong to Plaintiff Jesus
Christian and his wife as next of kin, and not to their son's estate. A wrongful death claim in the
District of Columbia is not an asset of the Decedent's estate and is not intended to compensate the
estate for any injury to a decedent or loss to the estate. Wrongful death is not a "survival" action
that accrued to the decedent prior to his death and which is brought by his "legal representative."
*Id.* § 12-101; *see also Runyon v. D.C.*, 463 F.2d 1319, 1321 (D.C. Cir. 1972) (contrasting the two
types of claims and observing that "in this jurisdiction, if a tort causes death, two interests have
been invaded").

Put simply, this means that through his wrongful death claims, Plaintiff Jesus Christian is
seeking redress for *his and his wife's* injuries (as Carlos' next of kin)—injuries that Uber and the
other defendants caused through their negligence. *See Robinson v. District of Columbia*, 130 F.
Supp. 3d 180, 188 (D.D.C. 2015) (explaining that The Wrongful Death Act permits "relatives . . .
[to] recover compensation from the wrongdoer commensurate with the loss sustained."). [3]

---

[3]    In a wrongful death suit, "the personal representative acts only as a trustee on behalf of the
decedent's family," *Strother v. District of Columbia*, 372 A.2d 1291, 1296 n.10 (D.C. 1977). Here,
Plaintiff Jesus Christian is both the personal representative and the next of kin on whose behalf the
personal representative ordinarily acts.

Given the distinct nature of the Wrongful Death Act claims, Carlos Christian's purported agreement with Uber cannot bind Jesus Christian to arbitrate those claims. As the Nevada Supreme Court recently explained, "[a] growing majority of courts . . . conclude that, under their wrongful death statutes, the decedent cannot bind the heirs to arbitrate their claims" in states where "a wrongful death statute establishes a distinct claim to compensate heirs for their individual loss . . . separate from the decedent's and not subject to the decedent's pre-death contracts." *El Jen Medical Hosp., Inc. v. Tyler*, 535 P.3d 660, 667-68 (Nev. 2023) (holding that "[Nevada Wrongful Death Act] does not allow a decedent to bind a statutory heir's wrongful death claim to arbitration").[4] The D.C. wrongful death statute is of precisely this kind. *Strother*, 372 A.2d at 1295 ("[T]he [D.C.] Wrongful Death Act creates a new cause of action which arises on the death of the decedent and is enforced by his 'personal representative.'"); *Semler v. Psychiatric Institute of Washington, D.C.*, 575 F.2d 922, 925 (D.C. Cir. 1978) ("The Wrongful Death Act is said to create an entirely new right of action in favor of designated beneficiaries").

Since (1) there is no nexus between Jesus Christian's purported agreement with Uber and his wrongful death claims, thus putting his wrongful death claims beyond the scope of Section 2 of the FAA's coverage, and (2) any purported agreement between Carlos Christian and Uber does

---

[4]     In reaching its holding, the court distinguished the Nevada statute from those it characterized as "wholly derivative" of the decedent's claims where the statutory language places heirs "in the same 'legal shoes' as the decedent." *El Jen Medical Hosp.*, 535 P.3d at 667.  While the D.C. statute "is derivative in nature" only insofar as "the plaintiff . . . needs a viable cause of action at the time of death," *Nelson v. Am. Nat'l Red Cross,* 26 F.3d 193, 199 (D.C. Cir. 1994), it is not "wholly derivative," as it does not place the heirs who are entitled to recover independent of the decedent's estate in the same "legal shoes" as the decedent.  *See, also, e.g.*, *Pisano v. Extendicare Homes, Inc.,* 77 A.3d 651, 660 (Pa. Super. Ct. 2013) (stating, when discussing a statute similar to D.C.'s, that "wrongful death actions are derivative of decedent's injuries but are not derivative of decedent's rights"). The personal representative bringing suit for a wrongful death is not, for example, bound by a statute of limitations that would apply to the decedent himself, or to survival claims. *See Nelson*, 26 F.3d at 199.

not govern the wrongful death claims, Uber's motion to compel arbitration of those claims should be denied.

### 3. *Plaintiff Camila Selman's Claims Are Based on Injuries She Suffered as a Passenger and Do Not Arise out of Any Use of Her Uber Account.*

Plaintiff Camila Selman's negligence claims arise out of the injuries she suffered when Carlos Christian and Defendant Ichinkhorol were using the Uber platform. Compl. ¶¶ 100–04 (Counts V and VI). Her claims have no more connection to her Uber account than Jesus Christian's wrongful death claims have to his Uber account: none. Camila's account was not used to call Ichinkhorol's car. Indeed, she had not called an Uber that entire weekend. Uber Decl. Ex. I (Dkt. 18-12) at 34. No nexus exists between Ms. Selman's purported agreement with Uber and her claims. Her claims are therefore not covered by the FAA.

### 4. *The Survival Claims Provide a Contrast with Plaintiffs' Other Claims—But Are Still not Arbitrable.*

Jesus Christian's negligence claims are Survival Act claims that he brings as the Personal Representative of his son's Estate. Compl. ¶¶ 93–99 (Counts III and IV). These two claims do arise out of Carlos Christian's *purported* contract with Uber, since they are the claims that he could have brought had he survived. The fact that the survival claims do have some connection to one Plaintiff's supposed contract with Uber serves to underscore the contrast with the other four claims—none of which bear any connection to a purported contract between a Plaintiff and Uber. Yet, Uber still cannot compel arbitration of these negligence claims, for a few different reasons: First, the breadth of Uber's Arbitration Provision places it entirely outside the scope of Section 2, which precludes enforcement by the Court pursuant to the Act's enforcement sections, 3 and 4. Second, as described below, Uber has not carried its burden to establish that Carlos Christian assented to Uber's Terms in the first place. Third, as also discussed below, even if the FAA did

apply and Uber could establish that Carlos agreed to Uber's Terms, those Terms, including their Delegation Clause, are unenforceable as a matter of D.C. law.

### C.  Uber is Not Entitled to Relief Under Sections 3 and 4 of the FAA.

Because Plaintiffs' claims do not arise out of the Uber Terms of Use, Section 2 of the FAA does not apply.[5] Accordingly, Uber's claim for relief pursuant to Sections 3 and 4 of the FAA cannot be granted. Since Uber provides no other basis for enforcing terms that, as explained below, are absurd and unconscionable under state law, its motion should be denied in full.[6]

### D.  The Delegation Clause Does Not Remove the Court's Authority to Determine Whether Section 2 Applies.

This Court decides whether the FAA applies here. The Delegation Clause does not, and cannot, take the question of Section 2's application away from the court and give it to an arbitrator because "[a] delegation clause is merely a specialized type of arbitration agreement" on which the FAA "operates . . . just as it does on any other," and can be enforced by a court only if the contract in which it appears is "consistent with § 2." *New Prime Inc.*, 586 U.S. at 112. That clause cannot be considered and enforced separately from the contract in which it is contained (pursuant to the FAA's "severability principle") if the court determines that the FAA does not apply to the contract as a whole. *Id.* ("[B]efore invoking the severability principle, a court should determine that the contract in question is within the coverage of the [FAA]." (quotation marks and alterations

---

[5]     If Defendants mean to claim that the FAA nevertheless applies because they have inserted an FAA choice-of-law clause in their adhesion contracts, that argument is meritless. *See, e.g.*, *Rittmann v. Amazon. com, Inc.*, 971 F.3d 904, 919 (9th Cir. 2020) (rejecting argument that parties may "contract around" limits of the FAA).

[6]     At a minimum, Uber's motion should be analyzed without the benefit of the "pro-arbitration canon of construction" which Uber invokes. *See* Uber Mem. at 8. This canon derives from the federal pro-arbitration policy evinced by the FAA. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). It therefore has no application to an Arbitration Provision that, like Uber's, is not covered by the FAA.

omitted)). A challenge to "the validity under § 2 of the precise agreement to arbitrate at issue" therefore must be resolved by the Court, before the court considers whether to "order[] compliance with that agreement under § 4." *Rent-A-Ctr.*, 561 U.S. at 71. Here, the Delegation Clause, as a specialized type of arbitration agreement, is a "precise agreement" not covered by the FAA.[7]

For the same reasons just discussed, *see supra* at I.A, the Delegation Clause cannot be enforced under the FAA because, if enforced, it would allow the arbitrator to compel arbitration of an issue that falls outside the scope of Section 2, as the arbitrator would be looking at a purported agreement that extends beyond disputes that "aris[e] out of" the Terms of Use that a Plaintiff supposedly agreed to. Therefore, the FAA does not apply to the Delegation Clause either.

## II.   UBER HAS NOT MET ITS BURDEN TO ESTABLISH THAT PLAINTIFFS OR CARLOS CHRISTIAN ASSENTED TO UBER'S TERMS OF USE.

"Arbitration is strictly a matter of consent." *Lamps Plus, Inc. v. Valera*, 587 U.S. 176, 184 (2019), and can only be compelled pursuant to a valid agreement. *See Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 10 (D.D.C. 2021) ("[T]he threshold issue for a court faced with a motion to compel arbitration is whether the parties entered into a valid and binding arbitration agreement[.]" (internal quotation marks omitted)). Importantly, "the question whether the parties ever successfully formed a contract in the first place is one for courts to decide." *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp.2d 127, 139 (D.D.C. 2011). The party moving to compel arbitration bears the burden of proving that the parties formed an agreement to arbitrate. *Camara v. Mastro's Restaurants LLC*, 952 F.3d 372, 373 (D.C. Cir. 2020). "[C]ourts should order arbitration of a dispute only where the

---

[7]     The same is true of the arbitration provision, and the contract as a whole, but, to be clear, the Plaintiffs are specifically challenging the FAA's application to the Delegation Clause as well. *Contra Oldacre v. ECP-PF CT Operations*, 673 F. Supp.3d 294, 299 (W.D.N.Y. 2023) (where "Plaintiff [did] not challenge the delegation provision, nor [did] his opposition even mention it").

court is satisfied" that there is no issue with respect to "the formation of the parties' arbitration agreement." *Granite Rock Co.*, 561 U.S. at 299.

Here, Uber has failed to prove that any Plaintiff entered into a valid and binding agreement to arbitrate, so even if the arbitration provisions in Uber's Terms of Use were within the coverage of the FAA, Uber's motion to compel would have to be denied.

### A. Uber Bears the Burden of Establishing That Its In-App Pop-Up Page Put the Plaintiffs and Carlos Christian on Inquiry Notice Regarding Uber's Terms of Use.

Courts apply "ordinary state-law principles that govern the formation of contracts" to questions of contract formation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under D.C. law, a contract is only formed when there has been an offer, an acceptance of all material terms, and valuable consideration or mutual obligations exchanged. *Osvatics*, 535 F. Supp. 3d at 10. Uber bears the burden of proving that a contract was formed. *Mero v. City Segway Tours of Washington DC, LLC*, 826 F. Supp. 2d 100, 106 (D.D.C. 2011). It has not met that burden with respect to any of the three Plaintiffs.

Uber claims to have formed what courts in this district call an "online adhesion contract"—specifically a "clickwrap" agreement. Uber Mem. at 11; *see Selden v. Airbnb, Inc.*, 16-cv-00933, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016) (describing varieties of "online adhesion contract[s]" including "'browsewraps,' 'clickwraps,' 'scrollwraps,' and 'sign-in wraps,'" as well as "sign-up wraps"). Uber nowhere argues that any of the Plaintiffs ever actually reviewed or even clicked through to see Uber's updated Terms in 2022. The D.C. Circuit recently explained, in a case concerning an online adhesion contract whose terms had not been viewed by the user, that consent to the terms of unseen contracts like this one "is determined by objective . . . criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe."

*Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021) (applying California law[8]). An "offeree"—the customer of an online business like Uber's—who lacks "actual notice of the terms" of a contract, can only "be bound if he manifested his consent and a reasonably prudent user would have been on inquiry notice of the terms." *Id.* (quotations and alterations omitted); *see id.* ("Inquiry notice . . . turns on whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them."). Courts evaluate the "layout and language" on the page where the user supposedly consented to the typically-unseen terms. *Id.*

**B. Uber Fails to Establish that the Plaintiffs Entered into a Contract With Uber When They First Signed Up for Uber in 2016.**

In attempting to convince the Court of an enforceable on-line adhesion contract, Uber ignores the process by which each Plaintiff allegedly contracted with Uber in the first place. Instead, Uber relies on the "We've updated our terms" pop-up screen it deployed in 2022 without acknowledging the significant differences between the initial formation of a (supposed) contract and one party's unilateral change to the terms of that contract. This is an insurmountable gap in Uber's reasoning, given that it has not even argued—and cannot show—that Uber gave Plaintiffs sufficient notice of the *original* terms of their supposed contracts with Uber. By completely ignoring the major difference between its "update" pop-up screen and the contract formation cases it cites, Uber fails to carry its burden of proving that Plaintiffs were ever put on notice of Uber's terms or that they formed a contract to arbitrate.

Uber says each Plaintiff "affirmatively agreed to the Terms by creating accounts," Uber Mem. at 12, and that each used Uber starting in 2016, Uber Decl. ¶¶ 34–36. Uber has also provided

---

[8]    *See Gambo v. Lyft, Inc.*, 642 F. Supp. 3d 46, 54 (D.D.C. 2022) ("The D.C. and California law requirements for formation of a binding contract . . . do not differ in material respects.").

lists of the trips completed through each user's Uber account. *Id.* Ex. H–J. Other than that, Uber presents no facts prior to December 2021 when it updated its Terms of Use and early 2022 when each Plaintiff was presented with the "update" pop-up screen and supposedly agreed to the updated terms. Uber does not even try to establish that the Plaintiffs consented to a version of the Uber Terms in 2016 and 2017. Because Uber fails to present facts concerning contract formation when the Plaintiffs first created their accounts, the Court should infer that no contract was formed at that time. *See Imperial Valet, Inc. v. Woodard*, No. 14-cv-01585, 2015 WL 13158506, at *2 (D.D.C. Mar. 24, 2015) (stating that on a motion to compel, all reasonable inferences must be drawn in favor of the nonmoving party).

It is likely that Uber omitted these critical facts from its motion because of previous court decisions holding that its sign-up process in the 2010s, including 2016, was a misleading and insufficient way of forming a contract—one that did not obtain users' consent to Uber's Terms. *E.g., Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62–64 (1st Cir. 2018) ("After reviewing the [2012-2014] Uber App registration process, we find that the Plaintiffs were not reasonably notified of the terms of the Agreement"); *Kauders v. Uber Techs., Inc.*, 159 N.E.3d. 1033, 1051–55 (Mass. 2021) (2014 and 2015 sign-ups); *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258, 270–73 (Me. 2022) (2015 sign-up); *Ramos v. Uber Techs., Inc.*, 77 N.Y.S.3d 296, 300–02 (N.Y. Sup. Ct. 2021) (2015 sign-up). *Chilutti v. Uber Techs., Inc.*, 300 A.3d 430, 445 (Pa. Super. Ct., 2023) ("Uber's legal program manager, Ryan R. Buoscio, admitted, during his deposition, that a purported user could create an account with Uber on its 2016 website without viewing the 'Terms and Conditions'" and that "the website made no reference to the fact that the 'Terms and Conditions' document contained an arbitration provision."). Uber failed, in each of these cases, to establish that users

signing up for Uber were given adequate notice of the Uber Terms of Use in the years just before the Plaintiffs supposedly registered for the app.

Because Uber has not shown that Plaintiffs ever formed an agreement with Uber in 2016 or 2017, and the Court can thus infer no such agreement was ever formed, the starting point for the Court's analysis of the 2022 "update" pop-up screen is not what Uber represents it to be. When considering whether the 2022 "update" pop-up screen put Plaintiffs on inquiry notice of the Terms, the question is *not* whether reasonable users *already bound to agreements with Uber* "would have known about the terms and the conduct that would be required to assent to them," but whether reasonable users *not already in agreements with Uber* "would have known about the terms and the conduct that would be required to assent to them." *Selden*, 4 F.4th at 156; *see also Campbell v. Gen. Dynamics Gov't Sys.*, 407 F.3d 546, 555–58 (1st Cir. 2005) (addressing the parties' past dealings in order to determine whether there would be an expectation that contractual terms would follow by email); *Davitashvili*, 2023 WL 2537777, at *9 (holding that where the defendant "has not established that the [plaintiffs] assented to any prior iteration of [defendant's] terms of use," it "[a]ccordingly, . . . fail[s] to demonstrate a course of dealing by which [plaintiffs] could be and have been on reasonable notice" of the manner in which updates to those terms of use would be conveyed to them); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 886–87 (N.D. Ill. 2020) (noting that a plaintiff's "history with [the defendant corporation] did not suggest that she should have expected to receive an email adding new terms to her dealings with the company" where she had "never previously assented to [the defendant]'s Terms of Use when" using the defendant's services).

### C. Uber's "Updated Terms" Pop-Up Did Not Create an Enforceable Online Adhesion Contract Because It Did Not Put Plaintiffs on Inquiry Notice.

Uber's brief contains a screenshot of the 2022 pop-up page in question and argues that Plaintiffs agreed to the Terms "when they affirmatively checked the box to 'Confirm' that they (1) reviewed and agreed to the Terms of Use and the Privacy Notice . . . and (2) were at least 18 years of age." Uber Mem. at 4. But Uber does not carry its burden to prove an agreement unless "the layout and language" presented by Uber "would provide a 'reasonably prudent smartphone user'"—*one who, like Plaintiffs, lacked an existing contractual relationship with Uber*, *Campbell*, 407 F.3d at 555–58—with notice that acting in the manner suggested by Uber would "manifest assent to an agreement." *Gambo v. Lyft*, 642 F. Supp. 3d 46, 54 (D.D.C. 2022) (quoting *Selden*, 4 F.4th at 156). It does not.

The supposed contractual nature of the Terms is hardly the most prominent information on the pop-up page. The top of the page announces, "We've updated our Terms," and the largest text on the page says "[w]e encourage you to read our updated Terms in full." Uber Decl. Ex. A (Dkt. 18-4). Blue underlined text reads "Terms of Use" and "Privacy Notice." *Id.* At the bottom of the screen is a small box that can be "checked" with a tap, and text reading "By checking the box, I have reviewed and agree to the Terms of Use and acknowledge the Privacy Notice." *Id.* Below, gray text reads "I am at least 18 years of age," and below that is a black box reading "Confirm." *Id.*

This page would be confusing to a user unaware that he or she had already (supposedly) agreed to a set of Uber's Terms of Use. The top three-quarters of the screen appears to be an announcement from Uber about new Terms, which the user is merely "encouraged" to read. None of the prominent text on the screen indicates that the Terms have anything to do with the User. Words like "contract," "agreement," or "binding" are nowhere to be found, except for one use of

"agree," buried in a sentence that is difficult to follow as a matter of syntax: It is unclear what it means to say that "[b]y checking the box, I *have reviewed* . . . the Terms of Use." By checking the box, the user has checked a box. The user hasn't reviewed anything. Users are not required to actually view the Terms before checking the box. Checking the box does not pull up the terms. Uber could have written "by checking the box, I <u>acknowledge that</u> I have reviewed the Terms of Use," but Uber did not write this, even though it managed to use fairly clear language in connection with the Privacy Notice ("By checking the box, I . . . acknowledge the Privacy Notice"). " The closer one reads the sentence, the less clear Uber's intent and thus the meaning to the user, becomes.

At the bottom of the page, the standalone "I am 18 years of age" only adds to the confusion. It is the closest text to the word "Confirm." A user might think that this is the only thing they are being asked to confirm. Reasonable users may not have known what it would mean to confirm that "by checking the box [they] have reviewed" something they absolutely did not review. By merely "encourag[ing]" users to review the terms, and not requiring or even suggesting that it is necessary for them to do so, Uber conveys a lack of importance.  The mere fact that users were permitted to click "confirm" without first clicking through to the terms might lead some reasonable users to discount any weight they might have placed on this page.

It is perhaps conceivable that users who knowingly agreed to Uber's Terms of Use when they first signed up for the app might understand Uber's intention to bind them in contract to these new updated terms. But here, where the Court is bound to infer that the Plaintiffs did not so agree (since Uber has not explained how they did) a reasonably prudent user in the Plaintiffs' shoes would either be perplexed by this odd pop-up, presented—most likely—in a moment when the Plaintiff is in a hurry to call a car and get somewhere, or reasonably assume that the "update" was

to the only terms of which they were aware from using the app, i.e. regarding how a ride was requested and paid for. Reasonable users like Plaintiffs, who were not made aware of the terms during sign-up and who only opened the app to request a ride, would hardly be aware that they were agreeing to, *inter alia*, wholesale arbitration and a waiver of their Constitutional right to a jury trial.  *See* Ex. A ¶ 19, Ex. C ¶ 21.

This careful parsing of Uber's "update" is not setting a standard that Uber—a multi-billion-dollar company with armies of lawyers at its disposal—is unable to meet. In 2021, the Supreme Judicial Court of Massachusetts conducted a thorough review of case law describing the process by which Uber *drivers* assent to the Terms of their contracts with Uber, and concluded that "[c]learly, Uber knows how to obtain clear consent to its terms." *Kauders*, 159 N.E.3d at 1055; *see also Sarchi*, 268 A.3d at 273 (following *Kauders*). As far back as 2014, Uber drivers were required to confirm they had reviewed their agreements with Uber by twice clicking the text "YES, I AGREE." *Kauders*, 159 N.E.3d at 1052 (citing *Singh v. Uber Techs., Inc.*, 235 F. Supp. 3d 656, 661 (D.N.J. 2017), *vacated on other grounds*, 939 F.3d 210 (3d Cir. 2019). Other cases had noted clear language reading "[b]y clicking below, you represent that you have reviewed all the documents above and that you agree to all the contracts above" or "PLEASE CONFIRM THAT YOU HAVE REVWIEWED [*sic*] ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS." *Id.* at 1055 (quoting *Capriole vs. Uber Techs., Inc.*, No. 19-cv-11941, 2020 WL 1536648 (D. Mass. Mar. 31, 2020)); *id.* at 1054 (quoting *Okereke vs. Uber Techs., Inc.*, No. 16-cv-12487, 2017 WL 6336080 (D. Mass. June 13, 2017)). Drivers had to log into the Uber App using their own unique names and passwords—guaranteeing that family members or others using their phone did not purport to agree to any contracts on the driver's behalf. *See id.* at 1052, 1054. This was in sharp contrast to the rider sign-up process where, as here, "the design of the interface

of the app . . . enable[d], if not encourage[d], users to ignore the terms and conditions." *Id.* at 1053. The contractual nature of the interaction was made abundantly clear for drivers in a way that it was not in the First Circuit's case or in this one, where the most prominent text simply announces that Uber has "updated Terms" of an undefined nature. *See id.* (noting that "the title at the top" of the interface screen "indicated" "the purpose of the screen" which was "for the user to enter payment information," not to be bound by the linked term).

In summary, Uber fails to establish that any of the Plaintiffs ever entered into a contract with Uber when they first signed up for their Uber accounts, and the 2022 update "pop-up" would not put a reasonably prudent person who had never entered into a contract with Uber in the first place on inquiry notice of those 2022 updated terms.

## III. AS A MATTER OF D.C. CONTRACT LAW, UBER'S TERMS ARE UNENFORCEABLE.

If the FAA did apply to Uber's Terms of Use (it does not), and if Uber had met its burden to establish that the Plaintiffs assented to their Terms (it has not), Uber's infinite arbitration clause would nonetheless remain unenforceable as a matter of D.C. law. A contract "is unenforceable on grounds of public policy if . . . the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of [its] terms." *Jacobsen v. Oliver*, 555 F. Supp. 2d 72, 79 (D.D.C. 2008) (quoting Restatement (Second) of Contracts § 178 at 6 (1981)); *see also*, *e.g.*, *Erikson v. Hawley*, 12 F.2d 491, 494 (Ct. App. D.C. 1926). Uber's Terms of Use contravene public policy across the board—the Delegation Clause and Arbitration Provision are both unconscionable and cannot be enforced.

### A. Because Uber's Delegation Clause Is Itself Unconscionable, the Court Must Not Yield Any Questions of Arbitrability to an Arbitrator.

The FAA's "severability principle," which would allow the Court to consider Uber's Delegation Clause or Arbitration Provision in isolation from the rest of the Terms of Use, "applies

only if the parties' arbitration agreement [or delegation clause] appears in a contract that falls within the field §§ 1 and 2 [of the FAA] describe." *New Prime Inc.*, 586 U.S. at 112. Because the Uber Terms of Use contain an infinite arbitration clause that places the Agreement outside the scope of § 2, *see supra* at I.A, the severability principle does not apply and the Court can assess the enforceability of the contract as a whole under D.C. law. At a minimum, Uber's arbitration clause is outside the scope of § 2 as applied to both of Jesus Christian's wrongful death claims (Counts I and II) and both of Camila Selman's claims (Counts V and VI), as there is no argument that any of these four claims "aris[e] out of" Jesus's or Camila's supposed agreement with Uber.

If, however, the Court were to determine that the FAA does apply to at least some of Uber's claims, it would nonetheless be *the Court's responsibility* to assess the enforceability of the Delegation Provision. Pursuant to the "severability principle," any challenge to a delegation clause or an arbitration agreement must be "treat[ed] . . . separately from a challenge to the validity of the entire contract in which it appears." *New Prime Inc.*, 586 U.S. at 112; *see also Rent-A-Ctr.*, 561 U.S. at 72 ("[U]nless [plaintiff] challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."). Here, where there is a specific challenge to the delegation provision, it is not presumptively valid, and cannot be automatically enforced. Sending questions of arbitrability to the arbitrator would mean enforcing the very delegation clause being challenged.

Uber's Delegation Clause is unenforceable because it is entirely inconsistent with public policy. According to the Delegation Clause, "[o]nly an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the . . . enforceability, or formation of this Arbitration Agreement." Uber Terms at 6–7. This is

a recipe for forcing persons who never agreed to arbitrate into arbitration. The suggestion that only an arbitrator would decide whether an agreement to arbitrate has been formed or is enforceable flies in the face of the principle that "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986); *see also Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010) ("Arbitration is strictly a matter of consent.").

### B. Plaintiffs and Uber Did Not Form an Agreement to Arbitrate Claims Unrelated to the Uber Terms of Use.

The Plaintiffs and Uber did not form a binding agreement to arbitrate claims unrelated to the Uber Terms. "For there to be an enforceable contract, there must be mutual assent of each party to all the essential terms of the contract . . . a 'meeting of the minds.'" *Brooks v. Rosebar*, 210 A.3d 747, 751 (D.C. 2019). A court should consider "whether the parties' objective acts manifested agreement." *Id.* No contract is formed where the parties "fail[ed] to agree on or even discuss an essential term" because that would mean that "the parties did not mutually assent" and cannot be "'reasonably certain' about what it is promising." *Id.*; *see also Williams v. Walker-Thomas Furniture*, 350 F.2d 445, 449 (D.C. Cir. 1965) ("[W]hen a party of little bargaining power, and hence little real choice, signs a[n] . . . unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms."). The goal of interpreting a contract in this objective manner is "to carry out the reasonable expectations of the parties." *Sobelsohn v. Am. Rental Mgmt. Co.*, 926 A.2d 713, 718 (D.C. 2007). In construing a contract, then, the Court must use only reasonable constructions of contractual terms. *DLY-Adams Place, LLC v. Waste Mgmt. of Md., Inc.*, 2 A.3d 163, 166 (D.C. 2010); *Keepseagle v. Perdue*, 856 F.3d 1039, 1047 (D.C. Cir. 2017) (avoiding an interpretation of contractual language that "would yield absurd results.").

29

Applying these principles to infinite arbitration clauses, courts have concluded that agreements containing such clauses do not reflect a meeting of the minds. With respect to the exact Uber Arbitration Clause at issue in this case, the Southern District of New York held:

> 'Notwithstanding the literal meaning of the clause's language, no reasonable person would think that' agreeing to [defendants' terms of use] 'would obligate [him or her] to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of [its] affiliates . . . .

*Davitashvili*, 2023 WL 2537777, at *11 (quoting *McFarlane*, 524 F. Supp. 3d at 277); *see also Revitch*, 997 F.3d at 718 ("[W]hen Revitch signed his wireless services agreement with AT&T Mobility . . . he could not reasonably have expected that he would be forced to arbitrate an unrelated dispute with DIRECTV, a satellite television provider that would not become affiliated with AT&T until years later."); *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) ("an arbitration clause that is unlimited in scope presents a question of contract *formation*" (emphasis in original)).

In this case, no reasonable person—especially one, like each plaintiff, who had not formed a contract with Uber in the first place—would think that he or she had agreed to arbitrate "any dispute, claim, or controversy in any way arising out of or *relating to* . . . [his or her] *relationship with Uber*." Uber terms at 3–4 (emphasis added). This would mean arbitrating "literally every possible dispute" with Uber, *McFarlane*, 524 F. Supp. 3d at 277, up to and including intentional torts with no connection to Uber ridesharing services. Uber could commit securities fraud against its shareholders, could release a defamatory press release, or could direct its Uber Eats delivery workers to rob customers' homes, and then turn around and demand secret arbitration. "[N]o reasonable person would think that" these implications could follow from merely checking a box and hitting "Confirm." *Id.* Even if Uber's infinite arbitration clause is enforceable to some degree, it is not enforceable to the extent that it purports to cover claims unrelated to user's own Terms of

Use, like the claims brought by Plaintiff Camila Selman or Plaintiff Jesus Christian's wrongful death claims asserted on his own behalf.

### C. An Agreement to Arbitrate Claims Unrelated to a Plaintiff's Own Terms of Use Would Additionally Be Unconscionable and Unenforceable.

Even if any Plaintiff had agreed to arbitrate claims against Uber that do not arise out of the Plaintiff's own Terms of Use, such an agreement would be "plainly one-sided," unconscionable, and thus unenforceable. *Simon v. Smith*, 273 A.3d 321, 331 (D.C. 2022). "Under [D.C.] law, a contract is unconscionable and therefore unenforceable if there is 'an absence of meaningful choice on the part of one of the parties' and the contractual terms are 'unreasonably favorable to the other party.'" *Id.* ("These two elements are often referred to as procedural unconscionability and substantive unconscionability, respectively."). Both defects "usually are present in unconscionability cases," though "one or the other may suffice" in an "egregious situation." *Urban Investments, Inc. v. Branham*, 464 A.2d 93, 99 (D.C. 1983). The doctrine aims to "prevent 'oppression and unfair surprise.'" *Id.*

It would be unfair and surprising, indeed, for a court to enforce an infinite arbitration clause with respect to claims having no connection to a plaintiff's own underlying contract with the defendant. As explained above, no "reasonable person" would expect to have agreed to something as sweeping as what Uber suggests, and courts have for these same reasons found infinite arbitration clauses to be unconscionable. Again, the Southern District of New York, reaching an alternative holding, said that "it would be unconscionable to enforce" the exact clause Uber is trying to enforce here "with respect to claims untethered to [Uber's] terms of use" because "[i]f interpreted literally, they would produce grossly unreasonable outcomes that would contravene a reasonable person's expectations." *Davitashvili*, 2023 WL 2537777, at *11 ("[A]ccording to their literal terms, defendants' arbitration clauses would require a user of defendants' platforms to

31

arbitrate claims for securities fraud, personal injury, or wrongful termination that have nothing to do with the plaintiff's use of the platform."). Other courts have ruled similarly with respect to comparable arbitration provisions. *E.g.*, *McFarlane*, 524 F. Supp. 3d at 277 ("[I]t would be unconscionable to enforce the [a]rbitration [p]rovision with respect to claims untethered to" the agreement containing that provision); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp.2d 1253, 1263 (S.D. Cal. 2012) (noting that a defendant did not even try to argue "that the agreement [could] truly encompass 'any and all disputes' between the parties" as "such a clause would clearly be unconscionable"). This Court should reach the same conclusion. No reasonable person in Plaintiffs' positions would believe that he or she had agreed to arbitrate any and all possible disputes with Uber.

## IV. THERE IS NO REASON TO STAY CLAIMS THAT ARE NOT SUBJECT TO ARBITRATION, INCLUDING THOSE BROUGHT AGAINST DEFENDANTS ICHINKHOROL AND JOHNSON.

In its introduction, Uber asserts that "Johnson was highly intoxicated and was driving more than twice the speed limit," thereby resulting in Carlos' death and Camila's injuries. This is true, as far as it goes. Mr. Johnson is indeed responsible for the collision, but equally—perhaps more so—are Uber and its driver, Defendant Ichinkhorol. To conveniently overlook its actions and those of its driver casts Uber's motion in a misleading light. Yet, at the same time that it seeks to blame Johnson, Uber also—by arguing for a stay of Plaintiff's entire case—is trying to stop Plaintiffs from achieving some small measure of accountability from the two drivers.

As will be established in the trial of this case, there is abundant—often irrefutable—evidence that establishes Ichinkhorol's and Uber's liability (as well as Johnson's), including numerous documents, photographic and video evidence, transcripts, and reports, many of which are attached to the Declaration of Jennifer Luong. Ex. D *et seq*. For example, it is irrefutable that the Uber driver was driving without glasses, as required by D.C. law, failed to properly observe

oncoming traffic as he entered the intersection, and failed to yield to oncoming traffic which had a green light and the right of way. Uber hopes that an overbroad stay of proceedings can help it bury all this evidence.

If the Court finds that some or all of the Plaintiffs' claims are subject to mandatory arbitration, it should deny Uber's unjustified and barely-explained request for a stay of proceedings in this Court. Shielding some of the Plaintiffs' efforts to hold Uber accountable from public view should be more than enough for Uber, and Uber provides no good reason why Plaintiffs' remaining claims—including claims against the two drivers—must await the resolution of secret arbitration proceedings.

The only ground Uber provides for why a stay is appropriate is the FAA. *See* Uber Mem. at 23 (citing 9 U.S.C. § 3). To the extent that the Court determines that the FAA does not apply to some or all of Plaintiffs' claims, the FAA cannot properly provide grounds for staying claims that it has no bearing on. Certainly it has no bearing on claims against Defendants Ichinkhorol and Johnson, with whom Plaintiffs are not bound to arbitrate anything.

To the extent that the FAA does apply, Section 3 permits a stay only if the Court is "satisfied that the issue involved in [the] suit or proceeding is referable to arbitration." 9 U.S.C. § 3. Uber has advanced no argument that non-arbitrable claims, including at a minimum those against defendants Ichinkhorol and Johnson, involve an "issue" referable to arbitration. As the party seeking a stay, Uber bears the burden of arguing for one, and has not even attempted to carry that burden. "[T]he party seeking a stay bears the burden of showing that the stay is needed and warranted," and courts are afforded "broad discretion" when it comes to granting one. *National Indus. for the Blind v. Dep't of Veterans Affairs*, 296 F. Supp. 3d 131, 137 (D.D.C. 2017); *see also Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 97 (4th Cir. 1996) ("[T]he

decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control"). Uber has not met its burden and has provided no reason why the Court should exercise its discretion to grant a stay on Uber's behalf. Again, Uber has forfeited any arguments not raised in its opening brief.

## CONCLUSION

For the reasons stated above, the Court should deny Uber's Motion to Compel Arbitration and should not stay proceedings in this case.

Plaintiffs request a hearing on this opposition.

Dated: April 26, 2024                    Respectfully Submitted,

_/s/ Robert F. Muse_____
Robert F. Muse (D.C. Bar No. 166868)
Juliana M. Andonian (D.C. Bar No. 90006115)
Ronald Kovner (D.C. Bar No. 166124)
Kevin P. Crenny (D.C. Bar No. 1765044)
**LEVY FIRESTONE MUSE LLP**
900 17th St. NW, Suite 1200
Washington, DC 20006
Tel: (202) 845-3215
Fax: (202) 595-8253
rmuse@levyfirestone.com
jandonian@levyfirestone.com
rk@levyfirestone.com
kcrenny@levyfirestone.com

*Counsel for Plaintiffs*

34

**CERTIFICATE OF SERVICE**

I certify that on April 26, 2024, I filed the foregoing Opposition and all attachments thereto via CM/ECF which serves a copy on all counsel of record.

<u>/s/ Juliana Andonian</u>
Juliana Andonian