# Exhibit D

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

_____
                                       :

**JESUS M. CHRISTIAN, Individually and**   :
**as Personal Representative of the Estate of**   :
**CARLOS ENRIQUE CHRISTIAN REY,  et. al**   :
                                        :

      **Plaintiffs**                          :

                                        :       **Case No. 1:24-cv-00304**

**v.**                                        :

**UBER TECHNOLOGIES, INC., et. al**         :

      **Defendants**                      :
_____ :

## DECLARATION OF JENNIFER LUONG

I, Jennifer Luong, hereby declare and state as follows:

1. I am over the age of 18, presently residing in the District of Columbia.

2. I am presently employed with the law firm of Levy Firestone Muse LLP, in Washington, D.C. as an investigator and paralegal.

3. I have assisted in the gathering of documents and other materials relevant to the above captioned case.

4. Attached to this declaration is a list of materials drawn from the files of the above captioned case, as well as the materials themselves or extracts therefrom.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _04/25/2024_          *Jennifer Luong*
                                      Jennifer Luong

## <u>ATTACHMENT TO THE DECLARATION OF JENNIFER LUONG</u>

The following is a list of examples of transcripts, legal standards, photographs, articles, and other materials relevant to Uber and Khalinmandakh Ichinkhorol's liability. They are designated D-1 to D-24:

D-1.   Photograph of Virginia Driver's License of Khalinmandakh Ichinkhorol ("Ichinkhorol")

D-2.   Video captures of Ichinkhorol at collision scene from police body-worn camera footage, January 15, 2023

D-3.   Extracts from Affidavit of Detective William Lee, regarding admissions by Ichinkhorol concerning his vision, February 28, 2023

D-4.   Relevant District of Columbia traffic rules and regulations

D-5.   District of Columbia presumption of negligence for failure to wear corrective lenses

    a.   District of Columbia Municipal Regulation Title 18, § 1100.09 ("No person whose license to operate a motor vehicle is subject to any restriction or restrictions shall operate a motor vehicle in the District unless he . . . comply in every respect with the restriction(s).")

    b.   *Massengale v. Pitts*, 737 A.2d 1029 (D.C. 1999) ("It is undisputed that Minda Massengale was not wearing her glasses at the time the collision occurred despite a driver's license restriction which required the use of corrective lenses. . . . This violation raises a presumption of negligence which is rebuttable only if Massengale can show that she 'did all a reasonable person who wished to comply with the law would do.'" (internal citation omitted)).

D-6.   Photographs of Ichinkhorol's vehicle, January 15, 2023

D-7.    Photographs of Ichinkhorol's vehicle, December 19, 2023

D-8.    Photograph of syringe in Ichinkhorol's vehicle, February 3, 2023

D-9.    Photographs of blood pressure cuff in Ichinkhorol's vehicle, December 19, 2023

D-10.   Photograph of cellphone mount in Ichinkhorol's vehicle, December 19, 2023

D-11.   Photographs of tires on Ichinkhorol's vehicle, December 19, 2023

D-12.   Photographs of collision scene, January 15, 2023

D-13.   Screenshots of intersection from Google Maps

D-14.   Video capture showing Ichinkhorol's vehicle set to turn, and three other vehicles either in, or approaching the intersection, seconds before the collision

D-15.   Transcript of sentencing in *U.S. v. Reginald Johnson*, 2023-CF1-1620, November 17, 2023

D-16.   Judgment and Commitment Order in *U.S. v. Reginald Johnson*, 2023-CF1-1620, November 17, 2023

D-17.   Photographs of distracted driving from Ichinkhorol's Facebook account

D-18.   Ichinkhorol's traffic violations in Virginia

      a.   May 20, 2019 – Violation of "no left turn" highway sign, Case No. GT19-20938

      b.   June 7, 2019 – "Left turn, fail to yield to oncoming traffic," Case No. GT19-24542

      c.   November 7, 2019 – Defective equipment, Case No. GT19-231548

D-19.   Examples of Uber's safety representations

D-20.   District of Columbia Code § 50-1731.02, definition of prohibited distracted driving

D-21.  District of Columbia Code § 50-1731.04, restricted use of mobile telephone and other electronic devices

D-22.  Examples of government, scientific, and professional studies regarding safe driving and Uber

    a.  Centers for Disease Control Fact Sheet on Distracted Driving, April 26, 2022

    b.  Nicole Yuen, et al., "Driving with Distraction: Measuring Brain Activity and Oculomotor Behavior Using fMRI and Eye Tracking," Frontiers in Human Neuroscience, August 16, 2021

    c.  Ed Garsten, "Smartphone Use Leading to More Distracted Driving Deaths, Safety Officials Say," Forbes, April 28, 2023

    d.  "Smartphone Apps Drive Gig Workers, Parents to Distraction," Insurance Institute for Highway Safety, November 3, 2022

    e.  Insurance Institute for Highway Safety Fact Sheet on Distracted Driving, December 2023

    f.  Tom Schweizer et al., "Brain Activity During Driving with Distraction: An Immersive fMRI Study," Frontiers in Human Neuroscience, February 28, 2013

    g.  U.S. Department of Transportation, National Highway Traffic Safety Administration, "Human Factors Design Guidance for Driver-Vehicle Interfaces," December 2016

D-23.  Examples of government regulations and scientific studies and regulations regarding eyesight and safe driving

    a.   David Turbert, "Diabetic Eye Disease," American Academy of Ophthalmology, October 14, 2021

    b.   Virginia Department of Motor Vehicles Website, "Vision Requirements"

    c.   Virginia Code § 46.2-311, Persons having defective vision; minimum standards of visual acuity and field of vision; tests of vision

    d.   Virginia Department of Motor Vehicles Driver's Manual, requirements re: corrective lenses

    e.   District of Columbia of Motor Vehicles Driver's Manual, requirements re: corrective lenses

D-24.  Uber blog post regarding lefthand turns, October 27, 2022

# Exhibit D-1





Exhibit D-2









Exhibit D-3

## *Superior Court of the District of Columbia*
### CRIMINAL DIVISION

AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT

| USW NO.: | |
|---|---|

| DEFENDANT'S NAME:<br>Reginald Roland Johnson | DOB:<br>6/26/1992 | PDID:<br>760032 | FBI NUMBER:<br>XHJL88PAE | CCN:<br>23008010 |
|---|---|---|---|---|

| NICKNAME:<br>Reggie | | | | ALIASES: | | | |
|---|---|---|---|---|---|---|---|
| SEX:<br>M | RACE:<br>B | HEIGHT:<br>6'2" | WEIGHT:<br>180 | EYES:<br>Br | HAIR:<br>Blk | COMPL.:<br>Light | SCARS, MARKS, TATTOOS: |

| DEFENDANT'S HOME AND/OR BUSINESS ADDRESS:<br>60 N 23rd Street, Philadelphia, PA 19103 | TELEPHONE NUMBER: |
|---|---|

COMPLAINANT'S NAME:
Carlos Christian, C.S.

LOCATION OF OFFENSE(S):
15th and Massachusetts Ave., NW. Washington, D.C. 20005

| DATE(S) OF OFFENSE(S):<br>1/15/2023 | TIME(S) OF OFFENSE(S):<br>approx. 6:10 p.m. |
|---|---|

**CAUTION AND MEDICAL CONDITIONS (CMC)** Select a valid CMC code below for wanted person when using the caution indicator:

| 00 = Armed and Dangerous | 15 = Explosive Expertise | 30 = Sexually Violent Predator | 60 = Allergies | 80 = Medication Required |
|---|---|---|---|---|
| 05 = Violent Tendencies | 20 = Known to Abuse Drugs | 50 = Heart Condition | 65 = Epilepsy | 85 = Hemophiliac |
| 10 = Martial Arts Expert | 25 = Escape Risk | 55 = Alcoholic | 70 = Suicidal | 90 = Diabetic |

GIVE BRIEF DESCRIPTION OF WHAT HAPPENED:

1. Your affiant has been a sworn member of the Metropolitan Police Department, Washington DC, for over thirteen (13) years. During that time, your affiant has worked in the capacity of a patrol officer and has obtained, assisted and executed numerous search and arrest warrants of persons and/or premises for violations of the District of Columbia Code. Your affiant has served as a detective at the Youth and Family Services Division for over three years and investigated hundreds of sexual and physical abuse allegations against children. Your affiant is currently assigned to the Special Operations Division, Major Crash Investigations Unit. Your Affiant has completed the "At-scene Traffic Crash/Traffic Homicide Investigation", "Advanced Traffic Crash Investigation" and "Bosch CDR Tool Technician Training" offered through the Institute of Police Technology and Management (IPTM) and the Maryland Crash Reconstruction Committee (MCRC). Your Affiant's current responsibilities are to investigate all major traffic crashes involving serious injuries and/or death that occur within the District of Columbia.

2. On Sunday, January 15, 2023, at approximately 1849 hours, the Major Crash Investigations Unit was requested by the Second District to respond to 15th and Massachusetts Avenue, Northwest, to assist with a traffic crash investigation involving a Jeep Cherokee and a Toyota Corolla. The investigation revealed the following:

3. At approximately 1810 hours, Vehicle 1 was traveling eastbound in the 1500 block of Massachusetts Avenue, Northwest, when it drove through a green traffic signal at the intersection of 15th and Massachusetts Avenue,

| Prosecutor: _____<br>NCIC APPROVED | Affiant: _____ | Judge: _____ | Page 1 of 10 |
|---|---|---|---|

## *Superior Court of the District of Columbia*
### CRIMINAL DIVISION

| AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT | | | USW NO.: | |
|---|---|---|---|---|
| DEFENDANT'S NAME: Reginald Roland Johnson | DOB: 6/26/1992 | PDID: 760032 | FBI NUMBER: XHJL88PAE | CCN: 23008010 |

11. On 1/19/2023, your Affiant interviewed Witness-5 who stated the following: They started out at Mission, having brunch with Witness-2, Witness-3, Witness-4, and later Witness-6. They were all playing charades prior to meeting the driver of Vehicle 1 and his friends. The guys came over and they wanted to know a little bit more about them. They came over with their own cups in their hands. IT does not remember noticing the driver of Vehicle 1 and his friends until they came over to their table. Witness-5 reported that the driver of Vehicle 1 was talking to ITS best-friend, Witness-2. IT does not remember the driver of Vehicle 1 driving, and IT did not see the driver of Vehicle 1 smoke anything while he was driving. IT sustained the following injuries: T2, T3 fractures. C2 fracture, and about 11 stitches to the forehead. IT does not remember the impact; it just remembers taking a selfie with W-6 then waking up after the crash. Witness 5 indicates IT was really brunching, and IT had to leave the restaurant for fresh air and to vomit a little before they all ultimately left together to get into Vehicle 1.

12. On 1/19/2023, your Affiant interviewed Witness-6, also a passenger in Vehicle 1, who provided the following statements: They were going through the intersection and the only thing that IT saw when IT looked up was the other car making a left hand turn across their lane. They tried swerving out of the way but they collided-boned the car. They ended up rolling onto the grass area before striking the wall. IT stated that it looked like Vehicle 2 was trying to make the light going across the intersection. They were all riding in the Vehicle 1 with the driver of Vehicle 1 driving prior to the crash, and they had all been at Mission having a brunch. IT was seating behind the driver's seat, and IT was not belted. They had been at Mission since about 12 or 12:30 P.M., and they had food and drinks. IT reported that the driver of Vehicle 1 did not really have many drinks, since he was driving later. IT only saw the driver of Vehicle 1 have one drink. Later they met some young ladies at Mission, and they all decided to go to Park on 14th Street together. IT did not see the driver of Vehicle 1 smoke anything or consume alcohol while he was driving. Witness-6 and the driver of Vehicle 1 had known each other since college. IT did not sustain any serious injury from the crash, just a minor nosebleed. Witness-6 reported that the driver of Vehicle 1 was not distracted while driving, but that it was too late to miss the collision based on the speed they were going and the turn the other driver made.

13. On 1/18/2023, your Affiant interviewed the driver of Vehicle 2 through a translator from the language line, and IT provided the following statements. IT was working Sunday evening as an Uber driver and was on Massachusetts Avenue, Northwest. IT recalled having one passenger in the vehicle. IT described the crash as

Prosecutor: _____ *ALH*
NCIC APPROVED          Affiant: _____          Judge: _____          Page 4 of 10

## Superior Court of the District of Columbia
### CRIMINAL DIVISION

**AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT**          LSW NO.:

| DEFENDANT'S NAME:<br>Reginald Roland Johnson | DOB:<br>6/26/1992 | PDID<br>760032 | FBI NUMBER:<br>X111L88PAE | CCN:<br>23008010 |
|---|---|---|---|---|

happening so fast and being like a dream. It was not sure if IT was dreaming. IT does not remember if IT was

turning left or right on 15th Street. IT did not wear corrected lenses prior to the crash. IT does not remember if

the traffic signal was red or green. IT stated it always follows the rules and goes about 25-30 miles per hour.

When asked by your Affiant if IT suffered from any memory loss before and after the crash, IT replied 'No."

14. On 06/07/2019, the Driver of Vehicle 2 had an infraction for making an illegal left turn into oncoming traffic in

Arlington County, Virginia which was prepaid.   The driver of Vehicle 2's license has a corrective lenses

restriction, and he is pictured wearing glasses in his photo.

15. The Driver of Vehicle 2 consented to a download of his vehicle's data. The crash data recorder had five recorded

events. Events 2-5 all occurred in ignition cycle 28144 and are separated in time by less than one hundred

milliseconds from one another. The download was performed at ignition cycle 28150. Event 1 is from ignition

cycle 6471.  The Crash Types for Events 2-5 include side crash (5), front/rear crash (4), rollover (3), and side

crash (2). The speed, acceleration, and braking records for Events 2-5 contain the same information. Therefore,

it appears that Events 2-5 are from this crash, and Event 1 is from another event in Vehicle 2's history.

| Events 2-5 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Time<br>(sec) | -5 | -4.5 | -4 | -3.5 | -3 | -2.5 | -2 | -1.5 | -1 | -.5 | 0 |
| Speed<br>MPH | 3.7 | 3.1 | 3.1 | 3.1 | 3.1 | 4.3 | 5.6 | 8.1 | 9.9 | 12.4 | 14.3 |
| Accele<br>rator % | 0.0 | 0.0 | 0.0 | 0.0 | 15.5 | 0.0 | 24.0 | 28.5 | 39.5 | 27.0 | 26.5 |
| Servic<br>e<br>Brake | ON | ON | OFF | ON | OFF | OFF | OFF | OFF | OFF | OFF | OFF |

16. There were inconsistent statements from witness(es) regarding the direction of travel by Vehicle 2. An on-scene

officer was told by a non-involved witness who was doing delivery at the time that Vehicle 2 (Toyota) was

traveling northbound on 15th Street Northwest and had the green light. Your Affiant also interviewed this

witness, who reported that it saw the Jeep drive through a red light at a high rate of speed crashing into a car

Prosecutor: _____          Affiant: _____          Judge: _____          Page 5 of 10
NCIC APPROVED

## Superior Court of the District of Columbia
### CRIMINAL DIVISION

| AFFIDAVIT IN SUPPORT OF AN ARREST WARRANT | | | USW NO.: | |
|---|---|---|---|---|

| DEFENDANT'S NAME: | DOB: | PDID: | FBI NUMBER: | CCN: |
|---|---|---|---|---|
| Reginald Roland Johnson | 6/26/1992 | 760032 | XHJL88PAE | 23008010 |

| PLEASE ISSUE A WARRANT FOR: | AFFIANT'S SIGNATURE: |
|---|---|
| **Reginald Roland Johnson** | Affiant's Name: **William Lee** <br> Badge Number: **D2-1559** |
| **CHARGED WITH:** <br><br> **SECOND DEGREE MURDER** | SUBSCRIBED AND SWORN BEFORE ME THIS <br> _3_ DAY OF _March_, 20 _23_ |
| PROSECUTOR'S SIGNATURE: <br><br> _2/28/2023_ <br><br> **AUSA Michael Spence** | JUDGE'S SIGNATURE: <br><br> JUDGE _BECK_  (print last name) <br> SUPERIOR COURT OF THE DISTRICT OF COLUMBIA |

Prosecutor: _____
**NCIC APPROVED**

Affiant: _____

Judge: _____

Page 10 of 10

Exhibit D-4

## RELEVANT DISTRICT OF COLUMBIA TRAFFIC RULES AND REGULATIONS

While driving for Uber and transporting Carlos Christian and Camila Selman in the District of Columbia, Defendant Khalinmandakh Ichinkhorol was subject to numerous safety rules and regulations designed to prevent accidents.  By way of example, these include:

1.  A duty to keep a proper lookout, meaning that Ichinkhorol was obligated to reasonably observe traffic, pedestrians, and other conditions that confronted him;

2.  A duty to look observantly and effectively, in an intelligent and careful manner, and see what is plainly there to be seen. One who looks and does not see what is plainly there to be seen is as negligent as one who never looked at all;

3.  When intending to turn left at an intersection, a duty to yield the right-of-way to any vehicle approaching from the opposite direction that is so close as to constitute an immediate hazard and wait until it is safe to turn;

4.  When intending to turn left at an intersection, a duty not to block the intersection while waiting for oncoming traffic to clear;

5.  A duty to be aware of and responsive to potential dangers and risks to all occupants of the car;

6.  A duty to obey the District of Columbia's prohibition against operating a motor vehicle in the District of Columbia without wearing the corrective lenses required by the restriction on his driver's license;

7.  A duty to afford full time and attention to one's driving and not drive while distracted;

8.  A duty to foresee the possibility of a dangerous situation and mistakes by other drivers, especially when entering intersections;

9.  The driver of a vehicle intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute an immediate hazard. D.C. Mun. Regs. tit. 18 § 2208;

10. No person shall turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. D.C. Mun. Regs. tit. 18 § 2204;

11. No person whose license to operate a motor vehicle is subject to any restriction or restrictions shall operate a motor vehicle in the District unless he or she, the motor vehicle, or both he or she and the motor vehicle, comply in every respect with the restriction(s). D.C. Mun. Regs. tit. 18, § 1100;

12. Where a person's violation of a statute proximately causes an injury that the statute was designed to prevent, "there is a rebuttable presumption of negligence on the part of the violator," i.e., negligence per se. *Asal v. Mina*, 247 A.3d 260, 269 (D.C. 2021) (quoting *Robinson v. District of Columbia*, 580 A.2d 1255, 1256 (D.C. 1990)).  *See also Mahnke v. Washington Metro. Area Transit Auth.*, 821 F. Supp. 2d 125, 137 (D.D.C. 2011);

13. A violation of a license restriction is one example of a statutory violation that raises a presumption of negligence. *Massengale v. Pitts*, 737 A.2d 1029, 1031 (D.C. 1999);

14. In the District of Columbia, persons driving on public roadways have the duty to use ordinary care at all times to avoid colliding with other persons using the roadways. That ordinary care includes the continuing duty to keep a proper lookout and make reasonable observations as to traffic and other conditions which confront him in order to protect himself and others while using the public roadways. *Kim v. Washington Metro. Area Transit Auth.*, No. CIV.A. 87-3204-OG, 1988 WL 82055, at *4 (D.D.C. July 29, 1988);

15. The failure to look effectively when driving an automobile and to observe another vehicle upon the highway which constitutes a hazard and is clearly there to be seen is negligence as a matter of law in *Frager v. Pecot* 327 A.2d 306, 307 (D.C. 1974) (collecting cases).

16. This duty to look effectively has been applied in the context of left turns to establish a driver negligent as a matter of law. *Singer v. Doyle*, 236 A.2d 436, 438 (D.C. 1967).

2

# Exhibit D-5

West's District of Columbia Municipal Regulations
Title 18. Vehicles and Traffic
Chapter 11. Motor Vehicle Offenses and Penalties

18 DCMR § 1100
D.C. Mun. Regs. Tit. 18, § 1100

1100. VIOLATONS OF LICENSE PROVISIONS

Currentness

1100.1 No person shall do any act forbidden by or fail to perform any act required by the provisions of chapters 1 through 9 of this title.

1100.2 No person shall display, cause or permit to be displayed, or have in his or her possession any canceled, revoked, suspended, fictitious, or fraudulently altered driver's license or any card or other document which such person holds out or represents as being a valid motor vehicle license issued by the District or any federal, state, territorial, or foreign government (or any agency or political subdivision of any of the foregoing) unless the card or document has been issued as represented.

1100.3 No person shall lend his or her driver's license to any other person or knowingly permit the use of the license by another person.

1100.4 No person shall display or represent as his or her own, any driver's license not issued to him or her.

1100.5 No person shall fail or refuse to surrender to the Department upon lawful demand any driver's license which has been suspended, revoked, or canceled.

1100.6 No person shall use a false or fictitious name in any application for an driver's license or knowingly make a false statement, knowingly conceal a material fact, or otherwise commit a fraud in any such application.

1100.7 No person shall permit any unlawful use of an operator's license issued to him or her.

1100.8 No person shall give information knowing the same to be false or knowingly swear or affirm falsely to any matter or thing required by the terms of this title.

1100.9 No person whose license to operate a motor vehicle is subject to any restriction or restrictions shall operate a motor vehicle in the District unless he or she, the motor vehicle, or both he or she and the motor vehicle, comply in every respect with the restriction(s).

1100.10 No person shall aid or assist, or attempt to aid or assist, another person to obtain a license by misrepresentation, making a false statement, knowingly concealing a material fact, or otherwise committing a fraud;

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 22 of 241

1100.11 No person shall aid or assist, offer to aid or assist, or solicit for a fee charged, directly or indirectly, any person to obtain a license in or around any building or premises in which licenses are issued, or to interfere in any manner with any person or persons engaged in issuing or applying for such licenses in or around any building or premises.

1100.12 No person shall authorize or knowingly permit a motor vehicle owned by him or her or under his or her control to be driven by any person who is not authorized under the provisions of this title, or who is not licensed for the type or class of vehicles to be driven or in violation of any of the provisions of this chapter.

Current through District of Columbia Register, Volume 71, Number 15, dated April 12, 2024.

18 DCMR § 1100, 18 DC ADC § 1100

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

737 A.2d 1029

District of Columbia Court of Appeals.

Minda MASSENGALE and

Jack Massengale, Appellants,

v.

Marteal PITTS, Appellee.

No. 97–CV–1169.

|

Submitted Oct. 6, 1998.

|

Decided Sept. 16, 1999.

**Synopsis**

Oncoming motorist brought negligence action against turning motorist after vehicles collided. Oncoming motorist's husband brought action for loss of consortium. The Superior Court, Russell F. Canan, J., entered judgment for turning motorist. Oncoming motorist and her husband appealed. The Court of Appeals, Ruiz, J., held that: (1) oncoming motorist's contributory negligence barred her recovery, but (2) oncoming motorist's contributory negligence did not bar her husband's claim for loss of consortium.

Affirmed in part; reversed and remanded in part.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*1030**  Minda Massengale and Jack Massengale, pro se.

Thomas C. Mugavero, Chevy Chase, MD, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and PRYOR, Senior Judge.

**Opinion**

RUIZ, Associate Judge:

Appellant Minda Massengale, and appellee, Marteal Pitts, were involved in an automobile accident at the intersection of 13th Street and Michigan Avenue, N.E. Minda Massengale sued Pitts for damages resulting from the collision, and her husband, Jack Massengale, sued for loss of consortium. Following a bench trial, the **\*1031** court found that Pitts had been negligent and Massengale contributorily negligent at the time the accident occurred. Judgment was entered for Pitts

and against the Massengales on both Minda Massengale's negligence claim and her husband's loss of consortium claim. On appeal, the Massengales contend that the trial court erred in finding Minda Massengale contributorily negligent and in dismissing Jack Massengale's claim for loss of consortium. We affirm the trial court's finding of contributory negligence, which defeats Minda Massengale's negligence claim, but reverse and remand for a hearing on the loss of consortium claim.

On the day of the accident, Minda Massengale was driving eastbound in the center lane of Michigan Avenue. Although her driver's license had a restriction for "corrective glasses," Minda Massengale was not wearing glasses while she drove. In addition, she was praying while she was driving. As she approached the Thirteenth Street intersection, the light turned green and she continued into the intersection. While traveling through the intersection, she collided with Pitts who was driving westbound on Michigan Avenue and turning left onto Thirteenth Street. Before the collision, Pitts saw Minda Massengale heading eastbound on Michigan Avenue, about four or five car lengths from the intersection. Immediately after the collision, a cab traveling to the right of Minda Massengale and at the same speed stopped, put the cab into reverse, and maneuvered around Massengale's and Pitts' vehicles to continue eastward on Michigan Avenue.

**1. *Contributory negligence.***

To assert the defense of contributory negligence, a party must "establish, by a preponderance of the evidence, that the plaintiff failed to exercise reasonable care," *Poyner v. Loftus,* 694 A.2d 69, 71 (D.C.1997) (citation omitted), and that this failure was a substantial factor in causing the alleged damage or injury. *See Durphy v. Kaiser Found. Health Plan of Mid–Atlantic States, Inc.,* 698 A.2d 459, 465 (D.C.1997); *see also Sinai v. Polinger Co.,* 498 A.2d 520, 528 (D.C.1985) (defining proximate cause as "an act that play[s] a substantial part in bringing about the injury or the damage") (internal quotation omitted). A presumption of negligence arises from the violation of a traffic regulation which may be rebutted only by a showing that the individual "did all a reasonable person who wished to comply with the law would do." *Washington Metro. Area Transit Auth. v. Davis,* 606 A.2d 165, 173 (D.C.1992) (citations omitted). A favored driver who does not "maintain a proper lookout while approaching and entering [an] intersection" is "guilty of contributory negligence if such failure is a substantial factor in the causation of the accident." *Frager v. Pecot,* 327 A.2d 306, 307 (D.C.1974) (quoting *D.C. Transit Sys., Inc. v.*

*Harris,* 284 A.2d 277, 279 (D.C.1971)) (finding contributory negligence as a matter of law when the driver's vision was unimpaired for an entire block and he failed to see the other vehicle).

It is undisputed that Minda Massengale was not wearing her glasses at the time the collision occurred despite a driver's license restriction which required the use of corrective lenses. Therefore, she was in violation of District of Columbia motor vehicle regulations at the time of the collision. *See* 18 DCMR § 1100.9 ("No person whose license ... is subject to any restriction ... shall operate a motor vehicle in the District unless he or she ... compl[ies] in every respect with the restriction."). This violation raises a presumption of negligence which is rebuttable only if Massengale can show that she "did all a reasonable person who wished to comply with the law would do." *Davis, supra,* 606 A.2d at 173.

The trial court found that although she was negligent, because the District is a pure contributory negligence jurisdiction, Pitts was not liable as Minda Massengale also did not exercise ordinary care in **\*1032** avoiding the accident. *See Elam v. Ethical Prescription Pharmacy, Inc.,* 422 A.2d 1288, 1289 n. 2 (D.C.1980) ("In this jurisdiction, the contributory negligence of the plaintiff is a complete bar to recovery.") In making this finding, the court credited appellee's testimony that she was able to see Massengale's vehicle four or five car lengths before it reached the Thirteenth Avenue intersection, suggesting that Pitts' vehicle also was visible to Minda Massengale from the eastbound direction of Michigan Avenue. In addition, Minda Massengale stated that she saw Pitts as she approached the intersection, but was surprised by the sudden impact. The evidence also indicates that Minda Massengale's vehicle was moving quickly, and that she was praying while driving. At the time of the collision, a cab traveling in the right lane next to Minda Massengale was able to stop, reverse, and bypass the accident to continue eastward on Michigan Avenue, which suggests that, with due care, Minda Massengale similarly could have avoided a collision with Pitts. From this evidence, as well as the fact that appellant was not wearing the required glasses, the trial court could reasonably find that Minda Massengale's failure to maintain a proper lookout and take action to avoid Pitts' car was a substantial factor in causing the collision.

We defer to the trial court's findings of fact unless such findings are "clearly erroneous and unsupported by the evidence." *Roberts & Lloyd, Inc. v. Zyblut,* 691 A.2d 635, 640 (D.C.1997); *see also* Super. Ct. Civ. R. 52 (1999). In this

case, there is sufficient evidence from which the fact-finder could find contributory negligence. As plaintiff's contributory negligence is a complete bar to recovery, *see Elam, supra,* 422 A.2d at 1289 n. 2, we conclude that the trial court did not err in denying Minda Massengale's damages claim. [1]

## 2. *Loss of consortium.*

Appellant Jack Massengale claims that the trial court erred in not awarding him damages for loss of consortium, after finding appellee negligent, once his wife's negligence claim was barred by her contributory negligence. We agree that one spouse's contributory negligence does not bar the other spouse's claim for loss of consortium resulting from the defendant's negligence. A loss of consortium claim stands "separate and independent" from a negligence claim and a "judgment against [a spouse claiming negligence] is not a bar to an action by [the spouse claiming loss of consortium]." *Lansburgh & Bro., Inc. v. Clark,* 75 U.S.App. D.C. 339, 341, 127 F.2d 331, 333 (1942); *see also Stutsman v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.,* 546 A.2d 367, 373 (D.C.1988) (recognizing that the "tort of loss of consortium is a distinct cause of action for injury to the marriage itself involving the prosecution of separate and independent rights"); *Hitaffer v. Argonne Co., Inc.,* 87 U.S.App. D.C. 57, 66, 183 F.2d 811, 820 (1950) ("[T]he injury to the *consortium* is an injury to a right which is independent of any right in the other spouse and to which the defendant owes an independent duty."), *overruled on other grounds by Smither and Co. v. Coles,* 100 U.S.App. D.C. 68, 74, 242 F.2d 220, 226 (1957) (overruling *Hitaffer* insofar as it applied Section 5 of the Longshoreman's and Harbor Workers' Act). *See generally,* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 125, at 937–39 (5th ed.1984) (reviewing various jurisdictions' reasons for traditionally deeming loss of **\*1033** consortium claims as derivative of the injured spouse's and noting academic and judicial skepticism of the rule).

In so holding, we do not lose sight that, on several occasions, we have remarked that a spouse's loss of consortium claim is dependent on or collateral to the other spouse's negligence claim. These cases stand for different propositions than the one presented in this appeal, whether a claim for loss of consortium is precluded by the injured spouse's contributory negligence. It is clear, for example, that a loss of consortium claim depends on whether the underlying claim of negligence against the defendant has been proven. *See Prins–Stairs v. Anden Group,* 655 A.2d 842, 843 (D.C.1995) (holding

that jury could reasonably have found that neither plaintiff's chronic back pain nor her husband's loss of consortium were proximately caused by the collision with defendant's employee); *Casper v. Barber & Ross Co.,* 109 U.S.App. D.C. 395, 396 n. 1, 288 F.2d 379, 380 n. 1 (1961) (spouse's damage claim for loss of consortium is dependent on plaintiff establishing that defendant was negligent). In *Romer v. District of Columbia,* 449 A.2d 1097, 1101 (D.C.1982), we held that a loss of consortium claim was not barred, under D.C.Code § 12–309, for lack of jurisdiction where the injured spouse had duly notified the District of the accident, and the purpose of the statutory notice requirement—to permit the District to investigate the accident and alleged resulting injury—had been accomplished, and the loss of consortium claim was based on the same accident and injuries of which the District had been notified. *See id.* at 1102 ("[A] loss of consortium action is a related but separate cause of action.") (Pryor, J., dissenting). In this case, the trial court made a specific finding that Pitts was negligent. Therefore, if the evidence is sufficient to support it, Jack Massengale's collateral loss of consortium claim stands, notwithstanding the fact that contributory negligence ultimately barred Minda Massengale's recovery on her negligence claim. [2]

Accordingly, the trial court's dismissal of the loss of consortium claim is

*Reversed.*

**All Citations**

737 A.2d 1029

## Footnotes

1    Minda Massengale also contends that appellee's violation of a traffic regulation precludes application of the contributory negligence defense. This contention is without merit. *See Martin v. George Hyman Constr. Co.,* 395 A.2d 63, 69 (D.C.1978) (defense of contributory negligence does not conflict with the purpose of traffic regulations which serve only to "clarify and define the elements of due care") (internal quotations and citation omitted); *see also Davis, supra,* 606 A.2d at 176–77 (recognizing defense of contributory negligence in automobile collision case); *Harris, supra,* 284 A.2d at 279 (same).

2    Appellee argued to the trial court that the evidence was insufficient to prove that Jack Massengale had suffered a loss of consortium. On appeal, however, she does not argue that the trial court's dismissal of the loss of consortium claim should be sustained on that basis.

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D-6



























# Exhibit D-7































# Exhibit D-8



# Exhibit D-9





Exhibit D-10



# Exhibit D-11

















# Exhibit D-12



















# Exhibit D-13

**1 - Westbound on Massachusetts Avenue NW (near 1411 Massachusetts Avenue NW)**



**2 - Westbound on Massachusetts Avenue NW (facing intersection)**



**3 - Eastbound on Massachusetts Avenue NW (near 1598 Massachusetts Avenue NW)**



**4 - Eastbound on Massachusetts Avenue NW (near 1502 Massachusetts Avenue NW)**



**5 - Eastbound on Massachusetts Avenue NW (near 1500 Massachusetts Avenue NW)**



**6 - Eastbound on Massachusetts Avenue NW (past driveway of 1500 Massachusetts Avenue NW)**



**7 - Eastbound on Massachusetts Avenue NW (facing intersection)**



**8 - Facing backwards (towards the West) from eastbound lane on Massachusetts Avenue NW (past the intersection and near National Housing Center building)**



**9 - Facing National Housing Center building from northwest curb at intersection of 15th and Massachusetts Avenue NW (part of the intersection closest to Tunisian Embassy)**



**10 - Google Maps view of the intersection**



**11 - Google Maps aerial view of the intersection**



Exhibit D-14



Exhibit D-15

```
 1              SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 2                           CRIMINAL DIVISION

 3      ------------------------:
                                :
 4      UNITED STATES OF AMERICA,:        Criminal Action No.
                                :           2023 CF1 001620
 5                              :
            v.                  :
 6                              :
        REGINALD JOHNSON,       :
 7                   Defendant. :
        ------------------------
 8                                   Washington, D.C
                                     Friday, November 17, 2023
 9

10            The above-entitled matter came on for trial
        before the Honorable ROBERT D. OKUN, Associate Judge, in
11      Courtroom Number 301, commencing at 11:06 a.m.

12              THIS TRANSCRIPT REPRESENTS THE PRODUCT
                OF AN OFFICIAL REPORTER, ENGAGED BY THE
13              COURT, WHO HAS PERSONALLY CERTIFIED
                THAT IT REPRESENTS THE TESTIMONY AND
14              PROCEEDINGS IN THE CASE AS RECORDED.

15

16      APPEARANCES:

17              On behalf of the Government:

18              JAMIE CARTER, Esquire

19              JERROB DUFFY, Esquire

20              On behalf of the Defendant:

21              DERRICK HAMLIN, Esquire

22

23

24

25      Reporter: Sherelle A. Bradley        (202)879-4629
```

1

```
1                    P-R-O-C-E-E-D-I-N-G-S
2                    (Wherein, the proceedings commenced at
3                    11:06 p.m.  The Defendant is present
4                    represented by counsel and the following is
5                    had.)
6         THE DEPUTY CLERK:  United States versus Reginald
7    Johnson case number 2023 CF1 1620.
8         THE COURT:  Okay.  If the parties can identify
9    themselves.
10        MR. CARTER:  Jamie Carter on behalf of the United
11   States.  Good morning, Your Honor.
12        MR. HAMLIN:  Derrick Hamlin on behalf of Mr. Johnson,
13   standing to my immediate left.
14        THE DEFENDANT:  Reginald Johnson.
15        MR. DUFFY:  Good morning, Your Honor.  Jerrob Duffy
16   on behalf of the victims, who are present.
17        THE COURT:  Good morning.  Everyone may have a seat.
18   I have reviewed the presentence report, the Government's
19   sentencing memorandum.  I believe there are 98 victim
20   impact statements that I've reviewed.
21        Was there anything else submitted to the Court, first
22   from the Government?
23        MR. CARTER:  No, Your Honor.
24        THE COURT:  Or the defense?
25        MR. HAMLIN:  No, Your Honor.
```

2

1          THE COURT:  Yes.

2          MR. DUFFY:  Yes, Your Honor.  The victims did submit

3     a notice to the Court earlier this week.

4          THE COURT:  Yes, with photographs.  Yes, I received

5     the notice as well.

6          MR. HAMLIN:  No objection to the pictures, Your

7     Honor.

8          THE COURT:  Okay.  Let me ask the parties if there

9     are any material inaccuracies in the presentence report,

10    first the Government?

11         MR. CARTER:  Your Honor, we noted a couple of traffic

12    contacts that are not in the presentence investigation but

13    I don't think it's material to the score, which I pointed

14    out is something the Court should consider but is not a

15    scored prior.

16         THE COURT:  Right.  So it would still be the same

17    criminal history score but it's information I can consider

18    in determining an appropriate sentence.

19         MR. CARTER:  Yes, sir.

20         THE COURT:  What about from the defense?

21         MR. HAMLIN:  No, Your Honor.

22         THE COURT:  Okay.  Let's proceed.  We'll first start

23    with the Government.  Are there going to be any victim

24    impact statements?

25         MR. CARTER:  Yes, Your Honor.

3

```
 1          THE COURT:  Or I will ask victim's counsel.
 2          MR. DUFFY:  Yes, Your Honor.  Thank you, Your Honor.
 3   I would just note that we had brought courtesy copies of
 4   our notice filed earlier this week, because several of the
 5   victims would like the opportunity to refer to it.  I want
 6   to make sure I serve a courtesy copy on the defense,
 7   Government and the Court.
 8          THE COURT:  Okay.
 9          MR. DUFFY:  I would like the record to reflect, I'm
10   going to provide the defense with two copies.
11          THE COURT:  Okay.
12          MR. DUFFY:  Your Honor, at this time would this be an
13   appropriate time for the victims to be heard?
14          THE COURT:  Yes.  That's fine by me.  Any objections
15   from the Government?
16          MR. CARTER:  No.
17          THE COURT:  Whoever wants to make a statement come up
18   to the microphone and just identify yourself and then say
19   whatever it is you would like to say.
20          MR. DUFFY:  Thank you, Your Honor.  Just before we
21   get started, if I may.  I know the Court has received the
22   filings that we have made, the description of the events
23   that we provided in our opposition to the continuance of
24   the last sentencing hearing, and also the almost 100
25   written victim impact statements.  We very much appreciate
```

4

1   the opportunity for the Court, nonetheless to hear from

2   victims who are present.

3        And I would, if I may, I would like to introduce

4   those present, if you would allow me to.  There are forty

5   present members of the Selman family, the Christian family

6   and their close loved ones and friends and I would like to

7   introduce them.

8        If they would stand: Noelia Rey, the mother of Carlos

9   Christian, who came from Dominican Republic.  Jesus

10  Christian, Sr., father of the victim who came also from

11  the Dominican Republic.  Jesus Christian, Jr. the brother

12  of the victim, who came from Denver Colorado.  Jean

13  Christian, the brother of the victim who came from the

14  Dominican Republic.  Paola Christian, the sister of the

15  victim, who came from Santo Domingo -- excuse me San Juan,

16  Puerto Rico.  Iraida Rodriguez, grandmother, who came from

17  San Juan, Puerto Rico.  Gloria Rey, aunt who came from San

18  Juan, Puerto Rico.  Ricardo Rodriguez, a cousin who came

19  from Las Angeles.  Armando Rey, uncle, who came from San

20  Juan, Puerto Rico.  Iraida Rey, aunt, who came from Corpus

21  Cristi, Texas.  Peter Allen Arnold, uncle of the victim

22  who came from Corpus Cristi, Texas.  Armando Rey, Jr.,

23  cousin of the victim, who came from Santo Domingo.

24  Armando Rey, also cousin of the victim, who came from New

25  York.  Anamillie Christian, an aunt of the victim, who

5

1    came from San Juan, Puerto Rico.  Catherine Rodriguez,

2    cousin, who came from San Juan, Puerto Rico.  Maria del

3    Carmen Escabi, who came from Dallas, Texas.  Forgive me.

4    Armando Rey, a cousin of the victim, who came from

5    Philadelphia.  Joseph Rey, cousin of the victim who came

6    from Philadelphia.  Nannette Cosme, a close family friend,

     came from Puerto Rico.  Fausto Rey, cousin, who came from

     Philadelphia.  Max Rey, cousin of the victim, who came

     from Philadelphia.  Robert Rey, who came from

10   Philadelphia.  Lucas Almeida, close friend of the victim,

11   who came hear from Washington, from GW University where

12   Carlos was an graduate school.  Also, Camila Selman is

13   here from -- excuse me.  From Santo Domingo.  Rafa Selman

14   is here from Santo Domingo.  Maria Troncoso, Camila's

15

16   of Camila is here from Santo Domingo.  Zedmara Troncoso,

17   aunt of the victim, here from Santo Domingo.  Andrea Vega,

18   cousin of the victim, who is here from New York.  Jaime

19

20   Ernesto Selman and Melissa Martinez, uncle and aunt of the

21   victim who are here from Virginia.

22       And classmates of Carlos from his program at GW, here

23   in Washington, Lucas Almeida Pinheiro, Amy Wongoso,

24   Natalie Sanchez Montero, Joshua Cavanaugh, Camila Batres

25

                                                                    6

1          Thank you, Your Honor.

2          THE COURT:  Okay.  Thank you.

3          MR. DUFFY:  Your Honor, I know that a number of the

4     victims would like the opportunity to address the Court

5     and I will ask them to come forward now.  We don't have a

6     particularly set order, so if can you would allow us a

7     little bit of leeway.

8          THE COURT:  Sure as much leeway as you would like.

9          People, you don't need to continue to stand.  Its

10    fine to have a seat.

11         MR. DUFFY:  One other thing I did not say is that

12    there are a number, a number of close family friends and

13    some relatives who were not able to make it today and they

14    are on the video.  And I can't introduce them because I

15    don't have a list of all of their names.  There are a

16    substantial number and I would like the record to reflect

17    that.

18         THE COURT:  Okay.

19         MR. ALMEIDA:  Good morning, Your Honor.  My name is

20    Lucas Almeida.  I'm a friend of Carlos, his family and

21    Camila.  I come from George Washington University.

22         THE COURT:  Good morning.

23         MR. ALMEIDA:  Your Honor, Judge Okun and esteemed

24    members of the Court.  My name a Lucas Almeida.  I stand

25    before you as a friend who has felt the sting of profound

1    loss.  Carlos was not merely a classmate, he was a guiding
2    light in my life, a friend who's support was vital to my
3    mental health and well being.  Today I speak not only for
4    myself but on behalf of my classmates representing a
5    diverse group of 55 MBA candidates for the George
6    Washington School of Business deeply affected in this
7    tragedy.
8         To know Carlos was to love him.  He was a pillar of
9    strength and kindness to those around him.  We connected
10   instantly at GW.  Our bond strengthened by shared Latino
11   heritage, a mutual love for soccer and a deep, heartfelt
12   commitment to our families, friends and community.
13        Carlos's charisma was magnetic.  His maturity and
14   passion resonated with us all, inspiring dreams of his
15   future in corporate fiance shaping the U.S. financial
16   market.  His gift for bridging divides and uniting people
17   was nothing short of extraordinary.
18        Carlos lived with a sense of responsibility that was
19   as natural to him as breathing, always caring, leading
20   study groups, always cheering others with a quiet,
21   steadfast presence, always helping, empowering, bringing
22   life in stressful moments.  The world desperately needs
23   more people like Carlos.  The void left by Carlos's
24   absence is culpable and painful.  It's a void that speaks
25   of stolen moments of laughter that will never be shared

1   again, of advice that cannot be sought.  His departure

2   took from us a companion and a leader who's own visions

3   were as vast as his hearts.

4        He nurtured dreams of uplifting his loving family of

5   being a pillar on which they could rest and building a

6   life with his soulmate Camila.  The tragedy that took

7   Carlos from us is a stark reminder of how life's most

8   precious gifts can be shattered in a moment of reckless

9   disregard.

10        The Defendant's choice to drive recklessly fueled by

11   alcohol robbed us of a treasure, a life that was a plan of

12   love, laugher and bonded potential.

13        It has been six years since I chose to make the

14   United States my home.  A decision grounded in a belief in

15   its justice and its values.  As I stand here a citizen, a

16   U.S. Army Veteran and a public servant, I trust in this

17   Court to honor the gravity of our loss and to uphold the

18   tragedy of justice.

19        Carlos's legacy endures in the hearts he has touched

20   and in the profound sorrow we share.  His absence is felt

21   deeply each day in every classroom discussion, inside

22   every gathering that misses his joy and every challenge

23   where we find ourselves reaching for help and strength.

24        Thank you, Your Honor, for allowing me to speak

25   today.  With this Court's judgment may we find solace, may

9

1  we find peace and may the memory of Carlos Enrique guide

2  us towards a future where such losses are never repeated.

3  Thank you.

4          THE COURT:  Thank you.

5          MR. SELMAN:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. SELMAN:  Rafa Selman, Maria Troncoso, Camila's

8  parents.

9          Honorable Judge Okun, it has been really difficult to

10  write these words for all of the pain and sorrow it brings

11  us every time we have to think about how Carlos and

12  Camila's accident will forever affect our lives.

13          As Camila's parents we have known Carlos since they

14  were little kids at school in our home city.  They were

15  classmates from the early age of four and grew up together

16  until they graduated from high school, in 2016.  In 2014,

17  they started a romantic relationship and became a couple.

18  They had a very steady, mature and loving relationship and

19  were together most of time, even when they were in

20  different cities while attending their universities, Emory

21  and Syracuse.  Times when they would travel regularly to

22  be together.  It was the same when they came home for

23  holidays.

24          When they decided to move to Washington together in

25  August of last year, for their masters degree at

10

1    Georgetown and George Washington Universities, where they
2    were studying until the day of the tragic accident that
3    took away Carlos's life and produced several severe
4    physical injuries and life long, emotional affects to our
5    daughter Camila.
6        Since he was a little boy Carlos was a very polite,
7    responsible and focused kid.  Very competitive in sports,
8    a good student with an extraordinary kind heart, a boy
9    that would never get in trouble and always acted with
10   integrity even at a young age.
11       Very close in the center of your family, we saw that
12   boy grow to be an honorable, respected and loved young man
13   in every circle he moved with his ways and actions,
14   touched the hearts of everyone he came in contact with, no
15   matter who, no matter where or how.  A young man that, in
16   2014, became an integral part of our intimate family, a
17   clan formed by Camila and her three older sisters, their
18   respected husband and children, my wife and I, were close
19   together most of the time in our daily lives in leisure,
20   entertain, travel and surely in bad times.
21       For the following nine years day by day Carlos became
22   an internal part of our clan.  He was not only Camila's
23   boyfriend anymore, he was also brother to Camila's sister
24   and brother, an uncle to grandkids, a son to me and my
25   wife and a caring friend to us all.  He became very, very

11

1   dear in our hearts.

2       Gentle in these matters, precise in his words and
3   with the self assurance of somebody very mature that
4   doesn't need to demonstrate anything to anybody.  Someone
5   who was truly in the ways of fulfilling his dreams and
6   achieving great success in life until he was suddenly
7   repressed of it.  A man who we would have been so proud
8   and happy of being the father of grandkids as
9   circumstances were pointing in the foreseeable future.

10      So how come we explain the affect of Carlos's death
11  and Camila's injuries in our lives.  Well, it's so
12  overwhelming and profound is that the only thing we are
13  certain of is that our lives will never be the same as
14  before.  And as much as we hurt and will miss Carlos, we
15  will need to learn to live with the true reality that he
16  will not be with us ever again.  His passing has brought
17  us so much pain and sadness to all, especially to Camila.

18      And he left such a mark in our lives there is no
19  conceivable way of this not impacting every aspect of our
20  lives forever.  But the truly subpart of this is that
21  Carlos's death, apart from being totally avoidable, unfair
22  and not caused by any of his actions it's' the result of a
23  serious of conscious irresponsible decisions that led to
24  unlawful actions which culminated in an atrocious and
25  fatal car accident.

12

1      We know nothing about Mr. Reginald Johnson, nobody
2   does, his history, previous conduct or anything else
3   related to him.  He could be someone without harm
4   intentions but his actions in this case have evidently
5   spoken much louder than his words.
6      Being part of society has institutionalize respect
7   everyone right as the United States is required that all
8   of its citizen obey and abide to a set of laws of conduct
9   designed with intention in the case of traffic laws of
10  minimizing the catastrophic loss of minimizing the
11  possibilities of accidents and preserving people's lives.
12      On the tragic afternoon, of January 15th this year,
13  Mr. Johnson disregarded many of these laws and after
14  several hours of drinking with friends, decided to get
15  behind the steering wheel of his Jeep Cherokee.  But even
16  worse, his inability to drive under sub conditions led him
17  into another unfortunate and fateful decision which was to
18  drive over 60 miles per hour in a 25-mile per hour limit
19  area, in an usually crowded intersection of Massachusetts
20  Avenue and 15th Street on a Sunday afternoon.
21      This decisions took away Carlos life and inflicted
22  sever wounds and injuries on Camila for whom we are
23  grateful and blessed is still with us today.  A surgery,
24  ten-day hospitalization period, over six months of
25  physical and continued psychological therapies, have all

1    been also the consequence of Mr. Johnson's decision that

2    afternoon, not to mention a shattered life, broken dreams,

3    suspended studies and ongoing emotional support and of the

4    economic implications.

5        So, Your Honor, with all due respect, we really

6    believe that Mr. Johnson's deliberate actions that led to

7    the accident are the sole reason for Carlos not being with

8    us today and for Camila's life-long consequences as

9    Mr. Johnson has already pleaded to.

10       And such actions are not from them but the full

11   weight of the law where people like Mr. Johnson, if left

12   unpunished, there is no way anyone could feel safe or

13   Government guarantee the preservation of human life as an

14   anarchy will rain in the streets.  Many times we have

15   tried to put ourselves in the shoes of Noelia Jesus and

16   the Christian family, as we would respectfully implore you

17   to do so.

18       But it's really hard just to imagine how painfully

19   devastating it would be to lose someone so dear to you as

20   your son, daughter or your, God forbid, even grandkids

21   while just riding an Uber because of the unlawful actions

22   of someone took the liberty of being irresponsible and

23   decided to drive under the influence of alcohol.  It's not

24   fair at all.

25       One thing is for sure, not even imposing the

14

1    strongest sentence will ever bring Carlos back to us or

2    and undue the harm caused to Camila and both families.  In

3    our perspective, Mr. Johnson's actions lead to a forever

4    irreversible condition.

5        So with all due respect, Your Honor, we understand

6    this sentence should be at least as close to the same

7    condition as the law provides for.  Thank you.

8        THE COURT:  Okay.  Thank you.

9    Camila.

10       MS. SELMAN:  Good morning, Your Honor.

11       THE COURT:  Good morning.

12       MR. HAMLIN:  Camila Selman, victim of the accident.

13   Thank you for granting us the opportunity to speak to the

14   Court today.

15       January 15th began as an ordinary Sunday.  And even

16   in the freezing weather, Carlos had easily agreed to come

17   with me to a Georgetown, a holiday light show exhibited

18   here.  His reason was very simple, my smile and my

19   happiness was enough to make him undergo the harsh D.C.

20   winter, strolling around for hours.  But we never made it.

21       At 6:14 p.m. that ordinary Sunday quickly transformed

22   into the most tragic day of my life.  That day both mine

23   and Carlos's lives were shattered due to the criminal

24   actions of Mr. Johnson.  I'm unable to provide any details

25   about the events leading up to or during the crash because

15

1   I have no recollection of that due to my concussion and

2   head injury.

3        However, I do wish to convey the profound impact this

4   crime has harmed by life, my health and overall well

5   being.  At 6:51 on that same day I was admitted to Howard

6   University Hospital emergency room.  Following numerous

7   medical tests it was revealed that I sustained four pelvic

8   fractures, a displaced lumbar fraction and I also suffered

9   a contusion to my left lung exhibited fluid and spleen

10  hematoma.

11       On January 16th, around 11:00 a.m. my parents rushed

12  into the hospital from the airport after flying in from

13  Dominican Republic to find me being wheeled in for a CT

14  scan.  At around noon, the devastating news was delivered

15  to me.  Carlos had not survived the accident.  The love of

16  my life had been tragically taken from me.  The following

17  days in the hospital were a mere blur.  A mix of tears,

18  prayers, pleas for help and excruciating physical and

19  emotional pain.

20       The fractures in my pelvis were so severe that even

21  sitting up was an impossibility, let alone standing.  It

22  was a period marked by profound vulnerability and

23  helplessness as I confronted the overwhelming reality of

24  my shattered body as well as the loss of Carlos.

25       On January 19th, at 4 p.m., I underwent orthopedic

16

1   surgery aimed at stabilizing my pelvic fractures.  The

2   procedure performed was a percutaneous screw fixation of

3   the sacroiliac joint.  A delicate operation that brought

4   with it very high levels of pain and discomfort.  The

5   surgery was just the beginning of a long and arduous road

6   ahead.

7        After my release from the hospital, I faced an

8   extended path of physical therapy that demanded lots of

9   dedication and resilience.  Over the course of six months

10  I committed myself to my physical healing process,

11  striving to regain, not just physical strength but also a

12  resemblance of the life and body I once knew.  It was

13  intense efforts as I slowly reclaimed my mobility and my

14  strength.  Yet I'm still confronting the necessity of

15  another surgery in the following year, followed by an

16  additional recovery period from the.

17       The affect this accident had on me isn't just about

18  physical injuries.  It was also a complete disruption of

19  my plans and of the life Carlos and I had so carefully

20  built.  My academic aspirations were drastically altered

21  putting my degree on hold temporarily trying to cope with

22  the overwhelming challenging this situation threw at me,

23  both physically and emotionally.

24       I have now resumed my academic studies at Georgetown

25  but instead of pursuing my master's degree in person, I

17

1   have not switched to online classes.  This meant losing

2   out on peer and professor interactions and the chance to

3   make the most of my graduate program.

4        Moreover, the accident's aftermath has now made it

5   impossible for me to pursue the optional practice training

6   offered to international students that could have greatly

7   enhanced my career after graduating.

8        Beyond academics my personal life was turned upside

9   down.  This tragedy compelled me to uproot my life from

10  D.C. and return to my home country, the Dominican

11  Republic.  Leaving the city where the accident occurred

12  was both a necessity for my recovery but also a very

13  painful departure from the life I had learned to know and

14  love.  I had to rearrange everything and the sudden and

15  drastic changes left me grappling with the sense of loss

16  and uncertainty about my future.

17       The accident also left we with intense fear and

18  anxiety particularly when it comes to being in cars.  For

19  months I was terrified every time I had to step into a

20  vehicle haunted by the thoughts of this tragic day.  It

21  took me over six months to muster the courage to begin

22  driving again.  And I still find myself being on high

23  alert and hypervigilant of my surroundings at all times.

24  I have battled heart palpitations triggered by the anxiety

25  and stress that have become constant companions in my

1  life.  The physical manifestations of my trama serve as a

2  relentless reminder of the profound impact that the

3  accident has had on my mental and emotional wellbeing.

4      Losing someone you love, especially at the hands of

5  someone else's criminal actions is the kind of pain that's

6  impossible to explain.

7      Before this happened I didn't really understand what

8  grief was like.  People speak of it and you witness others

9  experiencing it but you never truly get it until you are

10  in it.  Nothing and no one can prepare you for it.  When

11  it happened to me I learned how much is hurts and how it

12  changes every.  How everything you do is touched by it.

13  Every moment good or bad is somehow filled with sadness.

14  Even the nice moments, the achievements, successes and

15  celebrations are all tainted with the knowledge that

16  someone is missing, that he should still be here.

17      For months I assisted I can describe as the ghost

18  version of myself, physically present yet emotionally

19  numb.  Once you have been through something like this you

20  are never the same again.

21      I am internally grateful for the support of my grief

22  and trauma therapist who has been instrumental in helping

23  me navigate this very difficult journey.  Expressing what

24  Carlos meant and will always mean to me in simple words is

25  an impossible challenge.  He was not just my best friend,

19

1   he was confidant, my partner in every tense and the
2   perfect match for my heart and soul.
3       Carlos and I had been together for over eight years.
4   We were high school sweethearts whose love against all
5   odds withstood the test of time.  Our four years of
6   college consisted of dozens of flights between Atlanta and
7   Syracuse just to spend a few days together whenever we
8   could.
9       After living and working back at home during the
10  pandemic, we both secured spots at our dream schools in
11  D.C. and made a bold decision to move in together in,
12  August 2020.  We were just starting our second semester
13  grad school programs, myself at Georgetown and Carlos at
14  George Washington, in January.  We were at our happiest
15  living the best stage or our relationship when our lives
16  were turned upside down.  The eight years were more than I
17  ever dreamed up and both of our biggest hope was to build
18  a beautiful life and future together.
19      I know it is common to remember only the good thing
20  about those who are no longer with us.  Carlos is one of
21  the very few people everything he was was good.  Carlos
22  knew how to go out of his way for anyone who needs it
23  never expecting anything in return.  He lead by example,
24  teaching us the art of being fully present, yet detached
25  and offering our best selves to every challenge.

20

1      He was rarely seen without a smile on his face and

2  always the first to step forward whenever a helping hand

3  was needed.  And as Lucas just mentioned, to know him was

4  the love him.

5      Carlos was an embodiment of compassion kindness and

6  selflessness.  The impact he had on those fortunate enough

7  to cross his path is immeasurable.  And the void left by

8  his absence remains a testimony to the love and positivity

9  he radiated.  Carlos taught me that home isn't a place but

10  a feeling.  And Carlos was my home.  He was my person and

11  I was his.  And now, because of Mr. Johnson, I will have

12  to miss him for the rest of my life.

13      Your Honor, I respectfully ask the Court to

14  contemplate the immediate aftermath of Mr. Johnson's

15  actions but also the enduring and far reaching

16  consequences on my life and all of these who loved Carlos

17  as well.

18      While I acknowledge the legal complexity, I truly

19  believe that Mr. Johnson should be held accountable for

20  his reckless and irresponsibility actions.  His choices

21  not only resulted in the loss of a very special life but

22  has forever altered my own.

23      For all of these reasons, I respectfully request that

24  the Court impose the maximum period of incarceration.  I

25  hope that the weight of this loss and its consequences may

21

1    guide the Court on deciding on a sentence that accurately

2    reflects the gravity of the situation.  Thank you for your

3    time and consideration.

4         THE COURT:  Thank you.

5         Good morning.

6         MR. ARNOLD:  Good morning, Your Honor.  My name is

7    Peter Arnold and this is my wife, Iraida Rey Rodriguez,

8    who is the aunt of Carlos Christian.  Carlos Enrique

9    Christian Rey was that one in a million person in the

10   world so full of average people.  From an early age he set

11   himself apart from the rest.  Always never content

12   striving to be a better person, all of the while

13   maintaining very strong family values.

14        Up until his last day he was the glue that helped

15   keep his close family and extended family even closer.

16   Because of that ethic, he was loved and admired more than

17   just about anybody I have ever known.  I could go on and

18   on about how great Carlos was and how much he meant to us

19   but I feel that the sheer amount of support shown from

20   since his passing from hundreds and hundreds of people

21   speaks much louder than my simple voice ever could.

22        Unfortunately, what I have experienced is a huge loss

23   and daily agony that all of our family and friends are

24   going through.  It is coming up on one year now and it is

25   all still so raw.  Even with professional therapy family

22

1    members who I have known for 20 years to be full of life

2    are now like walking robots, hard to coax a smile from

3    them just going through life.

4         So, Your Honor, we respectfully request a maximum

5    sentence for Roland Reginald Johnson here today.  The

6    Christian family and extended family sentence has already

7    been handed down on us for the past ten month and two days

8    and will remain with us for the rest of our lives.  Thank

9    you and God bless you.

10        THE COURT:  Thank you.

11        Good morning.

12        MS. REY:  Good morning, Your Honor and this Court.

13        My name is Gloria Rey, aunt of Carlos Christian who

14   tragically died by a drunk driver Reginald Johnson,

15   January 15, 2023.  My nephew Carlos was a 24-year old

16   exceptional young man full of life.  He was kind,

17   passionate, full of happiness, integrity and honesty.  He

18   was always doing right things in life with sound moral

19   values and deeply loved by our family and friends.

20        Carlos was getting his master's in finance and

21   international business with a higher grades of his class

22   at George Washington University.  He was a natural leader

23   who had a positive influence in his family and friends.

24   He had many plans in his future, including being a

25   successful U.S. business man, marrying and starting a

23

1   family with his girlfriend, Camila Selman.

2        All those plans and dreams were forever ended by

3   Mr. Johnson who made decision to drink and drive.

4   Although nothing can bring Carlos back to us, I'm asking

5   this Court to consider the magnitude and impact his death

6   has caused the family for a lifetime.

7        I will ask, Your Honor, to consider sentencing

8   Mr. Johnson to the maximum sentence under the laws as any

9   time is nothing compared to the emptiness, sadness and

10  suffering we have in our souls because Carlos loss.

11       Thank you very much for the expression opportunity.

12  And may God guide you to make justice for our beloved

13  Carlos and our family.  Good morning.

14       THE COURT:  Thank you.

15       MR. CHRISTIAN:  Good morning, Your Honor.

16       THE COURT:  Good morning.

17       MS. REY:  Good morning, Honorable Judge and all this

18  Court.  My name is Noelia Rey, mother of Carlos Christian

19  Rey.  Who rest in peace in another better place and could

20  not be physically present here with us today.  Carlos life

21  smiles the world since he was young and gave to the

22  world -- he made an example of honesty, humble, respect

23  and happiness.  Qualities that were demonstrated in the

24  hundreds of letters addressed to us and to Your Honor.

25       You as so many people may think how proud we can be

24

1   as a parent related to Carlos life, that left the best

2   dreams a human being could.  Yes, and I wish there were

3   many other people who could leave this world loving and

4   respecting others to have a better world the way Carlos

5   did.

6       It is true we were -- we are so proud of Carlos life

7   and blessed of his goodness that remains in our hearts.

8   But let me tell you, Your Honor, we were proud of him in

9   life as we are proud of our other sons, Jesus, Jean and

10   Paola.

11       We did not need to lose him to value his life.  The

12   reality is that Carlos is not here today with us.  I do

13   not think there is pain comparable to what we are being

14   living, a pain of losing a son unfairly in the hands of an

15   irresponsible person.  Mr. Johnson decided to drink all

16   day and decided to drive under the influence of alcohol in

17   a reckless way, causing the end of my son's life, no

18   matter the loss stated in the United States to protect the

19   human life.

20       Mr. Johnson did this no matter the opportunity the

21   system gave for his recurring misconduct.  Believe me, it

22   is an injustice.  The value of the life of a human being

23   must be protected by the loss of the justice system.  The

24   justice system must address conduct like Mr. Johnson's who

25   previously was caught drinking and driving.

```
1          I feel frustrated because how could be possible the
2    system give so many opportunities to a person committing
3    over and over so many crimes, four years and resulting
4    today with the death of an innocent person, permanent
5    health damages to his girlfriend and again still giving
6    him opportunity for time to serve.
7          The law already gave him the opportunity for a plea
8    with reducing charges instead of second-degree murder.
9    This conduct must be sanctioned as the highest so that we
10   do not continuing losing life that really do contribute to
11   the society like my son, Carlos Enrique Christian.
12         Carlos will not be able to be with us at football
13   games like other people in this Court do with their sons.
14   Carlos will not be with us at Thanksgiving family trips
15   where we thank got for our love and blessing in life like
16   all in this court can do.  Carlos will not be able to
17   marry with the love of his life, Camila, and have his
18   children as others here can do.
19         Carlos will not be able to help his classmate with
20   their classes and to meet his professional goals.  His
21   precious life has ended and we are here to claim justice
22   for him.  As Carlos mother I tell you that I will no
23   longer see his smile.  I will no longer hear his good
24   night.  I love you so much, ma.  I will not be present at
25   his graduation or wedding.  I will not be able to see the
```

26

1    grandchildren he wanted to give us.  I will no longer
2    share with him his special gift of life.
3          But I am here standing in front of, Your Honor, Judge
4    Okun asking to give the maximum sentence penalty to
5    Mr. Johnson and send a clear message that laws are to be
6    respected.
7          Thank you, Judge Okun for giving me the opportunity
8    to be heard.
9          THE COURT:  Thank you.
10         MR. CHRISTIAN:  Good morning again, Your Honor.
11    Jesus Christian father of the Carlos Christian.  In the
12    last hearing you heard me.  Today you heard Camila, one of
13    the victims.  I believe that everything can be said has
14    been said.  And our loss it will be permanently forever.
15    I just want to add something that was given to me by him.
16         I was 24 years old on a Sunday afternoon of 50 -- on
17    15th and Massachusetts Avenue I lost my life.  Everything
18    happened so fast that I didn't have to time to say goodbye
19    to my loved ones, not even to Camila, who I had heard by
20    my side.  In those seconds all of my goals and my future
21    died.  The children I wanted to have and the family I
22    wanted to treasure.
23         I don't know what happened but you do, Your Honor.
24    See the facts were presented to you.  It is you who has
25    the capability to grant the just punishment to the person

27

1    who took me out of this world.  I only ask that you be

2    fair and protect the community I was part of seeing that

3    what happened to me could happen to any citizen, even you

4    if you had been in the same place at the same time as me.

5    I was not perfect but I didn't deserve to die this way.

6    And being denied of the honor of serving this world.

7         See who was the person that you killed.

8         THE COURT:  Thank you.

9         MR. DUFFY:  Your Honor, just a couple of quick legal

10   points and then I think we are done.  I think the first

11   just the point out the victims would like an opportunity

12   to be heard after the Court pronounces sentence with

13   respect to any conditions of release to the extent those

14   are entertained, Your Honor.

15        With respect to where we are.

16        THE COURT:  Actually, let me.  I'm going to interrupt

17   you there.  So to the extent that you want to be heard

18   about any conditions I would like to know that before I

19   impose sentence, not after.

20        MR. DUFFY:  Yes, Your Honor.  The victims would

21   request remand of the Defendant.  Also referred to in this

22   courthouse as step back into the custody of the United

23   States Marshals at the imposition of sentence.  And as the

24   Court has heard the victims do request this Court impose a

25   substantial sentence.

28

1        I would like to correct one or two things that were
2   said it is not to view of the victims.  I do speak on
3   their behalf and authorized to do so.  It's not the view
4   of the victims that this was an accident.  It is the view
5   of the victims that this was a series of deliberate
6   choices, five hours of drinking as established by
7   objective evidence, including photographs of the drinks.
8        It is the view of the victims that there was a prior
9   DWI and while that might not be a conviction for purpose
10  of the guidelines that's is relevant conduct for this
11  Court to consider and specifically as to the intent on the
12  date of the offense because it really is a five to
13  six-hour pattern of offense.  This is not an instant
14  moment in time offense.
15       THE COURT:  One second.
16       MR. DUFFY:  It is the view of the victims this
17  conduct was a pattern offense of deliberate, intentional
18  conduct over the course of five to six hours that
19  culminated in excess of 60-miles an hour on Massachusetts
20  Avenue and 15th Street.  And as we said previously, that
21  conduct was going to kill somebody.  It was, in this
22  incident unfortunately, the victims who you've heard about
23  were killed but it could have been any member of the
24  community.  Sixty miles an hour.
25       Your Honor, further, as the Court knows, it is

29

1    relevant from the victim's perspective that the victims
2    did object to the plea in this case.  We did so through
3    our opportunity to speak with the U.S. Attorney's Office
4    before the plea was made.  It was our understanding and
5    stated on the record that the Defendant was aware of the
6    victim's objection at the time of plea discussions.
7         The victims also came forward in this courtroom in
8    person when it was understood by them at that time it was
9    only for a preliminary hearing, yet they were here and
10   objected in person to the imposition of the plea.  The
11   Court took that, but nonetheless admonished the Defendant
12   and the defense counsel that the Court was not bound by
13   certain terms of the plea or sentencing recommendations
14   that might be made and that the Defendant chose to enter
15   into this plea nonetheless.
16        We also would like to remind the Court there are two
17   separate offenses.  Of course, as a legal matter the
18   imposition of sentence should take into account both of
19   those offenses and the harm, while there is absolutely
20   overlapping harm between the two offenses as this Court
21   can tell, given the nature of the relationship of Carlos
22   and Camila, their families.
23        But nonetheless there are two separate offenses, each
24   of which merit a substantial sentence of incarceration
25   stand alone and as a matter of law require a consecutive

                                                            30

1   sentence nonetheless but we would like to remind the

2   Court of that.

3        We are aware of the Government's recommendation of

4   that 12-year sentence.  We understand that is with respect

5   to the guidelines that are imposed and the deal that the

6   Government made that the victims objected to.

7        I would note that the victims objected that knowing

8   full well of the potential benefits of a plea with respect

9   to finality, with respect to certainty with respect to

10  delay.  Nonetheless, none of those considerations were

11  persuasive to the victims understanding fully as the Court

12  explained but I assured the Court the victims had been

13  explained that well before coming to court and voicing

14  their objection.

15       I note that because as this Court imposed sentence in

16  this case and in this community, the sentence of justice

17  has to not just be what takes place but also the

18  perception of justice.  And in this case the victims have

19  candidly objected at every turn.  But respectfully, in

20  accordance with their rights under the Crime Victim Right

21  Act and, of course, in person as they have been able to.

22       I can also assure the Court that if the victims had

23  been aware with any degree of certainty that there would

24  be a plea hearing there would have been more here.

25       I also note, Your Honor, at the prior sentencing

31

1  hearing, as we represented in our papers, we had more than
2  12 people who had purchased tickets to be here at their
3  own expense as evidence of the community of Carlos and
4  Camila who have appeared here today.  That is exactly what
5  took place.  This Court was in some measures hamstrung by
6  certain procedural issues.  But I will say, we would like
7  the opportunity to be heard on that issue after the Court
8  imposes sentence.  And that is what I was eluding to a
9  moment ago.  We would like the opportunity to be heard
10  after sentence is imposed.
11      THE COURT:  Okay.
12      MR. DUFFY:  Finally, Your Honor, we do not believe as
13  a matter of law that the Court is bound by the sentencing
14  recommendation or the guidelines.  Under the circumstances
15  here where there is a prior DWI, where there was five
16  hours of drinking, where there was in excess of 60-miles
17  an hour speed limit, violation of the speed limit,
18  60-miles per hour at the time of impact.  The harm that
19  occurred here, we don't believe a 12-year sentence is
20  appropriate.  And while this is, of course, the Superior
21  Court for the District of Columbia, that type of conduct
22  in other parts of the United States would result in a life
23  sentence in many, many, many, many jurisdictions of which
24  I speak of personal experiences having prosecuted cases
25  for this U.S. Attorney's Office in this district and other

1    Districts of the United States.

2         I will say, Your Honor, we do not believe that the

3    12-year sentence is appropriate.  We would respectfully

4    request a substantial sentence.  You have heard from the

5    victims ask for a maximum sentence as a matter of law.

6    The maximum sentence is forty years.  And I will leave our

7    sentencing recommendation at that.

8         Lastly, Your Honor, we would note that the victims in

9    this case have not left this experience with a sense of

10   justice.  The imposition of sentence is more or less the

11   last opportunity for them to receive that.  But

12   procedurally -- procedurally this has been a matter that

13   has been incredibly unfortunate in the way it is taken

14   place from their perspective.  It has cost them money,

15   through no fault of their own, other than their desire to

16   be here and their request through counsel they have that

17   opportunity and the Court attempted to afford them that.

18   But nonetheless that has been on imposition.

19        Finally, Your Honor, I leave with you this community

20   of Carlos and Camila, this community came here today

21   because they are seeking justice and they wanted to be

22   here, so they could, in person, as we represented they

23   would be, to be here in person to attend the sentencing

24   hearing.  And, of course, there are many of his community

25   and loved ones on the video who as the Court can tell from

1   far places, other states in the United States and overseas
2   who could not be here today and we honor their
3   participation as well.
4       Your Honor, we thank you very much for listening.
5       THE COURT:  Thank you.  The Government.
6       MR. CARTER:  Court's indulgence one moment.
7       If we can check with the family I'm going to show
8   some things.  I'm going to give people the opportunity to
9   step out if they want to.
10      THE COURT:  Sure.
11      MR. CARTER:  Just for those on the Webex, I'm going
12  to be showing some images of the crash.  They don't show
13  any blood but they do show the crime itself.  To the
14  extent anyone on the Webex wants to leave, I suggest you
15  come back in five to ten minutes and it should be complete
16  at that point.
17      Your Honor, may I share?
18      THE COURT:  You may.
19      MR. CARTER:  Your Honor, with these cases often the
20  defense will raise the argument that this is an accident.
21  And in the sense of Mr. Johnson not setting out to kill
22  someone that day that is true.  But what I want to
23  emphasize to the Court is a series of decisions
24  Mr. Johnson made that brought about the death of
25  Mr. Christian and the injuries to Ms. Selman, because I

1    think that's important to Your Honor's decision.

2         I laid out in my brief and also in the facts that
3    there was about four hours of drinking.  The bar that he
4    was at had a series of high quality video footage, which
5    we were able to gather.  And I pulled out images, stills
6    from that of every time that he took a drink that day.
7    There were a total of six different alcoholic beverages
8    over the course of more than four hours.  This not an
9    instance where someone had, quote/unquote, had one drink.
10   This is someone who spent that entire time from about one
11   -- from about 1:24 to 5:46 p.m. in that bar drinking.

12        You will see thin bottom right is the timestamp when
13   he left that bar.  At that point they met up with women
14   from a table nearby and were actually going to a second
15   bar.  That was -- the plan was to get into Mr. Johnson's
16   vehicle and go from this bar to another bar to continue
17   drinking.

18        Unfortunately, Mr. Johnson also chose to pile seven
19   people, the four young ladies he had met and his two
20   friends and him into a vehicle that seated five.  He then
21   smoked a cigarette and was chatting at the girl in the
22   front seat.  And, per one of the witnesses, was distracted
23   and looking over at her as he was driving at speeds
24   utterly unsafe inside the District.

25        This particular road, which a Massachusetts these are

1    Google images.  This is a direction of travel that he

2    would have been coming down you will see a the two

3    individuals on the left which is where the video camera is

4    mounted is a road with a 25-mile an hour speed limit.  The

5    left turn would be happening from the other side of the

6    intersection that you can see here from, this Google image

7    by choosing to go more than twice that speed limit.

8        He, Mr. Johnson, deprived himself of the opportunity

9    to see and properly react to the traffic around him.  And

10   he deprived the other driver of the opportunity to see and

11   properly react to him.  Speed limits are in place for a

12   reason.  So not only do we have someone under the

13   influence, which we know from his breath alcohol score,

14   who has been drinking for more than four hours.  We have

15   someone who piled way too many people in his car, who was

16   distracted, smoking, talking and chatting at the girl in

17   his passenger's seat and he is going through the

18   intersection and he sees the car turning left.

19       And his statement to the police is that he thought

20   they were stopping so he sped up.  So he is already going

21   more than twice the speed limit and he sped up.  I'm now

22   going to show the crash.

23       You will see in the lane on the other side of the

24   street, remember the Tahitian Embassy is closer to the

25   opposite traffic lane.  You will see Mr. Johnson and you

36

1   will see from the victim itself how quickly he was

2   driving.  The crash will appear to the intersection

3   straight ahead.

4                   (Video is playing.)

5       MR. CARTER:  Showing that a little more zoomed in at

6   the intersection.  He slammed into the passenger's side of

7   that vehicle which was where Mr. Christian was sitting, in

8   the rear, passenger's side seat.  Ms. Selman was in the

9   rear, driver's side of the vehicle.  You can see how

10  Mr. Christian took the blunt force trauma to his body that

11  occurred.

12      The car ultimately came to a rest on the sidewalk.

13  And you can see up the hill, against the building,

14  Mr. Johnson's car, which also suffered severe front-end

15  damage.  I show you-all these things to emphasize that

16  these are all choices that he made.  And the choices that

17  he made also, I think the Court should consider his

18  history which I've laid out.

19      Now, he does not have a high criminal history score

20  because of the way that the guidelines lay out how you do

21  or don't do traffic related charges.  But this is a

22  traffic related case, so I think it's absolutely

23  appropriate and I think the Court should consider his

24  prior convictions which are -- not convictions, I'm sorry,

25  Probation Before Judgment on the driving under the

 1   influence.

 2        I think that is incredibly relevant because

 3   Mr. Johnson indicated that just like during this event he

 4   was out with his fraternity brothers and he picked up his

 5   first DUI and Maryland gave him a chance.  And they gave

 6   him a Probation Before Judgment and allowed him to

 7   basically learn but not have a conviction on his record.

 8   He has had numerous contacts for various other traffic

 9   related offenses, including speeding contacts.

10        He does not have an extensive criminal conviction

11   history but I think his traffic history is troubling.  And

12   I think it's something he knew.  He knew when he was going

13   through all of this the dangers of what he was doing and

14   yet time, after time, after time he made decisions that

15   brought us here today.

16        I think it's very clear that the victim has had a

17   huge impact on not only his family but also the community

18   at large.

19        And, finally, as I indicated towards the tail end of

20   sentencing memorandum, I think the Court should consider

21   the impact of these cases in general on this community.  I

22   learned today when I was talking with Detective Lee that

23   we are up to 45 fatalities.  I cited 44 in my memo but as

24   of today it's 45.  Forty-five people that have died this

25   year in major traffic crashes.  The District is struggling

                                                              38

1   and how, Your Honor, sentences these cases matters.

2        So for the family and also for this community, we are

3   asking that you sentence to the maximum of 12 years to

4   serve.  Thank you.

5        THE COURT:  Thank you.

6        Mr. Hamlin.

7        MR. HAMLIN:  Thank you, Your Honor.

8        I'm going to pass some pictures over to both of the

9   attorneys to look over before I show them to the Court.

10       Your Honor, there are two things I think need to be

11  corrected about the advocate and the statements.  But

12  before I do I would like to offer my condolences to the

13  Christian family and friends, especially Camila and the

14  Selman family.

15       Mr. Johnson has been so sorry about this happening

16  from the very beginning.  At the scene of the incident at

17  the station, through this entire process, even during the

18  interviews for the presentencing investigation.

19       Your Honor, I would like to tell you a little bit

20  about Mr. Johnson.  But before we get started I heard a

21  lot of people talk about how active their client is in the

22  community.  But we would like to provide you pictures as

23  well.  The first picture I'm providing is you is my client

24  in a cafeteria.  This represents all of the food drives,

25  the water drives, the serving food to the homeless in food

1    kitchens and community clean up projects that he has done.

2         The second picture is called project Alpha.

3    Mr. Johnson a member of member of Alpha Phi Fraternity.

4    Several members of fraternity are here today.  This

5    picture is project Alpha.  This looks like middle school.

6    They go to middle school and high school student.  And

7    with project Alpha they mentor, they tutor, they teach

8    kids about domestic violence, conflict resolution, hygiene

9    SAT prep.

10        And he is also a youth football coach.  I'm passing

11   this one up, Your Honor.  The next two pictures I'm going

12   to send up.  You read a lot of about his mother in the

13   presentencing investigation and the depression and grief

14   he has been experiencing since losing her.  And also a

15   picture of his siblings.  They've come to a few of the

16   hearing but they live in other states but they are not

17   here today.  I don't think they are here today.

18        Additionally, Your Honor, this is just a picture of

19   Mr. Johnson getting an award at the National Convention.

20   Now, Mr. Johnson participates in charity step shows and

21   this particular show was the AIDS lock in.  It's to bring

22   awareness to AIDS and using protection.  And it's

23   basically a campus event where all of the fraternity,

24   sororities, lock into the gym over night with all of the

25   student and they teach them different seminars and

1   different people from here to talk about protecting
2   yourself and what to do if you do contract an STD.
3       The other picture is the, 2014 men of distinction
4   award Mr. Johnson won.  I don't have a picture of the
5   event.  But the picture I'm passing up now is a picture
6   from one of our homecoming events, what was supposed to
7   happen this year was, Mr. Johnson was scheduled to speak
8   at homecoming.  It was an event, we estimated
9   approximately 250 to 300 people was going to be in the
10  biggest ballroom we have at Morgan State University.
11      Unfortunately, there was a shooting, so they canceled
12  homecoming.  So we had to turn it into a Zoom hearing.
13  And the Zoom hearing had somewhere around 15 to 30 people
14  and this is what the flier read.
15      It was called Reginald's remorse.  It was a quote, I
16  went to college, a ran a successful construction business
17  and now I'm going to jail for killing someone.  Lives
18  ruined by drinking and driving.
19      He also plans to work with Mother's Against Drunk
20  Driving hoping to speak at any of their victim impact
21  panels that they will allow him to speak at.
22      This is another college tours from high school
23  students doing tours on campus participating in pep
24  rallies and student affairs.  And as the social and
25  community chair he put on all of the -- well, a lot of the

41

1    events for the fraternity, a lot of the.  Like, twice I
2    have done the Know Your Rights Seminar.  They have done
3    Heartbeats in Hip Hop, Heartbeats for health, seminars
4    about love, about domestic violence about relationships.

5         And this last picture is just a fundraiser, the
6    fraternity has national programs that all chapters
7    participate in.  But Morgan State University does it a
8    little differently and they all huge events.  They do a
9    March of Dimes walkathon.  There is a voter registration
10   program, called the voteless people is a hopeless people.
11   And campus leadership and fraternity leadership events,
12   fundraisers.

13        Mr. Johnson is very active in the community.  He
14   gives so much to the community, children, as I said,
15   coaching, mentoring.  I don't know how he does it.  I
16   coached football for the past two years and I'm so glad my
17   son is done with it and I don't have to do it anymore
18   because it is a time commitment.  He is doing tutoring,
19   mentoring and soup kitchen and all of these other
20   activities.

21        I asked him how he did it he told me he has the do is
22   because it helps him from being depressed.  Helping other
23   people helps him.

24        Mr. Johnson takes full responsibility for his actions
25   but there are some things I would like to address about

1    what the State and the advocate said that I completely

2    disagree with.  The first is that this is not an accident.

3    Well, the U.S. attorney obviously agrees it was an

4    accident.

5          And I understand now why reading the victim impact

6    letters they felt the way that they did.  If they are

7    constantly being told that this is not an accident, that

8    he had had multiple DUIs, which is not true.  That he had

9    a terrible traffic record, which is not true.  That the

10   facts support a second-degree murder, which is not true.

11   And that somehow manslaughter and assault, which carry

12   forty years total are not a big deal.  If I was being told

13   that by an advocate I would be asking this was a just

14   system and I would be asking for these thing too but that

15   is not the facts here, Your Honor.

16         My client definitely made a mistake.  And he

17   definitely had a DUI before too, he had one DUI, 8 years

18   before.  He got sober, stopped drinking, after his mom

19   passed away he started drinking on occasion again.

20         And I agree with the state and my client realizes

21   this now too.  When they initially did the presentencing

22   investigation he did not believe he was an alcoholic

23   because he rarely drank.  He drank socially with his

24   friends.  My client has been attending meetings at Zoom

25   meetings at 725 Fallsway, it's called Our Daily Bread, in

43

1    Baltimore City.  But they are Zoom AA meetings and he has
2    been doing in-person meeting at 3208 Chestnut in Philly at
3    the community center at Drexel University.  His sponsor's
4    name is Michael Ford.  In talking to Michael and going to
5    the meetings he learns he is what you call a social
6    alcoholic, so if he is out with friends and they are
7    drinking and they are drinking in excess then he is
8    drinking in excess.
9         Just to go back too, Your Honor, typically when we
10   are asking for the top of the guidelines and a range it's
11   because this is somebody who is three times the limit or
12   two times the limit.  And here we don't even have one and
13   a half times the limit.  Granted he should not have been
14   over the limit at all, he acknowledges that, Your Honor.
15   He never plans to drink again.
16        Court's indulgence.
17        We reserve for people who have absolutely no remorse
18   and from day one even on the scene, Your Honor, they are
19   not going to so you the video but my client could not
20   believe that someone had lost their life.  He did not
21   know.  He was so distraught, even with doing the
22   investigation throughout it different people tell you, the
23   police on the scene he was cooperative but he was
24   distraught he was remorseful.  He couldn't even speak.
25   They had to let him calm down because he was so -- he was

1  crying, he was so affected by the situation when asked

2  about it that they had to give him time to get himself

3  together.

4      My client is not taking his lightly this is -- I'm

5  sorry.

6      Now, other things that weren't as important, he was

7  drink forking over five hour if you are drinking over five

8  hours nonstop you don't blow a .01.  You are not and

9  again, I'm not trying to minimize what he did.  I'm trying

10  to make sure the exaggeration is -- Your Honor, some of

11  those drinks were water.  My client weighs 180 pounds.

12  You can have four drinks and blow a .01.

13      Again, Your Honor, that's not -- I'm not trying to

14  minimize I just want to correct the record.  Typically

15  whether we are sentencing we are concerned about

16  retribution.  And my client is in the process of -- I

17  guess, with retribution we want to make sure they don't

18  have the desire to commit this crime again.  And my client

19  absolutely does not plan to drink again ever.

20      Drinking and driving absolutely is not something that

21  he -- Your Honor, we had -- this is the crazy part too.

22  My client, whenever he is released, if he is incarcerated

23  at some point, he wants to start a nonprofit to teach

24  people about the affects of drinking and driving.  And we

25  talked about that and he said you know in the meantime as

1    soon as he is released, if he is incarcerated, he is going

2    straight to Mother's Against Drunk Driving to try to put

3    together his own program.

4         He said his program at Morgan was good but he said,

5    he needs to reach a lot more people.  He says basically

6    the whole system is a set up where they let you go out and

7    drink as much as you want and you are allowed to drive

8    home and he wants to educate people on it.

9         Rehabilitation yawn my client has been attending AA

10   meetings.  He has a sponsor now.  He is learning the

11   steps.  And I'm not sure what rehabilitation he is going

12   to need besides dealing with his mental health in terms of

13   his depression after the loss of his mom and dad.

14        But again, he is more than willing to do whatever the

15   Court requires, Your Honor.

16        In term of the being a deterrent his goal when

17   getting out of here and he's already started it, is to

18   deter other people through his Zoom hearing that probably

19   would have reached close to 250 to 300 people during

20   homecoming, if we were allowed today have it.  But it's

21   already in the works, Your Honor.

22        Incapacitation normally if you get a second DUI you

23   might get 30 days and that's the huge deterrent to never

24   drink and drive again, especially if you never been in

25   trouble or incarcerated in your life.  He's never been to

46

1    jail or incarcerated.  Thirty days seemed like an
2    astronomical amount to him.  I don't think anybody in here
3    if they had to spend 30 days in jail will say that's not
4    significant.
5        I understand the Court can impose up the 12 years or
6    the minimum of four and a half with suspended time.  But
7    any time in jail is going to be a huge deterrent for
8    Mr. Johnson.  He is not a criminal.  He is not somebody
9    that goes to jail all of the time.  He has no felonies, no
10   misdemeanor convictions -- I'm sorry he has traffic.
11       The Court has the ability to restrict his freedom and
12   allow him to do house arrest.  If at some point there is
13   some type of restitution or fees that need to be paid if
14   he is on house arrest and he can rocker it would make a
15   whole lot easier to take care of any restitution or fees
16   that need to be paid.
17       Court's indulgence.  I think I'm just about --
18       Another thing the State said about Mr. Johnson saying
19   he sped up because he thought the car was going to stop.
20   If you watch the video the car actually did stap.  And
21   Mr. Johnson thought he could make it through the light.
22   And the Uber driver decided that he thought he would turn
23   in front of Mr. Johnson now Mr. Johnson is again accepting
24   full responsibility with the understanding that if he
25   hadn't sped up, maybe he could have stopped.  If he hadn't

47

1   been drinking maybe he could have avoided the accident.

2        So again he is not trying to -- just wanted to

3   correct the record.  The car was stopped and they turned

4   out in front of Mr. Johnson.  If this was a civil case

5   that would definitely be contributory negligence and both

6   parties would be responsible.  But Mr. Johnson is still

7   taking responsibility for what he did.

8        Your Honor, we received approximately 20 letters in

9   support of Mr. Johnson.  But most of the letters we didn't

10  think were going to be helpful.  They say stuff like,

11  Mr. Johnson shouldn't go to jail or he didn't do this or

12  things we believed we did not believe to be helpful in

13  this situation, so I'm only going to ask maybe three or

14  four people to speak.

15       Mr. Johnson's girlfriend is here, Ms. Brooks, his

16  fiance.  I'm going ask her to come up and speak.

17       THE COURT:  Good afternoon.

18       AUDIENCE MEMBER:  Good afternoon, Your Honor, I'm

19  writing this letter on behalf of my fiance, Reginald

20  Johnson, who is set to appear before you in court today.

21  I have had the privilege of knowing Reggie for over seven

22  years.  And during this time I witnessed first hand his

23  remarkable character and extraordinary acts of kindness.

24       From my first encounter I knew Reggie was the one.

25  He was kind, respectful and most importantly, he was pure.

48

1   Heh is everything that love can be in human form.  He is
2   my best friend.  One of the most striking aspects of
3   Reggie and his incredibly giving nature is he consistently
4   donates to the homeless.  He goes out of his way to help
5   those in need, demonstrating the level of compassion that
6   is truly rare.  His sweet and loving demeanor extends not
7   only to the close friend but also strangers.  He can
8   easily strike up a conversation and make anyone feel at
9   ease.
10   As the CEO of own construction business, Reggie
11   exemplifies strong leadership in business acumen.  He not
12   only dedicated to the success of his company but to well
13   being of the employees and clients.  His ability to
14   navigate to challenges and persevere even after the loss
15   of both his mother and his biological father, is a
16   testament to his resilience and determination.
17   Moreover Reggie is a loving and responsible grandson
18   as he takes care of his grandparents, providing them with
19   love and support.  He is an incredible Godfather to his
20   two Godchildren they mean to world to him.  His dedication
21   to family and community is truly commendable and reflects
22   kind hearted nature.
23   On January 15th, my fiance had no idea when he
24   started his day how tragically it would end.  I've
25   witnessed from that day to the moments leading up to

49

1    walking into this courtroom today, his extreme regret and

2    remorse.  I have watched the consequences of his actions

3    eat away -- I'm sorry.  Eat away at his spirit every day.

4    He is not the same ask he never will be.

5        To the family and the friends of Carlos and Camila,

6    there are no words that I or anyone else could say that

7    could change what happened on that unfortunate day.  But I

8    can't leave here today without you knowing how sorry I am,

9    how sorry my fiance is for this tragic loss that was

10   caused by his negligence.  My sincere condolences and

11   continued prayers from his peace and healing.

12       Your Honor, I know my fiance isn't perfect, neither

13   am I or anyone else in this courtroom.  I know you will

14   hear lot of things about him, but I personally ask that

15   you consider everything I stated and also know that the

16   actions of his, on January 15th, are in no way an

17   indication of who he is.

18       Thank you.

19       THE COURT:  Thank you.

20       MR. HAMLIN:  Can Mr. Johnson's grandparents stand up

21   and everybody else here for Mr. Johnson.

22       Can Mr. Martel Gainer(phonetic) please come up.

23       THE COURT:  For those of you standing, you can have a

24   seat.

25       MR. GAINER:  Good evening or good morning.

1          THE COURT:  Good afternoon.

2          MR. GAINER:  I met Mr. Johnson, in 2012, through our

3     fraternity and became friends through community service

4     and the location of our universities.  I went to Coppin

5     State.  He went to Morgan State.  I became roommates with

6     Mr. Johnson, in 2016, and we have been true brothers ever

7     since.  We used to share so much of our resource to get by

8     in college, we shared a 20-dollar bill called the floating

9     twenty.

10          Mr. Johnson has met my parents.  And before his mom

11     passed, I had the opportunity to call her mom as well.  I

12     have had countless conversations with Mr. Johnson in

13     person, over the phone and not once has he deflected his

14     accountability for his involvement here.  He has only

15     expressed facing his actions, his remorse and in time

16     correcting his problem.

17          Genuinely, he has expressed his sincere remorse and

18     understanding that a life was lost and lives surrounding

19     that life were changed forever.  I have had conversations

20     with Mr. Johnson on Tuesday when he called me to check in

21     on a separate situation dealing with someone in my family.

22     And he spoke on how God is here.  He spoke on God in the

23     details.  He spoke on how God is teaching us all lessons

24     daily and that this a lesson that not only God set out for

25     him but everyone close to him, everyone here today,

1   everyone to understand that his level of awareness in the

2   situation and his accountable for actions really made me

3   proud because what he really wanted us to understand is

4   that you got to stand up.  You've got to stand up and

5   stand on every decision that you make you got to stand and

6   face it why at the end of the day we only are responsible

7   for our decisions.  He's taken that time and as his fiance

8   just said it's eating at him.  It's something he takes

9   into account every single day.

10          He is not shy to responsibility and I only ask that

11  you consider that in your ruling.  Mr. Johnson is not a

12  criminal.  Mr. Johnson does not have a history of violent

13  crimes.  He is not a threat to the community.  Mr. Johnson

14  does not deserve to be treated as a violent criminal.

15  Mr. Johnson is a community servant and business owner.

16  Mr. Johnson is a friend and brother.  Mr. Johnson is a

17  mentor and pillar of the black community to men in the

18  cities of Philadelphia and Baltimore.  Mr. Johnson is a

19  deeply rooted in family values.  You see he does have

20  family here today and family support.

21          I do understand that a tragedy has transpired and my

22  deepest condolences go to the family and the victim today.

23  Your Honor, these action the actions of that day do not

24  reflect the morality and character of Mr. Johnson.

25  Justice is defined as the quality of being impartial,

1    fair.  Justice is not an eye for an eye.  The true goal of

2    justice is to correct the wrong, to improve one person at

3    a time.  I'd ask that you consider that in your ruling.  I

4    ask that you consider Mr. Johnson does not deserve to

5    spend time behind pres prison walls.  But to be given the

6    duty to correct his problem through recovery and

7    rehabilitation measures as programs and service outline.

8    I's ask that you provide grace when imposing your sentence

9    and requirements for Mr. Johnson today.  Thank you.

10        THE COURT:  Thank you.

11        MR. HAMLIN:  Mr. Taylor.

12        MR. TAYLOR:  Good morning, Your Honor.

13        THE COURT:  Good afternoon.

14        MR. TAYLOR:  Good afternoon.  I'm sorry.

15        THE COURT:  Its oak.

16        MR. TAYLOR:  First, I would like to say to the family

17    of Carlos and Camila, I'm deeply remorseful for, you know,

18    the loss of a life, the surgeries that you have had to go

19    through, the trauma you had to go through through this

20    time.  I personally and for everyone here just wish you

21    the speedy recovery.  There is nothing that I can say to

22    truly, you know, feel the weight of the gravity but I do

23    offer my condolences.

24        When meeting reginal Johnson 12 years ago we met as

25    friends.  But 12 years later saying that I see him not

53

1  only as a brother but someone who I look up to greatly.

2  Since we met he has been one of my most trusted friends in

3  terms of character and nature having lived with him for

4  two years.  He has always managed to put the needs of

5  others before his own.  And still manages to carry both

6  responsibilities exceptionally well.  As my fraternity

7  brother of Alpha Phi Fraternity Incorporated he has

8  consistently been placed in leadership roles serving the

9  communities of Baltimore and Philadelphia as shining life

10  and nurturing our youth.  Most notably, his work as a

11  coach remains admirable.

12      One of the most striking aspects of Reggie is to the

13  incredibly giving nature.  He constantly donates to

14  homeless and goes out the way to help those in need,

15  demonstrating love and compassion that is truly rare.  His

16  sweet and loving demeanor extends not only to those close

17  to him and as he can easily strike conversations to make

18  anyone feel as ease.

19      Um, on January 15th, at around 6:30 p.m. I did

20  receive a call from Reginald Johnson stressed, panicked,

21  extremely worried that he did something irredeemably

22  irrevocable.  As I was about four blocks away I traveled

23  as soon as I could to see him to be there to console him.

24  And being able to be there when he received the news of

25  Mr. Carlos's passing.

1           The grief, the tears, the crying that I heard from
2     this man from the realization that he impacted not only
3     his own life but the lives and families of others is
4     something that will truly live with me to this day.
5           I understand that, Your Honor, his actions took, to
6     your knowledge will receive some punishments and judgment.
7     I ask for you to consider the nature of the man as well as
8     sits before you, knowing that what he does for the
9     community, what he does for himself, for everyone else
10    around him is more than just the accident that occurred on
11    that day.
12          I traveled here today from Kansas City, Missouri.
13    Even when I first moved in July, the first person to visit
14    me to offer me support in my time of process and
15    transition was Mr. Reginal Johnson as well as Ms. Brook
16    Richardson.  This is someone that I can truly consider
17    someone that is a family member to me.  My parents
18    consider him a son.  I consider his mother my mother
19    before she passed.  I consider his siblings my brothers
20    and sister.
21          I ask that, Your Honor, that you consider it all and.
22    Thank you for your time and consideration.
23          Once again, my condolences.  Thank you.
24          THE COURT:  Thank you.
25          MR. HAMLIN:  Your Honor, we have one more letter we

1    are going to pass up.  I thought he was going to be here
2    today.  And I guess the last person you will hear from is
3    Mr. Johnson.  Would you like to hear from him here or
4    would you like him to --
5         THE COURT:  Either way is fine.  You can stay right
6    there if you would like.
7         THE DEFENDANT:  Thank you, Your Honor.  I would like
8    to thank the Court and families of Christian Rey and
9    Camila Selman for allowing me to speak and be heard.
10        On, January 15, 2023, I visited the city and went to
11   brunch with fraternity brothers.  While at brunch, I began
12   drinking and unfortunately made a decision that changed
13   the lives of multiple families forever.  There is no
14   excuse or justifications for my actions that evening.
15   There can never be a justification for ending Christian's
16   life, leaving Camila with physical -- excuse me and
17   emotional scars and for forever devastating their
18   families, for this, I am sorry.  And I'm sorry will never
19   be enough.
20        Eight years go, in 2015, I drove a car impaired by
21   alcohol and was arrested.  I had the sincere belief I
22   learned my lesson.  In fact, I completely stopped drinking
23   for a while.  It wasn't until after my mother's passing
24   that I began drinking socially again.
25        Writing this letter has made me realize that when I

1    drink socially I drink in excess.  I recently learned
2    drinking in excess is a form of alcoholism.
3        To Camila, there are no words I could write or speak
4    to give you comfort.  The guilt I feel is immeasurable.  I
5    did not have the right to take your fiance from you.  I
6    did not have the right to affect your graduate studies and
7    cause you lasting physical pain.  I will continue to pray
8    that you will be able to return to school and pursue your
9    career goals.  Most of all I pray that one day you find
10   peace.
11       I also want to apologize to your family.  I can't
12   imagine the fear and worry they felt learning about the
13   accident and being in another country.  I truly regret the
14   choice I made that night.  And I'm truly sorry for the
15   pain I have caused you and your family.
16       To the Rey family.  I want to express my deepest
17   remorse for the loss of Christian.  I lost my mom a few
18   years ago.  When I lost her I vowed to be a man she would
19   be proud of.  From learning about Christian he sounds like
20   that type of man.  It is apparent how proud you are of him
21   and how much he meant to your family and friends.  My
22   decision to drink and drive took away your opportunity to
23   see Christian graduate, get married and start a family and
24   be a part of those milestones in his life.  I would like
25   you to know I pray for your daily.  Your healing and

1    Christian will always be in my thoughts and prays.

2         Lastly, I would like to address you, Christian.  We

3    never met.  If it wasn't for the recklessness of my

4    actions that day, we probably never would have crossed

5    paths.  I would like you to know that if I could change

6    places with you I would.  You did not deserve to lose your

7    life because of my irresponsibility.

8         When I read through the reports in this case, you

9    were many times referred to as the victim.  I decided I

10   needed to know the person and not just the victim.  I

11   learned you had a passion for soccer and wanted to play

12   professionally.  I discovered that passion led you to your

13   career choices.  I can't imagine how proud your family was

14   when you were accepted into graduated school.  I regret

15   the choice I made deprived you of the opportunity to

16   finish your education.  Because of my actions I stole your

17   chance of achieving your career goals and excelling in

18   your field.

19        Christian, there are no words or action to make this

20   better, to bring you back, to heal Camila and your

21   family's pain.  My actions back in January had a ripple

22   affect that will echo for the rest of our lives.

23        While I am serving my sentence you will be a constant

24   thought and reminder of how I need to be conscious of my

25   decisions and actions moving forward in life.  I have a

58

1    lot of work to do on myself and a lot of people I need to
2    make amends to for my destructive actions.  It will not be
3    right to ask anyone for forgiveness.  I understand that
4    may never come.  I will continue to pray your healing and
5    peace for you and your family daily.  Thank you.
6         THE COURT:  Thank you.
7         MR. HAMLIN:  Thank you, Your Honor.  That's it.
8         THE COURT:  So we have been going for a while now.  I
9    need to review a couple of the things that were just given
10   to me that I haven't already looked at.  And I need to
11   give the folks who are working in the courtroom a break
12   for lunch.  I know there are a lot of people in the
13   courtroom who have been here for a number of hours now.
14   But I am going to have to take a break now.
15        We are going to resume in an hour which is ten
16   minutes to 2:00 at which point I will hand down the
17   sentence.
18        I actually have a question though before we break,
19   which really concerns any conditions that I would either
20   recommend for supervised release or impose for probation,
21   because there are lots of possible conditions I could
22   impose in this case.  And I just wanted to see if the
23   parties or counsel for the victims had any recommendations
24   just with respect to conditions of either supervised
25   release or probation.

1          First the Government.

2          MR. CARTER:  Your Honor, we would recommend as matter

3     of supervised release since we are asking for a sentence

4     to served, the Traffic Alcohol Program, the Traffic Safety

5     Program, the Victim Impact Panel, alcohol and drug

6     assessment and treatment if needed upon release from any

7     incarceration, and an order not to drive at all.

8          THE COURT:  Yes.  I will put on the husher.

9                    (Counsel have a discussion at trial table.)

10         MR. CARTER:  Court's indulgence.

11         THE COURT:  Sure.

12         MR. DUFFY:  Your Honor, on behalf of the victims, I

13    want to point out that Carlos's name is Carlos Christian

14    Rey.  But I will say that it is our view that the safety

15    of the community and specifically the safety of the

16    victims, including Camila, should she return, a special

17    condition if there is release should be prohibition

18    against driving in the District of Columbia absent

19    specific prior approval from the probation office.

20         THE COURT:  Let me hear from the defense.

21         MR. HAMLIN:  Your Honor, my client has no problems

22    with any of those conditions.  He plans to seek counseling

23    on his own, so I don't think that needs to be a condition

24    but he wanted to let the Court know he does plan to seek

25    counseling.

```
 1        THE COURT:  Okay.  Thank you.  We'll be on break for
 2   an hour.
 3                  (Court stood in recess at 12:53 p.m.)
 4                  (Court reconvened at 1:59 p.m.)
 5        THE DEPUTY CLERK:  Returning to, Your Honor,
 6   sentencing calender United States versus Reginald Johnson
 7   case number 2023 CF1 1620.
 8        THE COURT:  Okay.  If the parties identify themselves
 9   the record.
10        MR. CARTER:  Jamie Carter on behalf of the United
11   States.  Good afternoon.
12        MR. HAMLIN:  Derrick Hamlin on behalf of Mr. Johnson,
13   who is presents.
14        THE DEFENDANT:  Reginald Johnson.  Good afternoon.
15        THE COURT:  Good afternoon.
16        MR. DUFFY:  Good afternoon, Your Honor.  Jerrob Duffy
17   on behalf of the victim, who are present in the courtroom.
18        THE COURT:  Okay.  Good afternoon, everybody.
19        This is an incredibly sad casement one of the saddest
20   I have ever seen.  And I want to start by offering my
21   condolences to Carlos's family and friends.  It's clear to
22   me that Carlos was an amazing person and that his death
23   has left a void for many, many people that I will never be
24   able to fill and for that I am sorry.
25        I also want to express my condolences to Camila and
```

61

1    her family and her friends, both for the loss of Carlos

2    and also for the injuries that Camila suffered, both

3    physical and emotional, as a result of Mr. Johnson's

4    actions.

5        Finally, I want to express my sympathy to

6    Mr. Johnson's family and friends who also have been

7    affected by what happened, on January 15, 2023.

8        I have to look at a whole number of factors when I

9    sentence someone.  I have to look at the nature of the

10   crime, the history and the characteristics of the

11   Defendant, the need to impose what is called just

12   punishment to deter the Defendant and others from

13   committing similar crimes and to provide any treatment the

14   Defendant may need.

15       I also have to look at the sentencing guidelines,

16   which are not mandatory, as Mr. Duffy has pointed out.

17   But which serve a very important purpose of providing some

18   level of consistency among the sentences that are handed

19   out by different Judges in which I follow unless there is

20   an extraordinary reason not to.

21       The range in this case for involuntary manslaughter

22   against Mr. Rey is 36 to 84 months.  And the range for

23   assault with a dangerous weapon against Ms. Selman is 18

24   to 60 months.  And the guidelines also call for

25   consecutive sentences when multiple victims are involved,

1    which is the case here.

2         So here the relevant factors in my opinion weigh in

3    different directions.  So the nature of the crimes weighs

4    heavily, heavily in favor of a sentence at the top end of

5    the guidelines.

6         Mr. Johnson had been drinking for four and a half

7    hours when he got into his car to drive to another bar

8    with seven people packed into a car that had five seats.

9    His blood alcohol level was above the legal limit and that

10   was more than three and a half hours after the accident.

11        In addition, he was driving 61 miles per hour on a

12   street with a 25-mile per hour speed limit.  More than

13   double the maximum speed limit at a time when many people

14   and cars were on the street.

15        Mr. Johnson's conduct was incredibly, incredibly

16   reckless and irresponsible and it resulted in one person

17   being killed and another person being seriously injured

18   and many, many family members and friends whose lives were

19   turned upside down in that moment and whose lives may

20   never be the same.

21        On the other hand, I don't agree with the victim's

22   counsel that this was not an accident.  It was reckless,

23   it was tragic but it clearly was not intentional.  And I

24   am considering that when I'm evaluating what is the proper

25   punishment in this case.

1        With respect to the history of characteristics of the
2   Defendant I think that factor on balance weighs in favor
3   of the Defendant.  I am aware of the fact this is not the
4   first time that Mr. Johnson drank and drive.  I'm aware of
5   the fact that he had a prior DWI, even if it did not
6   result in a conviction, it all means he should have known
7   better and that's a fact that certainly is a fact in favor
8   of a longer sentence.  At the same time I'm aware of the
9   fact that DWI was from almost eight years go.  And that he
10  completed probation successfully in that case, which is
11  why it didn't result in a conviction.  I'm aware of the
12  fact he has no other convictions other than a number of
13  traffic violations for either speeding or driving on a
14  suspended license.  I'm aware of the fact he has been
15  completely compliant with conditions of pretrial release
16  in this case.

17        More importantly, I'm aware of the fact that
18  Mr. Johnson, although he did something absolutely awful,
19  on January 15, 2023, has also done many good things in his
20  life.  That he has done extensive volunteer work, that he
21  is a CEO of his own construction company, that he is good
22  friend and mentor to many people and that he has been
23  truly remorseful throughout this case, not just at
24  sentencing where Defendants have an incentive but at the
25  scene, at the police station, at the time of the plea and

64

1    again here today.

2         So although the nature of the crime weighs in favor

3    of a sentence at the top of the range, Mr. Johnson's

4    history and characteristics in my opinion go in the

5    opposite direction.  So where does that leave me.  Leaves

6    me in a position where I will not impose the maximum

7    sentence and I will not impose the minimum sentence.

8    Instead, I'm going to impose a sentence in the middle of

9    the guidelines range because I think that is most

10   consistent with the relevant sentencings factors.  I also

11   think probation is more appropriate than supervised

12   release, given limited criminal history and his compliance

13   with probation in the past.

14        With all of that peeing said, here is what the

15   sentence is going to be.  On the involuntary manslaughter

16   count, I'm going to impose a sentence of 84 months of

17   imprisonment, execution suspended as to all but 60 months.

18   Five years of supervised release, all suspended.  And

19   there will be three years of probation.  I will get to the

20   conditions of probation in a second.

21        I have to impose an assessment under the Victims of

22   Violent Crime Act.  The minimum I can impose is $100.

23   That is what I will impose.  And that will be due by the

24   end of the period -- it will be due from prison pay.  And

25   if it's not pull fully paid from prison pay, it will be

1   due by the end of his probation, so that involuntary
2   manslaughter.
3       Assault with a dangerous weapon, I will impose a
4   sentence of 60 months of imprisonment.  It will suspended
5   as to all but 36 months.  Three are supervised release
6   that will all be suspended and three years of probation.
7   Again $100 assessment under the Victim of Violent Crime
8   Act and the same payment schedule.
9       So the imprisonment, as I mentioned before,
10  imprisonment is to run consecutively when you have
11  different victims, so that's what I'm going to do.  The
12  imprisonment portion of the sentence for involuntary
13  manslaughter and ADW will run consecutively on top of each
14  other.  The probation will run concurrently.
15      What this mean is the total sentence is a sentence of
16  12 years of imprisonment.  I'm suspended four of those
17  years, so that Mr. Johnson will have to serve eight years
18  in prison followed by three years of probation.
19      Terms of the condition of probation.  I am going to
20  require that Mr. Johnson attend the Traffic Alcohol
21  Program, Traffic Safety Program, the Victim Impact Panel.
22  I'm going to require substance abuse assessment and
23  treatment as directed by CSOSA, mental health assessment
24  and treatment as directed by CSOSA.  A requirement that he
25  not drive after consuming alcohol or narcotics anywhere in

1   the country and that he not drive at all in the District

2   of Columbia.

3        And that is my sentence.  I have a couple more things

4   to say.  Before I do that I want to ask the parties if

5   there is anything I should have addressed that I didn't?

6   First from the Government.

7        MR. CARTER:  No, Your Honor.  With regards to

8   sentencing, we have no further questions.

9        THE COURT:  For the defense?

10       MR. HAMLIN:  Would the Court consider house arrest at

11  some point?

12       THE COURT:  No.  I mean I will say that when people

13  go to the Bureau of Prisons they typically do a portion of

14  the end of the sentence on house arrest, in a half way

15  house but that's up to the Bureau of Prisons, not me.

16       I do want to say a couple more things to Mr. Johnson.

17  Is there anything else further from the victim's counsel

18  concerning the sentence I just imposed?

19       MR. DUFFY:  No, Your Honor.  Thank you, Your Honor.

20       THE COURT:  So two things, I mean in terms of

21  Carlos's family, Camila, Camila's family, Mr. Johnson's

22  family this is just a sad day.  Honestly, I feel as if you

23  have all suffered.  Clearly, Carlos and Carlos's family

24  has suffered the most along with Camila.

25       And I know that the sentence I'm imposing today is

67

1    not going to make anyone happy.  It's not going to bring

2    anyone back.  I do think it's a sentence most consistent

3    with the factors I have to consider.  And I hope for all

4    of the family and friends here that you can somehow,

5    eventually try to move on and go forward with your lives.

6    I know that easier for me to say than to actually do but

7    that is my hope.

8          With respect to Mr. Johnson, first, I have a couple

9    of question for you.  First, do you understand the

10   conditions of probation that I just described?

11         THE DEFENDANT:  Yes.

12         THE COURT:  And do you accept those conditions?

13         THE DEFENDANT:  I do.

14         THE COURT:  For you, Mr. Johnson, I mean, you've got

15   a lengthy prison sentence coming up.  And I know you are

16   not someone -- this is not something that you are used to,

17   that you have had before.  And I know this can be very

18   difficult for you.  At the same time you are going to be

19   getting out, you are not going to be an old man.  You are

20   going to have a lot of your life ahead of you.  For your

21   sake, for the community's sake, I really hope that you can

22   comply with those conditions of probation and that you are

23   never never ever here in court again.  So good luck, sir.

24         THE DEFENDANT:  Thank you.

25         THE COURT:  Was there anything further before we

 1   break?

 2        MR. CARTER:  Yes, Your Honor.  So couple of issues,

 3   one is property issue that's come up.  Just so it's on the

 4   record, the Defendant has been reaching out to the

 5   detective regarding his property in his vehicle.  I just

 6   wanted to state on the record, the Government will be

 7   releasing it's evidence hold.  However, I understand there

 8   are civil litigation.  And so that may have an affect on

 9   that.  All communications should be through counsel to

10   MPD's counsel.  If there are any questions regarding

11   property it should not be going to the detective.

12        THE COURT:  By the way that does make sense.  It

13   looks like Mr. Hamlin is writing that down.  Okay.

14        MR. CARTER:  I would also ask the Court at this time

15   for step back with the Defendant.

16        THE COURT:  Oh, he is being stepped back.

17        Yes.

18        MR. DUFFY:  Your Honor, yes.  Now that the Court has

19   pronounced sentence and that phase of today's proceedings

20   is over, we would like to apprize the Court that we know

21   now why there was an emergency and we didn't have a

22   sentencing six weeks ago.  We know now the reason because

23   there were social media videos posted of defense counsel

24   in London on the Saturday after the sentencing partying in

25   Wembley Stadium at the Baltimore Ravens game.  And we

 1    know, for example, that that emergency motion that was
 2    filed with this Court, that emergency did not say it was
 3    so that counsel could attend a football game.  That is
 4    outrageous for many reasons, including that there were
 5    flights from the Washington, D.C. airports to London that
 6    are in the evening.  And it would be absolutely possible
 7    for counsel to have arranged his personal vacation to go
 8    see a football game, so we could have been here and these
 9    victims could have not incurred the expense they incurred
10    to come here at the last scheduled hearing, which hearing
11    was scheduled four months in advance.  And it is
12    outrageous.

13          And we respectfully request this Court inquire into
14    this matter further.  We have a video prepared from social
15    media that we are prepared to post.  And we expect this
16    Court or the Government would consider a motion for order
17    to show cause why such conduct should not be held in
18    contempt and whether or not it would be appropriate to
19    order the fees or expenses incurred by the victim for that
20    travel so that counsel could go to a football game in
21    London, so counsel should consider whether or not paying
22    back in term of a fine to the Court or alternatively,
23    perhaps in terms of making recompense to the victim.  That
24    is outrageous, sir.  And that is not in accord with the
25    responsibilities of a member of the Bar of the District of

1   Columbia, which all of us present before this bar are.

2        THE COURT:  Mr. Hamlin.

3        MR. HAMLIN:  First off, the case was not postponed

4   because of my trip.  The case was postponed because I did

5   not pay by dues in time and I wasn't aware of the new

6   rule.  So all of this stuff he is saying has nothing to do

7   with that.  More importantly, he is not telling the Court

8   that he also saw a video of me at Kings College.

9        THE COURT:  Here is what I'm going to do.  Sounds to

10  me like there is some information that would be useful for

11  me to see.  What I'm going to ask and this is only if

12  victim's counsel would like to pursue this further.  I'm

13  happy, if victim's counsel does, is to submit in writing

14  the information that supports your request.  In other

15  words, basically, what you are describing today.  Once you

16  file that, I will give Mr. Hamlin a certain period of time

17  to respond.  And, if need be, we can have a hearing on

18  that down the road.  I will address it but I feel like I

19  need a fuller record before I do.

20       MR. DUFFY:  Yes, Your Honor.  Thank you, Your Honor.

21       THE COURT:  Thank you.  You all are free to go.

22            (The proceedings concluded at 2:15 p.m.)

23

24

25

1

2                    COURT REPORTER'S CERTIFICATE

3              I, Sherelle A. Bradley, an Official Court

4    Reporter for Superior Court of the District of Columbia,

5    do hereby certify that I stenographically transcribed the

6    proceedings had and testimony adduced in the case of

7    United States v. Reginald Johnson, Criminal Case No. 2023

8    CF1 001620, in said Court on the 17th day of November,

9    2023.

10             I further certify that the foregoing 71 pages

11   constitute the official transcript of said proceedings as

12   transcribed from my machine shorthand notes and reviewed

13   with my backup tapes, to the best of my ability.

14             In witness whereof, I have hereto subscribed my

15   name this 2nd day of January, 2024.

16

17

18

19                        *Sherelle A. Bradley*
                          Sherelle A. Bradley
20                        Official Court Reporter

21

22

23

24

25

                                                              72

# Exhibit D-16

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

**United States of America**
Vs.

**JUDGMENT IN A CRIMINAL CASE**
**(Incarceration / Probation)**

**REGINALD ROLAND**
**JOHNSON**

Case No. **2023 CF1 001620**

DOB: 06/26/1992

PDID No. **760032**

DCDC No.

**THE DEFENDANT HAVING BEEN FOUND GUILTY ON THE FOLLOWING COUNT(S) AS INDICATED BELOW:**

| Count | Court Finding | Charge |
|---|---|---|
| 1 | Found Guilty - Plea | Involuntary Manslaughter |
| 2 | Found Guilty - Plea | Assault With A Dangerous Weapon |

## SENTENCE OF THE COURT

**Count 1 Involuntary Manslaughter** Sentenced to 84 month(s) incarceration, execution of sentence suspended as to all but 60 month(s), 5 year(s) Supervised Release SUSPENDED, *Supervised Probation for 3 year(s), $100.00 VVCA, VVCA Due Date 11/17/2035

**Count 3 Assault With A Dangerous Weapon** Sentenced to 60 month(s) incarceration, execution of sentence suspended as to all but 36 month(s), 3 year(s) Supervised Release SUSPENDED, *Supervised Probation for 3 year(s), $100.00 VVCA, VVCA Due Date 11/17/2035

Sentences to run consecutively and the Probation to run concurrently

*"Upon release, Defendant shall by the next business day contact CSOSA's intake unit at (202) 585-7233 or RAP.Help@CSOSA.gov for initial intake/processing. Alternatively, CSOSA has a duty officer present at 633 Indiana Ave, NW for defendants who report in person and/or do not have electronic means to contact CSOSA."*

VVCA payable to Superior Court of the District of Columbia, 500 Indiana Ave., N. W. Finance Office in room 4003 on 4th floor. For more assistance with online or by mail payments email questions to CriminalFinance@dcsc.gov. or crmpay@dcsc.gov. Phone: (202) – 879 -1840…just in case the Defendant has any questions.

Yes, you can pay the restitution payments remotely, by sending an email to crmpay@dcsc.gov.
Phone: (202) – 879 -1840…just in case the Defendant has any questions

The defendant is hereby committed to the custody of the Attorney General to be incarcerated for a total term of
**96 months** . MANDATORY MINIMUM term of _____ applies.

The Court makes the following recommendations to the Bureau of Prisons/Department of Corrections:

Defendant is hereby ordered placed on probation - See-Page 2 of this Order for Conditions of Probation; *upon release from either the courtroom or incarceration, Defendant must report to 633 Indiana Avenue, NW, 8th Floor, Washington, DC, by the next business day after release from jail or prison.*

Total costs in the aggregate amount of $ **200.00** have been assessed under the Victims of Violent Crime Compensation Act of 1996, and ☐ have ☑ have not been paid. ☐ Appeal rights given ☐ Gun Offender Registry Order Issued

☐ Advised of right to file a Motion to Suspend Child Support Order     ☐ Sex Offender Registration Notice Given

☐ Domestic violence notice given prohibiting possession/purchase of firearm or ammunition     ☐ Voluntary Surrender

☐ In addition to any condition of probation, restitution is made part of the sentence and judgment pursuant to D.C. Code § 16-711.

| | |
|---|---|
| 11/17/23 | ROBERT D OKUN Fel 1 Cal 3 |
| Date | Judge |

Entered by Clerk pursuant to Criminal Rule 32(f)

| | |
|---|---|
| 11/17/23 | Michelle Henson |
| Date | Deputy Clerk |

Received by DUSM: _____ Badge#: _____ Signature: _____ Date:_____ Time: _____



CASE NUMBER:   **2023 CF1 001620**
DEFENDANT:      **REGINALD ROLAND JOHNSON**

The Defendant is hereby placed on **\*Supervised Probation** for a term of          **3 year(s)**

## GENERAL CONDITIONS OF PROBATION

1. Obey all laws, ordinances, and regulations.

2. Report to CSOSA today and then for all appointments scheduled by your Community Supervision Officer (CSO).

3. Permit your CSO to visit your place of residence.

4. Notify your CSO within one business day of (A) an arrest or questioning by a law enforcement officer, (B) a change in your residence, or (C) a change in your employment.

5. Obtain the permission of your CSO before you relocate from the District of Columbia.

6. Do not illegally possess or use a controlled substance or any paraphernalia related to such substances (you may take lawfully prescribed medication). You must not frequent a place where you know a controlled substance is illegally used or distributed.

7. You must drug test at the discretion of CSOSA. In the event of illicit drug use or other violation of conditions of probation, participate as directed by your CSO in a program of graduated sanctions that may include periods of residential placement or services.

8. Participate in and complete CSOSA's employment/academic program, if directed by your CSO.

9. Participate in and complete other CSOSA's programs as identified through CSOSA's risk and needs assessment.

10. Satisfy all court imposed financial obligation(s) (fines, restitution, Victim of Violent Crime Act assessments, etc.) to which you are subject. You must provide financial information relevant to the payment of such a financial obligation that is requested by your CSO. A payment plan will be established by your CSO so that you will be in a position to pay your court imposed financial obligation(s) within 90 days prior to the termination of your probation.

## SPECIAL CONDITIONS OF PROBATION

1. Cooperate in seeking and accepting medical, psychological or psychiatric treatment in accordance with written notice from your CSO.

2. Restitution of $ _____ in monthly installments of $ _____ beginning _____

   ☐ The Court will distribute monies to:  _____

   _____

3. ☐ See Attached Stay Away Form

You are not to have contact with any of the persons named above. You must remain at least 100 yards away from them, their home, and/or their places of employment. You are not to communicate, or attempt to communicate with any of these persons, either directly or through any other person, by telephone, written message, electronic message, pager, or otherwise, except through your lawyer.

4. **Other Special Conditions**: Traffic Alcohol Program
Traffic Safety Program
Victim Impact Panel
Other conditions: Mental Health Assessment treatment and supervision as directed by CSOSA
Other conditions: Do not Drive in D.C.
Other conditions: Do not drive after comsumption of alcohol or any impairing substance
Substance abuse assesment, testing and treatment as deemed appropriate by CSOSA

CDJCSPLIT.doc

# Exhibit D-17



This photo is from a post.

Khalinmandakh Ichinkhorol
February 13, 2020 ·

Like   Share









# Exhibit D-18

5914039 **VIRGINIA UNIFORM SUMMONS**

ARLINGTON COUNTY POLICE DEPARTMENT

CASE NO. GT1Q-200238

HEARING DATE AND TIME

□ PROSECUTING ATTORNEY (NAME)

☐ DEFENDANT'S ATTORNEY (NAME)
- ☐ NO ATTORNEY
- ☐ ATTORNEY WAIVED
- ☐ NO ATTY JAIL WAIVED BY CT

THE ACCUSED WAS THIS DAY:
- ☐ TRIED IN ABSENCE
- ☐ PRESENT
- ☐ CERTIFIED PURSUANT TO § 19.2-190.1

THE ACCUSED PLEADED:
- ☐ NOT GUILTY
- ☐ NOLO CONTENDERE
- ☐ GUILTY  ☐ PREPAYMENT

AND WAS TRIED AND FOUND BY ME:
- ☐ FINDING SUFFICIENT-DEFERRED §
- ☐ NOT GUILTY
- ☐ GUILTY AS CHARGED
- ☐ GUILTY OF
- ☐ COMPLIED WITH LAW UNDER §

IN ADDITION I FIND THE ACCUSED WAS:
- ☐ DRIVING A COMMERCIAL M.V.
- ☐ CARRYING HAZARDOUS MAT.
- ☐ A CDL HOLDER

AND THE OFFENSE:
- ☐ RESULTED IN A FATALITY
- ☐ WAS IN A HWY. SAFETY COR.

☐ I ORDER THE CHARGE DISMISSED

☐ I ORDER A NOLLE PROSEQUI ON COMMONWEALTH'S MOTION

I IMPOSE THE FOLLOWING SENTENCE:

YOU ARE SUMMONED TO APPEAR IN THE (CITY OF / COUNTY OF)

**ARLINGTON**

☒ GENERAL DISTRICT COURT (TRAFFIC)
☐ GENERAL DISTRICT COURT (CRIMINAL)
☐ JUVENILE & DOMESTIC RELATIONS DISTRICT COURT

1425 N. COURTHOUSE RD.

ARLINGTON, VA 22201

ON July 9, 20 19 AT 9:00 ☒ A.M. ☐ P.M.
ADDRESS

FOR VIOLATION OF ☐ STATE ☒ COUNTY ☐ CITY ☐ TOWN

LAW SECTION (14.2-1) 46-2-890 DESCRIBE CHARGE:

VIOLATE HWY SIGN - NO LEFT TURN

COMMERCIAL MOTOR VEHICLE ☐ YES ☒ NO
HAZARDOUS MATERIALS ☐ YES ☐ NO
RESULTED IN A FATALITY ☐ YES ☒ NO
HIGHWAY SAFETY CORRIDOR ☐ YES ☒ NO

VCC:

I PROMISE TO APPEAR AT THE TIME AND PLACE SHOWN ABOVE. SIGNING THIS SUMMONS IS NOT AN ADMISSION OF GUILT. I CERTIFY THAT MY CURRENT MAILING ADDRESS IS AS SHOWN BELOW

☒ _Cholamandach_
SIGNATURE

YOU MUST APPEAR AT TRIAL (JUVENILES MUST APPEAR WITH PARENT/ LEGAL GUARDIAN).

☒ YOU MAY AVOID COMING TO COURT ONLY IF THIS BLOCK IS CHECKED AND ALL INSTRUCTIONS ON DEFENDANT'S COPY ARE FOLLOWED.

ONLY CALL 703-228-4599 IF MORE HELP IS NEEDED.

MAILING ADDRESS: ☒ SAME AS ABOVE AT RIGHT
☐ CHANGE FROM D.L.

P.O. BOX/STREET   CITY/TOWN   STATE   ZIP

NAME  LAST  FIRST  MIDDLE

ICHINKHOROL, KHALINMANDKH

RES. ADDRESS  RES. JURIS.

1201 S COURTHOUSE RD #314 000

CITY/TOWN  STATE  ZIP

ARL VA 22204

| RACE | SEX | D.O.B. | | | HT. | | WGT. | EYES | HAIR |
|------|-----|--------|--|--|-----|--|------|------|------|
| | | MO. | DAY | YR. | FT. | IN. | | | |
| A | M | 7 | 3 | 68 | 5 | 04 | 200 | BR | BK |

DL/CDL # (IF CRIMINAL OFFENSE OR NO LICENSE, USE SSN)  STATE

CDL HOLDER ☐ YES ☒ NO  T6940 1507  VA

| | YEAR | MAKE | TYPE | LICENSE NO. | YEAR | STATE |
|--|------|------|------|-------------|------|-------|
| VEH | 17 | TOY | 4D | VWG-1321 | 19 | VA |

JURISDICTION OF OFFENSE  DATE OF OFFENSE  DAY OF WEEK  TIME

000  5 20 19  MON  1140 ☐ A.M. ☐ P.M.

DIRECTION  ACCIDENT  WEATHER  ROUTE NUMBER/STREET
YES  NO

E  ✗  Clear  BLK

LOCATION OF OFFENSE:

WASH. BL / CLARENDON

ARREST DATE  ARREST LOCATION

S/A  8100 BLK CLARENDON

OFFICER  CODE/BADGE NO.

MARTIN  1364

☐ FINE  ☐ CIVIL PENALTY OF $ ____ WITH $ ____ SUSPENDED.

☐ DRIVER'S LICENSE SUSPENDED EFFECTIVE IN THIRTY (30) DAYS IF FINES/COSTS/ FORFEITURE/PENALTY/RESTITUTION NOT PAID IN THIRTY (30) DAYS §46.2-395.

☐ JAIL SENTENCE OF ____ WITH ____ SUSPENDED. CONDITIONED UPON BEING OF GOOD BEHAVIOR AND KEEPING THE PEACE.

☐ ON PROBATION FOR ____

☐ DRIVER'S LICENSE SUSPENDED ____

CONSECUTIVE SUSPENSION UNDER §46.2-301 ☐ YES ☐ NO

☐ RESTITUTION OF ____ PAYABLE TO ____

BY ____ AS CONDITION OF SUSPENDED SENTENCE.

☐ OTHER: ____

DATE  JUDGE

| | | |
|--|--|--|
| 110/201 FINE | $ ____ | 121 TIA FEE | $ ____ |
| 114/129/237 CIVIL PENALTY | $ ____ | 244 C.H. SECURITY FEE | $ ____ |
| 460 FIXED TRAFFIC INFRACTION FEE | $ ____ | 120/217 CT. APPT. ATTY. | $ ____ |
| 461 FIXED MISDEMEANOR FEE | $ ____ | 113 WITNESS FEE | $ ____ |
| 462 FIXED MISDEMEANOR FEE - DRUGS | $ ____ | | |
| | $ ____ | TOTAL | $ ____ |
| APPEAL BOND | $ ____ | 109 INTEREST CHARGE | $ ____ |
| ☐ APPEAL NOTED ON ____ | | TOTAL WITH INTEREST | $ ____ |
| ☐ APPEAL WITHDRAWN ____ | | | |

**CS**

COURT COPY - PG. 1

VUS REV. 7-01-15

# COMMONWEALTH OF VIRGINIA



**OFFICIAL RECEIPT**

ARLINGTON GENERAL DISTRICT COURT
1425 N COURTHOUSE RD
ARLINGTON VA 22201
703-228-7900
**TRAFFIC**

DATE: 06/27/19 TIME: 10:42:28 ACCOUNT: 013GT19020938-00    RECEIPT: 19000022948
CASHIER: CLS   REG: LM15              TYPE: PRE-PAYMENT
ACCT OF: ICHINKHOROL, KHALINMANDKH     RECD: ICHINKHOROL, KHALINMANDKH
 CHARGE:      $99.84
DESCRIPTION 1: TRY: 07/19/19 CHG: VIO OF HWY SIGN
             2: OFF: 05/20/19 OL#: T69401507          DMV: NOT SENT
             3: CODE SECTION: 46.2-830
COMPLAINANT: MARTIN, M              HEARING: 07/19/19 AT 09:00AM IN 3C
     DESCRIPTION            PAID    DESCRIPTION              PAID
     FINE/FORFEITURE 201    30.00   PROCESSING FEES          69.84

                                    TENDERED   :            99.84
                                    AMOUNT PAID:            99.84
                                    CHANGE AMT :              .00


              RECEIPT COPY 1 OF 3

         CLERK OF COURT: STEVEN R. SPURR

FORM DC-18

5888375

**VIRGINIA UNIFORM SUMMONS**

ARLINGTON COUNTY POLICE DEPARTMENT

CASE NO. GT19-24542

HEARING DATE AND TIME

| ☐ PROSECUTING ATTORNEY (NAME) | YOU ARE SUMMONED TO APPEAR IN THE (CITY OF / COUNTY OF) | NAME LAST FIRST MIDDLE |
|---|---|---|

ICHINKHOROL KHALIN MANDAKH

**ARLINGTON**

| ☐ DEFENDANT'S ATTORNEY (NAME) | ☒ GENERAL DISTRICT COURT (TRAFFIC) | RES. ADDRESS 1201 S. Courthouse Rd Apt 314 | RES. JURIS. |
|---|---|---|---|

☐ NO ATTORNEY
☐ ATTORNEY WAIVED
☐ NO ATTY JAIL WAIVED BY CT

☐ GENERAL DISTRICT COURT (CRIMINAL)
☐ JUVENILE & DOMESTIC RELATIONS DISTRICT COURT

CITY/TOWN Arlington   STATE VA   ZIP 22204

THE ACCUSED WAS THIS DAY:
☐ TRIED IN ABSENCE
☐ PRESENT
☐ CERTIFIED PURSUANT TO § 19.2-190.1

**1425 N. COURTHOUSE RD.**

**ARLINGTON, VA 22201**

| RACE W | SEX M | MO. 12 | DAY 31 | YR. 68 | HT. 5 | IN. 4 | WGT. 200 | EYES Bro | HAIR BLK |
|---|---|---|---|---|---|---|---|---|---|

THE ACCUSED PLEADED:
☐ NOT GUILTY
☐ NOLO CONTENDERE
☐ GUILTY ☐ PREPAYMENT

ON September 13, 20 ___ AT 9:00 ☒ A.M. ☐ P.M.

FOR VIOLATION OF: ☐ STATE ☒ COUNTY ☐ CITY ☐ TOWN

DL/CDL # (IF CRIMINAL OFFENSE OR NO LICENSE, USE SSN) T69401507   STATE VA

AND WAS TRIED AND FOUND BY ME:
☐ FINDING SUFFICIENT- DEFERRED §

LAW SECTION (14.2-1) 46.2-825 DESCRIBE CHARGE:
Left turn, fail to yield to oncoming traffic

CDL HOLDER ☐ YES ☒ NO

| VEH | YEAR 2017 | MAKE Toy | TYPE Cor | LICENSE NO. VWG1321 | YEAR 19 | STATE VA |
|---|---|---|---|---|---|---|

☐ NOT GUILTY
☐ GUILTY AS CHARGED
☐ GUILTY OF
☐ COMPLIED WITH LAW UNDER §

COMMERCIAL MOTOR VEHICLE ☐ YES ☒ NO
HAZARDOUS MATERIALS ☐ YES ☒ NO
RESULTED IN FATALITY ☐ YES ☒ NO
HIGHWAY SAFETY CORRIDOR ☐ YES ☒ NO

VCC:

| JURISDICTION OF OFFENSE 000 | DATE OF OFFENSE 6/7/19 | DAY OF WEEK Fri | TIME 2112 ☐ A.M. ☐ P.M. |
|---|---|---|---|

IN ADDITION I FIND THE ACCUSED WAS:
☐ DRIVING A COMMERCIAL M.V.
☐ CARRYING HAZARDOUS MAT.
☐ A CDL HOLDER

I PROMISE TO APPEAR AT THE TIME AND PLACE SHOWN ABOVE. SIGNING THIS SUMMONS IS NOT AN ADMISSION OF GUILT. I CERTIFY THAT MY CURRENT MAILING ADDRESS IS AS SHOWN BELOW

Khalin Mandakh

| DIRECTION S | ACCIDENT YES / NO X | WEATHER Clear | ROUTE NUMBERS/STREET |
|---|---|---|---|

LOCATION OF OFFENSE: 10th St @ N. Ivy St

AND THE OFFENSE:
☐ RESULTED IN A FATALITY
☐ WAS IN A HWY. SAFETY COR.

SIGNATURE

YOU MUST APPEAR AT TRIAL (JUVENILES MUST APPEAR WITH PARENT/ LEGAL GUARDIAN).

ARREST DATE 6/7/19   ARREST LOCATION Same as

☐ I ORDER THE CHARGE DISMISSED

☒ YOU MAY AVOID COMING TO COURT ONLY IF THIS BLOCK IS CHECKED AND ALL INSTRUCTIONS ON DEFENDANT'S COPY ARE FOLLOWED.

OFFICER T. Williams   CODE/BADGE NO. 1484

☐ I ORDER A NOLLE PROSEQUI ON COMMONWEALTH'S MOTION

ONLY CALL 703-228-4599 IF MORE HELP IS NEEDED.

I IMPOSE THE FOLLOWING SENTENCE:

MAILING ADDRESS: ☐ SAME AS ABOVE AT RIGHT   P.O. BOX/STREET   CITY/TOWN   STATE   ZIP
☐ CHANGE FROM D.L.

| ☐ FINE ☐ CIVIL PENALTY OF $ _____ WITH $ _____ SUSPENDED. | 110/201 FINE | $ _____ | 121 TIA FEE | $ _____ |
|---|---|---|---|---|

☐ DRIVER'S LICENSE SUSPENDED EFFECTIVE IN THIRTY (30) DAYS IF FINES/COSTS/ FORFEITURE/PENALTY/RESTITUTION NOT PAID IN THIRTY (30) DAYS §46.2-395.

114/129/237 CIVIL PENALTY   $ _____   244 C.H. SECURITY FEE   $ _____

☐ JAIL SENTENCE OF _____ WITH _____ SUSPENDED.
CONDITIONED UPON BEING OF GOOD BEHAVIOR AND KEEPING THE PEACE.

460 FIXED TRAFFIC INFRACTION FEE   $ _____   120/217 CT. APPT. ATTY.   $ _____

461 FIXED MISDEMEANOR FEE   $ _____   113 WITNESS FEE   $ _____

☐ ON PROBATION FOR _____

☐ DRIVER'S LICENSE SUSPENDED _____

462 FIXED MISDEMEANOR FEE - DRUGS   $ _____

CONSECUTIVE SUSPENSION UNDER §46.2-301 ☐ YES ☐ NO

_____   $ _____   TOTAL   $ _____

☐ RESTITUTION OF _____ PAYABLE TO _____
BY _____ AS CONDITION OF SUSPENDED SENTENCE.

APPEAL BOND $ _____   109 INTEREST CHARGE   $ _____

☐ OTHER: _____

☐ APPEAL NOTED ON _____
☐ APPEAL WITHDRAWN

TOTAL WITH INTEREST   $ _____

DATE _____   JUDGE _____

COURT COPY - PG. 1   VUS REV. 7-01-15

*Receipt : 19000028227*

*Page 1 of 1*

**OFFICIAL RECEIPT**
**ARLINGTON GEN DIST COURT**
**TRAFFIC**

**DATE :** 08/15/2019          **TIME :** 09:39:50                    **CASE # :** 013GT1902454200

**RECEIPT # :** 19000028227   **TRANSACTION # :** 19081500010

**CASHIER :** CLS               **REGISTER # :** C721                 **CASE TYPE :** I               **TYPE :** PRE-PAYMENT

**ACCOUNT OF :** ICHINKHOROL, KHALINMANDAKH

**RECEIVED OF :** ICHINKHOROL, KHALINMANDAKH

**CREDIT/DEBIT CARD :** $99.84

**COMPLAINANT :** WILLIAMS, T   **HEARING DATE:** 09/13/2019            **HEARING TIME:** 09:00 AM      **COURT ROOM:** 3C

**DESCRIPTION 1 :** TRY: 09/13/19 CHG: L TURN FTY TO ONCOMING TRAFFIC

**2 :** OFF: 06/07/19 OL#: T69401507

**3 :** CODE SECTION: 46.2-825

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 201 | LOCAL FINES AND FORFEITURES | $30.00 |
| 241 | E-SUMMONS FEE | $5.00 |
| 244 | CHSF | $10.00 |

| ACCOUNT CODE | DESCRIPTION | PAID |
|---|---|---|
| 460 | TRAFFIC INFRACTION FEE | $51.00 |
| 407 | CONVENIENCE FEE | $3.84 |

**TENDERED : $**     99.84

**AMOUNT PAID : $**     99.84

*CLERK OF COURT : STEVEN R. SPURR*

 **Virginia Judiciary**
Online Case Information System 2.0

Return to Search Results

## *Fairfax County General District Court* (details)

Case #: **GT19231548-00**
Defendant: **ICHINKHOROL, KHALINMANDAKH**

### Defendant Information
Address: **ARLINGTON, VA 22204**
Gender: **MALE**
Race: **WHITE**
DOB: **12/31/****
Attorney:

### Case/Charge Information
Defendant Status: **RELEASED ON SUMMONS**
Filed Date: **11/12/2019**
Locality: **COMMONWEALTH OF VA**
Code Section: **46.2-1003**
Charge: **DEFECTIVE EQUIPMENT GENERALLY**
Case Type: **INFRACTION**
Class:
Offense Date: **11/07/2019**
Arrest Date:
Complainant: **FOX, J M**
Amended Code Section:
Amended Charge:
Amended Case Type:
Amended Class:

### Appeal Information
Appeal Date:

### Hearing Information

| Date | Time | Result | Type | Courtroom | Plea | Continuance |
|------|------|--------|------|-----------|------|-------------|
| **01/29/2020** | **09:30 AM** | **WAIVED** | **ADJUDICATORY** | **1C** | | |

### Disposition Information
Disposition: **PREPAID**
Sentence Time:
Sentence Suspended:
Probation Type:
Probation Time:
Probation Starts:
Operator License Suspension Time:
Restriction Effective Date:
Operator License Restrictions:
VASAP:
Fine: **$30.00** *
Costs: **$62.00** *
Fine/Costs Due: **01/29/2020** *
Fine/Costs Paid: **YES**
Fine/Costs Paid Date: **01/14/2020**
* This system cannot process online payments at this time. Please refer to ' How to Pay Traffic Tickets and Other Offenses ' for more information.

### Service/Process

Return to Search Results

# Exhibit D-19



**Emergency assistance button**

You can use the in-app Emergency Button to call 911 to get help if you need it. The app displays your location and trip details, so you can quickly share them with the 911 dispatcher. In select US cities, this information is automatically shared with emergency services when you call.



**24/7 incident support**

Our customer support team is specially trained to respond to urgent safety issues.



**Share My Trip**

Set up your Trusted Contacts and create reminders to share your trip status with friends and family in real time.



**Safety Toolkit**

Access the Uber app's safety features all in one place whenever you've requested a ride with Uber.



**2-way ratings**

Your feedback matters. Low-rated trips are logged, and users may be removed.



**GPS tracking**

All rides on the Uber platform are tracked by GPS.



**Phone number anonymization**

The app makes phone numbers anonymous, so your personal information stays private.



**RideCheck**

Using sensors and GPS data, RideCheck can help detect if a trip goes unusually off-course or a possible crash has occurred. If the app notices such events, we'll check in on you and offer resources to get help.



**On-Trip Reporting**

If you feel unsafe while on a trip, you can immediately and discreetly report it to Uber. A member of our Safety team will reach out for support shortly after the trip.



**Contact safety agent**

You can connect with an ADT Safety Agent via phone call or text on every trip. Just tap the safety shield icon and select Contact safety agent.



**Drivers are background checked before their first trip**

Prospective drivers must undergo a multi-step safety screen that checks for issues including, but not limited to impaired driving and violent offenses.[1]



**Ongoing checks are built into the Uber platform**

We use technology that obtains criminal offenses from a number of data sources.[1] If an offense involving an active driver is identified, we'll review these notifications to determine whether they're still eligible to drive with Uber.



**Drivers must pass an annual check to continue accessing the app**

Uber reruns driving[2] and criminal history checks at least every year to ensure that drivers continue to meet our standards.[1]



**Assuming someone else's identity is prohibited**

Drivers are periodically asked to take a photograph of themselves, which we match against their on-file identification to help make sure the right driver is behind the wheel.



**We enforce our Community Guidelines**

Uber reviews all reports submitted to our Support team. Not following any of our guidelines may result in the loss of access to your Uber accounts.

See our guidelines

**Your feedback helps create a safe and respectful community**

A high rating recognizes people's efforts, while a low rating can provide helpful feedback. And repeated low ratings can result in deactivation.



### Road safety at Uber

As a platform that facilitates movement, we're committed to being a leader in road safety. Through developing innovative features and initiatives, launching road safety education, and partnering with experts, we use our scale to help improve safety for everyone out on the road.



**Road safety education**

We provide educational materials and courses developed in partnership with road safety experts such as the Governors Highway Safety Association and the League of American Bicyclists to help keep drivers, delivery people, riders, and others safe while on the road.



**RideCheck**

Our RideCheck technology can help detect rare events such as unexpected long stops on a trip or possible vehicle crashes. The technology proactively checks in with riders, drivers, and couriers to see if everything is OK, and the app provides tools that they can use to get help if needed.*



**Bike lane alerts**

Before riders open the door when their dropoff is near a bike lane or along a bike route, in some markets they'll receive a notification to look for people on bikes and be asked to practice the Dutch Reach.



**Driving-hours tool**

To help prevent drowsy driving, Uber's Driver app limits the number of hours drivers and couriers can spend online.



**Speed limit alerts**

The Driver app displays the live location speed limit and can visually alert drivers if they go above the posted speed limit.

**Background checks**

Before anyone can drive with Uber, they must provide their driver's license number and undergo a background screening—including a check of your driving and criminal history—and other safety checks.**

### What to do in an accident

We're committed to everyone's safety. If you're involved in an accident, follow these steps:



- **Step 1**

  Ensure that everyone involved is OK. If there are injuries or damage, contact the police and paramedics. Be sure to save the police report number if there is one.



- **Step 2**

  Take photos of any damage to the vehicles involved, including your own, and get the contact and insurance information of other involved drivers and riders. We recommend taking photos of the accident location, too, if it's safe to do so.



- **Step 3**

  The easiest way to report a crash is through the Driver app. Select the **Safety Toolkit** by tapping the blue shield symbol in the bottom left corner of the map, then tap **Report a crash**. Report what happened and submit your claim.

  Or to speak with our trained support staff, choose **Safety** from the Help section of your app, then select Safety Incident Reporting Line. You can also submit a crash report here.

  Whichever path you choose, please complete this process as soon as it's reasonable to do so.

After your claim is submitted, a notification will show up on your Driver app homepage directing you to the Crash Center. This is your go-to resource for contacting Uber's insurer, viewing your claim's status, seeing rental car options, and more.

**What riders should do**

Riders can report an accident here.

**What anyone else involved should do**

Third parties can report an accident here.

# Do the right thing

**Period.**

## Stand for safety

**Safety never stops.**

We embed safety into everything we do. Our relentless pursuit to make Uber safer for everyone using our platform will continue to make us the industry leader for safety. We know the work of safety never stops, yet we can and will challenge ourselves to always be better for the communities we serve.

9:09

X



### All riders on Uber are protected

When you ride with Uber, trips starting in Washington D.C. are insured by Farmers in case of a covered accident.



### Uber's Community Guidelines

Our guidelines were developed to help make every experience feel safe, respectful, and positive.



### Always on the map

All Uber rides are GPS-tracked from start to finish so you can see your route and share your trip status with family and friends



### Uber's Zero Tolerance Policy

Uber does not tolerate the use of alcohol or drugs by drivers using the Uber app.

Table 1: Sample motor vehicle record screening standards[46]

| Minor violations<br>No more than 3 in 3 years | Major violations<br>None in the past 3 years | Severe violations<br>None in the past 7 years | Forbidden violations<br>None ever |
|---|---|---|---|
| Crashes (non-fatal) | Driving on suspended, revoked, or invalid license | DUI or drug-related driving violation | Fatal crashes |
| Traffic-light violations | Driving while uninsured/ insurance suspended, revoked or invalid | Speeding at 100+ mph | Vehicular homicide |
| Speeding violations | | Leaving scene of crash | Vehicular manslaughter |
| Moving violations | | Evading/eluding police | |
| | | Reckless driving | |
| | | Street racing/contest | |

## Safety product experience

We have long set the standard for platform safety technology. Our core safety features include:

 **The Safety Toolkit**, a single spot in the app where drivers and riders can access safety features during their trip.

 **In-app Emergency Button**, which connects riders and drivers directly to 911 with the push of a button and, where available, allows users to text 911.

 **Phone number and address anonymization**, which hides the personal details between riders and drivers.

 **Share My Trip/Follow My Ride**, which allow riders and drivers to share their trip with designated loved ones who can follow their trip in real time.

 **Speed Limit Alerts and Driving-Hours Tool**, which help reduce speeding and fatigued driving.

 **RideCheck** can detect rare events such as long stops, unexpected routes, or possible vehicle crashes and send a notification to riders and drivers to see if all is well. The app also provides tools they can use to get help if needed.

Since the publication of our last report, we have continued to innovate and launch new safety features for riders and drivers. A full list of new features is included in the "Safety investments" section. Highlights include:

- **Verify My Ride:** Riders can opt in to receiving a unique 4-digit PIN before each trip, which they provide verbally to their driver, who needs to enter it into their app to start the trip.
- **On-Trip Reporting:** This feature allows riders to discreetly report a non-emergency safety issue during a trip.
- **Rider Seat Belt Alerts:** To improve adoption of rear seat-belt use, we began rolling out Rider Seat Belt Alerts to prompt riders to take this lifesaving step. After a driver starts the trip, an audio tone will be emitted from the driver's phone and riders will receive a push notification reminding them to buckle up.
- **Audio Recording:** We began piloting a new Audio Recording feature that allows drivers and riders to record audio during a trip. Any recorded content is encrypted on the phone so that no one can access it without permission. Uber can only access it if the user reports a safety incident and includes the audio file.
- **Rider Verification:** Riders who try to set up a new account with an anonymous form of payment, such as a prepaid gift card, are required to upload an ID, which undergoes a series of validity checks. These additional verification requirements can act as a deterrent to those who are trying to use the app for theft or to harm drivers.

## Uber scale

When interpreting safety data, it is important to understand Uber's scale. For the purposes of this report, we examine data from 2019 and 2020, a time in which the world experienced devastating impacts from the COVID-19 pandemic. Compared with 2019, the number of trips taken with Uber decreased by as much as 80% in April 2020.[7]

With this significant shift, an average of almost 3 million trips took place each day in the US over the 2019–2020 period. **The vast majority (99.9%) of Uber trips in 2019-2020 ended without any safety-related issue at all, similar to our first report.**

> 99.9% of Uber trips end without any safety-related issue at all.

For example, for trips in 2019 and 2020:

- **1%** of trips had a support request of any kind, most frequently for issues such as lost items, refunds, or route feedback
- **0.1%** of trips had a support request for a safety-related concern, and the majority of those concerns were about less-severe safety issues such as complaints about driving or a verbal argument
- **0.0002%** of trips had a report of a critical safety incident, which are the incidents referenced in this report

## Safety product experience

Uber is dedicated to continually developing robust technology that puts safety at the heart of our service and platform. We also routinely educate riders and drivers about our safety features and how they can use them.

Below is a summary of our core safety features and those launched since our first Safety Report (marked as "new feature").[49]



### Safety Toolkit

We launched the Safety Toolkit in 2018 as a single place in the app where drivers and riders could access safety features during a trip—including many of the features listed below. We're continuing to create and add new features to the toolkit.

It's important that our users are aware of the safety products available to them, so continuous education is provided in addition to updates to the features themselves.

### | Pre-trip



### Real-Time ID Check

In-app prompts ask drivers to take a live photo of themselves before they can accept rides, which helps verify that the properly screened driver is behind the wheel.



### Verify My Ride (new feature)

In 2020, we launched an optional feature that sends riders who've opted in a unique 4-digit PIN before each trip. Once they get into the car, they provide this PIN to the driver verbally. The driver can only start the ride once the correct PIN has been entered in the Driver app. This added layer of verification can help ensure that a rider is in the correct car and that a driver is picking up the correct rider.



### Rider Seat Belt Alerts (new feature)

Buckling up may be one of the safest choices riders can make—in 2017, seat belts saved an estimated 14,955 lives in the US.[50] Yet according to the Insurance Institute for Highway Safety, 4 out of 5 adults surveyed say they don't always use a seat belt in a taxi or while using a rideshare platform.[51] In February, we began rolling out Rider Seat Belt Alerts to prompt riders to take this life-saving step. After a driver starts the trip, an audio seat belt tone will be emitted from the driver's phone and riders will receive a push notification reminding them to buckle up.



### Phone number and address anonymization

When riders and drivers contact each other through the app, their actual phone numbers are anonymized for the duration of the trip and are not valid after. Riders can contact drivers post-trip if they have lost an item, and this will be with a new anonymized number. Additionally, we've taken steps to anonymize exact pickup and dropoff addresses in the driver's trip history.

49. For an overview of previously announced safety features, please refer to the "Safety investments" section of our 2017-2018 Safety Report (pages 20-32).
50. "Seat Belts: Overview," National Highway Traffic Safety Administration (accessed May 3, 2021) nhtsa.gov/risky-driving/seat-belts.
51. "Adults admit to not always using safety belts in the back seat, IIHS survey finds," Insurance Institute for Highway Safety (August 3, 2017), iihs.org/news/detail/adults-admit-to-not-always-using-safety-belts-in-the-back-seat-iihs-survey-finds.

## On-trip



### Share My Trip, Trusted Contacts, and Follow My Ride

Riders can use Share My Trip to provide trip details to their loved ones, giving visibility and peace of mind. Trusted Contacts also allows riders to automatically use Share My Trip with up to 5 friends and family members that they select. They can choose to use the feature on all trips or just select to do so on nighttime trips based on their preferences. Follow My Ride, which is available to drivers, lets them share their live location (during or between trips) with designated loved ones.[52]



### In-app Emergency Button and Text to 911

In 2018, we launched an in-app Emergency Button that connects riders and drivers to their local emergency number with the simple tap of a button. In more than 2,000 cities, trip details and location information are shared automatically with first responders. Also, drivers and riders can send a text to emergency dispatch in cities where text-to-911 is available.



### On-Trip Reporting (new feature)

In addition to providing 24/7 in-app support, we launched On-Trip Reporting to allow riders to discretely report a non-emergency safety issue during a trip on the Uber platform. This feature enables Uber to capture valuable feedback from riders when it's top of mind instead of after the trip, when they may be distracted.



### RideCheck

When our system detects a possible issue with a trip, such as a suspected crash or unexpected long stop, both the rider and driver will receive a RideCheck notification asking if everything is OK. They can let us know through the app that all is well, or, if all is not well, they can use the Emergency Button or report the issue to Uber's Safety Incident Reporting Line. In late 2021, we expanded the capabilities of our RideCheck technology to detect when a trip takes an unexpected route or when a trip ends before the rider's final destination.



### Unsafe driving notifications (new feature)

When our data suggests a driver may be demonstrating unsafe behavior, like speeding or harsh braking, we send them driving safety education to help make them aware of the issue.

---

52. Follow My Ride does not share any rider information with the driver's designated contacts.



### Bike Lane Alerts

Bike Lane Alerts remind riders to look for people on bikes before opening a door when their upcoming dropoff point is near a bike lane or along a bike route. To date, we have sent more than 100 million notifications. As cities expand their bike networks, we continue to update the feature to include new routes.



### Audio Recording (new feature)

After the success of our Audio Recording feature in Latin America, we began piloting it in selected cities in the US in 2021. Once riders and drivers enable this feature, they can choose to record audio by tapping the shield icon on the map screen and selecting **Record Audio**. Riders and drivers can choose to record individual trips, and drivers will also have the option to leave the feature on while they're online. Before the trip, we'll let the rider know in their app if a driver has opted in to the feature.



### Dashcam Registration (new feature)

Drivers are free to install dashcams in their vehicle and record their trips as long as they follow state and local laws. In 2021, we rolled out a Dashcam Registration feature nationally, which enables drivers to directly share video with Uber Support when reporting a safety incident through the app. Riders receive an alert that their trip will be recorded when matched with a driver who has registered their dashcam.



### Speed Limit Alerts

According to NHTSA, approximately one-third of all motor vehicle fatalities involve speeding.[53] To help reduce speeding, this feature can display the local speed limit in the Driver app and will alert drivers visually or audibly if they go over the limit.



### Driving-Hours Tool

In 2019, 697 people lost their lives due to drowsy driving–related crashes in the US.[54] To help prevent drowsy driving, the Driver app is unavailable for 6 hours after 12 hours of driving on the platform.[55]

---

53. "Speeding: Overview," National Highway Traffic Safety Administration (accessed May 3, 2022), nhtsa.gov/risky-driving/speeding.
54. "Drowsy Driving: Overview," National Highway Traffic Safety Administration (accessed May 3, 2022), nhtsa.gov/risky-driving/drowsy-driving.
55. This may vary by local regulation. Some jurisdictions set other limits, which the app is adjusted to comply with.

Table 1: 2019-2020 motor vehicle fatalities by vehicle miles traveled (Uber-related and US rates)[111]

| | 2017-2018 | | 2019-2020 | | Incident rate change over reports (2019-2020 compared with 2017-2018) | |
|---|---|---|---|---|---|---|
| | Uber rate[x] (per 100 million VMT) | National rate[x] (per 100 million VMT) | Uber rate[x] (per 100 million VMT) | National rate[x] (per 100 million VMT) | Uber rate change[x] | National rate change[x] |
| | 0.58 | 1.15 | 0.62 | 1.22 | +7% | +6% |
| Total miles | 18.5 billion | 6.4 trillion | 16.3 billion | 6.2 trillion | | |

Table 2: 2019-2020 motor vehicle fatalities by trips (Uber-related)[117]

| 2019-2020 | | | 2019 | | 2020 | |
|---|---|---|---|---|---|---|
| Frequency of rider fatalities (by # of trips) | Frequency of driver fatalities (by # of trips) | Frequency of total fatalities (by # of trips) | # of Uber-related fatalities | % of total trips | # of Uber-related fatalities | % of total trips |
| ~1 in 90,000,000 | ~1 in 140,000,000 | ~1 in 30,000,000 | 59 | 0.000004% | 42 | 0.000006% |
| Total trips | 2.1 billion | | 1.4 billion | | 650 million | |

Table 4: Deceased parties in Uber-related motor vehicle crashes[119]

| Deceased party | 2019 | 2020 |
|---|---|---|
| Occupant | 68% (n=40) | 74% (n=31) |
| Driver using Uber app | 10 | 4 |
| Rider using Uber app | 9 | 10 |
| Third-party driver | 9 | 9 |
| Third-party motorcyclist | 6 | 6 |
| Third-party passenger | 6 | 2 |
| Non-occupant | 32% (n=19) | 26% (n=11) |
| Driver/rider using Uber app fatally struck outside of vehicle | 2 | 2 |
| Third-party pedestrian | 15 | 8 |
| Bicyclist/scooter rider | 2 | 1 |
| Total | 59 | 42 |

Figure 5: % of Uber-related fatalities involving risky driving behavior, predominantly by third parties



Figure 6: % of national fatalities involving risky driving behavior [125]



# Exhibit D-20

# § 50–1731.02. Definitions.

For the purposes of this chapter, the term:

(1) "Distracted driving" means inattentive driving while operating a motor vehicle that results in the unsafe operation of the vehicle where such inattention is caused by reading, writing, performing personal grooming, interacting with pets or unsecured cargo, using personal communications technologies, or engaging in any other activity which causes distractions.

(2) "Hands-free accessory" means an attachment, add-on, built-in feature, or addition to a mobile telephone, whether or not permanently installed in a motor vehicle, that when used allows the vehicle operator to maintain both hands on the steering wheel.

(3) "Mobile telephone" means a cellular, analog, wireless, or digital telephone capable of sending or receiving telephone messages without an access line for service.

(4) "Other electronic device" includes, but is not limited to, hand-held computers, pagers, and video games.

(4A) "Text" or "texting" means using an electronic wireless communications device to compose, send, receive, or read a written message or image using a text-based

communication system, including communications referred to as a text message, instant message, or electronic mail.

(5) "Use" means talking, placing, texting, or receiving a call, or attempting to place, text, or receive a call, on a wireless communications device, including a mobile telephone.

([Mar. 30, 2004, D.C. Law 15-124, § 2, 51 DCR 1541](); [Dec. 10, 2009, D.C. Law 18-88, § 227(a), 56 DCR 7413]().)

## Effect of Amendments

[D.C. Law 18-88]() added par. (4A); and rewrote par. (5), which had read as follows: "(5) 'Use' means talking, placing, or receiving a call, or attempting to place or receive a call, on a mobile telephone."

## Emergency Legislation

For temporary (90 day) amendment of section, see § 227(a) of Omnibus Public Safety and Justice Emergency Amendment Act of 2009 (D.C. Act 18-181, August 6, 2009, 56 DCR 6903).

For temporary (90 day) amendment of section, see § 227(a) of Omnibus Public Safety and Justice Congressional Review Emergency Amendment Act of 2009 (D.C. Act 18-227, October 21, 2009, 56 DCR 8668).

# Exhibit D-21

# § 50–1731.04. Restricted use of mobile telephone and other electronic devices.

(a) No person shall use a mobile telephone or other electronic device while operating a moving motor vehicle in the District of Columbia unless the telephone or device is equipped with a hands-free accessory.

(b) The provisions of subsection (a) of this section shall not apply to the following:

(1) Emergency use of a mobile telephone, including calls to 911 or 311, a hospital, an ambulance service provider, a fire department, a law enforcement agency, or a first-aid squad;

(2) Use of a mobile telephone by law enforcement and emergency personnel or by a driver of an authorized emergency vehicle, acting within the scope of official duties; or

(3) Initiating or terminating a telephone call, or turning the telephone on or off.

(c) No person shall use headphones that cover both ears or earbuds in both ears while operating a motor vehicle in the District, except if the headphones or earbuds are being used

to assist a hearing-impaired driver.

# Exhibit D-22

## Transportation Safety

- Transportation Safety
- Data and Resources for States and Tribes
- Cost Data and Prevention Policies
- Child Passenger Safety
- Seat Belts
- Teen Drivers
- Older Adult Drivers
- Impaired Driving
- **Distracted Driving**
- Pedestrian Safety
- Tribal Road Safety
- Motorcycle Safety
- Bicycle Safety
- Global Road Safety

**Get Email Updates**

To receive email updates about this topic, enter your email address:

[Email Address]

What's this?    Submit

# Distracted Driving

**On This Page**

- Types of Distraction
- How big is the problem?
- Who is most at risk for distracted driving?
- How to Prevent Distracted Driving
- What States are Doing to Prevent Distracted Driving

- What the Federal Government is Doing to Prevent Distracted Driving
- Distracted Driving Fact Sheet
- Additional Resources
- References

How people in the United States are killed every day in crashes that are reported to involve a **distracted driver**.[1]

Distracted driving is doing another activity that takes the driver's attention away from driving. Distracted driving can increase the chance of a motor vehicle crash.

### There are three types of driving distractions[1]

- **Visual:** taking your eyes off the road
- **Manual:** taking your hands off the wheel
- **Cognitive:** taking your mind off driving

**11 U.S. teens per hour** is nothing is going on in that car during the drive time it takes 5 seconds of eyes off the road.[1]

See more!

At 55 mph, that's like driving the length of a football field with your eyes closed.[1]

Hands-free is not risk free.

## Distracted driving impacts thousands of Americans each year

Anything that takes your attention away from driving can be a distraction. Sending a text message, talking on a cell phone, using a navigation system, and eating while driving are a few examples of distracted driving. Any of these distractions can endanger you, your passengers, and others on the road.

**There are three main types of distraction:**[1]



### About **3,000 people die** in crashes involving a distracted driver every year.

- In the United States, over 3,100 people were killed and about 424,000 were injured in crashes involving a distracted driver in 2019.[1]
- About 1 in 5 of the people who died in crashes involving a distracted driver in 2019 were not in vehicles—they were walking, riding their bikes, or otherwise outside a vehicle.[1]

Sources: National Highway Traffic Safety Administration. 2015 [2] [PDF – 1 MB] and 2019 [3]. For more information on how data on motor vehicle crash deaths are collected and the limitations of distracted driving data.

See All Data

## Some groups are more at risk for distracted driving

**Young, adult and teen drivers[1]**

- Among fatal crashes involving distracted drivers in the U.S. in 2019
  - A higher percentage of drivers ages 15–20 were distracted than drivers age 21 and older.
  - Among those younger drivers, 9% of them were distracted at the time of the crash.[1]
- A 2019 survey[4] of U.S. high school students found:
  - 39% of high school students who drove in the past 30 days texted or emailed while driving on at least one of those days[4]
  - Texting or emailing while driving was more common among older students than younger students
  - Texting or emailing while driving was more common among students who reported other risky driving behaviors, such as not always wearing a seat belt, riding with a driver who had been drinking alcohol, and driving after drinking alcohol.[4]
  - Students who texted or emailed while driving were also more likely to report other transportation risk behaviors. They were:
    - more likely to not always wear a seat belt.
    - more likely to ride with a driver who had been drinking alcohol, and
    - more likely to drive after drinking alcohol.[4]

### Among drivers age 15-20 involved in fatal crashes, 9% were distracted at the time of the crash.

Source: National Highway Traffic Safety Administration [5], 2019

### Texting or emailing while driving is **more common among older teens than younger teens.**

Percentage of drivers among students who drove in the past 30 days, by grade

| 9th | 10th | 11th | 12th |
|-----|------|------|------|
| 16% | 16%  | 31%  | 51%  |

60%

Source: [4] Transportation Behaviors among High School Students — Youth Risk Behavior Survey, United States, 2019

See All Data

## Distracted driving is preventable

**What drivers can do:**

- Do not multitask while driving. Whether it's adjusting your mirrors, selecting music, eating, making a phone call, or reading a text or email—do it before or after your trip, not during.
- You can see just [6] to help you avoid cell phone use while driving. Consider trying an app to reduce distractions while driving.

**What passengers can do:**

- Speak up if you are a passenger in a car with a distracted driver. Ask the driver to focus on driving.
- Reduce distractions for the driver by assisting with navigation or other tasks.

**What parents can do:**

- Talk to your teen or young adult about the rules and responsibilities involved in driving. Share stories and statistics related to texting and other risky driving behaviors.[7]
  - Remind them driving is a skill that requires the driver's full attention.
  - Emphasize that texts and phone calls can wait until arriving at a destination.
- Families can put a parent-teen driving agreement in place [8] and enforce its guidelines for your teen.
- Know your state's laws on distracted driving [7]. Many states have novice-driver provisions in their distracted driving laws. Talk with your teen about the consequences of distracted driving and make yourself and your teen aware of your state's penalties for talking or texting while driving.
- Set consequences for distracted driving. Fill out CDC's Parent-Teen Driving Agreement [8] [PDF – 461 KB] together to begin a safe driving discussion and set your family's rules of the road. Your family's rules of the road can be stricter than your state's laws. You can also use those simple and effective ways to get involved with your teen's driving. Parents-lead the example.
- Set an example by keeping your own eyes on the road and your hands on the wheel while driving.
- Learn more: visit NHTSA's website on safe teen driving [7].

## States are working to prevent distracted driving

- Many states have enacted laws to help prevent distracted driving. These include banning texting while driving, implementing hands-free laws, and limiting the number of young passengers who can ride with teen drivers.
  - The Insurance Institute for Highway Safety tracks cell phone use laws [9] and graphic equipment restrictions [10], by state.
- While the effectiveness of cell phone and texting laws requires further study, high-visibility enforcement (HVE) efforts for distracted driving laws can be effective in reducing cell phone use while driving. From 2010 to 2013, NHTSA evaluated distracted driving HVE demonstration programs in four communities. The programs combined dedicated law enforcement along with advertisements, media, and other methods. The projects were complex, observed driver cell phone use fell from:
  - 4.1% to 2.7% in the Sacramento Valley Region in California.[1]
  - 6.8% to 2.9% in Hartford, Connecticut.[1]
  - 4.5% to 3.0% in the state of Delaware.[1]
  - 3.7% to 2.5% in Syracuse, New York.[1]
- Graduated driver licensing (GDL) is a system which helps new drivers gain experience under low-risk conditions by granting driving privileges in stages. Comprehensive GDL systems have 5 components, one of which addresses distracted driving that young passenger restrictions [11]. CDC's Parents Are the Key [12] campaign aims to assist in assisting parents, developing, and implementing achievable graduated driver licensing restrictions.
- Some states have installed rumble strips on highways to alert drivers, distracted, or otherwise inattentive drivers that they are about to go off the road. These rumble strips are effective at reducing certain types of crashes.[13]

## The Federal Government is working to prevent distracted driving

- CDC has developed the Parents Are the Key campaign, which helps parents, pediatricians, and communities help keep teen drivers safe on the road.
- In 2022, the U.S. Department of Transportation released the National Roadway Safety Strategy [14] [PDF – 43 pages] [7]. Part of the strategy includes supporting vehicle technology systems that detect distracted driving.
- In 2021, Congress provided resources to add distracted driving awareness as part of driver's license exams as part of the Bipartisan Infrastructure Law [15] [PDF – 1,039 pages] [7].
- NHTSA leads several campaigns to:
  - In 2009, President Obama issued an Executive Order [7] prohibiting federal employees from texting while driving government vehicles or while using government equipment or on official government business.
  - In 2010, the Federal Motor Carrier Safety Administration and the Pipeline and Hazardous Materials Safety Administration banned text messaging while operating a commercial vehicle.[7]
  - In 2011, the Federal Motor Carrier Safety Administration and the Pipeline and Hazardous Materials Safety Administration banned hand-held cell phone use by commercial drivers.[7]
- NHTSA has several campaigns [7] to raise awareness of the dangers of distracted driving, including their annual "U Drive. U Text. U Pay." campaign and April's Distracted Driving Awareness Month.
- NHTSA has issued voluntary guidelines to promote safety by discouraging the introduction of both original equipment [16] [PDF – 177 pages] [7] and aftermarket electronic devices [17] that may be used while driving, reducing certain types of crashes.[13]

## Distracted Driving Fact Sheet

This fact sheet provides an overview of distracted driving and priming strategies that are being used to address distracted driving.

Distracted Driving Summary Fact Sheet [18] [PDF – 143 KB]

## Additional Resources

- CDC NIOSH – Transportation Risk Behaviors among High School Students — Youth Risk Behavior Survey, United States, 2019
- CDC NIOSH – Mobile Device Use While Driving — United States and Seven European Countries, 2011
- NHTSA – Distracted Driving [7]
- Governors Highway Safety Association – Distracted Driving [19]
- Insurance Institute for Highway Safety – Distracted Driving [9]
- World Health Organization – Mobile Phone Use: A Growing Problem of Driver Distraction [7]
- National Institute for Occupational Safety and Health (NIOSH) – Distracted Driving at Work
- National Highway Traffic Safety Administration (NHTSA) – Consumer Spotlight: Distracted Driving [7]

See All Resources

References

Last Reviewed: April 18, 2022
Source: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control

 



in Human Neuroscience

ORIGINAL RESEARCH
published: 16 August 2021
doi: 10.3389/fnhum.2021.659040



# Driving With Distraction: Measuring Brain Activity and Oculomotor Behavior Using fMRI and Eye-Tracking

Nicole H. Yuen[1,2], Fred Tam[2], Nathan W. Churchill[3], Tom A. Schweizer[3,4] and Simon J. Graham[1,2*]

[1] Department of Medical Biophysics, Faculty of Medicine, University of Toronto, Toronto, ON, Canada, [2] Physical Sciences Platform, Sunnybrook Research Institute, Toronto, ON, Canada, [3] Keenan Research Centre for Biomedical Science, St. Michael's Hospital, Toronto, ON, Canada, [4] Division of Neurosurgery, St. Michael's Hospital, Toronto, ON, Canada

**Introduction:** Driving motor vehicles is a complex task that depends heavily on how visual stimuli are received and subsequently processed by the brain. The potential impact of distraction on driving performance is well known and poses a safety concern – especially for individuals with cognitive impairments who may be clinically unfit to drive. The present study is the first to combine functional magnetic resonance imaging (fMRI) and eye-tracking during simulated driving with distraction, providing oculomotor metrics to enhance scientific understanding of the brain activity that supports driving performance.

**Materials and Methods:** As initial work, twelve healthy young, right-handed participants performed turns ranging in complexity, including simple right and left turns without oncoming traffic, and left turns with oncoming traffic. Distraction was introduced as an auditory task during straight driving, and during left turns with oncoming traffic. Eye-tracking data were recorded during fMRI to characterize fixations, saccades, pupil diameter and blink rate.

**Results:** Brain activation maps for right turns, left turns without oncoming traffic, left turns with oncoming traffic, and the distraction conditions were largely consistent with previous literature reporting the neural correlates of simulated driving. When the effects of distraction were evaluated for left turns with oncoming traffic, increased activation was observed in areas involved in executive function (e.g., middle and inferior frontal gyri) as well as decreased activation in the posterior brain (e.g., middle and superior occipital gyri). Whereas driving performance remained mostly unchanged (e.g., turn speed, time to turn, collisions), the oculomotor measures showed that distraction resulted in more consistent gaze at oncoming traffic in a small area of the visual scene; less time spent gazing at off-road targets (e.g., speedometer, rear-view mirror); more time spent performing saccadic eye movements; and decreased blink rate.

**Conclusion:** Oculomotor behavior modulated with driving task complexity and distraction in a manner consistent with the brain activation features revealed by fMRI.

## OPEN ACCESS

### Edited by:
Kuniyoshi L. Sakai,
The University of Tokyo, Japan

### Reviewed by:
Nina Maria Hanning,
Ludwig Maximilian University
of Munich, Germany
Stephen D. Mayhew,
University of Birmingham,
United Kingdom

### *Correspondence:
Simon J. Graham
simon.graham@utoronto.ca

### Specialty section:
This article was submitted to
Brain Imaging and Stimulation,
a section of the journal
Frontiers in Human Neuroscience

**Received:** 26 January 2021
**Accepted:** 29 June 2021
**Published:** 16 August 2021

### Citation:
Yuen NH, Tam F, Churchill NW,
Schweizer TA and Graham SJ (2021)
Driving With Distraction: Measuring
Brain Activity and Oculomotor
Behavior Using fMRI
and Eye-Tracking.
Front. Hum. Neurosci. 15:659040.
doi: 10.3389/fnhum.2021.659040

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 175 of 241

Yuen et al.                                                                                                          Driving With Distraction: fMRI, Eye-Tracking

The results suggest that eye-tracking technology should be included in future fMRI studies of simulated driving behavior in targeted populations, such as the elderly and individuals with cognitive complaints – ultimately toward developing better technology to assess and enhance fitness to drive.

Keywords: driving simulation, distraction, neural correlates of driving, fMRI, eye-tracking

## INTRODUCTION

Distracted driving poses a danger to drivers, passengers, pedestrians and cyclists and is a growing threat to road safety across the world. For example, the United States (US) National Highway Traffic Safety Administration reported 37,461 fatalities caused by motor vehicle crashes (MVCs) in 2016, with over 2 million people in the United States injured in MVCs each year (National Center for Statistics and Analysis, 2018). In many of these cases, the MVC occurred because drivers were engaged in dangerous multi-tasking (including activities such as texting, eating, or talking to a passenger). Such behavior can distract the driver from performing driving-related tasks safely, such as maintaining proper lane position (Hamish Jamson and Merat, 2005). The rapid development and widespread use of smart cellphone technology in particular has increased concerns over distracted driving - as texting while driving takes a hand away from the wheel, decreases visual attention to the road (Fitch et al., 2015), and impairs driving response and reaction time (Strayer and Drew, 2004; Drews et al., 2009). Studies have shown that distracted driving with cell phone usage results in failure to stop completely at stop signs, delayed braking responses and more rear-end collisions (Strayer and Drew, 2004; Kramer et al., 2006; Thompson et al., 2012). Cell phone usage alone has been attributed to approximately 15 – 25% of fatal distracted driving crashes (National Center for Statistics and Analysis, 2013; Ortiz et al., 2016).

From the perspective of psychological science, driving is a complex, demanding task that requires numerous cognitive abilities, including attention, memory, decision-making, and alertness to adapt to a rapidly changing environment. A decline in driving performance can arise due to processes that negatively affect such abilities, such as distraction (Lee et al., 2003; Cantin et al., 2009; Rizzo, 2011). Distraction, introduced as a secondary task that requires executive functions (as opposed to distraction by sudden, attention capturing events, such as children running into the street) has the potential to divert attention and resources from the primary driving task, thereby increasing risk of MVCs from degraded driving ability (Thompson et al., 2012).

Moreover, cognitive abilities are relevant for processing and responding to the continuous stream of sensory input that is received by the driver, requiring them to make informed and correct decisions, especially during complex road or traffic scenarios. Examples of these scenarios include driving at busy intersections, making left turns with oncoming traffic, or merging into traffic and making lane changes (Thompson et al., 2012; Noyce et al., 2017). Declines in cognitive abilities also pose a safety risk and potentially make the driver more prone to the

effects of distracted driving (Fraade-Blanar et al., 2018). Elderly and middle-aged drivers have been shown to commit significantly more driving errors and reduced steering wheel control when distracted (Thompson et al., 2012).

In many cases, physicians lack quantitative and objective tools to assess fitness to drive in patients, and must make such decisions based on clinical exam and rapid cognitive assessments that are often insufficiently informative (Marshall and Gilbert, 1999; Withaar et al., 2000). The decision to declare an individual unfit to drive is also complicated by the fact that in the developed world, driving is very often key to functional dependence and to employment.

Neuropsychological tests (NPTs) may also have a role in clinical and scientific settings in the assessment of fitness to drive and the ability to drive safely. These standardized behavioral tests are more detailed than clinical assessments and can be used to assess cognitive functions that underpin driving abilities, determining whether test performance is impaired in relation to population norms (Lundberg et al., 1997; Lezak et al., 2004). Although NPTs are useful to identify cognitive decline, they have not been established as good predictors of driving ability, however. For example, one study investigating a range of NPTs found that the best four-test combination was able to identify at-risk drivers with 95% specificity, but only 80% sensitivity (Bowers et al., 2013). Further research is needed to develop complex cognitive tasks or screening tools to predict driving performance better. As an initial part of this work, there is a strong need to understand the underlying brain activity associated with normal and unimpaired driving performance. From this information, it may be possible in the future to develop objective, robust behavioral methods to assess fitness to drive.

Many researchers have followed this line of thinking to study the task-related brain activity associated with various types of driving behavior, especially using the method of functional magnetic resonance imaging (fMRI). By necessity, these studies involve simulated rather than actual driving behavior, using various forms of virtual reality or video game technology to give test participants the simulated experience of driving while they lie in the magnet bore of an MRI system. The costs associated with fMRI and other practical considerations (e.g., access and availability) make it very unlikely that this imaging method can provide direct utility as a clinical tool for assessing fitness to drive – however, fMRI is very useful for providing scientific insight. Simulated driving studies using fMRI have revealed a broad network of task-related brain activity, engaging areas in all major lobes of the brain (Calhoun et al., 2002; Graydon et al., 2004; Callan et al., 2009; Crundall and Underwood, 2011; Calhoun and Pearlson, 2012; Choi

Case 1:24-cv-00304-EGS Document 21-5 Filed 04/26/24 Page 176 of 241

Yuen et al.                                                                                          Driving With Distraction: fMRI, Eye-Tracking

et al., 2017). In simple straight driving, increased activations in the visual-association, parietal and occipital regions were observed, related to visuomotor integration; additionally, the precentral gyrus, superior and inferior parietal lobules, and cerebellum were seen to activate and contribute to motor control (Calhoun and Pearlson, 2012). In a study investigating driving while concurrently performing arithmetic tasks, activations of the motor cortex, parietal and occipital lobes were seen to decrease in comparison to the driving only task; whereas the temporal and inferior frontal regions, associated with auditory processing and additional task performance, showed an increase in activation when concurrently performing a secondary task (Choi et al., 2017). Similarly, activation in the motor cortex, parietal and occipital lobes and superior temporal gyrus was reported when driving with an auditory task (Uchiyama et al., 2012). Furthermore, an auditory distraction task was reported to shift activation from the posterior and visual areas to the frontal regions, which are responsible for planning, decision-making and cognition (Schweizer et al., 2013).

Despite the knowledge gained from these studies, the interpretation of the brain activity associated with simulated driving behavior remains limited, as many brain areas are active when performing simulated driving tasks and it is difficult to link the contribution of specific areas to the various behavioral subcomponents of driving behavior. One method to overcome this difficulty involves augmenting the behavioral recording that is undertaken during fMRI experiments of simulated driving. In particular, vision and visual attention are extremely crucial to safe driving. Attention has been described to be involved in guiding eye movements, including point of gaze spatiotemporal characteristics, eye blink rate and pupil dilation (Schneider, 1995; Moore and Fallah, 2001). Such parameters can be readily measured using modern eye-tracking devices (Land, 2006). The introduction of a secondary task to driving has been shown to decrease the percentage of gaze points in peripheral regions (e.g., speedometer, rearview mirror), and to cause spatial gaze concentration due to the increased mental workload (Recarte and Nunes, 2003; Tsai et al., 2007). In addition, eye blink rate and duration have been shown to have associations with cognitive load in a range of behavior including word-naming tasks (Ohira, 1996), visuospatial memory tasks (Van Orden et al., 2001) and driving in various environments (Brookings et al., 1996; Tsai et al., 2007; Haak et al., 2009; McIntire et al., 2014; Faure et al., 2016). It has been suggested that the blink rate decreases to minimize the loss of incoming information, or to prevent disruption to cognitive processes involved in the mental task (Holland and Tarlow, 1972; McIntire et al., 2014; Maffei and Angrilli, 2018). One study that investigated changes in driving behavior in the presence of a secondary cognitive task found that when the driving environment was more demanding, blink rate decreased (Faure et al., 2016). Pupil dilation has also been observed to modulate cognitive processing. Greater dilation has been correlated with greater cognitive load across various mental tasks (Recarte and Nunes, 2003; Tsai et al., 2007; Palinko et al., 2010; Gable et al., 2015; Niezgoda et al., 2015) and individuals with better task performance have been shown to undergo a larger percent change in pupil size (Tsai et al., 2007; Palinko et al., 2010).

Because eye-tracking technology can be used to measure cognitive load, combining eye-tracking with fMRI is likely to support and inform the interpretations of the ensuing activation maps associated with simulated driving behavior by providing additional information about the participant behaviors during each task. At present, no studies have been conducted using both fMRI and eye-tracking simultaneously in the context of simulated driving.

To fill this gap in the scientific literature, the present study adopts simultaneous eye-tracking and fMRI. It is hypothesized that complex driving conditions will engage greater brain activity in areas involved in visual and motor processing, and that the addition of a distracting cognitive task will engage medial and lateral frontal areas, while decreasing the extent of occipital activation. It is also hypothesized that an increase in driving task demand and distraction during simulated driving will result in decreased gaze distribution and blink rate, and increased pupil diameter, and that these effects will correlate with similar changes in fMRI signals.

## MATERIALS AND METHODS

### Ethics Statement

This study was carried out in accordance with the recommendations of the Research Ethics Board at Sunnybrook Health Sciences Centre, Canada. All participants were given a full explanation of the experimental procedures and provided written informed consent prior to participating in the study.

### Participants

Nineteen healthy adults between the ages of 20 and 30 were recruited for this study. Seven participants were excluded due to unusable eye-tracker data quality (arising from factors such as blue eye color, and obstruction of the view between the eye and the eye-tracking video camera due to long eyelashes). Twelve participants remained for subsequent analysis (4 females and 8 males, mean age = 23.4 years, SD = 1.1 years) with mean driving experience of 5.3 years (SD = 2.1 years, range = 1.5 – 9.0 years). All participants had a valid driver's license in the Canadian province of Ontario, no history of psychological or neurological illness, and were able to be imaged in a 3 T MRI system (i.e., they were free from MRI exclusion criteria, such as claustrophobia or ferromagnetic implants). All participants were right-handed with normal or corrected vision. Ten of the participants were right-eye dominant (4 females, 6 males), whereas two were left-eye dominant (2 males).

### Driving Simulation

Simulated driving tasks were administered using STISIM Drive Software (Systems Technology, Inc., Hawthorne, CA, United States), controlled by custom fMRI-compatible driving simulator hardware (with foot pedals and steering wheel) (Kan et al., 2012). The steering wheel included response buttons embedded on the wheel that enabled participants to answer questions while driving, similar to modern steering wheels in real life that include buttons to adjust volume or answer cell

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 177 of 241

Yuen et al.                                                                                      Driving With Distraction: fMRI, Eye-Tracking

phone calls. The simulation environment was shown on a screen using an fMRI-compatible projector (Avotec SV-6011 LCD Projection System, Stuart, FL). The environment was observed by the participants through a mirror mounted on the head coil, and auditory stimuli were delivered through fMRI-compatible headphones (Avotec SS-3100, Stuart, FL).

Prior to the fMRI experiment, participants underwent training in an fMRI simulator for approximately one hour to familiarize them with the driving hardware and software. The training scenario included the same tasks to be performed during fMRI, in pseudo-randomized order. Participants were told to follow traffic laws and maintain the posted speed limit of 60 km/h during the session.

## Driving Tasks

When in the magnet, participants were again instructed to adhere to traffic lights and road rules while maintaining the posted speed of 60 km/h. The environment of the driving scenario was mainly rural, with minimal scenery, trees and buildings. Driving tasks included straight driving ("Straight," "S," **Figure 1A**) and turns at intersections with and without oncoming traffic, with or without having to perform an auditory task simultaneously. At task onset, participants were presented with an auditory recording of a male voice to mimic instructions from a modern navigation device (e.g., "At the intersection, turn right"). The recording occurred one hundred virtual meters in advance of the intersection (a time duration of approximately 6 s when driving at the speed limit). For all turning tasks, the intersection included a set of traffic lights with the appropriate light in the green "go" condition. Each participant performed eight trials of right-hand turns ("Right Turn," "R," not shown) and seven trials of left-hand turns ("Left Turn," "L," **Figure 1B**) without any traffic or distraction. To increase complexity of the driving task, oncoming traffic was introduced to left turns (without distraction), which required participants to decide when it was safe to turn ("Left Turn + Traffic," "LT"; seven trials, **Figure 1C**). To simulate distraction, an auditory task was presented to the participant as a general knowledge true or false question (e.g., "a hammer is lighter than a feather") during straight driving ("Straight + Audio," "SA"; six trials) and in left turns with oncoming traffic ("Left Turn + Traffic + Audio," "LTA"; seven trials), immediately after the turn instruction was presented. Questions were answered by pressing buttons corresponding to true and false on the steering wheel. During LTA and SA conditions, participants were not told to prioritize either the driving or the auditory task; and no error feedback was provided throughout all the task conditions, other than what each participant detected using their senses. The simulated driving scenarios were administered in pseudo-randomized order and were split into two runs to enable participants to remain vigilant without becoming fatigued. Each trial duration was approximately 20 s long, and each run had a duration of approximately 12 min (depending on the driving speed of the participant), for a total driving time of approximately 25 min. Straight driving after each turn task served as the baseline condition and was the same for all participants. Driving task trials were separated by at least 10 s of baseline straight driving

to minimize overlapping of fMRI and eye movement response signals between the various driving task conditions.

## Functional MRI Protocol

Once each participant completed the fMRI simulator session, they were asked to complete a screening form to ensure that they were able to undergo fMRI. The form was reviewed by the MRI technologist and after clearance was granted to enter the magnet room, the participant was positioned on the patient table of the MRI system. To increase participant comfort and to minimize body and head motion, pillows were placed under the knees for leg support, and pads were placed under the arms and elbows and beside the head. The foot pedals (accelerator and brake) were placed appropriately such that when they were fully depressed, there was no bulk body movement that could translate into unwanted head motion. The steering wheel was then placed over the torso. The fMRI-compatible headset was fitted on the participant over noise-reducing ear plugs, and the sound system was tested to ensure that the participant was able to hear instructions clearly during the driving scenarios. Because both hands were used to steer, the peripheral pulse monitor was placed on the toe to record heart beat information, rather than the standard placement on the finger. Respiration was monitored, and an emergency call squeeze bulb was placed on the participant so that they could discontinue the study for any reason, if they wished.

Two fMRI runs with simulated driving were performed to enable the participant to maintain vigilance throughout task performance and to reduce fatigue. Anatomical imaging was acquired at high spatial resolution in between the runs to allow the participant to rest their eyes. The fMRI session took approximately one hour to complete, involving 30 min of setup and calibration and 30 minutes of imaging. The driving scenarios were triggered synchronously with the start of fMRI data collection. Images were acquired using a 3.0 Tesla MRI system (Prisma, Siemens, Erlangen, Germany). Functional MRI during simulated driving was performed using T2*-weighted echo planar imaging (EPI; repetition time (TR) = 1.75 s, echo time (TE) = 30 ms, flip angle (FA) = 40°, field of view (FOV) = 256 × 256 mm², 60 slices, voxel size = 2.5 × 2.5 × 2.5 mm³, 377 time points). Anatomical imaging was performed using T1-weighted, three-dimensional magnetization prepared rapid acquisition gradient echo imaging (3D MPRAGE; TR = 1.8 s, TE = 2.21 ms, FA = 10°, FOV = 256 × 256 mm², 176 slices, voxel size = 1.0 × 1.0 × 1.0 mm³).

## Eye-Tracking Setup

An fMRI-compatible high-speed eye-tracker was used to record movements of the right eye for consistency of methodology, at 1000 Hz using a monocular system with a 50 mm lens (EyeLink 1000 Plus, SR Research Ltd., Mississauga, Canada) and infrared illumination (910 nm wavelength). The eye was tracked using corneal reflection, and the pupil was detected using a centroid fitting algorithm, using the standard hardware and software of the system. Metrics that were measured included brief pauses (ocular fixations) as well as rapid shifts (saccades) in the point of



**FIGURE 1 |** Screenshots of STISIM driving scenarios. **(A)** S, straight driving; **(B)** L, left turn at an intersection without traffic; and **(C)** LT, left turn with traffic.

gaze, fixations and blinks. Each sample included the time latency (measured from the time the tracker software was started), eye position on the display screen (measured as coordinates on the calibrated display screen), and pupil size (measured in arbitrary units).

If vision correction was required, the appropriate prescription MRI-compatible lens was selected and prepared. When the lens was placed in MRI-compatible frames, it created reflection onto the eye-tracker camera, preventing the eye to be tracked. To avoid this, the lens was gently placed on the participant's face, supported with tape and cotton pads (five participants). To calibrate the eye-tracking system, the participant was instructed to fixate on each of thirteen target locations on the display screen, appearing consecutively after a fixation on the target was detected. Following calibration, a validation procedure was undertaken to measure gaze position accuracy on the screen using the prior calibration parameters. Calibration and validation were performed before each simulated driving run. Eye-tracking measurements were started manually, then subsequent initialization of the fMRI acquisition sent a synchronous trigger to the eye-tracker to denote the time that the fMRI and driving scenario were started.

## Data Extraction and Analysis

### Driving Simulator Data

Driving simulator data were automatically generated and saved at the end of each driving scenario as an STISIM Drive data file. This output was parsed to extract the time series data of driving metrics that were measured. Driving metrics extracted included length of run, longitudinal position, lane position (deviation of lateral lane position of the vehicle referenced in relation to the center of the driver vehicle with respect to the roadway center dividing line), driving speed, vehicle heading angle, and number of collisions. These metrics, which have been used to characterize impaired driving performance in various patient populations with neurological impairment (e.g., Mansur et al., 2018; Hird et al., 2017), were converted into a matrix of size N × M (with N variables and M time points) and read into MATLAB (The MathWorks Inc., Natick, MA, United States). Metrics that were calculated in MATLAB included event onset time (longitudinal position of event onset converted into time), time to turn (time between event onset and when the vehicle heading angle was

at 25°, considered to be start of the turn position), turn speed (mean speed between turn start time and turn end time, after the vehicle heading angle returned to 0°), and question response time (time a response button was pressed minus the time the question was administered). Metrics of interest were concatenated for both driving runs. Statistical analyses of behavioral data were completed using Statistical Product and Service Solutions (SPSS) software (IBM SPSS Statistics Version 25, IBM, Armonk, NY, United States). Repeated Measures ANOVA tests were used to determine if there were significant differences between the time to turn and turn speed across R, L, LT, and LTA conditions, with subsequent Bonferroni-corrected *post hoc* contrasts to determine which factors were significantly different. Paired samples *t*-tests were used to assess significance of driving speed and lane position between S and SA conditions, and question response time and accuracy between SA and LTA conditions.

### MRI Data

The fMRI time series data were preprocessed using Analysis of Functional NeuroImages (AFNI) freeware (Cox, 1996) to remove large spikes in the time series, to correct for the physiological effects of the cardiac and respiratory cycles, to suppress artifacts from head motion correction (and ensuring no excessive head motion), and to correct for the slight differences in time that each image slice was acquired in each multi-slice acquisition of the brain volume (i.e., "slice-time correction"). The data were spatially smoothed using a 5 mm full width at half maximum Gaussian kernel, then normalized by the mean of each voxel. From the driving simulator data, the times of each event onset for all trials of all tasks (L, R, LT, LTA, S and SA conditions as defined in section "Driving Tasks") were extracted for both driving runs and saved as individual text files for each task. These event onset times, reflecting the time the auditory instructions were presented, were used to enter a stimulus timing file into a general linear model (GLM) using straight driving (the S condition) as the control, to estimate task-related brain activity at each voxel location. The stimulus-timing file, which included the full 20 s duration of each driving task, was convolved with a canonical hemodynamic response function with six regressors (head motion parameters in six degrees of freedom). The maps were then averaged in Talairach and Tournoux (TT) atlas space (Talairach and Tournoux, 1988) and thresholded using a false

discovery rate (Genovese et al., 2002) of q = 0.05 to correct for multiple statistical comparisons. Maps for all 12 participants were entered into a within-participants, random effects analysis of variance (ANOVA) to create final group activation maps, which were overlaid on an anatomical average in Talairach atlas space for interpretation. Activation maps were generated for the following task contrasts of interest: R − S, L − S, (L − S) − (R − S), LT − S, LT − L, LT − R, (LT − L) − (LT − R), SA − S, LTA − S, LTA − SA and LTA − LT.

### Eye-Tracker Data

The eye-tracker output data were converted from the native Eyelink Data File (.EDF) to ASCII text format and were then read into MATLAB. These data consisted of the raw pupil size time series, blink start and end times, saccade start and end times, fixation start and end times and the associated gaze locations on the display screen. The first data pre-processing step involved removing invalid pupil size samples (non-positive values, created by loss of eye target, eyelid occlusion or blinks). The remaining pupil size samples were subjected to additional criteria for removal, including dilation speed outliers and edge artifacts, trend-line deviation outliers, and samples that were temporally isolated (Kret and Sjak-Shie, 2019). Dilation speed outliers are samples that have a disproportionately large absolute pupil size change relative to adjacent samples, likely due to artifacts. These were detected based on the median absolute deviation calculated from the dilation speed. Trend-line deviation outliers are samples that deviate greatly from the signal trend line, which was generated through interpolation and data smoothing. Temporally isolated samples are likely the result of noise or system error (e.g., pupil detection when eyes are shut or not properly tracked) (Kret and Sjak-Shie, 2019).

A temporal threshold of 100 ms was subsequently used in the eye-tracking data to distinguish between fixations and saccades. This threshold is suitable for tasks that involve visual processing of complex geometric stimuli, whereas highly automatic processing (e.g., of the human face) typically involves longer fixations (Manor and Gordon, 2003). Fixations were grouped by tasks, then further grouped by areas of interest (road, non-road) within each task. Percentage of time spent in fixation (i.e., percent fixation duration) was measured as the total duration of fixations from the time of trial onset to the time the participant turned, divided by this time duration and multiplied by 100%. The spatial distribution of percent fixation duration was determined for each participant by the additive superposition of Gaussians, centered at each fixation location and weighted by the fixation duration. The distribution maps for each of the L, LT and LTA conditions were then averaged over all participants, and depicted as colored contour lines overlaid on the driving simulation screen. A Gaussian function was also fit to the distributions for each participant, resulting in estimated values for the percent fixation duration peak and width for each task condition. The sampling distributions of the peaks and widths were tested for normality using the Kolmogorov-Smirnov test using SPSS, then tested for differences using paired samples t-tests and 95% Confidence Interval (CI) testing by bootstrapping.

Saccades that did not meet the minimal saccadic duration of 10 ms were removed, and the percent saccade duration was measured as the total duration of saccades over the length of the trial (Nij Bijvank et al., 2018). The saccade amplitude, peak velocity, and number of performed saccades were also compared for each task.

The average percentage duration of each eye behavior, including saccades, blinks and fixations, was also plotted on a stacked bar graph for each left turn condition from the time of trial onset to the time of turning. Fixations were categorized as "road" (including motor vehicles), and non-road (including the horizon and interior locations of the driven car, such as the rear-view mirror and speedometer). In separate analyses, the effect of blink rate and pupil size was investigated over the time duration, measured as the time of trial onset to offset. Blink rate was calculated for each task as the number of recorded blinks for each participant divided by the total trial duration (reported as blinks per minute). Similarly, the mean pupil dilation size was calculated as the temporally averaged pupil size for each task condition.

### Relationships Between BOLD Signal and Eye-Tracking Metrics

To investigate the relationships between the BOLD signal and eye-tracking metrics, the mean BOLD signal intensity was first calculated in key brain regions that have been associated with eye movements, attention and cognitive processing (inferior frontal, inferior occipital, medial frontal, middle frontal, middle occipital, orbitofrontal, superior frontal, superior occipital, superior temporal and thalamic regions). The brain regions of interest were masked and the time series were averaged over all voxels in a given mask region. The mean BOLD signal intensity was then calculated for each left turn task (L, LT, and LTA). The differences in BOLD signal from the LT condition were then calculated as a change score for each region of interest (i.e., mean BOLD signal intensity of L − mean BOLD signal intensity of LT, and mean BOLD signal intensity of LTA − mean BOLD signal intensity of LT). Change scores for blink rate and pupil dilation were calculated in the analogous manner. Scatter plots were then generated to compare the change scores for the BOLD signal intensity and each eye-tracking metric to investigate the relationships based on the Pearson correlation value.

## RESULTS

### Driving Behavior

Descriptive statistics for the behavioral metrics of simulated driving performance, as obtained from the STISIM software and further calculated in MATLAB, are shown in **Table 1** for the S, SA, R, L, LT, and LTA conditions. Participants followed the rules of the road and were able to complete all the driving conditions "safely": a total of 2 collisions was observed across all participants for each of R, LT and LTA conditions, whereas only 1 collision was observed for the L condition (The metric was not relevant for the S and SA conditions). Moreover, a number of the behavioral metrics were not significantly different across the driving conditions. This included the time to turn

**TABLE 1** | Descriptive statistics of behavioral metrics of simulated driving performance: turn speed, time to turn and number of collisions in the turning tasks (R, L, LT, and LTA), driving speed and lane position in straight driving tasks (S, SA), and response time and response accuracy in audio tasks (SA, LTA).

| Condition | Turn speed | | | | Time to turn | | | | Collisions |
|---|---|---|---|---|---|---|---|---|---|
| | Mean (km/hr) | SD (km/hr) | 95% CI | | Mean (s) | SD (s) | 95% CI | | total count |
| | | | LB | UB | | | LB | UB | |
| R | 30.5 | 5.9 | 26.8 | 34.3 | 10.4 | 1.3 | 9.6 | 11.3 | 2 |
| L | 37.9 | 4.8 | 34.9 | 40.9 | 10.2 | 1.2 | 9.4 | 11.0 | 1 |
| LT | 35.6 | 3.4 | 33.4 | 37.7 | 9.9 | 2.5 | 8.3 | 11.5 | 2 |
| LTA | 34.3 | 3.0 | 32.4 | 36.3 | 10.5 | 1.7 | 9.4 | 11.6 | 2 |

| | Driving speed | | | | Lane position | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean (km/hr) | SD (km/hr) | 95% CI | | Mean (m) | SD (m) | 95% CI | |
| | | | LB | UB | | | LB | UB |
| S | 62.5 | 2.0 | 61.2 | 63.8 | 2.2 | 0.4 | 1.9 | 2.5 |
| SA | 60.4 | 0.8 | 59.9 | 60.9 | 2.3 | 0.3 | 2.1 | 2.5 |

| | Response time | | | | Response accuracy | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean (s) | SD (s) | 95% CI | | Mean (%) | SD (%) | 95% CI | |
| | | | LB | UB | | | LB | UB |
| SA | 4.1 | 0.7 | 3.6 | 4.6 | 83.3 | 20.1 | 70.6 | 96.1 |
| LTA | 4.1 | 1.3 | 3.3 | 5.0 | 77.4 | 14.2 | 68.3 | 86.4 |

*SD, standard deviation; CI, Confidence Interval; LB, Lower Bound; UB, Upper Bound. R, right turns; L, left turns; LT, left turns with oncoming traffic; LTA, left turns with oncoming traffic and auditory distraction; S, straight driving; SA, straight driving with auditory distraction.*

(Repeated Measures ANOVA; $p > 0.05$), and lane position for the S and SA conditions (paired samples $t$-test; $p > 0.05$). However, a paired samples t-test showed that driving speed (reported as the mean (SD), where SD is the standard deviation) for the SA condition (60.4 (0.8) km/hr) was significantly slower than that of S condition (62.5 (2.0) km/hr). In addition, there was a significant effect of turning condition on turn speed (Repeated Measures ANOVA; $p < 0.05$; **Figure 2B**). Bonferroni-corrected *post hoc* contrasts showed no significant differences in the turn speed between L and LT conditions, and between R and LTA conditions. The turn speed was significantly slower for the R condition (30.5 (5.9) km/hr) than for the L condition (37.9 (4.8) km/hr), and similar contrast was found between the R and LT condition (35.6 (3.4) km/hr) (corrected $p < 0.05$). In addition, the turn speed for the LTA condition (34.3 (3.1) km/hr) was significantly slower than for the L condition (corrected $p < 0.05$).

Regarding the auditory task performance during distracted simulated driving, paired samples t-tests did not reveal significant differences between the SA and the LTA conditions, neither for question response time, nor response accuracy ($p > 0.05$). Notably, the mean (SD) of the response time was 4.1 (1.0) s over both conditions, whereas the time to turn in the LTA task was 10.5 (1.7) s. Because the time to turn was not significantly elevated for the LTA condition in comparison to the other turn conditions and the turn speed was slower for the LTA condition than for the L condition, this suggests that participants were dual-tasking rather than performing the two tasks sequentially during the LTA

condition. If the tasks were performed sequentially, then a time to turn of approximately $10.5 + 4.1 = 14.6$ s would have been expected for the LTA task. As this was not observed, it can be inferred that the tasks were performed in parallel.

## Brain Activity
### Regular Driving

Brain activations are reported relative to the S control condition. The R (**Figure 2A**) and L (**Figure 2B**) turning conditions without traffic showed similar activation maps ($p < 0.001$), and contrast maps between the two conditions were not significantly different. Both R and L conditions showed significant positive bilateral activation in the occipital (lingual gyrus, middle occipital), inferior parietal, primary motor, primary somatosensory and premotor cortices. Activation was also observed in the precuneus, cerebellum and basal ganglia.

The addition of oncoming traffic to left turns (LT, **Figure 2C**) produced activation maps ($p < 0.001$) that were very similar to those for the R and L conditions. Although negative activations were slightly more extensive in the frontal (left inferior, left and right medial, left middle, left superior) cortex and the anterior cingulate cortex, the contrast maps between the regular driving conditions (LT − L, LT − R) did not show statistically significant differences ($p > 0.01$).

### Distracted Driving

When evaluating the differences in brain activation between distracted straight driving and straight driving conditions, the

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 181 of 241

Yuen et al.                                                                                                                                   Driving With Distraction: fMRI, Eye-Tracking



**FIGURE 2 |** Brain activations of participants when performing regular driving tasks: **(A)** R, right turns; **(B)** L, left turns; **(C)** LT, left turns with oncoming traffic. Activations are shown as *t* contrasts in comparison with straight driving, and are reported with a statistical significance threshold of *p* < 0.001. "Right" indicates the right cerebral hemisphere.

(SA − S) contrast showed significant positive activations in the temporal (left and right superior, right middle) and frontal (left and right inferior) cortices and the anterior cingulate cortex (*p* < 0.001, **Figure 3A**). No significant activation was observed in the occipital, parietal and somatosensory areas. The (LTA − S) contrast was evaluated in analogous fashion. In addition to activations in occipital, parietal, motor, somatosensory and cerebellar regions observed for the L and LT conditions, the LTA condition showed greater positive activations in relation to the S condition in frontal (right middle, left and right inferior) and temporal (left and right middle and superior) cortices, anterior cingulate cortex and insula (*p* < 0.001, **Figure 3B**).

Next, the difference maps between LTA − SA and LTA − LT are shown in **Figure 4**. These two contrasts are of interest as they serve to illustrate the differing effects of distraction response for different driving demands. Compared to SA, LTA showed significantly greater activation in the left and right superior temporal gyrus (*p* < 0.001, **Figure 4A**). Significant increases in activation were also seen in the occipital (middle, superior); the primary motor, somatosensory and premotor cortices; as well as the precuneus and cerebellum. Significant decreases in activation were seen in the left inferior frontal gyrus. Compared to LT, LTA showed significantly greater activation in the frontal (left and right inferior, left superior, left medial, left middle), temporal (left and right middle, left and right superior) cortices and precuneus (*p* < 0.001, **Figure 4B**). Significant decreases were observed in the right occipital (middle, superior), right inferior parietal, and cerebellar areas.

The activations shown in **Figures 2–4** are subsequently listed in **Table 2**, which provides the *t*-value of peak activation, the

location of each peak in Talairach and Tourneaux (TT) atlas coordinates and the associated brain region in the TT atlas.

## Oculomotor Measures

Contour lines representing the spatial distribution of percent fixation duration for the L, LT and LTA conditions are shown in **Figure 5**, overlaid on the driving simulation environment. The distribution map for the L condition showed the widest span of fixation across the screen, including peripheral areas (mirror and speedometer) and the left side of the screen. The LT condition showed less fixation on the left side of the screen, as participants directed their gaze more to the oncoming traffic. The addition of auditory distraction in the LTA condition further narrowed the percent fixation duration onto the road immediately ahead.

Statistical analyses were subsequently conducted to test for the effects of driving condition on the spatial distribution of percent fixation duration. The sampling distributions of the peak amplitudes and widths of the percent fixation duration were normal for the L, LT, and LTA conditions (Kolmogorov-Smirnov Test, *p* < 0.05). No significant differences were found in the percent fixation duration distribution widths between these conditions, and no significant differences were found in the peak amplitudes of the fixation distribution between LT and L. However, the 95% CI testing of the mean difference of estimated peak amplitudes between "LTA − L" and "LTA − LT" rejected the null hypothesis. The peak amplitude for the LTA condition (56.8 (7.8)%) was found to be significantly greater than the values for both the LT condition (27.4 (4.5)%) and the L conditions (25.4 (3.4)%) (95% CI Testing, Paired Samples *T*-Test, *p* < 0.05). The interpretation of this effect is that during the LTA condition,



**FIGURE 3 |** Brain activations of participants when performing driving tasks while distracted. **(A)** SA, straight driving with audio task; **(B)** LTA, left turns with oncoming traffic and audio. Activations are shown as t contrasts in comparison with straight driving, and are reported with a statistical significance threshold of $p < 0.001$. "Right" indicates the right cerebral hemisphere.



**FIGURE 4 |** Brain activation maps of contrast between task factors: **(A)** LTA – SA, Left turns with oncoming traffic and audio vs. straight driving with audio; and **(B)** LTA – L, left turns with oncoming traffic and audio vs. left turns with oncoming traffic without audio. Activations are shown with a statistical significance threshold of $p < 0.001$. "Right" indicates the right cerebral hemisphere.

the spatial distribution of percent fixation duration for each participant was more consistent across the group than during the other two conditions.

Next, the average percentage of time spent performing each different eye behavior (fixations, saccades, blinks) was plotted in a stacked bar graph for each left turn task condition (**Figure 6**). No significant differences were found for the time spent fixating on the road (including motor vehicles) between LTA and LT conditions (Repeated Measures ANOVA; $p > 0.05$), whereas a significant elevation was found for LT compared to L (mean difference = 7.2%, Repeated Measures ANOVA; $p < 0.05$). Time spent fixating on non-road locations showed decreases with increasing task complexity, with mean differences of $-7.3\%$ and $-3.3\%$ for LTA compared to L and LTA compared to LT, respectively (Repeated Measures ANOVA; $p < 0.05$). The percentage of time performing saccades was significantly increased for LTA compared to LT and compared to L (mean difference = 5.4%, 5.0% respectively, Repeated Measures

ANOVA; $p < 0.05$). No significant differences were observed between the peak velocity and number of saccades performed across the three tasks, however the mean saccade amplitude for the LTA condition (2.6 (0.28) units) was significantly less than that for the L condition (3.3 (0.35) units) (Repeated Measures ANOVA; $p < 0.05$).

In a separate analysis of eye-blink behavior (i.e., not reported in **Figure 6**), the mean blink rate over the total trial duration for the LTA condition [34.8 blinks/min (3.8)] was significantly lower than that for the L condition (37.0 blinks/min (5.3), Repeated Measures ANOVA; $p < 0.05$). No significant differences were found for the mean pupil dilation size for L, LT and LTA, although an increasing trend was observed across the conditions.

## Relationships Between Eye-Tracking Metrics and BOLD Signals

No significant relationships were found between the mean BOLD signal intensity and pupil dilation size. However,

Yuen et al.

Driving With Distraction: fMRI, Eye-Tracking

**TABLE 2 |** Peak activation (*t*-value), spatial coordinates (Left, Posterior, Inferior) and brain region of statistically significant brain activity with respect to the Talairach and Tournoux (TT) brain atlas.

| Peak activation intensity (*t*-value) | Atlas coordinates | | | TT Atlas region |
|---|---|---|---|---|
| | **L** | **P** | **I** | |
| **R - S** | | | | |
| 16.45 | 9 | 59 | 64 | Left Precuneus, BA 7 |
| 14.20 | 11 | 34 | 71 | Left Postcentral Gyrus, BA 3 |
| 9.89 | −26 | 61 | −14 | Right Declive |
| 7.48 | 39 | 64 | −14 | Left Fusiform Gyrus, BA 19 |
| 7.06 | 29 | 66 | −14 | Left Declive |
| 7.03 | −1 | 1 | 49 | Right Medial Frontal Gyrus, BA 6 |
| 6.39 | −11 | 69 | 6 | Right Cuneus, BA 18 |
| 6.04 | −11 | 76 | 4 | Right Lingual Gyrus, BA 18 |
| 5.93 | −21 | 6 | 61 | Right Middle Frontal Gyrus, BA 6 |
| 5.03 | 9 | 69 | 11 | Left Cuneus, BA 30 |
| 5.02 | 9 | 94 | -9 | Left Lingual Gyrus, BA 17 |
| **L - S** | | | | |
| 12.67 | −14 | 79 | 41 | Right Precuneus, BA 7 |
| 10.10 | 26 | 74 | −16 | Left Declive |
| 9.72 | −16 | 81 | 36 | Right Cuneus, BA 19 |
| 9.51 | −24 | 66 | −14 | Right Declive |
| 8.14 | −1 | 14 | 54 | Right Medial Frontal Gyrus, BA 6 |
| 7.86 | 1 | 26 | 56 | Left Medial Frontal Gyrus, BA 6 |
| 6.21 | 26 | 49 | −11 | Left Culmen, BA 37 |
| 6.11 | 29 | 84 | 6 | Left Middle Occipital Gyrus, BA 18 |
| 5.94 | −19 | 59 | 16 | Right Posterior Cingulate, BA 30 |
| 5.85 | −24 | 49 | −11 | Right Culmen, BA 37 |
| 5.75 | −1 | 41 | −9 | Right Cerebellar Lingual |
| **LT - S** | | | | |
| 11.38 | −14 | 79 | 41 | Right Precuneus, BA 7 |
| 9.51 | −26 | 66 | −16 | Right Declive |
| 8.60 | 26 | 76 | −16 | Left Declive |
| 6.62 | −4 | 1 | 46 | Right Cingulate Gyrus, BA 24 |
| 6.34 | −1 | 11 | 49 | Right Medial Frontal Gyrus |
| 6.08 | 1 | 76 | −1 | Left Lingual Gyrus, BA 18 |
| 6.06 | 6 | 44 | 49 | Left Precuneus, BA 7 |
| 5.82 | 16 | 36 | −39 | Left Cerebellar Tonsil |
| 5.66 | −24 | 46 | −11 | Right Culmen, BA 37 |
| 5.38 | 44 | 26 | 11 | Left Transverse Temporal Gyrus, BA 41 |
| 5.07 | −11 | 46 | −46 | Right Cerebellar Tonsil |
| 5.02 | −19 | 59 | 19 | Left Posterior Cingulate |
| **SA - S** | | | | |
| 4.48 | 1 | −9 | 51 | Left Superior Frontal Gyrus, BA 6 |
| 4.33 | −49 | 31 | 1 | Right Middle Temporal Gyrus, BA 21 |
| 3.71 | −49 | 39 | 6 | Right Superior Temporal Gyrus, BA 22 |

*(Continued)*

**TABLE 2 |** Continued

| Peak activation intensity (*t*-value) | Atlas coordinates | | | TT Atlas region |
|---|---|---|---|---|
| | **L** | **P** | **I** | |
| **LTA - S** | | | | |
| 9.39 | −29 | 66 | −16 | Right Declive |
| 8.28 | −1 | 56 | 49 | Right Precuneus, BA 7 |
| 7.13 | 16 | 79 | 36 | Left Precuneus, BA 7 |
| 7.05 | 29 | 66 | −14 | Left Declive |
| 6.92 | −51 | 21 | 11 | Right Transverse Temporal Gyrus, BA 41 |
| 6.47 | −1 | 6 | 44 | Right Cingulate Gyrus, BA 24 |
| 6.32 | −1 | 11 | 51 | Right Medial Frontal Gyrus, BA 6 |
| 5.36 | 1 | -11 | 39 | Left Cingulate Gyrus, BA 24, 32 |
| **LTA - SA** | | | | |
| 10.18 | −1 | 56 | 49 | Right Precuneus, BA 7 |
| 7.67 | −29 | 69 | −14 | Right Declive |
| 6.60 | −19 | 56 | 19 | Right Posterior Cingulate |
| 6.46 | −21 | 26 | −21 | Right Culmen |
| 5.91 | −1 | 11 | 51 | Right Medial Frontal Gyrus, BA 6 |
| 5.53 | 46 | 24 | 11 | Left Transverse Temporal Gyrus, BA 41 |
| 5.42 | 11 | 44 | −44 | Left Cerebellar Tonsil |
| **LTA - LT** | | | | |
| 9.23 | 51 | −19 | −1 | Left Inferior Frontal Gyrus, BA 47 |
| 6.61 | 64 | 29 | 6 | Left Superior Temporal Gyrus, BA 42 |
| 4.12 | 44 | −4 | 44 | Left Middle Frontal Gyrus, BA 6 |
| 3.83 | 54 | 51 | 9 | Left Middle Temporal Gyrus, BA 22 |
| 3.67 | 14 | −46 | 41 | Left Superior Frontal Gyrus, BA 8 |
| 3.25 | −46 | 36 | 4 | Right Superior Temporal Gyrus, BA 22 |
| 1.71 | −36 | 56 | 24 | Right Middle Temporal Gyrus, BA 39 |

*BA, Brodmann Area; S, straight driving; SA, straight driving with auditory distraction; L, left turns; R, right turns; LT, left turns with oncoming traffic; LTA, left turns with oncoming traffic and auditory distraction. Atlas coordinates L, left; P, posterior; I, inferior. Not all regions of significant activation are reported, with a cutoff value of t = 5 (unless there were less than 3 regions greater than this cutoff). Each peak within a given activation zone is only reported once.*

scatter plots showing the change scores for the mean BOLD signal intensity and blink rate (L − LT, LTA − LT) showed negative, statistically significant Pearson correlations in the insula [mean slope of −0.13 (0.05)], middle frontal [−0.01 (0.04)] and superior temporal [−0.03 (0.07)] regions, as shown in **Figure 7**. A positive, statistically significant Pearson correlation was found in the middle occipital gyrus [0.02 (0.02)].

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 184 of 241

Yuen et al.                                                                                    Driving With Distraction: fMRI, Eye-Tracking

## DISCUSSION

The present study investigated simulated driving using the novel combination of fMRI and eye-tracking. As the study was intended to investigate whether it was possible to replicate the fMRI findings of Schweizer et al. (2013) using the same task design, comparisons to this prior work are made throughout. In addition, given that driving requires considerable visual processing demands, the study extends beyond Schweizer et al. (2013) to include eye-tracking for an initial evaluation of oculomotor measures for each task, and their relationship with simulated driving task-related behavior and brain activity. The results of the study are in good agreement with the stated hypotheses, and are discussed below for the behavioral metrics of the driving simulator performance, brain activity and oculomotor measures. The inter-relationships between these measures are then discussed, followed by the limitations of the study.

### Behavioral Metrics of Simulated Driving

The behavioral metrics of simulated driving performance (**Table 1**) indicated that the R, L, LT, and LTA conditions were performed well by participants for the most part, while they obeyed the "rules of the road." Over all participants and fMRI runs, only two collisions were observed for both the LT and LTA conditions, whereas only one collision was observed for the L condition. Only one participant was involved in multiple collisions (one in each of the R, LT, and LTA conditions). The left turn conditions were performed similarly by all participants on the time to turn metric, and the turn speed was similar in the L and LT conditions. In addition, the S and SA conditions were performed without differences in lane position. These results suggest that each of the simulated driving conditions, while containing variations in the complexity of task, were well within the skill level for efficient execution by the participants without large changes in the behavioral metrics studied. It is important to emphasize that these results are specific to young healthy drivers, and analogous results for other populations of interest, such as elderly drivers or individuals with cognitive impairments, are likely to be different.

Two noteworthy differences in simulated driving performance were found between certain conditions. First, the turn speed was significantly slower for the R condition than for the L, LT and LTA conditions. This may have resulted from the smaller turning radius of the road when turning right, resulting in slower turn speeds to drive safely and maintain lane position. However, the R and L conditions showed similar brain activation maps (see below), suggesting that both turns require similar behavioral elements. Second, there were slight but significant reductions in driving speed associated with distracted driving. The effect was slightly more pronounced when comparing the SA and S conditions, whereas the slowing in the LTA condition was only significant in comparison to the L condition, not the LT condition. These results suggest that the primary task (driving) was slightly impacted by the additional cognitive demand associated with responding to the secondary task (auditory questions) in both cases. From the auditory task performance, there was no evidence that participants were making trade-offs

between how well to perform the driving tasks in comparison to the auditory task – as the question response time and response accuracy was not statistically significant between the LTA and SA conditions. This may be due to the age of the participants, or the auditory tasks that were administered (general knowledge true or false questions), as they were not very demanding. This effect on driving speed could be investigated in more detail in the future by conducting a behavioral study with more participants, and by manipulating the strength of the auditory distraction. Certain behavioral data related to the LTA condition were also noteworthy: the question response time was substantially shorter than the time to turn, and the time to turn was not significantly different from that of the LT condition. As described in the Results, these findings suggest that participants engaged in driving-auditory dual-tasking in the LTA condition rather than performing the two tasks sequentially.

The results observed in this study were similar to those previously reported by Schweizer et al. (2013), however some slight discrepancies were also observed. In both studies, no significant differences were found between the lane position in straight driving and distracted straight driving. The average response accuracy to the audio distraction task was also similar, and the observed turn speed of right turns was slower than all left turns (L, LT and LTA). In this study, the turn speed of the L condition was faster than both LT and LTA, whereas Schweizer et al. (2013) reported the turn speed of the L condition was slower than both LT and LTA. Additionally, no significant differences were previously observed in the average speed during straight driving and distracted straight driving. It is reasonable to speculate that these discrepancies were observed due to the different cohorts investigated in the two studies, the relatively low sample size and the variability in human behavior. None of the participants volunteered in both studies. Although the two studies were conducted using slightly different versions of fMRI-compatible driving simulator, one-hour simulator training periods were part of the experimental design in both cases to control for systematic bias. Irrespective of the discrepancies, the simulated driving behavior in the present study helps to inform the interpretation of the task-related brain activation maps, as discussed below.

### Brain Activity

Previous simulated driving studies have shown a network of brain regions activated during straight driving, including the occipital and parietal lobes, cerebellum, and areas involved in motor control and somatosensory integration (Calhoun et al., 2002; Uchiyama et al., 2003; Graydon et al., 2004; Spiers and Maguire, 2007; Just et al., 2008; Callan et al., 2009; Crundall and Underwood, 2011; Calhoun and Pearlson, 2012; Li et al., 2012; Schweizer et al., 2013; Hyung-Sik et al., 2014; Choi et al., 2017; Ware et al., 2020). Straight driving involves visual vigilance and small adjustments in driving control to maintain speed and lane position. To isolate the visual, motor and cognitive functions activated in more demanding driving tasks (e.g., performing turns), straight driving was chosen as the baseline condition. As such, all the subsequent activation maps of the task conditions must be thought of as referenced to this baseline behavior, and

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 185 of 241

Yuen et al.                                                                                                          Driving With Distraction: fMRI, Eye-Tracking



FIGURE 5 | Distribution of gaze in the various tasks, averaged over all participants. Maps of percent fixation duration were computed as described in the text, and are shown as contour lines overlaid on the driving simulation screen. **(A)** L, left turn condition; **(B)** LT, left turn with traffic condition; and **(C)** LTA, left turns with traffic and auditory distraction.



FIGURE 6 | Percentage of time spent on eye movements for L, left turns; LT, left turns with oncoming traffic; and LTA, left turns with oncoming traffic and auditory distraction. Fixations on the road are shown in blue, fixations away from the road are shown in green, saccades are shown in yellow and blinks are shown in orange. Horizontal bars and asterisks represent statistically significant differences at $p < 0.05$.

represent an augmentation of this supposedly least-taxing state of driving and associated brain activity.

In this study, occipital, parietal, cerebellar and motor areas were recruited in both the R and L conditions, and also the LT condition (**Figure 2**). The brain regions that were found to be activated (occipital, parietal, cerebellar and motor areas) were

consistent with previous studies investigating simple driving as noted above (Calhoun et al., 2002; Uchiyama et al., 2003; Graydon et al., 2004; Spiers and Maguire, 2007; Callan et al., 2009; Crundall and Underwood, 2011; Calhoun and Pearlson, 2012; Li et al., 2012; Hyung-Sik et al., 2014; Choi et al., 2017; Ware et al., 2020). Some additional aspects are noteworthy. First, the driving

Yuen et al.                                                                                                    Driving With Distraction: fMRI, Eye-Tracking



**FIGURE 7 |** Mean change in BOLD fMRI signal vs. mean change in blink rate for "L – LT" (green) and "LTA – LT" (blue) task contrasts for the insula, and regions of interest in the middle frontal, middle occipital and superior temporal gyri. The dotted line connects the data points for each participant. The linear regression line is shown in black, with the 95% confidence interval for the regression line shown in red. BOLD, blood oxygenation level dependent; L, left turns; LT, left turns with oncoming traffic; LTA, left turns with oncoming traffic and auditory distraction.

conditions showed decreased activity in the medial frontal cortex and anterior cingulate cortex (ACC). Both regions are part of the default mode network (DMN), which decreases in activity when performing tasks (Raichle, 2015). Thus, it is speculated that the more engaging R, L, and LT conditions produced more suppression of the DMN than occurred during straight driving. Second, minimal activity was observed in the rest of the prefrontal cortex, suggesting that the R, L, and LT conditions were performed by the participants as a consequence of extensive training and practice in driving maneuvers, leading to efficient mental processing controlled primarily by the posterior brain, largely in the absence of executive control. Third, no significant differences were found in the brain activation between R, L and LT conditions. The lack of difference in brain activation between R and L conditions is expected because the task requirements are largely the same, except that the direction of simulated movement is different. Additionally, the lack of difference in brain activation between the LT and L or R conditions is consistent with the behavioral metrics, which showed that each condition produced a similar time of turning. This suggests that the inclusion of traffic to left turns was not very challenging for this cohort of young but experienced drivers.

The present results are similar to but slightly different from those reported by Schweizer et al. (2013), in which the R condition produced minimal significant activations, including the somatosensory association, parietal and visual cortices, whereas the L condition showed greater activation in the posterior regions (occipital, parietal, motor, cerebellar), and the LT condition showed a progressive increase in the extent of activation in the posterior network and cingulate cortex. Two methodological elements are noteworthy in discussing the findings of this prior study in relation to the present work. First, the differences in brain activation between conditions were assessed visually and qualitatively in the prior study, whereas the present study used a quantitative assessment of statistical contrasts. Thus, it is possible that effects interpreted between conditions in the previous study were not statistically significant. Second, as previously discussed in section 4.1 above, the two studies consist of different samples of young healthy adults. Although the two studies were conducted using slightly different versions of 3T Siemens MRI system, systematic differences arising from this effect are anticipated to be minor when comparing task-related brain activity at the group level.

Shifting to the effects of distraction on brain activity, brain activations were observed in the middle and superior temporal gyrus (MTG, STG) when the LTA – S contrast was evaluated (**Figure 3A**). These regions have previously been associated with cognitive processes including language and semantic processing, spatial awareness, and attentional processing from the dorsal and ventral streams (Chao et al., 1999; Tranel et al., 1997; Onitsuka et al., 2004). Similar effects were observed for the LTA – S contrast (**Figure 3B**). Furthermore, the LTA – SA contrast showed activation of the STG, occipital, primary motor and premotor cortices, whereas significant decreases in activations were observed in the left inferior frontal gyrus (IFG) (**Figure 4A**). The activations in the occipital, primary motor and premotor cortices are consistent with the increased visuomotor demands associated with performing left turns with oncoming traffic in the LTA condition in relation to the straight driving required in the SA condition. Greater activation in the STG suggests a higher demand for cognitive processing in the LTA condition in relation to the SA condition. In addition, the LTA condition showed less activation of the left IFG compared to the SA condition. The left IFG has been linked to language processing and working memory, and has been found to be activated during semantic tasks (Petersen et al., 1989; Démonet et al., 1992; Moss et al., 2005; Liakakis et al., 2011). Two possible mechanisms may be speculated for the observed decrease in activation, although future work with a larger sample size will be required to determine which is correct. From **Table 1**, there was a trend for lower response accuracy for the auditory task in the LTA condition compared to the SA condition, but without statistical significance. Considering this trend as a "false positive," then the difference in IFG activity (and inferred resources for language processing) should disappear with larger sample size. Alternatively, if the trend is thought of as a "false negative," then both the difference in response accuracy and IFG activity should persist in a study with larger sample size. As the task instructions were not specific about prioritizing the auditory task, it is conceivable that participants performed as they would in the real world, to trade off auditory task performance to ensure safe driving behavior in the more cognitively demanding task (LTA compared to SA). The observed trend in response accuracy is consistent with this interpretation, although no more definite statements can be made at present.

Distraction poses a great risk to drivers especially when they perform left turns. Of the MVCs that occur while drivers turn or cross an intersection, 61% involve turning in the left direction (U.S. Department of Transportation National Highway Traffic Safety Administration, 2008). Compared to L or LT conditions, the LTA condition showed significantly greater bilateral activation in the middle frontal gyrus (MFG), IFG, SFG, MTG, STG and ACC (**Figure 4B**). In particular, the increase in frontal activity is characteristic of dual-tasking (Dux et al., 2006) and is consistent with the hypotheses of the study. The right MFG and IFG have been associated with the ventral attention network, activated in response to unexpected stimuli and to attend to relevant task information and distractors (Friedman-Hill et al., 2003; Hahn et al., 2006; Buschman and Miller, 2007; Fan et al., 2008; Neufang et al., 2011; Weissman and Prado,

2012; Japee et al., 2015). The IFG has also been suggested to be play a role in sustained attention, attentional control, working memory and motor response inhibition (Swick et al., 2008; Hampshire et al., 2010; Tops and Boksem, 2011). The activation of this region suggests the involvement of attentional control and reorientation when a secondary task was introduced. The left SFG is known to play a role in working memory and executive processing, suggesting that recruitment of this region is necessary for performance of the auditory task (Boisgueheneuc et al., 2006). Recruitment of the MTG and STG suggests involvement of spatial awareness and attentional processing to undertake executive functions and additional task processing, consistent with previous findings (Schweizer et al., 2013). The ACC has been linked to cognitive modulation and error processing (Bush et al., 2000; Paus, 2001; Fan et al., 2008; Orr and Hester, 2012). Greater activation in the ACC suggests that the secondary auditory task increased the overall cognitive load, and thus the need to monitor and correct for errors.

In addition to the regions of increased activation in the LTA condition compared to the LT or L conditions, significantly decreased activation was observed in the right middle occipital gyrus (MOG), superior occipital gyrus (SOG), right inferior parietal lobe (IPL), cerebellum and precuneus. This observation is also in line with the study hypotheses. The right MOG and SOG are considered to be part of the visual dorsal stream, associated with spatial and visuomotor processing (Dumoulin et al., 2000; Wandell et al., 2007; Matthys et al., 2009; Renier et al., 2010), and the right IPL is involved in sustained visual and somatosensory attention (Wilkins et al., 1987; Pardo et al., 1991; Rueckert and Grafman, 1996, 1998). These results are in agreement with those of previous studies that investigated brain activity in simulated driving with a relatively simple secondary behavioral task, showing a shift in activation from the posterior, visual areas to the frontal areas responsible for planning, decision-making and cognition (Just et al., 2008; Schweizer et al., 2013; Choi et al., 2017).

## Oculomotor Measures

Investigating the same driving tasks as in the present work, Schweizer et al. (2013) stated that "the distracted brain sacrificed areas in the posterior brain important for visual attention and alertness to recruit enough brain resources to perform a secondary cognitive task." However, the inclusion of oculomotor measures in the present study, as subsequently described below, suggest an additional, alternative interpretation. Given the task instructions, participants modified their gaze behavior to maintain the ability to make left turns in the presence of oncoming traffic. As the task was performed in a simulator under very simple conditions, there were no significant task penalties associated with not gazing at off-road areas such as the dash-board and rear-view mirror. Instead, in the presence of distraction there were performance advantages to directing gaze much more consistently at the oncoming traffic to simplify the visual processing demands (and the resulting brain activity). Additional experimental methodology involving augmented simulated driving tasks will be required to evaluate these two interpretations further.

Case 1:24-cv-00304-EGS    Document 21-5    Filed 04/26/24    Page 188 of 241

Yuen et al.                                                                                              Driving With Distraction: fMRI, Eye-Tracking

There is a correlation between distraction and increased risk of crashes and near-crashes (2006). The implication of interest here is that one of the effects of distraction, contributing to its role in dangerous driving, is an associated modification in visual processing that can potentially stop drivers from reacting to possible threats. Supporting the modulation of visual processing in the present study, and as hypothesized, it was found that the less demanding left turn task (i.e., L condition) resulted in a wide distribution of gaze points across the scene as quantified using the percent fixation duration map, including peripheral areas (mirror and speedometer) and the left side of the road (**Figure 5**); as the task became more demanding, (i.e., LT condition), the distribution remained similar, although there was an increase in the fraction of time spent fixating on the road at oncoming traffic, as appropriate for the specific task (**Figure 6**). With the introduction of distraction (i.e., the LTA condition), the fixation distribution narrowed: the fixation duration onto the immediate road and oncoming vehicles was increased further, as participants concentrated on the essential features of the visual scene to maintain driving performance. Although differences in the widths of the fixation distribution were not significantly different (LTA – LT, LTA – L), the effect was nevertheless detected as an increase in the mean peak amplitude of the fixation distribution for these contrasts. This suggests that as a group, the participants were gazing more consistently at the oncoming traffic during the LTA condition. Although not specifically studied in these driving tasks, it would be useful in future studies to investigate whether these changes in gaze behavior result in decreased ability to react appropriately to other dynamic changes in the visual scene that would constitute a threat to safe driving - such as cross-traffic failing to obey traffic lights – requiring aversive maneuvers. Furthermore, the current methodology and study findings are not definitive regarding how to quantify attention (and modulations thereof) across the driving task conditions, and this should be addressed in future studies.

Irrespective of the two interpretations discussed above, the oculomotor results are consistent with the brain activation maps showing a decrease in activation in the visual cortex for the LTA – LT contrast (**Figure 4B**). **Figures 5, 6** confirm that this reduction is accompanied by a narrowed field of view, involving an increasing trend in the percentage of on-road fixations and a significant decrease in the percentage of off-road fixations when comparing LTA to LT. Furthermore, compared to the LT and L conditions, the LTA condition showed less percentage time of overall fixations (i.e., road and non-road) with significantly greater percentage of time spent performing saccades. This observation is consistent with recent eye-tracking research showing that the percentage of time spent in fixation can decrease when visual processing tasks are performed in the presence of auditory distraction tasks (Wu et al., 2019). Control of saccades has been associated with the frontal eye fields (Brodmann Area 8), the dorsolateral prefrontal cortex (DLPFC) and the cingulate eye field within the ACC (Künzle et al., 1976; Vernet et al., 2014). In **Figure 4B**, increased activation was observed in these regions when comparing the LTA condition to the LT condition, consistent with increased saccades in the former. Together with the decrease in fixation on the periphery in the LTA condition,

these results further support the interpretations that for the simulated driving tasks investigated, distraction resulted in less visual processing resources (a) made available or (b) required to support driving performance.

No significant differences were found in blink rate for the LT – L contrast. This is consistent with the brain activation maps and behavioral results, which did not show significant differences between the two tasks. As hypothesized, however, distraction resulted in a statistically significant decrease in blink rate for the LTA – L contrast. This finding is consistent with consensus in the literature that blink rate decreases with increased cognitive load (Brookings et al., 1996; Ohira, 1996; Van Orden et al., 2001; Haak et al., 2009; McIntire et al., 2014; Faure et al., 2016; Maffei and Angrilli, 2018). However, one study found an increase in blink rate when a straight driving task was combined with an auditory arithmetic task - suggesting that other factors may influence the effect, such as disinhibition of blink rate effects under certain task conditions and ranges of workload (Tsai et al., 2007). The experimental design of the present study cannot refute this claim.

A trend of increasing pupil diameter was observed across the left turn conditions (L, LT, LTA) suggesting that greater cognitive processing may have occurred across this progression of tasks. Although this effect was small and not statistically significant, the direction of the effect is consistent with the brain activation data, and with the study hypotheses. Pupil dilation in cognitive processing has been linked to activation of the MFG and ACC, measuring attention and effort (Siegle et al., 2003; Alnaes et al., 2014; Murphy et al., 2014; Zekveld et al., 2014; Joshi et al., 2016). This is consistent with the increase in activation of the MFG and ACC observed in the brain activation maps for the LTA - LT contrast (**Figure 4B**).

## Relationships Between Eye-Tracking Measures and Bold Signals

The change score relationships for BOLD signals and eye-tracking metrics were invested as $r^2$ values, representing the proportion of variance of the change in BOLD signal that can be attributed to the change in each eye-tracking metric. As hypothesized, significant Pearson correlations were found between the BOLD signal change score and blink rate change score for several regions. Negative correlations were found for the insula, the STG and the MFG, whereas a positive correlation was found for the MOG. The insula and STG have been described to play a role in the suppression of eye blinking (Lerner et al., 2009; Berman et al., 2012). The MFG, which has been associated with the reorientation of attention, has also been correlated with blink inhibition (Andersson et al., 2009; Mazzone et al., 2010; Neufang et al., 2011; Japee et al., 2015). The increased activation in the insula, STG and MFG is consistent with the suppression of the blink mechanism as the cognitive load is increased. The MOG has been related to visual attention, spatial and visuomotor processing, consistent with these components across the driving tasks in step with the associated decrease in blink rate (Mangun et al., 1998; LaBerge, 2000; Hahn et al., 2006; Wandell et al., 2007; Renier et al., 2010). However, it must be noted that the observed $r^2$ values were modest for all four brain regions. In addition to the natural variations

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 189 of 241

Yuen et al.                                                                                          Driving With Distraction: fMRI, Eye-Tracking

in human performance and brain function, the BOLD signal is influenced by numerous confounding factors, including age, sex and caffeine levels (D'Esposito et al., 2003; Chang et al., 2018). This can result in high inter-subject variability, reducing the power of the fMRI data. More work will be required to determine the main factor underlying the change in BOLD signal related to oculomotor behavior in the present context, involving a larger sample size and/or different analysis tools. Despite this, the observed relationships are important to note nevertheless. They support the interpretation that an increase in cognitive load across L, LT and LTA tasks increases certain brain activity to suppress blink rate; and also results in decreasing activity related to aspects of visual processing – suggesting a strategy of using neural resources efficiently to maintain task performance.

## Limitations

The results of the present study must be considered in relation to a number of limitations in the experimental design and execution. Technical issues associated with fMRI-compatible eye-tracking caused the sample size to be somewhat lower than originally intended. One disadvantage of eye-tracking is that participant factors (e.g., glasses, contacts, eye color) can negatively impact how the pupil or the eye are tracked from the video recordings (Jacob and Karn, 2003; Nyström et al., 2013; Kok and Jarodzka, 2017). Additionally, cognitive processes cannot be inferred directly and conclusively from eye-movements. Visual attention can also be guided by peripheral vision, which cannot be captured through eye-tracking (Kok and Jarodzka, 2017). Just as it is possible to attend to something without directly fixating on it, it is also possible to fixate on something without attending to it - an effect known as attentional blindness (Mack, 2003). As a result, it can be challenging to develop a complete understanding of the relationships between eye movements and cognition. Thus, the eye-tracking results in the present study must be viewed as supporting (rather than defining) the interpretation of brain/behavior relationships across the various driving conditions.

Although the results largely replicate (while also extending from) a previous fMRI study with a very similar experimental design (Schweizer et al., 2013), additional work involving a larger sample size would be beneficial to better characterize human variability and potentially to detect important new findings with potentially smaller effect sizes in the driving conditions studied. The current study also examines the effect of distraction in a young adult population, which is like to differ when conducting analogous work involving the elderly. When distracted, older drivers have been found to drive slower with increased steering variability, and to commit more driving errors (Thompson et al., 2012). Although MVCs more frequently involve younger drivers (possibly due to lack of sufficient driving skills and incomplete maturation), older drivers have been attributed to an increased risk of MVCs in highly complex situations (e.g., intersections) due to age-associated changes in attention and cognitive decline (Stinchcombe and Gagnon, 2013). In addition, deficits in visual functioning, perception and information processing have been observed in the elderly (Kline et al., 1992; Stinchcombe and Gagnon, 2013). However, the present study of young adults

is useful, as distracted driving is a prominent issue in this demographic with the rise in cell phone technology and social media (Klauer et al., 2014). This study also provides a normative data set to be used as a baseline for future studies.

The eye-tracking data obtained in this study were useful, but did not exhibit sufficient detection power to reveal statistically significant effects in all cases. In this study cohort, an increasing trend was seen in the pupil dilation size with the increase in cognitive load, although the effect was not significant. If this work were to be extended to an older adult or clinical population with cognitive deficits, this eye-tracking metric will remain important to investigate, as eye-tracking has been suggested for assessment of cognitive impairment and diagnosis of neurodegenerative conditions. Patients with dementia and Alzheimer's disease have been shown to demonstrate altered pupillary responses and oculomotor impairments, which can be associated to brain function and neural mechanisms to assess cognitive dysfunction (Pavisic et al., 2017; Marandi and Gazerani, 2019; Tao et al., 2020). Aging has also been associated with an increased latency of saccades and increased blink frequency in addition to neurocognitive decline (Marandi and Gazerani, 2019). Thus, the inclusion of eye-tracking methodology to future simulated driving studies may provide critical insight to the understanding of brain activity and behavior.

Another limitation of this study is that the simulation used did not replicate potential anxiety experienced in real driving due to the lack of stressing factors (e.g., other drivers, no real crash risk or danger). A subsequent experiment may expand on this area by incorporating more factors into the simulation such as vehicles to maintain a safe following distance, multiple lanes on the road with other vehicles, increased traffic or construction; as well as narratives, rewards and penalties related to driving performance.

Lastly, the simulated driving apparatus used inside the MRI system inevitably produced an experience that was different from real world driving, as the participants viewed the simulation through a projector screen while lying on a patient table, driving with minimal head and body motion. Usage of driving simulator hardware is suggested to provide a sufficient level of realism for evaluating demanding driving scenarios that would be dangerous to assess in on-road testing (Kan et al., 2012). However, the setup may create activation maps for simulated driving that imperfectly reflect the mental processes that occur when individuals drive motor vehicles in the real world (Kan et al., 2012). To mitigate this possibility, each participant underwent a training session with the driving simulator prior to fMRI. The training session was intended to familiarize participants with the simulator controls and thus ensure that their driving skills encompassed use of the experimental apparatus.

## CONCLUSION

The present study uses a unique multi-measurement approach, combining fMRI with eye-tracking to measure brain and oculomotor behavior during simulated driving. It was observed that simple driving primarily involved the visual and motor systems, whereas the introduction of auditory distraction

shifted resources to the frontal and temporal systems for greater cognitive processing. Neural resources were modulated as task complexity increased, with re-allocation of resources when there were competing task demands in driving with auditory distraction. The inclusion of eye-tracking data furthered understanding of the effect of distraction on driving behavior and brain activity. Decreased brain activation in the visual system for distracted driving was supported by a more peaked mean distribution of gaze points as quantified by the percent fixation duration metric, concentrated on the road at the expense of the periphery, as well as a decrease in blink rate. Providing a baseline for comparison, these findings may be applied to future research involving an elderly or clinical population to determine the effect of aging or brain damage on the ability to multitask while driving. Because distraction promotes dangerous driving behavior and has been shown to display significant changes in brain activation and eye movements, assessing fitness to drive should consider including varying driving demands (e.g., with a secondary task introduced as distraction) to mimic real world scenarios where distraction is prevalent. Automotive companies may also wish to consider implementing strategies to mitigate visual tunneling when distracted, or to minimize the effect of distracting activities and communication devices.

## DATA AVAILABILITY STATEMENT

The raw data supporting the conclusions of this article will be made available by the authors, without undue reservation.

## ETHICS STATEMENT

The studies involving human participants were reviewed and approved by the Research Ethics Board at Sunnybrook Health Sciences Centre, Canada. The patients/participants provided their written informed consent to participate in this study.

## AUTHOR CONTRIBUTIONS

TS and SG did the conceptualization and supervision. NY, FT, and SG did the investigation. SG did the resources, project administration, and funding acquisition. NY and SG did the data curation and writing-original draft preparation. NY, FT, NC, TS, and SG wrote-reviewed and edited and did the visualization. All authors contributed to the article and approved the submitted version.

## FUNDING

This work was funded by the Canadian Institutes of Health Research (grant number PGT 162241) and the Ontario Graduate Scholarship (OGS, provided by the University of Toronto to NY).

## REFERENCES

Alnaes, D., Sneve, M. H., Espeseth, T., Endestad, T., van de Pavert, S. H. P., and Laeng, B. (2014). Pupil size signals mental effort deployed during multiple object tracking and predicts brain activity in the dorsal attention network and the locus coeruleus. *J. Vis.* 14:1. doi: 10.1167/14.4.1

Andersson, M., Ystad, M., Lundervold, A., and Lundervold, A. J. (2009). Correlations between measures of executive attention and cortical thickness of left posterior middle frontal gyrus - a dichotic listening study. *Behav. Brain Funct.* 5:41. doi: 10.1186/1744-9081-5-41

Berman, B. D., Horovitz, S. G., Morel, B., and Hallett, M. (2012). Neural correlates of blink suppression and the buildup of a natural bodily urge. *Neuroimage* 59, 1441–1450. doi: 10.1016/j.neuroimage.2011.08.050

Boisgueheneuc, F. D., Levy, R., Volle, E., Seassau, M., Duffau, H., Kinkingnehun, S., et al. (2006). Functions of the left superior frontal gyrus in humans: a lesion study. *Brain* 129, 3315–3328. doi: 10.1093/brain /awl244

Bowers, A. R., Anastasio, R. J., Sheldon, B. S., O'Connor, M. G., Hollis, A. M., Howe, P. D., et al. (2013). Can we improve clinical prediction of at-risk older drivers? *Accident Anal. Prevent.* 59, 537–547. doi: 10.1016/j.aap.2013.06.037

Brookings, J. B., Wilson, G. F., and Swain, C. R. (1996). Psychophysiological responses to changes in workload during simulated air traffic control. *Biol. Psychol.* 42, 361–377. doi: 10.1016/0301-0511(95)05167-8

Buschman, T. J., and Miller, E. K. (2007). Top-Down versus bottom-up control of attention in the prefrontal and posterior parietal cortices. *Science* 315, 1860–1862. doi: 10.1126/science.1138097

Bush, G., Luu, P., and Posner, M. I. (2000). Cognitive and emotional influences in anterior cingulate cortex. *Trends Cogn. Sci.* 4, 215–222. doi: 10.1016/s1364-6613(00)01483-2

Calhoun, V. D., and Pearlson, G. D. (2012). A selective review of simulated driving studies: combining naturalistic and hybrid paradigms, analysis approaches, and

future directions. *NeuroImage* 59, 25–35. doi: 10.1016/j.neuroimage.2011.06.037

Calhoun, V. D., Pekar, J. J., McGinty, V. B., Adali, T., Watson, T. D., and Pearlson, G. D. (2002). Different activation dynamics in multiple neural systems during simulated driving. *Hum. Brain Mapp.* 16, 158–167. doi: 10.1002/hbm.10032

Callan, A. M., Osu, R., Yamagishi, Y., Callan, D. E., and Inoue, N. (2009). Neural correlates of resolving uncertainty in driver's decision making. *Hum. Brain Mapp.* 30, 2804–2812. doi: 10.1002/hbm.20710

Cantin, V., Lavallière, M., Simoneau, M., and Teasdale, N. (2009). Mental workload when driving in a simulator: effects of age and driving complexity. *Accident Anal. Prevent.* 41, 763–771. doi: 10.1016/j.aap.2009.03.019

Chang, D., Song, D., Zhang, J., Shang, Y., Ge, Q., and Wang, Z. (2018). Caffeine caused a widespread increase of resting brain entropy. *Sci. Rep.* 8:2700.

Chao, L. L., Haxby, J. V., and Martin, A. (1999). Attribute-based neural substrates in temporal cortex for perceiving and knowing about objects. *Nat. Neurosci.* 2, 913–919. doi: 10.1038/13217

Choi, M.-H., Kim, H.-S., Yoon, H.-J., Lee, J.-C., Baek, J.-H., Choi, J.-S., et al. (2017). Increase in brain activation due to sub-tasks during driving: fMRI study using new MR-compatible driving simulator. *J. Physiol. Anthropol.* 36:11.

Cox, R. (1996). AFNI: software for analysis and visualization of functional magnetic resonance neuroimages. *Comp. Biomed. Res.* 29, 162–173. doi: 10.1006/cbmr.1996.0014

Crundall, D., and Underwood, G. (2011). "Visual attention while driving," in *Handbook of Traffic Psychology*, ed. B. E. Porter (Amsterdam: Elsevier), 137–148. doi: 10.1016/b978-0-12-381984-0.10011-6

Démonet, J. F., Chollet, F., Ramsay, S., Cardebat, D., Nespoulous, J. L., Wise, R., et al. (1992). The anatomy of phonological and semantic processing in normal subjects. *Brain* 115(Pt 6), 1753–1768. doi: 10.1093/brain/115.6.1753

D'Esposito, M., Deouell, L. Y., and Gazzaley, A. (2003). Alterations in the BOLD fMRI signal with ageing and disease: a challenge for neuroimaging. *Nat. Rev. Neurosci.* 4, 863–872. doi: 10.1038/nrn1246

Drews, F. A., Yazdani, H., Godfrey, C. N., Cooper, J. M., and Strayer, D. L. (2009). Text messaging during simulated driving. *Hum. Factors* 51, 762–770. doi: 10.1177/0018720809353319

Dumoulin, S. O., Bittar, R. G., Kabani, N. J., Baker, C. L., Le Goualher, G., Bruce Pike, G., et al. (2000). A new anatomical landmark for reliable identification of human area V5/MT: a quantitative analysis of sulcal patterning. *Cereb. Cortex* 10, 454–463. doi: 10.1093/cercor/10.5.454

Dux, P. E., Ivanoff, J., Asplund, C. L., and Marois, R. (2006). isolation of a central bottleneck of information processing with time-resolved fMRI. *Neuron* 52, 1109–1120. doi: 10.1016/j.neuron.2006.11.009

Fan, J., Hof, P. R., Guise, K. G., Fossella, J. A., and Posner, M. I. (2008). The functional integration of the anterior cingulate cortex during conflict processing. *Cereb. Cortex* 18, 796–805. doi: 10.1093/cercor/bhm125

Faure, V., Lobjois, R., and Benguigui, N. (2016). The effects of driving environment complexity and dual tasking on drivers' mental workload and eye blink behavior. *Transportation Res. Part F: Traffic Psychol. Behav.* 40, 78–90. doi: 10.1016/j.trf.2016.04.007

Fitch, G. M., Bartholomew, P. R., Hanowski, R. J., and Perez, M. A. (2015). Drivers' visual behaviour when using handheld and hands-free cell phones. *J. Safety Res.* 54, 105–108.e29. doi: 10.1016/j.jsr.2015.06.008

Fraade-Blanar, L. A., Ebel, B. E., Larson, E. B., Sears, J. M., Thompson, H. J., Chan, K. C. G., et al. (2018). Cognitive decline and older driver crash risk. *J. Am. Geriatr. Soc.* 66, 1075–1081. doi: 10.1111/jgs.15378

Friedman-Hill, S. R., Robertson, L. C., Desimone, R., and Ungerleider, L. G. (2003). Posterior parietal cortex and the filtering of distractors. *Proc. Natl. Acad. Sci. U S A.* 100, 4263–4268. doi: 10.1073/pnas.0730772100

Gable, T. M., Kun, A. L., Walker, B. N., and Winton, R. J. (2015). "Comparing heart rate and pupil size as objective measures of workload in the driving context: initial look," in *Proceedings of the Adjunct Proceedings of the 7th International Conference on Automotive User Interfaces and Interactive Vehicular Applications - AutomotiveUI '15*, (Nottingham: ACM Press), 20–25.

Genovese, C. R., Lazar, N. A., and Nichols, T. (2002). Thresholding of statistical maps in functional neuroimaging using the false discovery rate. *NeuroImage* 15, 870–878. doi: 10.1006/nimg.2001.1037

Graydon, F. X., Young, R., Benton, M. D., Genik, R. J., Posse, S., Hsieh, L., et al. (2004). Visual event detection during simulated driving: identifying the neural correlates with functional neuroimaging. *Transportation Res. Part F: Traffic Psychol. Behav.* 7, 271–286. doi: 10.1016/j.trf.2004.09.006

Haak, M., Bos, S., Panic, S., and Rothkrantz, L. J. M. (2009). "Detecting stress using eye blinks and brain activity from EEG signals," in *Proceeding of the 1st Driver Car Interaction and Interface (DCII 2008)*, Netherland 35–60.

Hahn, B., Ross, T. J., and Stein, E. A. (2006). Neuroanatomical dissociation between bottom–up and top–down processes of visuospatial selective attention. *NeuroImage* 32, 842–853. doi: 10.1016/j.neuroimage.2006.04.177

Hamish Jamson, A., and Merat, N. (2005). Surrogate in-vehicle information systems and driver behaviour: effects of visual and cognitive load in simulated rural driving. *Transportation Res. Part F: Traffic Psychol. Behav.* 8, 79–96. doi: 10.1016/j.trf.2005.04.002

Hampshire, A., Chamberlain, S. R., Monti, M. M., Duncan, J., and Owen, A. M. (2010). The role of the right inferior frontal gyrus: inhibition and attentional control. *Neuroimage* 50, 1313–1319. doi: 10.1016/j.neuroimage.2009.12.109

Hird, M. A., Vesely, K. A., Fischer, C. E., Graham, S. J., Naglie, G., and Schweizer, T. A. (2017). Investigating simulated driving errors in amnestic single- and multiple-domain mild cognitive impairment. *J. Alzheimer's Dis.* 56, 447–452. doi: 10.3233/jad-160995

Holland, M., and Tarlow, G. (1972). Blinking and mental load. *Phych. Rep.* 31, 119–127.

Hyung-Sik, K., Mi-Hyun, C., Hee-Jeong, Y., Hyun-Joo, K., Ul-Ho, J., Sung-Jun, P., et al. (2014). Cerebral activation and lateralization due to the cognition of a various driving speed difference: an fMRI study. *Biomed. Mater. Eng.* 24, 1133–1139. doi: 10.3233/bme-130913

Jacob, R. J. K., and Karn, K. S. (2003). "Eye tracking in human-computer interaction and usability research: ready to deliver the promises," in *The Mind's Eye: Cognitive and Applied Aspects of Eye Movement Research*, eds H. Deubel and J. R. J. Hyönä (Amsterdam: Elsevier Science).

Japee, S., Holiday, K., Satyshur, M. D., Mukai, I., and Ungerleider, L. G. (2015). A role of right middle frontal gyrus in reorienting of attention: a case study. *Front. Syst. Neurosci.* 9:23. doi: 10.3389/fnsys.2015.00023

Joshi, S., Li Y., Kalwani, R. M., and Gold, J. I. (2016). Relationships between pupil diameter and neuronal activity in the locus coeruleus, colliculi, and cingulate cortex. *Neuron* 89, 221–234. doi: 10.1016/j.neuron.2015.11.028

Just, M. A., Keller, T. A., and Cynkar, J. (2008). A decrease in brain activation associated with driving when listening to someone speak. *Brain Res.* 1205, 70–80. doi: 10.1016/j.brainres.2007.12.075

Kan, K., Schweizer, T. A., Tam, F., and Graham, S. J. (2012). Methodology for functional MRI of simulated driving: functional MRI of simulated driving. *Med. Phys.* 40:012301. doi: 10.1118/1.4769107

Klauer, S. G., Guo, F., Simons-Morton, B. G., Ouimet, M. C., Lee, S. E., and Dingus, T. A. (2014). Distracted driving and risk of road crashes among novice and experienced drivers. *New Engl. J. Med.* 370, 54–59. doi: 10.1056/nejmsa1204142

Kline, D., Kline, T., Fozard, J., Kosnik, W., Schieber, F., and Sekuler, R. (1992). Vision, aging, and driving: the problems of older drivers. *J. Gerontol.* 47, 27–34.

Kok, E. M., and Jarodzka, H. (2017). Before your very eyes: the value and limitations of eye tracking in medical education. *Med. Educ.* 51, 114–122. doi: 10.1111/medu.13066

Kramer, A. F., Wiegmann, D. A., and Kirlik, A. (2006). *AttentionFrom Theory to Practice.* Oxford: Oxford University Press.

Kret, M. E., and Sjak-Shie, E. E. (2019). Preprocessing pupil size data: guidelines and code. *Behav. Res. Methods* 51, 1336–1342. doi: 10.3758/s13428-018-1075-y

Künzle, H., Akert, K., and Wurtz, R. H. (1976). Projection of area 8 (frontal eye field) to superior colliculus in the monkey. An autoradiographic study. *Brain Res.* 117, 487–492. doi: 10.1016/0006-8993(76)90754-x

LaBerge, D. (2000). "Networks of attention," in *The New Cognitive Neurosciences*, ed. Michael S. Gazzaniga (Cambridge, MA: MIT Press), 711–724.

Land, M. F. (2006). Eye movements and the control of actions in everyday life. *Prog. Retinal Eye Res.* 25, 296–324. doi: 10.1016/j.preteyeres.2006.01.002

Lee, H. C., Cameron, D., and Lee, A. H. (2003). Assessing the driving performance of older adult drivers: on-road versus simulated driving. *Accident Anal. Prevent.* 35, 797–803. doi: 10.1016/s0001-4575(02)00083-0

Lerner, A., Bagic, A., Hanakawa, T., Boudreau, E. A., Pagan, F., Mari, Z., et al. (2009). Involvement of insula and cingulate cortices in control and suppression of natural urges. *Cereb. Cortex* 19, 218–223. doi: 10.1093/cercor/bhn074

Lezak, M. D., Howieson, D. B., Loring, D. W., and Fischer, J. S. (2004). *Neuropsychological Assessment.* New York, NY: Oxford University Press.

Li, Y.-O., Eichele, T., Calhoun, V. D., and Adali, T. (2012). Group study of simulated driving fMRI data by multiset canonical correlation analysis. *J. Signal Process. Systems* 68, 31–48. doi: 10.1007/s11265-010-0572-8

Liakakis, G., Nickel, J., and Seitz, R. J. (2011). Diversity of the inferior frontal gyrus—a meta-analysis of neuroimaging studies. *Behav. Brain Res.* 225, 341–347. doi: 10.1016/j.bbr.2011.06.022

Lundberg, C., Johansson, K., Ball, K., Bjerre, B., Blomqvist, C., Braekhus, A., et al. (1997). Dementia and driving: an attempt at consensus. *Alzheimer Dis. Assoc. Disord.* 11, 28–37. doi: 10.1097/00002093-199703000-00006

Mack, A. (2003). Inattentional blindness: looking without seeing. *Curr. Direct. Psychol. Sci.* 12, 180–184. doi: 10.1111/1467-8721.01256

Maffei, A., and Angrilli, A. (2018). Spontaneous eye blink rate: an index of dopaminergic component of sustained attention and fatigue. *Int. J. Psychophysiol.* 123, 58–63. doi: 10.1016/j.ijpsycho.2017.11.009

Mangun, G. R., Buonocore, M. H., Girelli, M., and Jha, A. P. (1998). ERP and fMRI measures of visual spatial selective attention. *Hum. Brain Mapp.* 6, 383–389. doi: 10.1002/(sici)1097-0193(1998)6:5/6<383::aid-hbm10>3.0.co;2-z

Manor, B. R., and Gordon, E. (2003). Defining the temporal threshold for ocular fixation in free-viewing visuocognitive tasks. *J. Neurosci. Methods* 128, 85–93. doi: 10.1016/s0165-0270(03)00151-1

Mansur, A., Hird, M. A., Desimone, A., Pshonyak, I., Schweizer, T. A., and Das, S. (2018). Driving habits and behaviors of patients with brain tumors: a self-report, cognitive and driving simulation study. *Sci. Rep.* 15:4635.

Marandi, R. Z., and Gazerani, P. (2019). Aging and eye tracking: in the quest for objective biomarkers. *Future Neurol.* 14:FNL33.

Marshall, S. C., and Gilbert, N. (1999). Saskatchewan physicians' attitudes and knowledge regarding assessment of medical fitness to drive. *CMAJ* 160, 1701–1704.

Matthys, K., Smits, M., Geest, J. N. V., der, Lugt, A. V., der, et al. (2009). Mirror-Induced visual illusion of hand movements: a functional magnetic resonance

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 192 of 241

Yuen et al.                                                                                     Driving With Distraction: fMRI, Eye-Tracking

imaging study. *Arch. Phys. Med. Rehabil.* 90, 675–681. doi: 10.1016/j.apmr. 2008.09.571

Mazzone, L., Yu, S., Blair, C., Gunter, B. C., Wang, Z., Marsh, R., et al. (2010). An fMRI study of frontostriatal circuits during the inhibition of eye blinking in persons with tourette syndrome. *Am. J. Psychiatry* 167, 341–349. doi: 10.1176/appi.ajp.2009.08121831

McIntire, L. K., McKinley, R. A., Goodyear, C., and McIntire, J. P. (2014). Detection of vigilance performance using eye blinks. *Appl. Ergon.* 45, 354–362. doi: 10.1016/j.apergo.2013.04.020

Moore, T., and Fallah, M. (2001). Control of eye movements and spatial attention. *Proc. Natl. Acad. Sci. U S A* 98, 1273–1276.

Moss, H. E., Abdallah, S., Fletcher, P., Bright, P., Pilgrim, L., Acres, K., et al. (2005). Selecting among competing alternatives: selection and retrieval in the left inferior frontal gyrus. *Cereb. Cortex* 15, 1723–1735. doi: 10.1093/cercor/bhi049

Murphy, P. R., O'Connell, R. G., O'Sullivan, M., Robertson, I. H., and Balsters, J. H. (2014). Pupil diameter covaries with bold activity in human locus coeruleus: pupil diameter and locus coeruleus activity. *Hum. Brain Mapp.* 35, 4140–4154. doi: 10.1002/hbm.22466

National Center for Statistics and Analysis (2013). *Distracted Driving 2011. Traffic Safety Facts Research Note.* Report No. DOT HS 811 737, Washington, DC: National Highway Traffic Safety Administration.

National Center for Statistics and Analysis (2018). *Distracted Driving 2016. Traffic Safety Facts Research Note.* Report No. DOT HS 812 517, Washington, DC: National Highway Traffic Safety Administration.

Neufang, S., Akhrif, A., Riedl, V., Förstl, H., Kurz, A., Zimmer, C., et al. (2011). Disconnection of frontal and parietal areas contributes to impaired attention in very early Alzheimer's disease. *J. Alzheimer's Dis. JAD* 25, 309–321. doi: 10.3233/jad-2011-102154

Niezgoda, M., Tarnowski, A., Kruszewski, M., and Kamiński, T. (2015). Towards testing auditory–vocal interfaces and detecting distraction while driving: a comparison of eye-movement measures in the assessment of cognitive workload. *Transportation Res. Part F: Traffic Psychol. Behav.* 32, 23–34. doi: 10.1016/j.trf.2015.04.012

Nij Bijvank, J. A., Petzold, A., Balk, L. J., Tan, H. S., Uitdehaag, B. M. J., Theodorou, M., et al. (2018). A standardized protocol for quantification of saccadic eye movements: DEMoNS. *PLoS One* 13:e0200695. doi: 10.1371/journal.pone. 0200695

Noyce, D. A., Chitturi, M. V., Nassereddine, H., Santiago-Chaparro, K. R., and Bill, A. R. (2017). *Neural Correlates of Older Driver Performance.* Washington, DC: University Transportation Center.

Nyström, M., Andersson, R., Holmqvist, K., and van de Weijer, J. (2013). The influence of calibration method and eye physiology on eyetracking data quality. *Behav. Res. Methods* 45, 272–288. doi: 10.3758/s13428-012-0247-4

Ohira, H. (1996). Eyeblink activity in a word-naming task as a function of semantic priming and cognitive load. *Percept. Mot. Skills* 82, 835–842. doi: 10.2466/pms. 1996.82.3.835

Onitsuka, T., Shenton, M. E., Salisbury, D. F., Dickey, C. C., Kasai, K., Toner, S. K., et al. (2004). Middle and inferior temporal gyrus gray matter volume abnormalities in chronic schizophrenia: an MRI study. *Am. J. Psychiatry* 161, 1603–1611. doi: 10.1176/appi.ajp.161.9.1603

Orr, C., and Hester, R. (2012). Error-related anterior cingulate cortex activity and the prediction of conscious error awareness. *Front. Hum. Neurosci.* 6:177. doi: 10.3389/fnhum.2012.00177

Ortiz, N., Ramnarayan, M., and Mizenko, K. (2016). The effect of distraction on road user behavior: an observational pilot study across intersections in Washington, DC. *J. Transport Health* 3:S67.

Palinko, O., Kun, A. L., Shyrokov, A., and Heeman, P. (2010). "Estimating cognitive load using remote eye tracking in a driving simulator," in *Proceedings of the 2010 Symposium on Eye-Tracking Research & Applications*, (New York, NY: ACM), 141–144.

Pardo, J. V., Fox, P. T., and Raichle, M. E. (1991). Localization of a human system for sustained attention by positron emission tomography. *Nature* 349, 61–64. doi: 10.1038/349061a0

Paus, T. (2001). Primate anterior cingulate cortex: where motor control, drive and cognition interface. *Nat. Rev. Neurosci.* 2, 417–424. doi: 10.1038/35077500

Pavisic, I. M., Firth, N. C., Parsons, S., Rego, D. M., Shakespeare, T. J., Yong, K. X. X., et al. (2017). Eyetracking metrics in young onset Alzheimer's disease: a

window into cognitive visual functions. *Front. Neurol.* 8:377. doi: 10.3389/fneur. 2017.00377

Petersen, S. E., Fox, P. T., Posner, M. I., Mintun, M., and Raichle, M. E. (1989). Positron emission tomographic studies of the processing of singe words. *J. Cogn. Neurosci.* 1, 153–170. doi: 10.1162/jocn.1989.1.2.153

Raichle, M. E. (2015). The brain's default mode network. *Annu. Rev. Neurosci.* 38, 433–447.

Recarte, M. A., and Nunes, L. M. (2003). Mental workload while driving: effects on visual search, discrimination, and decision making. *J. Exp. Psychol. Appl.* 9, 119–137. doi: 10.1037/1076-898x.9.2.119

Renier, L. A., Anurova, I., De Volder, A. G., Carlson, S., VanMeter, J., and Rauschecker, J. P. (2010). Preserved functional specialization for spatial processing in the middle occipital gyrus of the early blind. *Neuron* 68, 138–148. doi: 10.1016/j.neuron.2010.09.021

Rizzo, M. (2011). Impaired driving from medical conditions: a 70-year-old man trying to decide if he should continue driving. *JAMA* 305:1018. doi: 10.1001/jama.2011.252

Rueckert, L., and Grafman, J. (1996). Sustained attention deficits in patients with right frontal lesions. *Neuropsychologia* 34, 953–963. doi: 10.1016/0028-3932(96)00016-4

Rueckert, L., and Grafman, J. (1998). Sustained attention deficits in patients with lesions of posterior cortex. *Neuropsychologia* 36, 653–660. doi: 10.1016/s0028-3932(97)00150-4

Schneider, W. X. (1995). VAM: a neuro-cognitive model for visual attention control of segmentation, object recognition, and space-based motor action. *Visual Cogn.* 2, 331–376. doi: 10.1080/13506289508401737

Schweizer, T. A., Kan, K., Hung, Y., Tam, F., Naglie, G., and Graham, S. J. (2013). Brain activity during driving with distraction: an immersive fMRI study. *Front. Hum. Neurosci.* 7:53. doi: 10.3389/fnhum.2013.00053

Siegle, G. J., Steinhauer, S. R., Stenger, V. A., Konecky, R., and Carter, C. S. (2003). Use of concurrent pupil dilation assessment to inform interpretation and analysis of fMRI data. *NeuroImage* 20, 114–124. doi: 10.1016/s1053-8119(03)00298-2

Spiers, H. J., and Maguire, E. A. (2007). Neural substrates of driving behaviour. *NeuroImage* 36, 245–255. doi: 10.1016/j.neuroimage.2007.02.032

Stinchcombe, A., and Gagnon, S. (2013). Aging and driving in a complex world: exploring age differences in attentional demand while driving. *Transportation Res. Part F: Traffic Psychol. Behav.* 17, 125–133. doi: 10.1016/j.trf.2012.11.002

Strayer, D. L., and Drew, F. A. (2004). Profiles in driver distraction: effects of cell phone conversations on younger and older drivers. *Hum. Factors: J. Hum. Factors Ergonom. Soc.* 46, 640–649. doi: 10.1518/hfes.46.4.640. 56806

Swick, D., Ashley, V., and Turken, A. U. (2008). Left inferior frontal gyrus is critical for response inhibition. *BMC Neurosci.* 9:102. doi: 10.1186/1471-2202-9-102

Talairach, J., and Tournoux, P. (1988). *Co-planar Stereotaxic Atlas of the Human Brain: 3-Dimensional Proportional System: an Approach to Cerebral Imaging.* New York, NY: Thieme Medical Publishers, Inc.

Tao, L., Wang, Q., Liu, D., Wang, J., Zhu, Z., and Feng, L. (2020). Eye tracking metrics to screen and assess cognitive impairment in patients with neurological disorders. *Neurol. Sci.* 41, 1697–1704. doi: 10.1007/s10072-020-04310-y

Thompson, K. R., Johnson, A. M., Emerson, J. L., Dawson, J. D., Boer, E. R., and Rizzo, M. (2012). Distracted driving in elderly and middle-aged drivers. *Accident Anal. Prevent.* 45, 711–717. doi: 10.1016/j.aap.2011.09.040

Tops, M., and Boksem, M. A. S. (2011). A potential role of the inferior frontal gyrus and anterior insula in cognitive control, brain rhythms, and event-related potentials. *Front. Psychol.* 2:330. doi: 10.3389/fpsyg.2011.00330

Tranel, D., Damasio, H., and Damasio, A. R. (1997). A neural basis for the retrieval of conceptual knowledge. *Neuropsychologia* 35, 1319–1327. doi: 10.1016/s0028-3932(97)00085-7

Traffic safety Association. (2013). *Distracted Driving 2011. Traffic Safety Facts.* Fraser, MI: Traffic safety Association.

Tsai, Y.-F., Viirre, E., Strychacz, C., Chase, B., and Jung, T.-P. (2007). Task performance and eye activity: predicting behavior relating to cognitive workload. *Aviat. Space Environ. Med.* 78, B176–B185.

Uchiyama, Y., Ebe, K., Kozato, A., Okada, T., and Sadato, N. (2003). The neural substrates of driving at a safe distance: a functional MRI study. *Neurosci. Lett.* 352, 199–202. doi: 10.1016/j.neulet.2003.08.072

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 193 of 241

Yuen et al.                                                                                     Driving With Distraction: fMRI, Eye-Tracking

Uchiyama, Y., Toyoda, H., Sakai, H., Shin, D., Ebe, K., and Sadato, N. (2012). Suppression of brain activity related to a car-following task with an auditory task: an fMRI study. *Transportation Res. Part F: Traffic Psychol. Behav.* 15, 25–37. doi: 10.1016/j.trf.2011.11.002

U.S. Department of Transportation National Highway Traffic Safety Administration (2008). *National Motor Vehicle Crash Causation Survey: Report to Congress.*

Van Orden, K. F., Limbert, W., Makeig, S., and Jung, T.-P. (2001). Eye activity correlates of workload during a visuospatial memory task. *Hum. Fact.* 43, 111–121. doi: 10.1518/001872001775992570

Vernet, M., Quentin, R., Chanes, L., Mitsumasu, A., and Valero-Cabré, A. (2014). Frontal eye field, where art thou? anatomy, function, and non-invasive manipulation of frontal regions involved in eye movements and associated cognitive operations. *Front. Integr. Neurosci.* 8:66. doi: 10.3389/fnint.2014.00066

Wandell, B. A., Dumoulin, S. O., and Brewer, A. A. (2007). Visual field maps in human cortex. *Neuron* 56, 366–383. doi: 10.1016/j.neuron.2007.10.012

Ware, M., Feng, J., and Nam, C. S. (2020). "Neuroergonomics behind the wheel: neural correlates of driving," in *Neuroergonomics: Principles and Practice*, ed. C. S. Nam (Cham: Springer International Publishing), 353–388. doi: 10.1007/978-3-030-34784-0_18

Weissman, D. H., and Prado, J. (2012). Heightened activity in a key region of the ventral attention network is linked to reduced activity in a key region of the dorsal attention network during unexpected shifts of covert visual spatial attention. *NeuroImage* 61, 798–804. doi: 10.1016/j.neuroimage.2012.03.032

Wilkins, A. J., Shallice, T., and McCarthy, R. (1987). Frontal lesions and sustained attention. *Neuropsychologia* 25, 359–365. doi: 10.1016/0028-3932(87)90024-8

Withaar, F. K., Brouwer, W. H., and Van Zomeren, A. H. (2000). Fitness to drive in older drivers with cognitive impairment. *J. Int. Neuropsychol. Soc.* 6, 480–490. doi: 10.1017/s1355617700644065

Wu, D., Huang, H., Liu, N., and Miao, D. (2019). Information processing under high and low distractions using eye tracking. *Cogn. Process.* 20, 11–18. doi: 10.1007/s10339-018-0876-3

Zekveld, A. A., Heslenfeld, D. J., Johnsrude, I. S., Versfeld, N. J., and Kramer, S. E. (2014). The eye as a window to the listening brain: neural correlates of pupil size as a measure of cognitive listening load. *NeuroImage* 101, 76–86. doi: 10.1016/j.neuroimage.2014.06.069

**Conflict of Interest:** The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

**Publisher's Note:** All claims expressed in this article are solely those of the authors and do not necessarily represent those of their affiliated organizations, or those of the publisher, the editors and the reviewers. Any product that may be evaluated in this article, or claim that may be made by its manufacturer, is not guaranteed or endorsed by the publisher.

*Copyright © 2021 Yuen, Tam, Churchill, Schweizer and Graham. This is an open-access article distributed under the terms of the Creative Commons Attribution License (CC BY). The use, distribution or reproduction in other forums is permitted, provided the original author(s) and the copyright owner(s) are credited and that the original publication in this journal is cited, in accordance with accepted academic practice. No use, distribution or reproduction is permitted which does not comply with these terms.*

Smartphone Use Leading To More Distracted Driving Deaths, Safety Officials Say

# Smartphone Use Leading To More Distracted Driving Deaths, Safety Officials Say

[Ed Garsten](#)   Apr 28, 2023,





A report by the National Distracted Driving Coalition shows smartphones are a key cause of ... [+]

National Distracted Driving Coalition

Holding up a smartphone as he kicked off a day long conference on

distracted driving this week, National Transportation Safety Board vice chairman Bruce Landsberg cited the devices as a key contributor to the increase in distracted driving, which can lead to injuries and deaths.

Landsberg's view was supported by National Highway Traffic Association deputy director Sophie Shulman who observcd in her keynote speech, "we know that many drivers struggle with the technology we already have using our phones while behind the wheel. The pull of that text or alert is just too strong for many to ignore."

Shulman and Landsberg both spoke at the "Seeking Solutions to Eliminate Distracted Driving" conference sponsored by the National Distracted Driving Coalition (NDDC) in Washington D.C. on Wednesday.

The NDDC was created by the NTSB to research and take action to reduce distracted driving, a growing problem brought to the public's attention during April, designated as National Distracted Driving Awareness Month.

Landsberg framed the overall issue of distracted driving using a stark aviation metaphor declaring, "If we pull up the number of distracted driving fatalities compared to aviation, we would be losing one airliner a week, one airliner a week that's the losses that we have due to distracted driving."



Forbes Innovation 00:01 01:12





[Here's What Else Happens Eclipse Day:'Devil Comet,' Rocket Launches And Dark Matter](#)

That's only a microcosm of the deadly affects of distracted driving as revealed in a sweeping report on the issue released earlier this month by telematics company [Cambridge Mobile Telematics (CMT)](#).

The report revealed drivers were 30% more distracted in February 2022 than they were in February 2020, making it the worst month for phone distraction in the U.S. since 2019.

An increase in distracted driving resulted in a corresponding increase in deaths and economic losses, according to the report which noted, "CMT's data shows that every 10% increase in distracted driving kills over 420 people and costs the American economy $4 billion per year. With the 23% surge in distraction since 2020, CMT estimates that the increase in distracted driving caused an additional 420,000 crashes, 1,000 fatalities, and $10 billion in damages to the US economy in 2022."

"According to the police reports in 2021, we lost 3,522 friends, family members and neighbors to distracted driving," noted Shulman.

More broadly, in a December, 2022 report, the NDDC revealed distracted driving is estimated to play a role in 25%-30% of fatal crashes, citing, there were 3,142 deaths and an estimated additional 324,652 injured on U.S. roadways as a result of distracted driving, according to NHTSA.

"Of concern, eight percent of fatal crashes, 14% of injury crashes, and 13% of vehicle collisions in 2020 reported to police involved distraction as a contributing factor (NHTSA, 2022)," the report said.

Distracted driving is caused by basically anything that takes the driver's attention away from the road including speaking on a smartphone, reading or sending texts, eating, fiddling with infotainment controls or simply having a conversation with passengers.

But the introduction of smartphones is seen as a key driver of motorist distraction, resulting injuries and deaths.

"When the iPhone was introduced in 2007, over 4,600 pedestrians were killed on American roadways. By 2021, 85% of Americans owned a smartphone, 7,485 pedestrians were killed — the most in 40 years — and there were 985 cycling deaths, the highest since 1990," states the CMT

report, which goes on to say, "NHTSA estimates that distracted driving killed 3,522 people in 2021, but caveats that the "estimates are almost certainly conservative because they are based only on identified distraction cases."

Indeed, the report shows not only has smartphone use increased by drivers, but so has the length of time they're being used while behind the wheel.

Drivers interacted with their phones on nearly 58% of trips in 2022, up from 54% in 2020, according to the report. Screen interaction while driving reached two minutes and 12 seconds of every hour driving in 2022, a 23% increase over 2020.





| 2020-2022 US Road Risk | 2020 | 2021 | CHANGE | | 2020 | 2022 | CHANGE |
|---|---|---|---|---|---|---|---|
| FATALITIES | 38,824 | 42,915 | 10.5% | PERCENTAGE OF TRIPS WITH SCREEN INTERACTION | 54% | 58% | 7.6% |
| FATALITIES PER 100 MILLION MILES | 1.34% | 1.33% | -0.7% | SCREEN INTERACTION TIME | 0:01:47 | 0:02:12 | 23.4% |
| PEDESTRIAN FATALITIES | 6,516 | 7,485 | 14.9% | PERCENTAGE OF TRIPS WITH PHONE MOTION | 34% | 37% | 7.7% |
| CYCLIST FATALITIES | 938 | 985 | 5% | PHONE MOTION TIME | 0:01:26 | 0:01:44 | 20.9% |
| SMARTPHONE OWNERSHIP | 83% | 85% | 2.4% | PERCENTAGE OF TRIPS WITH HANDHELD CALLS | 4% | 4% | -7.4% |
| | | | | HANDHELD CALL TIME | 0:00:31 | 0:00:25 | -19.4% |
| | | | | PHONE MOTION ABOVE 50 MPH | 33% | 34% | 5.0% |
| | | | | VEHICLES ON US ROADS (IN MILLIONS) | 279 | 284 | 1.8% |
| | | | | TOTAL MILES DRIVEN (IN BILLIONS) | 222 | 264 | 18.9% |
| | | | | MILES PER PERSON PER DAY | 29.3 | 32 | 9.2% |

Sources: Cambridge Mobile Telematics, Experian, American Petroleum Institute, Federal Highway Administration, NHTSA, Pew Research

Chart from Cambridge Mobile Telematics indicating a relationship between smartphone use and injuries ... [+]

Cambridge Mobile Telematics

"The increase in crashes when drivers interact with their screens is stark:

The worst offenders are 240% more likely to crash than the safest drivers," the report stated.

Of course there are other distractions taking drivers' attention away from the road including o more elaborate and complex infotainment screens for choosing entertainment and comfort options.

In the case of smartphones, some of this technology can be addictive, as asserted by the NTSB's Bruce Landsberg, but the increase in distracted driving may also be attributed to opportunity, especially when one is stuck in traffic.

One way to mitigate that is by finding ways to keep traffic moving, said Bobby Lee, director of marketing and spokesperson for LYT, a cloud-based software platform aimed at reducing traffic congestion.

"Triple A foundation for traffic safety says that, you know, when we're sitting in traffic, we're two to four times more likely to be distracted and that leads to really dangerous things on the road. For example, with buses, one of the areas that we focus on at LYT, that 60,000 bus involved accidents annually," said Lee in an interview.

His company is using a combination of artificial intelligence and machine learning to keep traffic moving by prioritizing when traffic signals turn green. It not only clears the way for emergency and transit vehicles, it better regulates overall traffic flow, which also reduces the opportunity for drivers to be distracted.

"So when you can keep people moving when they're engaged on the roadway.That means there's fewer distractions, that means they're going to get there faster, fewer minutes of distraction, and that means less, less, less danger to all of us," explained Lee.

To reduce smartphone use and better understand the extent of driver distraction in general, there are a number of mobile apps and technologies monitoring and recording smartphone use.

Some apps provide the option of disabling a smartphone while the vehicle is in motion.

Several insurance companies are offering the use of [mobile apps](mobile apps) that monitor driving habits of their customers and lowering premiums for those resisting distractions and exhibit overall safe practices.

Most smartphones contain a do not disturb mode which users can choose to block incoming calls, texts or notifications.

NHTSA's Sophie Shulman also suggested storing a smartphone in the vehicle's glove box or in a bag in the back of the car.

She noted 25 states ban handheld cell phone use to reduce distraction while a number of communities are fighting the issue with so-called high-visibility enforcement.

"There's no magic wand to solve this problem," concluded Shulman. "Instead it will take all of us working together on many aspects including data collection, research, technology, laws, and equitable enforcement to take behavior to save lives."

# Smartphone apps drive gig workers, parents to distraction

By

November 3, 2022



Gig-economy workers are 4 times as likely as other drivers to use smartphone apps regularly while driving, a new survey from the Insurance Institute for Highway Safety shows.

"The explosion of smartphone features and services has not only created new forms of driver distraction, but also a new

group of rideshare and delivery drivers whose jobs require them to interact with their phones while they're on the road," IIHS President David Harkey said.

Parents are also nearly 50 percent more prone to routinely making video calls, checking weather reports and other types of smartphone-enabled distractions than drivers without children 18 or younger, the survey found.

Statistics from the National Highway Traffic Safety Administration indicate that more than 3,000 people died in distraction-related crashes in 2020, accounting for 8 percent of all traffic-related fatalities. Because it's difficult to determine if distraction contributed to a crash, that number is almost certainly an underestimate.

Anything that diverts the driver's attention — eating, adjusting the radio, putting on makeup — can increase the risk of a crash. But tasks involving mobile phones and other electronic devices can be both more demanding and more tempting than other common distractions. The variety of smartphone applications has also exploded in recent years.

To begin exploring the impact of these newer applications, IIHS surveyed more than 2,000 drivers nationwide about what secondary tasks they perform while driving. Tasks were separated into ordinary activities and those that involved a mobile phone or another electronic device, and the device-

based activities were further categorized into basic talking and texting and smartphone-based activities like programming a navigation app or checking a social media feed. For some device-based activities, drivers were also asked whether they performed the task using a hands-free feature.

Overall, nearly two-thirds of the participating drivers reported performing one or more distracting activities of any type most or every time they drove over the past 30 days. Half said they performed at least one device-based task during most drives. Common device-based activities included making phone calls, streaming music and reading texts, but the most common was programming a navigation app. Far fewer people reported playing games on a mobile device while driving, but 8 percent said they play games regularly while they're behind the wheel.

For the most part, the drivers said they usually used the hands-free feature for device-based activities when the capability was available. About 8 out of 10 drivers who said they regularly programmed their navigation app and 7 out of 10 who said they regularly read and sent texts while driving reported that they used voice commands to do so.

"Hands-free operation is generally believed to be less dangerous, since drivers can more easily keep their eyes on the road," said IIHS Research Associate Aimee Cox, the lead

author of the study. "However, it doesn't eliminate the distraction altogether."

[Previous research](#) has shown, for instance, that hands-free systems that require drivers to perform some operations manually, such as scrolling through a contact list, are less safe than those that can be managed completely with voice commands. Hands-free capabilities are irrelevant or impractical for some smartphone-based activities, such as scrolling social media or playing games.

Not surprisingly, the survey showed that drivers between the ages of 18 and 34 were more likely to use smartphone apps while behind the wheel than drivers ages 35-49. Less predictably, however, it also showed that parents of children 18 and younger were 65 percent more likely than other drivers to perform non-device-based tasks, 31 percent more prone to any device-based distraction and 47 percent more likely to engage in smartphone-enabled secondary activities.

Gig-economy workers were more than twice as likely as other drivers to engage in any distracting activity and nearly 4 times as likely to regularly use smartphone apps while driving. The smartphone-based activities they performed also went well beyond communicating with customers and navigating to pickup and delivery locations using the app provided by their employer.

One possible reason could be that they're more tempted to conduct other business or find ways to entertain themselves while driving because their jobs force them to spend so much time behind the wheel. In response, ridesharing and delivery companies should put in place or strengthen policies that mandate safe practices for necessary operations and restrict device-based behaviors that are not an essential part of the job.

"These results show that nobody is immune to distraction and suggest that hands-free capabilities may be making us a little too comfortable using our phones and other devices behind the wheel," said Harkey.

# Distracted driving

Using a cellphone while driving increases crash risk. Researchers have consistently linked texting or otherwise manipulating a cellphone to increased risk. Some studies, but not all, have found that talking on a cellphone also increases crash risk.

Cellphone and texting aren't the only things that can distract drivers. The National Highway Traffic Safety Administration defines distracted driving as any activity that could divert attention from the primary task of driving. Besides using phones, examples of distracted behaviors include adjusting a radio, eating and drinking, reading, grooming, and interacting with passengers. This list has not expanded with these other activities isn't well established.

Laws restricting phone use by drivers and in-vehicle technology are two common approaches that may help reduce distraction-related crashes. Broad-based or manipulating electronic devices seem to be most promising, rather than laws that target only texting or talking. Crash-avoidance systems can bring drivers' attention back to the road, regardless of the cause of the distraction.

## Latest news

### Better ways to track distraction
Roadside cameras and dashcams take quick periods to recognize more actions of some drivers in a state.
June 2, 2023

### Leveraging smartphones for safety
Smartphones are among the most common causes of distraction driving, but can also be part of the solution.
Ian Reagan
July 30, 2021

## Cellphone use by drivers

A 2021 national observational survey found that 2.5% of drivers stopped at intersections were talking on hand-held phones at any moment during the day (National Center for Statistics and Analysis, 2022). Combining the observational data with self-reported data on how hand-free phones are used, the federal government estimates that 7.4% of drivers used some type of phone (hand-held or hands-free) at any given moment during the day.

In the same survey, 3.3% of drivers were observed manipulating hand-held devices at intersections. Likewise, the rate was highest, at 5.4%, for drivers estimated to be 16-24 years old.

In a recent IIHS survey of US drivers, over a fifth of respondents reported engaging in at least one smartphone-based interaction, such as making video calls, watching videos or using social media, at most or all of their trips (Ian Reagan, 2022).

People who use cellphones more frequently while driving may be more aware in other respects. In an IIHS study of drivers who were continuously monitored for one year, the drivers who reported the greatest cellphone use were observed making more phone-related trips and the highest rates of hard braking and acceleration events (Seyfried, 2013). In an old study, drivers who reported frequent cellphone use drove faster, changed lanes more often and made more hard-braking maneuvers than drivers who said they rarely used cellphones while driving (Seyfried, 2013).

## Cellphone use and crash risk

There are no reliable estimates of the number of crashes caused by distracted drivers. Much of what we know about distracted drivers comes from police reports and driver studies. Studies have consistently linked texting or otherwise manipulating a phone to increased risk. There is mixed evidence about whether talking on a cellphone increases crash risk.

Based on national police-reported data on fatal crashes in the United States during 2021, 3,522 people died in motor vehicle crashes in which distraction was deemed a contributing factor. That is 8% of all crash deaths. Of those crashes, 377, or less than 1% of people killed in the crash, died in crashes involving cellphone use.

Statistics based on police-reported crash data almost certainly underestimate the role of distraction in fatal crashes. Police crash reports aren't a reliable way to count cellphone-related distraction because people often don't volunteer that they were on the phone, and it is often difficult to confirm it. Police aren't always willing to say whether distraction was a factor in crashes that result in deaths (National Highway Traffic Safety Administration, 2009).

Data from over 3,500 drivers who were continuously monitored for up to 3 years during 2010-13 have been used for several studies of the effect of cellphone conversation. Times of these (Klauer et al., 2014; Dingus et al., 2016; Simons-Morton et al., 2014), including one by IIHS researchers, have not found an increased risk of a crash associated with talking on a cellphone (Kidd et al., 2016). In a study of 105 teen drivers monitored for 1.5 years, the crash risk was increased when drivers had completed with cellular other tasks, but not when they were talking on a cellphone (Simons-Morton et al., 2014). The finding is consistent with an earlier IIHS study of cellphone use by 105 drivers during a one-year period (Kidd et al., 2016).

Nearly all experimental studies using driving simulators or instrumented vehicles reported that some measures of driver performance were affected by the cognitive distractions associated with cellphone tasks (McCartt et al., 2006). Statistical analyses aggregating the results of multiple studies reported significant degrees of impairment during phone tasks. The effect on reaction time or other measures of attention can be similar to the effect of cellphone conversations on lane keeping, speed or following distance (Caird et al., 2008; Horrey & Wickens, 2006).

In analyses aggregating the results of 28 experimental studies using driving simulators or instrumented vehicles reported that typing or sending text messages significantly slowed drivers' reaction times and increased time keeping and increased the length of time drivers looked away from the roadway (Caird et al., 2014).

Cellphone use also affects how drivers scan and process information from the roadway. Drivers generally take their eyes off the roadway to dial or manipulate a hand-held phone. In contrast, drivers engaged in cellphone conversations and other forms of cognitive distraction tend to concentrate their gaze toward the center of the roadway (Recarte & Nunes, 2003) but process less of what they see in other locations (Strayer & Drews, 2007).

Researchers have found that brain activity associated with visual processing and attention is suppressed when drivers are cognitively distracted (Strayer et al., 2003; Strayer et al., 2013). Consequently, cognitive distractions can lead to a so-called "inattention blindness," in which drivers fail to comprehend or process information they expect in the roadway even when they are looking at them (Strayer et al., 2003).

## Electronic device laws

States initially banned drivers from using cellphones in a car or truck in 2001. Now Oklahoma has become the first state to ban hand-held phone conversations by all drivers. Since laws that target specific types of electronic devices or functions, uses device types, may and many of all electronic device while driving. Most states also recognize laws that make it illegal to use any type of electronic device, some of these laws are stronger than others, but all ban texting and all most all prohibit all hand-held phone conversations by all drivers. Currently, 14 states ban drivers from holding electronic devices.

### Bans on holding electronic devices



Thirty-five states and the District of Columbia have full bans on holding electronic devices, use, including hand-free use. Little is known about the effects of these bans on highway safety, but one study indicated that a large of these device bans led to fewer injury crashes but not crash fatality, in particular of texting. In most states, drivers may use all phones to talk on hand-free mode as well as text but not want to change device behavior as much as such bans do. A range of bans on hand-held phone conversations and texting than on the same (IIHS, Report 2012). This has be decreased they are harder to enforce.

### Full bans for novice drivers



IIHS found that the earliest all-driver bans on hand-held phones concentrated large and texting effects on phone use (Braitman & McCartt, 2010).

Studies of the effects of the early hand-held device and texting bans on crashes are few and inconclusive.

Early analyses by HLDI found that collision claims didn't change or went up after hand-held phone bans in California, Connecticut, New York, and the District of Columbia. More recent HLDI studies of the effects of all and hand-held device bans and texting bans on crash claims showed similar results. Researchers for IIHS and HLDI did not seem to change device behaviors as much as such bans do (Trempel, 2011). These effects suggest that these bans found that collision claims in certain states were no more likely to decline in states that enacted hand-held device bans than in states without such bans (McCartt et al., 2010).

A number of later studies showed that texting bans in states with new or recent hand-phone was (Trempel, 2011; Rocco & Sampaio, 2016; Rocco & Sampaio, 2016; Trempel et al., 2016). However, these studies had methodological limitations and large number of confounded effects.

Many of the early studies of texting bans were conducted before smartphones became widespread. One study analyzed functionality of these devices compared with earlier types of cellphones had fundamentally changed the nature of distracted driving.

As cell phones have changed, later device bans on crash deaths or to address different types of device use by drivers blocked texting and texting.

IIHS evaluated the relationship between new and crash rates and broad laws in California, Oregon and Washington that could prohibit all electronic devices was behind the wheel. Broad laws crash rates also showed decreased significantly in Oregon and Washington after more stringent electronic device bans took effect, but this was not the case in California (Trempel, et al., 2019).

The model results suggest that the specific wording of texting bans and device bans for the severity of penalties were no more a difference. Oregon and Washington banned any "holding" of a cellphone, and specified penalties for high or low driving. California specified penalties for holding a cellphone hand-free, by prohibiting "holding and using" an electronic device, rather than simply holding it (Trempel et al., 2019).

## Technology to combat distraction

Crash-avoidance technology may be the most promising avenue for reducing crash-risk related to distraction, because it doesn't require drivers to change their behavior — it corrects the driver's attention back to the roadway. Unlike cellphone restrictions, these systems attempt to avoid the actions altogether if a driver does not respond fast enough to avoid a crash.

A promising recent development is camera-based driver monitoring systems designed to alert the driver when they are looking away from the road for long. Initially designed to use cars with other driver-assistance technology, such camera-based neck warning systems are beginning to appear as a standalone feature in some vehicles (IIHS, 2021).

The model results suggest that the specific wording of texting bans and device bans for the severity of penalties were no more a difference. Oregon and Washington banned any "holding" of a cellphone, and specified penalties for high or low driving. California specified penalties for holding a cellphone hand-free, by prohibiting "holding and using" an electronic device, rather than simply holding it (Trempel et al., 2019).

Automakers are integrating infotainment systems into vehicles to let drivers and other occupants plug in or wirelessly connect smartphone features as controllers and cars and apps on a central dashboard display and controls.

On the one hand, increased complexity of the center stack area of the vehicle has been associated with increased crash risk (Dingus et al., 2016). However, designers are also encouraging certain people and integrated inputs that require less visual-manual attention. For example, messaging systems using voice commands can be entered into using touchscreen (McCartt et al., 2006). Some of these systems allow drivers to connect their phones to the vehicle's built-in infotainment screen. These in-vehicle systems, Android Auto and Apple CarPlay, are now available in many vehicles. The systems display selected smartphone apps and information and function to a standardized infotainment appearance adjusting for different phones.

Many newer infotainment systems and portable devices can be controlled using voice commands. Drivers take driver glances away from the roadway when keeping their eyes on the road for a greater proportion of the time than when using a touchscreen or hand-free mode (Reagan et al., 2020; Kidd et al., 2017). However, an IIHS study found that drivers took their eyes and mental attention off the road for longer when using a system in which a single interaction could be completed using a single voice command, compared with a system that required multiple voice commands to complete the same action (Kidd et al., 2016). On the other hand, speech-based systems require drivers to generate drivers' attention while the driver is performing a voice command and was looking at the roadway (Reagan et al., 2016).

The effect of voice recognition technology on crash risk are unknown. NHTSA has issued voluntary guidelines for integrated infotainment systems in an effort to minimize the visual and manual attention required of these systems (National Highway Traffic Safety Administration, 2013). NHTSA also has provided similar voluntary guidelines for drivers of portable and aftermarket devices (National Highway Traffic Safety Administration, 2016).

Phone applications that restrict or limit access to electronic devices also have been developed. These apps generally work when a phone is in motion and connect to the phone, a reduced subsequent keystroke of iPhone phones and found that only about 1 in 5 had the feature set to activate automatically when moving (Ian Reagan, 2022).



**frontiers in**
**HUMAN NEUROSCIENCE**

ORIGINAL RESEARCH ARTICLE
published: 28 February 2013
doi: 10.3389/fnhum.2013.00053

# Brain activity during driving with distraction: an immersive fMRI study

**Tom A. Schweizer** [1,2,3]*, **Karen Kan** [3], **Yuwen Hung** [1], **Fred Tam** [4], **Gary Naglie** [5,6,7,8] and **Simon J. Graham** [4,9]

[1] Keenan Research Centre of the Li Ka Shing Knowledge Institute, St. Michael's Hospital, Toronto, ON, Canada
[2] Department of Surgery, Faculty of Medicine, Division of Neurosurgery, University of Toronto, Toronto, ON, Canada
[3] Institute of Biomaterials and Biomedical Engineering, University of Toronto, Toronto, ON, Canada
[4] Department of Physical Sciences, Sunnybrook Research Institute, Toronto, ON, Canada
[5] Department of Medicine, Baycrest Geriatric Health Care Centre, Toronto, ON, Canada
[6] Rotman Research Institute, Baycrest, Toronto, ON, Canada
[7] Toronto Rehabilitation Research Institute, University Health Network, Toronto, ON, Canada
[8] Department of Medicine and Institute of Health Policy, Management and Evaluation, University of Toronto, Toronto, ON, Canada
[9] Department of Medical Biophysics, Faculty of Medicine, University of Toronto, Toronto, ON, Canada

**Edited by:**
Daniel S. Margulies, Max Planck
Institute for Human Cognitive and
Brain Sciences, Germany

**Reviewed by:**
Kimmo Alho, University of Helsinki,
Finland
Lutz Jäncke, University of Zurich,
Switzerland

**\*Correspondence:**
Tom A. Schweizer, Keenan Research
Centre of the Li Ka Shing
Knowledge Institute, St. Michael's
Hospital, 30 Bond Street, Toronto,
ON M5B 1W8, Canada.
e-mail: schweizerT@smh.ca

**Introduction:** Non-invasive measurements of brain activity have an important role to play in understanding driving ability. The current study aimed to identify the neural underpinnings of human driving behavior by visualizing the areas of the brain involved in driving under different levels of demand, such as driving while distracted or making left turns at busy intersections.

**Materials and Methods:** To capture brain activity during driving, we placed a driving simulator with a fully functional steering wheel and pedals in a 3.0 Tesla functional magnetic resonance imaging (fMRI) system. To identify the brain areas involved while performing different real-world driving maneuvers, participants completed tasks ranging from simple (right turns) to more complex (left turns at busy intersections). To assess the effects of driving while distracted, participants were asked to perform an auditory task while driving analogous to speaking on a hands-free device and driving.

**Results:** A widely distributed brain network was identified, especially when making left turns at busy intersections compared to more simple driving tasks. During distracted driving, brain activation shifted dramatically from the posterior, visual and spatial areas to the prefrontal cortex.

**Conclusions:** Our findings suggest that the distracted brain sacrificed areas in the posterior brain important for visual attention and alertness to recruit enough brain resources to perform a secondary, cognitive task. The present findings offer important new insights into the scientific understanding of the neuro-cognitive mechanisms of driving behavior and lay down an important foundation for future clinical research.

**Keywords: driving, driving distractions, neural correlates of driving, driving complexity, fMRI**

## INTRODUCTION

Driving is an essential daily activity for many people, providing mobility, independence, and sometimes a source of livelihood. Previous research has reported factors that increase the risk of vehicle crashes and driving errors including fatigue and sleepiness after extended driving (Sagaspe et al., 2008) and alcohol consumption (De Boni et al., 2012). Research has also reported on neurological factors that impact driving ability, especially in individuals with cognitive impairments (Rapoport et al., 2007; Carr and Ott, 2010; MacDonald and Hébert, 2010; Nelson, 2010), that increase the risk of vehicle crashes (Rizzo, 2011). Health professionals have the responsibility to identify individuals with medical conditions that may detract from safe driving ability (Carr et al., 2006). However, to date there has been no consensus on the assessment of fitness to drive and it remains a significant challenge

for clinicians to evaluate a patient's driving capacity (Eby and Molnar, 2010). Some individuals may be able to drive in simple, well-practiced circumstances, but may be incapable of driving safely when circumstances become more demanding or novel. There is very limited knowledge about how different levels of driving behavior are supported by normally functioning brains, and how different areas of the brain interact when performing various driving tasks.

Safe driving requires the ability to concentrate, to divide attention between multiple sensory events across visual and auditory modalities, and to make fast cognitive decisions in a complex and rapidly changing environment. The present study applied virtual reality (VR) technology in a functional magnetic resonance imaging (fMRI) system to investigate how brain responses of healthy adults change across various driving scenarios. Using

this novel setup allowed us to obtain a real-time, spatiotemporal profile of brain activity while driving in a safe environment. Previous fMRI driving research has identified brain areas responsive to different aspects of driving (Carvalho et al., 2006; Spiers and Maguire, 2007), including maintaining driving speed (Peres et al., 2000; Calhoun et al., 2002) and responding to uncertainties during driving (Callan et al., 2009). These studies commonly identified brain regions involving the motor, parietal, occipital, and cerebellar cortices responsible for various driving maneuvers (Walter et al., 2001; Calhoun et al., 2002; Uchiyama et al., 2003; Graydon et al., 2004; Calhoun and Pearlson, 2012) such as turning, reversing, and stopping (Spiers and Maguire, 2007) all of which require visual-spatial and visual-motor processes. Specific tasks such as monitoring other cars, processing traffic rules, and action planning, recruit the pre-supplementary motor area, the superior parietal and lateral occipital cortices, as well as the cerebellum (Spiers and Maguire, 2007). These additional activations in posterior brain regions have been attributed to the increased demands that driving places on vision and motor skills, as well as visuo-motor and visuo-spatial integration. Previous research examining driving performance with distractions has reported an associated reduction in brain resources (Just et al., 2008). However, existing studies have provided limited data related to real-world driving behaviors, such as driving with distraction.

Cognitive psychologists have proposed that the posterior attention system engages brain areas such as the occipital-parietal and posterior cingulate regions that are critical to visual-spatial orientation and integration functions. In contrast, the anterior attention system serves a higher-level attention function, engaging anterior portions of the frontal lobes such as the prefrontal and anterior cingulate regions, which are responsible for executive attentional control in more complex cognitive tasks associated with problem-solving and decision-making, especially during multi-tasking (Posner and Dehaene, 1994; Posner, 2012). Studies have used electroencephalography (EEG) techniques to estimate possible intracerebral sources associated with driving-related processing: deactivation of signals during fast driving related to a drop of cognitive control has been reported (Jancke et al., 2008); and visual event-related potentials (ERP) components were diminished and the attentional selection of target stimuli were less efficient during concurrent auditory dual-tasks (Gherri and Eimer, 2011). Magnetoencephalography (MEG) studies with driving simulators have reported multiple brain sources, including visual, parietal, and frontal areas that are engaged during visual attention to driving-related signals (traffic lights and direction signs), with increased attention demand in a dual-task audio condition modifying the neural processing of visual signals (Fort et al., 2010). Functional Near Infrared Spectroscopy (FNIRS) has also been used to explore the neural underpinnings of driving behavior. Recent studies have suggested that the frontal lobes are sensitive to the type of driving task, with greater frontal lobe activity observed for externally directed driving behavior (following audio driving instructions) compared to internally-driven driving behavior (based on memory) (Liu et al., 2012). FNIRS data also suggest that parietal and occipital brain areas are responsible for spatial attention in the perception of VR space (Seraglia et al., 2011; also see the review of Calhoun and Pearlson, 2012).

The current study focused on identifying the underlying neural networks subserving different driving behaviors including distracted driving. Our immersive and novel VR setup (Kan et al., 2013) allowed us to investigate how the brains of healthy young adult drivers respond during various simulated driving conditions ranging in levels of complexity. This goal was achieved by using virtual driving technology combined with advanced neuroimaging techniques. Driving tasks were designed to require increasing levels of attentional processing demands and visual complexity. For example, the tasks included making turns at intersections with and without oncoming traffic, or driving under auditory distractions that mimic driving while talking on a hands-free cell phone or engaging in a conversation with a passenger. These simulated driving conditions allowed us to tap into the same neural processes associated with a more complete range of real-world driving behaviors. The cognitive manipulation during driving in the current study can be helpful in studying the underlying neural substrates for various driving behaviors, such as distracted driving. The knowledge of these neural substrates ultimately can help health professionals to more effectively assess driving competence in individuals with brain dysfunctions (e.g., using office-based, cost-effective tests), and will eventually contribute to the design of potential cognitive rehabilitation strategies.

We hypothesized that complex simulated driving conditions (such as making turns, particularly left turns at busy intersections while encountering oncoming traffic) would involve posterior brain activations including motor and occipital-parietal regions for visual-spatial and visual-motor activation. On the other hand, prefrontal activation would be involved in a distracted condition consisting of performing a secondary cognitive task during simulated driving, related to the executive function demands when attentional resources are divided across multiple tasks.

## MATERIALS AND METHODS
### ETHICS STATEMENT
Ethical approval for the study was obtained on July 18th 2010, by the Research Ethics Board at Baycrest Hospital in Toronto, Canada. All participants provided written informed consent prior to participating in the study.

### PARTICIPANTS
Participants were recruited through the university network via advertisement and emails. All participants were right-handed with normal or corrected vision. Participants without a valid driver's license, with a history of psychological or neurological illness, or with fMRI contraindications (such as having claustrophobia or ferromagnetic implants) were excluded. Sixteen participants (7 females and 9 males) between the ages of 20 and 30 years (Mean = 25.8, $SD$ = 1.5) who were actively driving and with mean driving experience of 7.4 years ($SD$ = 2.5) were studied.

### DRIVING SIMULATION
We applied a novel approach using an immersive VR environment in a 3.0 Tesla MRI system to capture brain activity with high ecological validity (Kan et al., 2013). We applied driving hardware

(steering wheel and foot pedals) custom built for compatibility with fMRI. The driving scenario was designed using STISIM Drive software (Systems Technology Inc., Hawthorne, CA). Participants viewed the simulation through a mirror attached to the head coil (see "Neuroimaging" section), which oriented on a projection screen illuminated by an LCD projector system projecting through a waveguide in the radiofrequency shield of the MRI room; participants also wore fMRI-compatible headphones (Silent Scan, Avotec, Inc., Stuart, FL) to hear the audio tasks.

### DRIVING TASKS

Prior to fMRI, participants underwent an hour-long training session in an fMRI simulator to practice simulated driving. The tasks included straight driving ("Straight Driving," **Figure 1A**), turning at intersections with and without oncoming traffic, or driving while performing audio tasks. Each participant performed six simple right-hand turns ("Right Turn") and six left-hand turns ("Left-Turn," **Figure 1B**) with no traffic. To increase driving complexity, participants encountered six left turns with a stream of oncoming traffic ("Left Turn + Traffic," **Figure 1C**), which required participants to decide when to turn safely. In conditions of distracted driving, participants were presented with concurrent audio tasks consisting of general knowledge true or false

questions (e.g., "a triangle has four sides") during straight driving ("Straight + Audio"; six times) as well as in the demanding turns ("Left Turn + Traffic + Audio"; six times). Participants answered the questions by pressing corresponding buttons embedded on the steering wheel (similar to modern vehicle designs for answering hands-free devices or volume controls). The experimental protocol is shown in **Figure 2**. Straight driving served as the control condition (baseline) interspersed between other specific tasks in pseudo-random order. Each task was introduced by a voice recording (e.g., "At the intersection, turn left") approximately 5 s prior to the task, similar to navigation instructions with a Global Positioning System. Participants were asked to follow the traffic rules and to drive as close to the posted speed limit as possible. Each driving task was separated by at least 15 s of straight driving (baseline/controls) to maintain separation to limit overlapping of the fMRI hemodynamic response signals.

### NEUROIMAGING

Participants received motion training to operate the driving controls with minimal head motion and practiced on four training runs that introduced all driving conditions. During testing, participants were placed in the MRI system with the driving hardware in a comfortable position. A high-resolution anatomical scan was



**FIGURE 1 | Representative STISIM screenshots of simulated driving conditions used in the fMRI.** Rural scenery was chosen to minimize the potential confounding variations from using complex visual backgrounds. **(A)** Straight driving; **(B)** Left turn at intersection with no traffic; **(C)** Left turn with oncoming traffic.



**FIGURE 2 | The experimental task design.**

acquired first, followed by three fMRI runs with simulated driving. The driving scenarios were triggered synchronously with the fMRI time series data collection. Each run was approximately 9–9.5 min. Images were acquired using a research-dedicated whole body 3.0 Tesla MRI system (Magnetom TIM system version b15, Siemens, Erlangen, Germany). The high-resolution anatomical scan was acquired with T1-weighted, 3D magnetization prepared rapid gradient echo imaging (MPRAGE; echo time ($TE$) = 2.63 ms, 160 slices, thickness = 1.0 mm, gap = 0 mm, field of view ($FOV$) = 256 × 192 mm, matrix = 256 × 192, yielding 1 × 1 × 1 mm voxels). Functional MRI was undertaken using T2*-weighted echo planar imaging (EPI; repetition time ($TR$) = 2 s, $TE$ = 30 ms, flip angle = 70 degrees, 32 slices, thickness = 4.5 mm, gap = 0 mm, $FOV$ = 200 × 200 mm, matrix = 64 × 64, yielding 3.13 × 3.13 × 4.5 mm voxels).

### DATA ANALYSIS
The first 10 s of scanning for each driving run was discarded to allow for equilibration effects. Using AFNI freeware (Cox, 1996), time series data were corrected for physiological movement due to respiration, corrected for slice timing effects, and co-registered to the 16th time point of the first run. The dataset was spatially smoothed using a 5 mm full width at half maximum (FWHM) Gaussian kernel and normalized by the run-wise mean of each voxel. Statistical brain activation maps were calculated using a General Linear Model (GLM) by convolving a stimulus-timing file with a variable-shape hemodynamic response function (HRF) with seven regressors (for an expected HRF of 14 s, one regressor was used per TR). Estimated head motion parameters, in six degrees of freedom as determined from the co-registration procedure indicated above, were included as nuisance regressors as well as a 4th order polynomial for baseline detrending. The resulting GLM parameter estimates were summed, transformed into Talairach brain atlas space (Talairach and Tournoux, 1988), spatially smoothed using a 6 mm FWHM Gaussian kernel, and the maps for all 16 subjects were entered into a within-subjects, random effects ANOVA. Finally, t-statistic maps for all conditions were thresholded using a false discovery rate method (Genovese et al., 2002) at a level of $q = 0.05$, to correct for multiple statistical comparisons. For interpretation, the final group activation maps were overlaid on the average of all 16 anatomical images, which were also transformed into Talairach brain atlas space. To disentangle the visuo-motor and higher cognitive functions involved in driving, straight driving was used as the control condition in comparison with all other driving conditions. The statistical comparisons of interest across group activation maps were, therefore: distracted straight driving vs. control; right turns vs. control; left turns vs. control; complex turns vs. control; and distracted complex turns vs. control.

## RESULTS
### BRAIN ACTIVATIONS
Significant brain activations are summarized below, reported relative to the straight driving control condition. Brain activation images for each task are shown in **Figures 3** and **4**. Peak locations of brain activity are reported in **Table 1**. All reported results were

in contrast with the baseline (control condition: straight driving). Behavioral results can be seen in Appendix.

### Regular driving
***Right turn (Figure 3A).*** Minimal significant activation was observed in this simple task, including the somatosensory association (postcentral gyrus), parietal (including precuneus), and visual cortices (lingual gyrus).

***Left turn (Figure 3B).*** More activation was detected in this condition, which was observed in the premotor cortex, somatosensory area, visual and parietal cortices, as well as the cerebellum.

***Left turn + traffic (Figure 3C).*** This condition showed larger significant activations of multiple bilateral regions in the mid-posterior brain, including motor and premotor areas, visual, parietal, and somatosensory regions, and the cerebellum.

### Distracted driving
***Straight + audio (Figure 4A).*** Significant activations were found in the ventrolateral prefrontal cortex (vlPFC) bilaterally, in addition to auditory cortex. Other activations were detected in the parietal lobes. Decreased activation in occipital-visual regions was observed.

***Left turn + traffic + audio (Figure 4B).*** In addition to auditory, motor, somatosensory, visual, parietal, and cerebellar regions, significant additional activations were detected in anterior brain areas bilaterally, mainly in the dorsolateral prefrontal cortex (dlPFC) and the frontal polar region.

### BEHAVIORAL RESULTS
Driving performance showed an effect of speed differences among undistracted driving conditions ($p < 0.05$; Repeated Measure ANOVA; **Table A1**); *post-hoc* comparisons showed that the mean speed in left-turn-traffic was the slowest (29.4 km/hr, $SD$ = 4.3 km/hr) compared to left turns (26.8 km/hr, $SD$ = 5.2 km/hr) and right turns (24.0 km/hr, $SD$ = 3.3 km/hr). Left turn speed was significantly slower than right turn speed, which was the fastest among all conditions significantly ($p < 0.05$, Least Significant Difference *post-hoc* tests; **Table A2**). The speed in the distracted left-turn-traffic condition was not significantly different from the left turn and left-turn-traffic conditions and was only slower than right turns ($p < 0.05$). Average speed during straight driving (58.57 km/hr, $SD$ = 3.36 km/hr) was not significantly different from that of distracted straight driving (58.69 km/hr, $SD$ = 2.34 km/hr) (**Table A3**). Lane position during straight driving (2.35 km/hr, $SD$ = 0.31 km/hr) was not significantly different from that of distracted straight driving (2.51, $SD$ = 0.42 km/hr) (**Table A3**). Average response accuracy to the audio distraction task was 87% (range = 50–100%, above the chance level).

## DISCUSSION
The current study extends previous research by using an immersive fMRI-compatible driving simulator to examine how the human brain responds to various driving conditions, and by characterizing the effects of cognitive distraction on driving. First,



**FIGURE 3 | Brain activations from the bottom to the top of the brain (left to right figures) of participants when performing various simulated driving conditions. (A)** The right-turn condition showed minimal activation in the brain; **(B)** Left-turn showed more activation in the posterior brain regions; **(C)** The left-turns with oncoming traffic generated larger significant activations of multiple bilateral regions in the mid-posterior brain areas. See details in the "Results" section.



**FIGURE 4 | Brain activations associated with distracted driving. (A)** Straight driving with a cognitive-distraction, audio task. **(B)** The demanding, left-turn condition with oncoming traffic plus the cognitive distraction.

we observed that the patterns of brain activation depend on the type of simulated driving task. Performing right turns, the simplest task, generated minimal activation relative to the control condition (**Figure 3A**). Making left turns, without oncoming traffic, the participants showed activations in the posterior brain, including visual-parietal and motor areas (**Figure 3B**), suggesting that cognitive resources involving visuospatial and motor coordination are required for making left turns. Performing the

**Table 1 | Peak locations (Tailarach coordinates) of brain activations during each driving task.**

| Peak activations | L | P | I | TT Atlas |
|---|---|---|---|---|
| **RIGHT TURNS** | | | | |
| | −24 | −60 | −62 | L superior parietal lobule, BA7 |
| | −14 | −78 | 44 | L precuneus, BA7 |
| | 34 | −40 | 64 | R postcentral gyrus, BA5 |
| | 20 | −66 | 58 | R superior parietal lobule, BA7 |
| | 18 | −72 | −8 | R lingual gyrus, BA18 |
| **LEFT TURNS** | | | | |
| | −44 | −30 | 60 | L postcentral gyrus, BA1/2 |
| | −6 | −62 | 64 | L precuneus, BA7 |
| | −4 | −86 | 38 | L cuneus, BA7 |
| | 12 | −76 | 56 | R precuneus, BA7 |
| | 34 | −14 | 66 | R precentral gyrus, BA6 |
| | 38 | −34 | 64 | R postcentral gyrus, BA1/2 |
| | 58 | −44 | −34 | R cerebellum (Crus 1) |
| **LEFT TURNS + TRAFFIC** | | | | |
| | −30 | −28 | 68 | L precentral gyrus, BA4 |
| | −28 | −4 | 64 | L superior frontal gyrus, BA6 |
| | −8 | −74 | 56 | L precuneus, BA7 |
| | −2 | −84 | −18 | L lingual gyrus, BA18 |
| | −20 | −72 | −14 | L fusiform gyrus, BA19 |
| | −32 | −36 | −50 | L cerebellum (VIII) |
| | 32 | −12 | 66 | R precentral gyrus, BA6 |
| | 36 | −34 | 66 | R postcentral gyrus, Ba1/2 |
| | 34 | −84 | 26 | R superior occipital gyrus, BA19 |
| | 4 | −96 | 18 | R cuneus, BA18 |
| | 10 | −76 | 54 | R precuneus, BA18 |
| | 26 | −92 | −18 | R fusiform gyrus, BA18 |
| | 30 | −36 | −50 | R cerebellum (VIII) |
| **LEFT TURNS + TRAFFIC + AUDIO** | | | | |
| | −2 | −98 | −2 | L cuneus, BA18 |
| | −6 | −72 | 58 | L precuneus, BA7 |
| | −4 | −84 | −20 | L lingual gyrus, BA18 |
| | −46 | −70 | −16 | L fusiform gyrus, BA19 |
| | −2 | −34 | 74 | L paracentral lobule |
| | −32 | −36 | −52 | L cerebellum (VIII) |
| | 68 | −14 | 0 | R superior temporal gyrus, BA22 |
| | 34 | −12 | 66 | R precentral gyrus, BA6 |
| | 36 | −34 | 66 | R postcentral gyrus, BA1/2 |
| | 2 | −96 | 20 | R cuneus, BA18 |
| | 24 | −88 | −16 | R fusiform gyrus, BA18 |
| | 4 | −74 | 54 | R precuneus, BA7 |
| | 30 | −38 | −52 | R cerebellum (VIII) |
| **STRAIGHT DRIVING + AUDIO** | | | | |
| | −66 | −28 | 2 | L middle temporal gyrus, BA21 |
| | −64 | −48 | −10 | L inferior temporal gyrus, BA37 |
| | −64 | −8 | 6 | L superior temporal gyrus, BA22 |
| | −54 | 20 | −6 | L inferior frontal gyrus, BA47 |
| | −46 | −56 | 52 | L inferior parietal lobule, BA40 |
| | −32 | −76 | 48 | L superior parietal lobule, BA47 |
| | 54 | 22 | −4 | R inferior frontal gyrus, BA47 |
| | 68 | −14 | 2 | R superior temporal gyrus, BA22 |

BA, Brodmann area.

more demanding left turns at busy intersections, where in the real world most serious crashes occur (National Highway Traffic Safety Administration, 2009; Choi, 2010), produced larger activations in the posterior network, along with additional activation of the cingulate cortex, an area important for cognitive-response selection and alertness (Vogt et al., 2004) (**Figure 3C**).

Second, a significant shift in activation from the posterior to the anterior brain was observed when driving became distracted. Compared to straight driving, auditory distraction during straight driving significantly activated not only auditory areas but also the prefrontal cortices (mainly in the ventral lateral prefrontal cortex regions; **Figure 4A**), while decreased activation in posterior brain regions was evident. These findings support the study hypothesis in that undistracted driving, even in attentionally demanding conditions, engaged the posterior brain system, while driving under cognitive distractions activated the anterior brain system. Consistently, when the more challenging maneuver (turning left at a busy intersection) was performed under cognitive distraction, the anterior network was additionally engaged (**Figure 4B**), predominantly in the dorsolateral prefrontal cortex/frontal pole. These regions are associated with executive functions including attention and working memory processes, and processing thoughts and decision-making critical for multitasking (Christoff and Gabrieli, 2000).

To substantiate the observed shift from occipital to frontal brain activations, particularly in the prefrontal areas when comparing the left-turn-traffic condition to the left-turn-traffic plus cognitive distraction, we extracted mean BOLD percentage change values for each subject from the activated occipital and prefrontal regions of interest, and conducted *post-hoc* tests of the differences between task conditions using Matlab (Mathworks Inc., Natick, MA). Results confirmed a significant decrease in the mean occipital activation [from 0.59 to 0.36%, $p = 0.001$, paired samples $t_{(15)} = 4.01$] and an increase in the mean prefrontal activation [from 0.11 to 0.39%, $p = 0.016$, paired samples $t_{(15)} = −2.72$].

This anterior-vs.-posterior shift in BOLD signals reflects changing reactions of the brain, and highlights the effect of distracted driving and the role of the anterior frontal region, an area that has been associated with impulsiveness (e.g., Beeli et al., 2008) critical to driving. The pattern of increased frontal activation accompanied by cognitive distraction has been previously observed in participants performing a visual event detection task while passively watching a driving video under auditory distraction (Hsieh et al., 2009), as well as during performing divided attention, dual-tasks involving both visual and auditory modalities compared to performing single-modality tasks (Schubert and Szameitat, 2003; Johnson and Zatorre, 2006). One important caveat is that the prefrontal activity observed when the participants were performing simultaneous driving and auditory tasks may not be entirely associated with the distraction, but may be at least partly related to auditory attention needed for the secondary task. Future studies will be required to analyze this issue in more detail.

Supporting the findings and interpretation of the present work, an observation of decreased activation in parietal-visual areas and impaired driving performance in a dual-task driving

condition involving concurrent language comprehension has also been previously reported (Just et al., 2008). We provided data within a single study demonstrating a response shift between these brain areas from the posterior to the anterior networks related to driving distraction. This interplay between anterior and posterior brain regions is possibly related to a competition for limited resources and attentional reallocation between the anterior, executive attention in multitasking and the posterior, visual-response attention system (Rees et al., 1997; Wickens, 2008). The brain may face a "bottleneck" when multiple tasks simultaneously compete for shared and limited resources, constraining available resources for individual tasks (Just et al., 2001; Dux et al., 2006). This view suggests that with cognitive distraction during driving, to support mental processing in the anterior brain, resources of the posterior brain important for visual alertness and visual attention were sacrificed.

The current finding has important implications regarding distracted driving. While changes in driving performance observed in the undistracted conditions (slowing down from right turns to left turns and traffic) were parallel to the results of brain activations in the posterior brain (increases in activated areas), brain activity shifted to the anterior network when there was no behavioral change from the undistracted to the distracted condition. Eye-tracking studies have shown that hands-free conversations using cell phones impair attention to visual inputs (Strayer et al., 2003). These distracted drivers experience "inattention blindness": their field of view narrows (Maples et al., 2008), and they tend to "look at" but not "see" the information in their driving environment (Strayer, 2007), and miss visual cues important for safe driving (Jacobson and Gostin, 2010). As a result, epidemiological findings of real-world collisions show that drivers using hands-free phones are just as likely to experience vehicle crashes as those using hand-held devices (Redelmeier and Tibshirani, 1997; McEvoy et al., 2005). The present study provides neuroimaging evidence supporting previous behavioral observations suggesting that multitasking while driving may potentially compromise visual attention and alertness due to a reduction in brain activation supporting critical visual processing areas, even without significant behavioral changes. Therefore the dangers introduced by distracted driving should be regarded in terms of increased cognitive distractions (i.e., using hands-free cell phones) rather than motor distractions (i.e., physically holding a device) (Strayer and Johnston, 2001).

Previous studies have reported measures that may be able to predict those who passed on-road assessments from those who failed (Baldock et al., 2006). These tests include, for example, The Trail Making Test-B (Richardson and Marottoli, 2003; Staplin et al., 2003; Whelihan et al., 2005), Ergovision Movement Perception Test (De Raedt and Ponjaert-Kristoffersen, 2000), UFOV (De Raedt and Ponjaert-Kristoffersen, 2000), Complex Reaction Time Task (De Raedt and Ponjaert-Kristoffersen, 2000), Paper Folding Task (De Raedt and Ponjaert-Kristoffersen, 2000), Dot Counting (De Raedt and Ponjaert-Kristoffersen, 2000), WMS Visual Reproduction (Richardson and Marottoli, 2003), and Computerized Visual Attention Test Single Task (Mathias and Lucas, 2009). It is clinically important to understand the specific cognitive functions required in different driving circumstances in order to identify "borderline" drivers or those with "restricted" capacities who may be at risk in certain driving conditions. Recent evidence shows that smaller gray matter volume in frontal brain regions was associated with lower executive function capacity and a proclivity to risky driving (Sakai et al., 2012). Given the current finding that prefrontal areas were only significantly activated during the distracted driving conditions, we propose that future assessment should consider using neurocognitive tests that tap into executive, frontal-lobe functions and divided attention for evaluating "fitness for distracted driving." Based on the current study, it can be inferred that damage to the anterior brain regions may result in specific or restricted impairment (i.e., this type of patient may be unfit to drive safely in distracted circumstances), whereas damage to the posterior brain areas involving the visual, spatial, and motor abilities would significantly compromise general fitness to drive. This implication is also critical for establishing potential restricted driving licensing (Marshall et al., 2002).

In addition, while regular driving (e.g., simple right/left turn without traffic) relies on more learned and automatic processes that activate a driving network in the posterior brain, the midcingulate cortex was only differentially activated when the driving conditions became more demanding (left turn with oncoming traffic). This brain region has a major role to play in response selection (Paus et al., 1993; Vogt et al., 2004), attention-for-action (Posner et al., 1988), and working memory (Petit et al., 1998); therefore neurocognitive tests associated with selective attention, response inhibition, and visual-motor abilities can be targeted to evaluate the ability to drive safely in demanding circumstances, even without distraction.

A limitation of the present study is the use of young drivers, which may reduce the generalizability to older populations. Another limitation is that by using simulated driving we were unable to replicate the potential anxiety associated with driving under conditions of increasing complexity, given that there is no real crash risk. Although the use of simulated driving during fMRI may not perfectly generalize to real-world driving, it allows for the investigation of complex driving conditions that are not usually tested during on-road assessments (i.e., left turns during peak traffic or driving while talking on a cell phone). Indeed, previous research suggests that there is a significant correlation between on-road test performance and performance in the driving simulator (Freund et al., 2002). Lundqvist and colleagues have suggested that the predictive ability of driving simulators in assessing actual driving behavior was superior to that of on-road driving tests, partially due to the well-controlled complexity levels in the simulated driving scenarios (Lundqvist et al., 2000). Driving simulators provide a more standardized environment (Michon, 1989; Ranney, 1994) compared to on-road driving tests, offering an ecologically valid and safe way to study human driving behavior in a variety of challenging conditions (Grealy et al., 1999).

## CONCLUSIONS

The present study provides new neuroimaging data of the complex brain activity associated with distracted driving and driving under different levels of complexity. We found that brain activations during driving rely on areas important for various

cognitive functions including the posterior visual-spatial attentional system vs. the anterior, frontal-lobe functions in multitasking and divided attention. For most people, driving involves highly practiced skills that generally draw on automatic or practiced abilities relying on a posterior network, and does not heavily require the anterior frontal system for more effortful mental processing. However, there are potentially many distractions present during driving (Editorial, 2001), including conversations with passengers, or unpredictable events that increase the risk of crashes. The current findings may be applied to future research on clinical populations with various brain disorders (e.g., Ott et al., 2000; Bedard et al., 2011) to determine how brain damage affects the ability to adapt to daily driving tasks. The shift in brain activation indicates that the assessment of fitness to drive should consider different levels of driving demands and more selective evaluations of driving ability (e.g., in different traffic conditions, or driving while conversing with the examiner). As the brain has limited cognitive resources, this fundamental constraint limits the capacity during driving to carrying out any other cognitive operations such as language comprehension (Newman et al., 2007).

Lastly, automobile manufacturers also have a responsibility to improve safety by refraining from installing various communication devices in vehicles, or by installing deactivation systems if drivers attempt to use the devices while the car is in motion (Jacobson and Gostin, 2010). More research is needed to determine if intervention programs (e.g., Devos et al., 2009) that apply simulator protocols with attention training can improve fitness to drive, for example, in improving left turns at busy intersections, or reducing vehicle collision risks for certain brain damaged populations.

## ACKNOWLEDGMENTS

This work was supported by a Personnel Award from the Heart and Stroke Foundation of Canada and an Early Researcher Award from the Ontario Ministry of Research and Innovation to Dr. Tom A. Schweizer. Dr. Naglie is supported by the University of Toronto Mary Trimmer Chair in Geriatric Medicine. We would also like to thank Monica Maher, Megan Hird, and Meishan Yan for their assistance in the preparation of the manuscript, and Annette Weekes-Holder for performing fMRI of the volunteers.

## REFERENCES

Baldock, M. R., Mathias, J. L., McLean, A. J., and Berndt, A. (2006). Self-regulation of driving and its relationship to driving ability among older adults. *Accid. Anal. Prev.* 38, 1038–1045.

Bedard, M., Riendeau, J., Weaver, B., and Clarkson, A. (2011). Roadwise review has limited congruence with actual driving performance of aging drivers. *Accid. Anal. Prev.* 43, 2209–2214.

Beeli, G., Casutt, G., Baumgartner, T., and Jäncke, L. (2008). Modulating presence and impulsiveness by external stimulation of the brain. *Behav. Brain Funct.* 4:33. doi: 10.1186/1744-9081-4-33

Calhoun, V. D., and Pearlson, G. D. (2012). A selective review of simulated driving studies: combining paradigms, analysis approaches, and future direction. *Neuroimage* 59, 25–35.

Calhoun, V. D., Pekar, J. J., McGinty, V. B., Adali, T., Watson, T. D., and Pearlson, G. D. (2002). Different activation dynamics in multiple neural systems during simulated driving. *Hum. Brain Mapp.* 16, 158–167.

Callan, A. M., Osu, R., Yamagishi, Y., Callan, D. E., and Inoue, N. (2009). Neural correlates of resolving uncertainty in driver's decision making. *Hum. Brain Mapp.* 30, 2804–2812.

Carr, D. B., Meuser, M., and Morris, J. C. (2006). Driving retirement: the role of the physician. *CMAJ* 175, 601–602.

Carr, D. B., and Ott, B. R. (2010). The older adult driver with cognitive impairment. *JAMA* 303, 1632–1641.

Carvalho, K. N., Pearlson, G. D., Astur, R. S., and Calhoun, V. D. (2006). Simulated driving and brain imaging: combining behavior, brain activity, and virtual reality. *CNS Spectr.* 11, 52–62.

Choi, E. (2010). *Crash Factors in Intersection-Related Crashes: An On-Scene Perspective*. Washington, DC: U.S. Department of Transportation. DOT HS 811 366. Accessed March 27, 2012. Available online at: http://www-nrd.nhtsa.dot.gov/Pubs/811366.pdf

Christoff, K., and Gabrieli, J. D. E. (2000). The frontopolar cortex and human cognition: evidence for a rostrocaudal hierarchical organization within the human prefrontal cortex. *Psychobiology* 28, 168–186.

Cox, R. W. (1996). AFNI: software for analysis and visualization of functional magnetic resonance neuroimages. *Comput. Biomed. Res.* 29, 162–173.

De Boni, R., do Nascimento Silva, P. L., Bastos, F. I., Pechansky, F., and de Vasconcellos, M. T. (2012). Reaching the hard-to-reach: a probability sampling method for assessing prevalence of driving under the influence after drinking in alcohol outlets. *PLoS ONE* 7:e34104. doi: 10.1371/journal.pone.0034104

De Raedt, R., and Ponjaert-Kristoffersen, I. (2000). The relationship between cognitive/neuropsychological factors and car driving performance in older adults. *J. Am. Geriatr. Soc.* 48, 1664–1668.

Devos, H., Akinwuntan, A. E., Nieuwboer, A., Tant, M., Truijen, S., de Wit, L., et al. (2009). Comparison of the effect of two driving retraining programs on on-road performance after stroke. *Neurorehabil. Neural Repair* 23, 699–705.

Dux, P. E., Ivanoff, J., Asplund, C. L., and Marois, R. (2006). Isolation of a central bottleneck of information processing with time-resolved fMRI. *Neuron* 52, 1109–1120.

Eby, D. W., and Molnar, L. J. (2010). Driving fitness and cognitive impairment: issues for physicians. *JAMA* 303, 1642–1643.

Editorial. (2001). Driven to distraction: cellular phones and traffic accidents. *CMAJ* 164, 1557.

Fort, A., Martin, R., Jacquet-Andrieu, A., Combe-Pangaud, C., Foliot, G., and Daligault, S., et al. (2010). Attentional demand and processing of relevant visual information during simulated driving: a MEG study. *Brain Res.* 1363, 117–127.

Freund, B., Gravenstein, S., and Ferris, R. (2002). Evaluating driving performance of cognitively impaired and healthy adults: a pilot study comparing on-road testing and driving simulation. *J. Am. Geriatr. Soc.* 50, 1309–1310.

Genovese, C. R., Lazar, N. A., and Nichols, T. (2002). Thresholding of statistical maps in functional neuroimaging using the false discovery rate. *Neuroimage* 15, 870–878.

Gherri, E., and Eimer, M. (2011). Active listening impairs visual perception and selectivity: a study of auditory dual-task costs on visual attention. *J. Cogn. Neurosci.* 23, 832–844.

Graydon, F. X., Young, R., Benton, M. D., Genrik, R. J. II., Posse, S., Hsieh, L., et al. (2004). Visual event detection during simulated driving: identifying the neural correlates with functional neuroimaging. *Transport. Res. F Traffic Psychol. Behav.* 7, 271–286.

Grealy, M. A., Johnson, D. A., and Rushton, S. K. (1999). Improving cognitive function after brain injury: the use of exercise and virtual reality. *Arch. Phys. Med. Rehabil.* 80, 661–667.

Hsieh, L., Young, R. A., Bowyer, S. M., Moran, J. E., Genik, R. J. II., Green, C. C., et al. (2009). Conversation effects on neural mechanisms underlying reaction time to visual events while viewing a driving scene: fMRI analysis and asynchrony model. *Brain Res.* 1251, 162–175.

Jacobson, P. D., and Gostin, L. O. (2010). Reducing distracted driving: regulation and education to avert traffic and fatalities. *JAMA* 303, 1419–1420.

Jancke, L., Brunner, B., and Esslen, M. (2008). Brain activation during fast driving in a driving simulator: the role of the lateral prefrontal cortex. *Neuroreport* 19, 1127–1130.

Johnson, J. A., and Zatorre, R. J. (2006). Neural substrates for dividing and focusing attention between

simultaneous auditory and visual events. *Neuroimage* 31, 1673–1681.

Just, M. A., Carpenter, P. A., Keller, T. A., Emery, L., Zajac, H., and Thulborn, K. R. (2001). Interdependence of nonoverlapping cortical systems in dual cognitive tasks. *Neuroimage* 14, 417–426.

Just, M. A., Keller, T. A., and Cynkar, J. (2008). A decrease in brain activation associated with driving when listening to someone speak. *Brain Res.* 1205, 70–80.

Kan, K., Schweizer, T., Tam, F., and Graham, S. (2013). Methodology for functional MRI of simulated driving. *Med. Phys.* 40:012301. doi: 10.1118/1.4769107

Liu, T., Saito, H., and Oi, M. (2012). Distinctive activation patterns under intrinsically versus extrinsically driven cognitive loads in prefrontal cortex: a near-infrared spectroscopy study using a driving video game. *Neurosci. Lett.* 506, 220–224.

Lundqvist, A., Gerdle, B., and Ronnberg, J. (2000). Neuropsychological aspects of driving after a stroke—in the simulator and on the road. *Appl. Cogn. Psychol.* 14, 135–150.

MacDonald, N., and Hébert, P. C. (2010). Driving retirement program for seniors: long overdue. *CMAJ* 182:645. doi: 10.1503/cmaj.100273

Maples, W. C., DeRosier, W., Hoenes, R., Bendure, R., and Moore, S. (2008). The effects of cell phone use on peripheral vision. *Optometry* 79, 36–42.

Marshall, C. M., Spasoff, R., Nair, R., and van Walraven, C. (2002). Restricted driver licensing for medical impairments: does it work? *CMAJ* 167, 747–751.

Mathias, J. L., and Lucas, L. K. (2009). Cognitive predictors of unsafe driving in older drivers: a meta-analysis. *Int. Psychogeriatr.* 21, 637–653.

McEvoy, S. P., Stevenson, M. R., McCartt, A. T., Woodward, M., Haworth, C., Palamara, P., et al. (2005). Role of mobile phones in motor vehicle crashes resulting in hospital attendance: a case-crossover study. *Br. Med. J.* 331:428. doi: 10.1136/bmj.38537.397512.55

Michon, J. A. (1989). Explanatory pitfalls and rule-based driver models. *Accid. Anal. Prev.* 21, 341–353.

National Highway Traffic Safety Administration. (2009). *Traffic Safety Facts*. Washington, DC: U.S. Department of Transportation; 2011. DOT HS 811 402. Accessed March 27, 2012. Available online at: http://www.thenewspaper.com/rlc/docs/2011/us-tsf09.pdf

Nelson, R. F. (2010). Driving for seniors. *CMAJ* 182, 804–805.

Newman, S. D., Keller, T. A., and Just, M. A. (2007). Volitional control of attention and brain activation in dual-task performance. *Hum. Brain Mapp.* 28, 109–117.

Ott, B. R., Heindel, W. C., Whelihan, W. M., Caron, M. D., Piatt, A. L., and Noto, R. B. (2000). A SPECT imaging study of driving impairment in patients with Alzheimer's disease. *Dement. Geriatr. Cogn. Disord.* 11, 153–160.

Paus, T., Petrides, M., Evans, A. C., and Meyer, E. (1993). Role of the human anterior cingulate cortex in the control of oculomotor manual, and speech responses: a positron emission tomography study. *J. Neurophysiol.* 70, 453–469.

Peres, M., van de Moortele, P. F., Pierard, C., Lehericy, S., LeBihan, D., and Guezennec, C. Y. (2000). fMRI of mental strategy in a simulated aviation performance task. *Aviat. Space Environ. Med.* 71, 1218–1231.

Petit, L., Courtney, S. M., Ungerleider, L. G., and Haxby, J. V. (1998). Sustained activity in the medial wall during working memory delays. *J. Neurosci.* 18, 9429–9437.

Posner, M. I. (2012). Imaging attention networks. *Neuroimage* 61, 450–456.

Posner, M. I., and Dehaene, S. (1994). Attentional networks. *Trends Neurosci.* 17, 75–79.

Posner, M. I., Peterson, S. E., Fox, P. T., and Raichle, M. E. (1988). Localization of cognitive operations in the human brain. *Science* 240, 1627–1631.

Ranney, T. A. (1994). Models of driving behavior: a review of their evolution. *Accid. Anal. Prev.* 26, 733–750.

Rapoport, M. J., Herrmann, N., Molnar, F. J., Man-Son-Hing, M., Marshall, S. C., Shulman, K., et al. (2007). Sharing the responsibility for assessing the risk of the driver with dementia. *CMAJ* 177, 599–601.

Redelmeier, D. A., and Tibshirani, R. J. (1997). Association between cellular-telephone calls and motor vehicle collisions. *N. Engl. J. Med.* 336, 453–458.

Rees, G., Frith, C. D., and Lavie, N. (1997). Modulating irrelevant motion perception by varying attentional load in an unrelated task. *Science* 278, 1616–1619.

Richardson, E. D., and Marottoli, R. A. (2003). Visual attention and driving behavior among community-living older persons. *J. Gerontol. A Biol. Sci. Med. Sci.* 58, 832–836.

Rizzo, M. (2011). Impaired driving from medical conditions: a 70-year-old man trying to decide if he should continue driving. *JAMA* 305, 1018–1026.

Sagaspe, P., Taillard, J., Akerstedt, T., Bayon, V., Espié, S., Chaumet, G., et al. (2008). Extended driving impairs nocturnal driving performances. *PLoS ONE* 3:e3493. doi: 10.1371/journal.pone.0003493

Sakai, H., Takahara, M., Honjo, N. F., Doi, S., Sadato, N., and Uchiyama, Y. (2012). Regional frontal gray matter volume associated with executive function capacity as a risk factor for vehicle crashes in normal aging adults. *PLoS ONE* 7:e45920. doi: 10.1371/journal.pone.0045920

Schubert, T., and Szameitat, A. J. (2003). Functional neuroanatomy of interference in overlapping dual tasks: am fMRI study. *Cogn. Brain Res.* 17, 733–746.

Seraglia, B., Gamberini, L., Priftis, K., Scatturin, P., Martinelli, M., and Cutini, S. (2011). An exploratory fNIRS study with immersive virtual reality: a new method for technical implementation. *Front. Hum. Neurosci.* 5:176. doi: 10.3389/fnhum.2011.00176

Spiers, H. J., and Maguire, E. A. (2007). Neural substrates of driving behaviour. *Neuroimage* 36, 245–255.

Staplin, L., Gish, K. W., and Wagner, E. K. (2003). MaryPODS revisited: Updated crash analysis and implications for screening program implementation. *J. Safety Res.* 34, 389–397.

Strayer, D. L. (2007). *Presentation at Cell Phones and Driver Distraction*. Washington, DC: Traffic Safety Coalition.

Strayer, D. L., Drew, F. A., and Johnston, W. A. (2003). Cell-phone induced failures of visual attention during simulated driving. *J. Exp. Psychol. Appl.* 9, 23–32.

Strayer, D. L., and Johnston, W. A. (2001). Cell phone induced failures of visual attention during simulated driving. *J. Exp. Psychol. Appl.* 9, 23–32.

Talairach, P., and Tournoux, J. (1988). *A Stereotactic Coplanar Atlas of the Human Brain*. Stuttgart: Thieme.

Uchiyama, Y., Ebe, K., Kozato, A., Okada, T., and Sadato, N. (2003). The neural substrates of driving at a safe distance: a functional MRI study. *Neurosci. Lett.* 352, 199–202.

Vogt, B. A., Hof, P. R., and Vogt, L. J. (2004). "Cingulate Gyrus," in *The Human Nervous System, 2nd Edn*, eds G. Paxinos and J. K. Mai (Amsterdam: Elsevier Science), 915–949.

Walter, H., Vetter, S. C., Grothe, J., Wunderlich, A. P., Hahn, S., and Spitzer, M. (2001). The neural correlates of driving. *Neuroreport* 12, 1763–1767.

Whelihan, W. M., DiCarlo, M. A., and Paul, R. H. (2005). The relationship of neuropsychological functioning to driving competence in older persons with early cognitive decline. *Arch. Clin. Neuropsychol.* 20, 217–228.

Wickens, C. D. (2008). Multiple resources and mental workload. *Hum. Factors* 50, 449–455.

**Conflict of Interest Statement:** The authors declare that the research was conducted in the absence of any commercial or financial relationships that could be construed as a potential conflict of interest.

*Received: 05 November 2012; accepted: 08 February 2013; published online: 28 February 2013.*

*Citation: Schweizer TA, Kan K, Hung Y, Tam F, Naglie G and Graham SJ (2013) Brain activity during driving with distraction: an immersive fMRI study. Front. Hum. Neurosci. 7:53. doi: 10.3389/fnhum.2013.00053*

*Copyright © 2013 Schweizer, Kan, Hung, Tam, Naglie and Graham. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in other forums, provided the original authors and source are credited and subject to any copyright notices concerning any third-party graphics etc.*

# APPENDIX

## GENERAL LINEAR MODEL: REPEATED MEASURE ANOVA

**Table A1 | ANOVA results showed a significant effect on speed across four driving conditions.**

| Within-subjects factors | |
|---|---|
| Speed condition | Dependent variable |
| 1 | Right turn speed |
| 2 | Left turn speed |
| 3 | Left turn traffic speed |
| 4 | Left turn traffic distraction speed |

| Descriptive statistics | | | |
|---|---|---|---|
| | Mean | Std. deviation | N |
| Right turn speed | 24.0366 | 3.32044 | 16 |
| Left turn speed | 26.7939 | 5.16746 | 16 |
| Left turn traffic speed | 29.3542 | 4.26414 | 16 |
| Left turn traffic distraction speed | 28.9814 | 3.75817 | 16 |

| Tests of within-subjects effects | | | |
|---|---|---|---|
| **MEASURE: MEASURE_1** | | | |
| Source | Type III sum of squares | df | Mean square |
| **SPEED CONDITION** | | | |
| Sphericity assumed | 287.234 | 3 | 95.745 |
| Greenhouse-geisser | 287.234 | 2.579 | 111.382 |
| Huynh–Feldt | 287.234 | 3.000 | 95.745 |
| Lower-bound | 287.234 | 1.000 | 287.234 |
| **ERROR (SPEED CONDITION)** | | | |
| Sphericity assumed | 324.448 | 45 | 7.210 |
| Greenhouse-geisser | 324.448 | 38.682 | 8.387 |
| Huynh–Feldt | 324.448 | 45.000 | 7.210 |
| Lower-bound | 324.448 | 15.000 | 21.630 |

| Tests of within-subjects effects | | |
|---|---|---|
| **MEASURE: MEASURE_1** | | |
| Source | F | Sig. |
| **SPEED CONDITION** | | |
| Sphericity assumed | 13.280 | 0.000 |
| Greenhouse-geisser | 13.280 | 0.000 |
| Huynh–Feldt | 13.280 | 0.000 |
| Lower-bound | 13.280 | 0.002 |

**Table A2 | *Post-hoc* tests suggest that speed in the distracted left-turn-traffic condition was significantly slower than both the left and the right turn speed, and the left turn speed was significantly slower than the right turn speed.**

| Pairwise comparisons | | | | |
|---|---|---|---|---|
| **MEASURE: MEASURE_1** | | | | |
| (I) Speed condition | (J) Speed condition | Mean difference (I-J) | Std. error | Sig.[a] |
| 1 | 2 | −2.757* | 1.078 | 0.022 |
| | 3 | −5.318* | 0.820 | 0.000 |
| | 4 | −4.945* | 0.763 | 0.000 |
| 2 | 1 | 2.757* | 1.078 | 0.022 |
| | 3 | −2.560* | 0.997 | 0.021 |
| | 4 | −2.187 | 1.110 | 0.068 |
| 3 | 1 | 5.318* | 0.820 | 0.000 |
| | 2 | 2.560* | 0.997 | 0.021 |
| | 4 | 0.373 | 0.873 | 0.676 |
| 4 | 1 | 4.945* | 0.763 | 0.000 |
| | 2 | 2.187 | 1.110 | 0.068 |
| | 3 | −0.373 | 0.873 | 0.676 |

*The right-turn speed was the slowest ($p < 0.05$, LSD post-hoc tests).*

*Based on estimated marginal means:*

* *The mean difference is significant at the 0.05 level.*

[a] *Adjustment for multiple comparisons: least significant difference (equivalent to no adjustments).*

Schweizer et al.
Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 217 of 241
Brain activity during driving

**Table A3 | The straight driving speed and lane position measures were not significantly different from those during the distracted straight driving conditions.**

### Pairwise comparisons

| MEASURE: MEASURE_1 | | | |
|---|---|---|---|
| (I) Speed condition | (J) Speed condition | 95% Confidence interval for difference[a] | |
| | | Lower bound | Upper bound |
| 1 | 2 | −5.056 | −0.459 |
| | 3 | −7.066 | −3.569 |
| | 4 | −6.571 | −3.318 |
| 2 | 1 | 0.459 | 5.056 |
| | 3 | −4.686 | −0.435 |
| | 4 | −4.554 | 0.179 |
| 3 | 1 | 3.569 | 7.066 |
| | 2 | 0.435 | 4.686 |
| | 4 | −1.489 | 2.234 |
| 4 | 1 | 3.318 | 6.571 |
| | 2 | −0.179 | 4.554 |
| | 3 | −2.234 | 1.489 |

### Descriptive statistics

| | N | Minimum | Maximum | Mean | Std. deviation | Std. error mean |
|---|---|---|---|---|---|---|
| Straight speed | 16 | 54.37 | 67.78 | 58.5669 | 3.36209 | 0.84052 |
| Straight distraction speed | 16 | 55.67 | 63.50 | 58.6931 | 2.33586 | 0.58397 |
| Straight lane position | 16 | 1.91 | 2.95 | 2.3519 | 0.31327 | 0.07832 |
| Straight distraction position | 16 | 1.82 | 3.26 | 2.5069 | 0.42180 | 0.10545 |

### Paired samples test

| | | Paired differences | | |
|---|---|---|---|---|
| | | Mean | Std. deviation | Std. error mean |
| Pair 1 | Straight speed—straight distraction speed | −0.12625 | 2.91779 | 0.72945 |
| Pair 2 | Straight lane position—straight distraction position | −0.15500 | 0.34065 | 0.08516 |

### Paired samples test

| | | Paired differences | |
|---|---|---|---|
| | | 95 Confidence interval of the difference | |
| | | Lower | Upper |
| Pair 1 | Straight speed—straight distraction speed | −1.68103 | 1.42853 |
| Pair 2 | Straight lane position—straight distraction position | −0.33652 | 0.02652 |

### Paired samples test

| | | t | df | Sig. (2-tailed) |
|---|---|---|---|---|
| Pair 1 | Straight speed—straight distraction speed | −0.173 | 15 | 0.865 |
| Pair 2 | Straight lane position—straight distraction position | −1.820 | 15 | 0.089 |

*Based on estimated marginal means:*
[a] *Adjustment for multiple comparisons: least significant difference (equivalent to no adjustments).*



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**



DOT HS 812 360

December 2016

# Human Factors Design Guidance For Driver-Vehicle Interfaces

**Discussion**

Driver distraction can contribute to motor vehicle crashes when a driver's attention is diverted away from the driving task at a time when there is an unexpected hazard or change in the driving situation (e.g., lead vehicle braking, a pedestrian crossing the road, etc.). Distraction may also be associated with lapse of vehicle control, resulting in unintended speed changes or allowing the vehicle to drift outside of the lane boundaries [4]. This diversion of attention away from the driving task can be caused by a secondary task that shares the same resources that are needed for safe driving. The greater the extent to which an action shares the same resources with a driving activity, the higher the degree of incompatibility between that action and driving, and the higher is the expected degree of distraction induced by performance of that action while driving [1]. While a driver's attention should not be diverted away from activities critical for safe driving, there are safety-related instances in which redirecting attention is beneficial. For example, if a driver is checking a blind spot to make a lane change while a leading vehicle suddenly brakes, a forward crash warning will draw the driver's attention away from the lane change task. In this case, the redirection of attention to the more safety-critical event is appropriate.

Secondary tasks are numerous and many may benefit drivers in some way (e.g., inputting a destination into a navigation system, receiving traffic information updates, etc.). Some drivers may become accustomed to performing secondary tasks while driving, leading to secondary tasks becoming the rule rather than the exception [4]. In order to engage in a secondary task without degrading driving performance, there needs to be a balance between the benefits and costs associated with engaging in the secondary tasks. Proper message prioritization may help reduce the disruptiveness of secondary task messages [e.g., 5]. Drivers need to have an awareness of the risks associated with secondary tasks so they are able to make safe choices while driving [1].

**Design Issue**

The NHTSA *Visual-Manual Guidelines* give a specific list of per se lock outs [2], while the AutoAlliance Statement of Principles [3] identify different categories of tasks that should not be available to the driver while driving. There is some exploratory pilot research on methods to assess situational awareness as a tool for evaluating driver performance under distracting conditions (e.g., visual search on a digital map [6]).

Distraction can occur due to drivers taking their eyes off the forward roadway to perform an in-vehicle task and when drivers return their eyes back to the forward roadway while still in the process of performing the in-vehicle task [7, 8]. This results in cognitive distraction [9, 10]. An example of this is alternating glances between the forward roadway and a GPS device [11].

**Cross References**
*Workload From Secondary Tasks, 3-6*

**Topic References**

1.  Lee, J. D., Young, K. L., & Regan, M. A. (2009). Defining driver distraction. In M. A. Regan, J. D. Lee, & K. L. Young (Eds.) *Driver distraction: Theory, effects, mitigation* (pp. 31-40). Boca Raton, FL: CRC Press.
2.  National Highway Traffic Safety Administration (2013). *Visual-manual NHTSA driver distraction guidelines for in-vehicle electronic devices* (Report No. DOT 37-13; Docket No. NHTSA-2010-0053). Available at http://www.distraction.gov/downloads/pdfs/11302a-Distraction_Guidelines_Final_Notice_010815_v1_tag.pdf.
3.  Alliance of Automobile Manufacturers. (2006). *Statement of principles, criteria and verification procedures on driver interactions with advanced in-vehicle information and communication systems, including 2006 updated sections* (Report of the Driver Focus-Telematics Working Group). Available at www.autoalliance.org/index.cfm?objectid=D6819130-B985-11E1-9E4C000C296BA163.
4.  Ranney, T. A. (2008). *Driver distraction: A review of the current state-of-knowledge* (Report No. DOT HS 810 787). Washington, DC: National Highway Traffic Safety Administration. Available at www.nhtsa.gov/DOT/NHTSA/NRD/Multimedia/PDFs/Crash%20Avoidance/2008/810787.pdf
5.  Park, G. D., Allen, R. W., & Cook, M. L. (2013). Volume 4 – Scheduling of messages to maximize driver performance (Report No. DTNH22-12R-00629). Washington, DC: National Highway Traffic Safety Administration.
6.  Westat, Inc. (2014). *Connected vehicle DVI design research and distraction assessment. Draft final report: Review package #5 Re-Submit* (Unpublished draft report prepared for NHTSA under contract DTNH22-11-D-00237).
7.  Horrey, W., & Wickens, C. (2007). In-vehicle glance duration. *Transportation Research Record, 2018*, 22-28.
8.  Klauer, S., Guo, F., Simons-Morton, B., Ouimet, M., Lee, S., & Dingus, T. (2014). Distracted driving and risk of road crashes among novice and experienced drivers. *New England Journal of Medicine, 370*, 54-59.
9.  Borowsky, A., Horrey, W., Lian, Y., Garabet, A., Simmons, L., & Fisher, D. (2015). The efforts of momentary visual disruption on hazard anticipation and awareness in driving. *Traffic Injury and Prevention, 16*, 133-139.
10. Biondi, F., Turrill, J., Coleman, J., Cooper, J., & Strayer, D. (2015). Cognitive distraction impairs driver's anticipatory glances: An on-road study. In D. McGhee & M. Rizzo (Eds.), *Driver Assessment 2015: International Symposium on Human Factors in Driver Assessment, Traning, and Vehicle Design*. Iowa City, University of Iowa: Public Policy Center.
11. Yamani, Y., Horrey, W., Lian, Y., & Fisher, D. (2015). Sequential in-vehicle glance distributions: an alternative approach for analyzing glance data. *Human Factors, 57*, 567-572.

## General Workload Considerations

**Introduction**

This topic provides a high-level discussion that is intended to introduce the concept of driver workload. Workload has been conceptualized in a number of ways: time demand of a task, the number of activities, or complexity of activities. At a high level, workload is a psychological concept that represents the proportion or amount of a driver's mental and physical capacity (i.e., perceptual, cognitive, psychomotor) that is used to complete a task. Primary driving tasks, such as controlling the vehicle, scanning for hazards, navigating, etc. impose workload on the driver. Workload increases or decreases based on the driving conditions (e.g., roadway complexity, weather, traffic flow, etc.) or driver state (fatigued, alert, etc.), but it is always present to some degree.

---

**Design Goal: Design information displays for secondary tasks in a manner that imposes minimal workload.**

**Design Guidance**

The best available research on this topic suggests that this design goal can be met when the following points are considered:

- Workload is complex and difficult to predict on a moment-to-moment basis. Use caution when making assumptions about when workload is low.
- In-vehicle tasks that use the same information-processing resources (e.g., listening to an audio system and hearing an auditory warning) require drivers to switch between the tasks, which can degrade driving performance.
- Driver workload is a limited resource. Secondary tasks performed during normal driving may exceed available total driver workload capacity. This may lead to reductions or deterioration of driving capabilities [1, 2].

---

**Conceptual framework for relating variables that influence driver performance and workload.**

(See the Discussion section on the next page for a description of the figure.)



Adapted from Hart and Staveland [3]

# Exhibit D-23

# Diabetic Eye Disease

[David Turbert](#)

Reviewed By [G Atma Vemulakonda, MD](#)

Published Oct. 14, 2021

## What Is Diabetes?

Diabetes is a disease that affects the body's ability to produce or use insulin effectively to control blood sugar (glucose) levels. Too much glucose in the blood for a long time can cause damage in [many parts of the body](#). Diabetes can damage the heart, kidneys and blood vessels. It damages small blood vessels in the eye as well. Even if diabetes is well controlled, it can [affect your regular eye care](#).

The Centers for Disease Control and Prevention (CDC) says that about 90% of vision loss from diabetes can be prevented. Early detection is key. [People with diabetes should get critical, annual eye exams](#) even before they have signs of vision loss. Studies show that [60% of diabetics are not getting the exams their doctors recommend](#).

## What Is Diabetic Eye Disease?

Diabetic eye disease is a term for [several eye problems that can all result from diabetes](#). Diabetic eye disease includes:

- diabetic retinopathy,
- diabetic macular edema,
- cataract, and
- glaucoma.

# Video: What Is Diabetic Retinopathy?

## Diabetic retinopathy

Diabetic retinopathy is when blood vessels in the retina swell, leak or close off completely. Abnormal new blood vessels can also grow on the surface of the retina.

People who have diabetes or poor blood sugar control are at risk for diabetic retinopathy. Risk also increases the longer someone has diabetes. One woman developed diabetic retinopathy after living with diabetes for 25 years.

## Diabetic macular edema

Macular edema happens when fluid builds up on the retina and causes swelling and blurry vision. Diabetes can cause macular edema. Diabetic macular edema can lead to permanent vision loss.

## Diabetes and cataracts

Excess blood sugar from diabetes can causes cataracts. You may need cataract surgery to remove lenses that are clouded by the effects of diabetes. Maintaining good control of your blood sugar helps prevent permanent clouding of the lens and surgery.

## Diabetes and glaucoma

Glaucoma is a group of diseases that cause damage to your eye's optic nerve. This damage leads to irreversible loss of vision. Having diabetes doubles your chance of getting glaucoma.

# What Other Eye Problems Are Related to Diabetes?

Diabetes can cause vision problems even if you do not have a form of diabetic eye disease. These can include:

- **Blurry vision.** If your blood sugar levels change quickly, it can affect the shape of your eye's lens, causing blurry vision. Your vision goes back to normal after your blood sugar stabilizes. Have your blood sugar controlled before getting your eyeglasses prescription checked. This ensures you receive the correct prescription.
- **Double vision.** Diabetes can damage the nerves that move the eyes and help them work together. This nerve damage can lead to double vision.

Diabetes is a risk factor for several other eye diseases. They include:

- Branch retinal vein occlusion (BRVO)
- Central retinal vein occlusion (CRVO)

# Take Steps to Protect Your Vision

To prevent eye damage from diabetes, maintain good control of your blood sugar. Follow your primary care physician's diet and exercise plan. If you have not had an eye exam with an ophthalmologist, it is crucial to get one now. Be sure to never skip the follow-up exams that your ophthalmologist recommends.

# More Resources

- HelpAdvisor tips for living with diabetes.
- Medicare Advantage guide has treatment and lifestyle options for managing diabetes.

# Vision Requirements

| LICENSE TYPE | MINIMUM VISION REQUIREMENTS | EXPLANATION |
|---|---|---|
| Driver's License - Unrestricted | • 20/40 or better vision in one or both eyes, corrected or uncorrected<br>• 110 degrees or better horizontal vision in one or both eyes | |
| Driver's License - Restricted to Daylight Only | • 20/70 or better vision in one or both eyes, corrected or uncorrected<br>• 70 degrees or better horizontal vision. If vision is limited to only one eye, 40 degrees or better temporal and 30 degrees or better nasal are required | A license restricted to daylight hours only permits you to drive during the period of time beginning one-half hour after sunrise and ending one-half hour before sunset. |
| Commercial Driver's License (CDL) or Commercial Learner's Permit (CLP) | • 20/40 or better vision in each eye, corrected or uncorrected<br>• 140 degrees or better horizontal vision | You must meet these visual requirements without the aid of a telescopic lens. Some drivers may be granted waivers from these requirements by the Federal Motor Carrier Safety Administration or by Virginia DMV. See below. |

# Code of Virginia

## Article 3. Persons Not to Be Licensed.

### § 46.2-311. Persons having defective vision; minimum standards of visual acuity and field of vision; tests of vision.

A. The Department shall not issue a driver's license or learner's permit (i) to any person unless he demonstrates a visual acuity of at least 20/40 in one or both eyes with or without corrective lenses or (ii) to any such person unless he demonstrates at least a field of 110 degrees of horizontal vision in one or both eyes or a comparable measurement that demonstrates a visual field within this range. However, a license permitting the driving of motor vehicles during a period beginning one-half hour after sunrise and ending one-half hour before sunset, may be issued to a person who demonstrates a visual acuity of at least 20/70 in one or both eyes without or with corrective lenses provided he demonstrates at least a field of 70 degrees of horizontal vision or a comparable measurement that demonstrates a visual field within this range, and further provided that if such person has vision in one eye only, he demonstrates at least a field of 40 degrees temporal and 30 degrees nasal horizontal vision or a comparable measurement that demonstrates a visual field within this range.

B. The Department shall not issue a driver's license or learner's permit to any person authorizing the driving of a commercial motor vehicle as defined in the Virginia Commercial Driver's License Act (§ 46.2-341.1 et seq.) unless he demonstrates a visual acuity of at least 20/40 in each eye and at least a field of 140 degrees of horizontal vision or a comparable measurement that demonstrates a visual field within this range.

C. Every person applying to renew a driver's license and required to be

reexamined as a prerequisite to the renewal of the license, shall:

1. Appear before a license examiner of the Department to demonstrate his visual acuity and horizontal field of vision, or

2. Accompany his application with a report of such examination made within 90 days prior thereto by an ophthalmologist or optometrist.

D. The test of horizontal visual fields made by license examiners of the Department shall be performed at thirty-three and one-third centimeters with a 10 millimeter round white test object or may, at the discretion of the Commissioner, be performed with electronic or other devices designed for the purpose of testing visual acuity and horizontal field of vision. The report of examination of visual acuity and horizontal field of vision made by an ophthalmologist or optometrist shall have precedence over an examination made by a license examiner of the Department in administrative determination as to the issuance of a license to drive. Any such report may, in the discretion of the Commissioner, be referred to a medical advisory board or to the State Health Commissioner for evaluation.

E. Notwithstanding the provisions of subsection B of this section, any person who is licensed to drive any motor vehicle may, on special application to the Department, be licensed to drive any vehicle, provided the operation of the vehicle would not unduly endanger the public safety, as determined by the Commissioner.

The Commissioner may waive the vision requirements of subsection B for any commercial driver's license applicant who either (i) is subject to the Federal Motor Carrier Safety Regulations but is exempt from the vision standards of 49 C.F.R. Part 391 or (ii) is not required to meet the vision standards specified in 49 C.F.R. § 391.41 of the regulations.

Case 1:24-cv-00304-EGS   Document 21-5   Filed 04/26/24   Page 228 of 241

In order to determine whether such a waiver would unduly endanger the public safety, the Commissioner shall require such commercial driver's license applicant to submit a special waiver application and to provide all medical information relating to his vision that may be requested by the Department. The Department may require such commercial driver's license applicant to take a road test administered by the Department before determining whether to grant a waiver. If a waiver is granted, the Department may subject the applicant's use of a commercial motor vehicle to reasonable restrictions, which shall be noted on the commercial driver's license. If a waiver is granted, the Department may also limit the validity period of the commercial driver's license, and the expiration date shall be noted on the commercial driver's license.

1968, c. 642, § 46.1-357.2; 1972, c. 502; 1980, c. 118; 1981, c. 194; 1984, c. 780; 1989, cc. 705, 727; 2010, c. 18; 2013, cc. 165, 582; 2017, cc. 121, 279.

## § 46.2-312. Persons using bioptic telescopic lenses.

A. Persons using bioptic telescopic lenses shall be eligible for driver's licenses if they:

1. Demonstrate a visual acuity of at least 20/200 in one or both eyes and a field of seventy degrees horizontal vision without or with corrective carrier lenses or a comparable measurement that demonstrates a visual field within this range, or if these persons have vision in one eye only, they demonstrate a field of at least forty degrees temporal and thirty degrees nasal horizontal vision or a comparable measurement that demonstrates a visual field within this range;

2. Demonstrate a visual acuity of at least 20/70 in one or both eyes with the bioptic telescopic lenses and without the use of field expanders;

3. Meet all other criteria for licensure;

4. Accompany the license application with a report of examination by an ophthalmologist or optometrist on a form prescribed by the Department for evaluation by the Medical Advisory Board.

B. Persons using bioptic telescopic lenses shall be eligible for learner's permits issued under § 46.2-335 provided they first meet the requirements of subsection A of this section, except for that part of the examination requiring the applicant to drive a motor vehicle.

C. Persons using bioptic telescopic lenses shall be subject to the following restrictions:

1. They shall not be eligible for any of the driver's license endorsements provided for in § 46.2-328;

2. Their driver's licenses shall permit the operation of motor vehicles only during the period beginning one-half hour after sunrise and ending one-half hour before sunset.

D. Notwithstanding the provisions of subdivision C 2 of this section, persons using bioptic telescopic lenses may be licensed to drive motor vehicles between one-half hour before sunset and one-half hour after sunrise if they:

1. Demonstrate a visual acuity of at least 20/40 in one or both eyes with the bioptic telescopic lenses and without the use of field expanders;

2. Have been licensed under subsection C of this section for at least one year; and

3. Pass a skills test taken at night.

1986, c. 115, § 46.1-357.3; 1989, cc. 147, 727; 2010, c. 18.

## § 46.2-313. Persons with suspended or revoked licenses.

The Department shall not issue a driver's license to any person whose license has been suspended, during the period of the suspension; nor to any person whose license has been revoked, or should have been revoked, under the provisions of this title, until the expiration of one year after the license was revoked, unless otherwise permitted by the provisions of this title.

Code 1950, § 46-354; 1958, c. 541, § 46.1-358; 1984, c. 780; 1989, c. 727.

## § 46.2-314. Repealed.

Repealed by Acts 2017, c. 156, cl. 2, effective February 23, 2017.

## § 46.2-315. Disabled persons.

The Department shall not issue a driver's license to any person when, in the opinion of the Department, the person is suffering from a physical or mental disability or disease which will prevent his exercising reasonable and ordinary control over a motor vehicle while driving it on the highways, nor shall a license be issued to any person who is unable to understand highway warning or direction signs.

The words "disability or disease" shall not mean inability of a person to hear or to speak, or both, when he has good vision and can satisfactorily demonstrate his ability to drive a motor vehicle and has sufficient knowledge of traffic rules and regulations.

Code 1950, § 46-357; 1958, c. 541, § 46.1-361; 1984, c. 780; 1989, c. 727.



# Virginia Driver's Manual

Virginia Department of Motor Vehicles



# Road Skills Test

You will need to take the road skills test if you do not hold a valid driver's license from another U. S. state, Canada, Germany, France, the Republic of Korea, or Taiwan. You must provide a vehicle for the road skills test (cannot be taken in an autocycle). The vehicle must have a valid safety inspection sticker, license plates, registration card and decals, working brakes, safety belts, horn, lights, turn signals, mirrors and speedometer.

To take the road skills test, the DMV examiner will require that you either:

- present an acceptable driver's education certificate of completion, or
- complete a behind-the-wheel checklist (DMV form CSMA 19 available at dmv.virginia.gov or any DMV office) that describes specific driving tasks that you may be asked to perform while taking the road skills test. A licensed driver will need to certify on the form that he/she has been with you while you practiced the driving tasks and that you have complied with all requirements for learner's permit holders while operating a motor vehicle.

For applicants under 18, the road skills test will be given as part of the driver education course taken at a public, private or commercial driving school. If you are home schooled, refer to the Home-Schooled In-Car Driver Education Information Sheet (HS 3) for more information about taking the road skills test.

Applicants age 18 or older must hold the learner's permit for 60 days prior to the first road skills test or complete a course of driver's education at a driver training school approved by DMV or the Department of Education. For applicants who choose to take driver's education, the road skills test will be administered by the driver training school. For those who opt to hold a learner's permit for 60 days, the road skills test will be given by a DMV staff member. The test may be taken only once per business day. If you fail the road skills test, you must wait two days to take it again. If you fail the road skills test at DMV three times, you will not be able to take it a fourth time until you complete and pass the in-vehicle part of driver education at a driver training school approved by DMV or the Department of Education. The completion date for the in-vehicle part must be after the date you failed the road skills test the third time. Once you successfully complete the in-vehicle part and give DMV your certificate of completion, you can take the road skills test again.

# Vision Screening

To screen your vision, a DMV staff member will ask you to look into a machine and read a series of letters or numbers. The vision screening is not a medical exam. The screening shows whether your vision meets Virginia's standards to safely drive. If you fail the vision screening, you may be asked to visit an eye care professional.

If you need to wear glasses or contact lenses to pass the vision screening, you must wear them when you drive. Your license will display a C for this restriction. To have this restriction removed after having laser surgery to correct your vision, you must visit a DMV customer service center and pass the vision screening without wearing glasses or contact lenses or submit a Vision Screening Report (MED 4).

## Vision Standards

**Driver's license – unrestricted**

- 20/40 or better vision in one or both eyes, and
- 110 degrees, or better, horizontal vision in one or both eyes, or comparable measurement that shows a field of vision within this range.

**Driving – restricted to daylight hours only**

- 20/70 or better vision in one or both eyes, and
- 70 degrees, or better, horizontal vision. If you have vision in only one eye, you must have horizontal vision of at least 30 degrees or better when looking toward your nose and 40 degrees or better when looking toward your temple, or comparable measurement that shows a field of vision within this range.

A daylight driving only restricted license permits you to drive only during the period of time beginning a half-hour after sunrise and ending a half-hour before sunset.

**Bioptic telescopic lenses:** If you wear bioptic telescopic lenses, read the DMV publication Driver's Licensing Information for Bioptic Telescopic Lense Wearers (MED 44) available at dmv.virginia.gov or contact DMV at (804) 497-7100.



# DEPARTMENT OF MOTOR VEHICLES

# DISTRICT OF COLUMBIA
# DRIVER MANUAL



B. Use the shoulder of the main road to get up to the speed of traffic

C. Speed up on the entrance only after you have found a gap in traffic

**Answers: 1-A, 2-D, 3-C**

Foreign Nationals that possess a valid out-of-country driver license and would like to obtain a DC driver license will be required to take and pass the knowledge and eye examinations.

If your DC driver license has been expired for more than 365 days, you must take and pass the knowledge test or DC online traffic school course. If your DC driver license has been expired for more than 545 days, you will be required to take and pass the knowledge test and road skills test. If your driver license is revoked, upon being reinstated, you will be required to take and pass the knowledge test and road skills test.

If you are obtaining or renewing a DC driver license and you are 70 years or older when your driver license expires, you must have your physician complete the Mature Driver section of the DC Driver License or Identification Card Application, certifying based on their medical diagnosis, you have the ability to safely operate a motor vehicle.

If you fail the driver knowledge test, you will not be allowed to re-test until 3 calendar days after the failed test. If you fail your knowledge test six (6) consecutive times, you will not be allowed to re-test until twelve (12) months from the first failed test date.

## Vision Screening

To screen your vision, you will be asked to look into a machine and read lines of characters to the DMV representative. This screening determines whether your eyesight and peripheral vision meet the District's standards to safely operate a motor vehicle. It is not a medical examination.

If you fail the vision screening, you are required to submit an Eye Report from your eye care professional. If you need to wear glasses or contact lenses to pass the vision screening, you must wear them when you drive, and your license will show this restriction.

If you have had corrective vision laser surgery, a doctor's certification is required to remove the corrective lenses restriction from your driver license.

## Road Skills Test

The Road Skills driving test will include maneuvers, driving in traffic, your ability to use turn signals, safely controlling the vehicle and parallel parking. The road skills test will be administered on DC roads. A $10 fee will be charged for each Road Skills test.

The Road Skills test is generally waived if you possess a valid out-of-state license for the same class of license and are converting to a DC driver license. If your DC driver license has been expired for more than 545 days, you will be required to take and pass the knowledge and road skills test examinations.

Road Skills tests are scheduled by appointment only. To schedule a driver license road test appointment with the DMV, you must possess a valid learner permit. You may schedule your road test appointment online at www.dmv.dc.gov or by calling 311.

Failure to cancel a scheduled road skills test within two business days will result in a $30 cancellation fee. This fee will not be charged if you cancel your road skills test prior to two business days or if the DMV cancels your road skills test. You may cancel a road test by calling 311.

On the day of your scheduled road test, you must:

- Arrive at least 10 minutes before your appointment;
- Arrive in a vehicle that fulfills the vehicle requirements;

# Exhibit D-24

US  |  Oct 27, 2022

# Only on Uber: safety in the driver's seat

Our goal is to make Uber the best platform for flexible work on Earth. That starts with listening to drivers and innovating to make their experience better.

As we said **this summer**, we've been spending more time getting feedback from drivers—whether it's five-star or one-star.

Newsroom    News    Company info    Leadership    Media assets

seat.

## Road safety

### Reducing left turns

Anyone who drives knows the challenges of making a left turn, especially in a busy city. According to the National Highway Traffic Safety Administration (NHTSA), 22% of crashes involve a vehicle making a left turn at an intersection. We've now improved our in-app navigation to suggest fewer left turns. With just a few minor adjustments to GPS routing that have little to no impact on trip time, drivers who use Uber's in-app navigation can enjoy a less stressful driving experience.



### Partially controlled intersection alerts



According to NHTSA, a quarter of traffic fatalities and about half of all traffic injuries occur at intersections, and in 2018 alone there were more than 6,700 fatalities involving intersections without signals. When a driver using Uber's in-app navigation is approaching an intersection without a four-way stop, the app will now highlight this on the map



screen with a message reminding them to "watch for cross traffic."

## Record My Ride

**Audio Recording expansion**

Already available to riders and drivers in more than a dozen countries, our optional in-app Audio Recording feature began piloting last year in three US cities. We've seen many instances



where this technology has helped us determine the best course of action after a safety incident, and the majority of riders and drivers in the pilot cities told us this feature helped them feel safer when using Uber. Based on this response, we will expand the Audio Recording pilot to six new US cities (Cincinnati, Nashville, Phoenix, Salt Lake City, San Antonio and Tucson) beginning next month.

The Audio Recording feature is built with privacy in mind. The audio file is encrypted and stored directly on the rider or driver's device. No one can listen to the audio—including Uber, the rider or the driver—while it remains on the device. If a safety-related incident occurs during a trip, a rider or driver can attach the audio file and other relevant information when sending us a safety report. The file will be decrypted and a trained safety agent will review it to help determine what happened.

Importantly, it is the rider or driver who decides when to record audio and when to share it with

Uber. For more details on this feature, including answers to common questions, please see the **Audio Recording information page.**

## Video recording trial

Since the launch of Audio Recording, we've been exploring the ability to allow drivers to choose to record video using the front-facing camera on their smartphone, similar to a dashcam. Many drivers use traditional dashcams today, but those can require extensive setup and can come with a hefty price tag.



On the other hand, the feature we'll test is free and can be set up in seconds in Uber's Driver app. Once it's enabled, drivers can record both video and audio on every trip. When placed in a phone mount, the front-facing camera has a view of the vehicle's interior. Because we built this feature on top of our existing Audio Recording technology, it comes with the same privacy protections—so no one, including the driver, can access the recording unless that driver chooses to share it with Uber.

We are excited to test this technology with select drivers in Cincinnati, Louisville and New York City in the U.S., as well as Santos and João Pessoa, Brazil. Their feedback will shape the future of this feature.

## In-app safety tips and resources

Drivers can encounter challenging moments out on the road. So we've created new tips, now available in the in-app Learning Center, to help them manage some of the trickiest situations drivers have reported to us. We've consulted with experts, police and drivers themselves for advice on how to handle situations—like what to do if a rider falls asleep





in the car after a night out or if a rider doesn't have a car seat for their toddler.

In addition, we've added a section in the Learning Center dedicated to safety tips from law enforcement that range from helping drivers avoid falling victim to criminals to helping them report potential instances of human trafficking. This content can be tailored to a region in case police in a driver's city have specific warnings.

Updating rider accounts

To help make the Uber platform as accessible as possible and prevent discrimination based on a name, we allow riders to update their name in the Uber app. However, we've seen some riders use fake names—such as the names of cartoon characters or even offensive language—which can lead to challenging pickups or uncomfortable situations for drivers.

That's why we're conducting a large audit of rider account names and freezing accounts with names that are clearly fake. These accounts will remain blocked until riders update or validate their account names with our support agents.

We're also making it easier for drivers to flag any fake or inappropriate names they encounter. Drivers can go to their app's Help section, find the option to report an issue with a rider, and select **My rider had an inappropriate name**. Uber's Support team will then be able to take appropriate action to block those accounts until the names are updated.

Additionally, we know from law enforcement and other experts that anonymous payment methods are often linked to bad actors—and we heard from drivers that they wanted more information about who they are picking up. That's why we require a valid email address, phone number and payment method to open an Uber rider account. In 2021, we also **began asking**

riders with unverified forms of payment, like a prepaid gift card or Venmo, to upload an ID before they can start requesting trips. We will continue to listen to driver feedback and look for ways to build off of these enhancements.

Our work to build the safest platform on Earth is never done, and we believe technology can make every ride safer. We've designed these new features to provide more peace of mind when driving and delivering. We look forward to your feedback.

# The latest Uber news

US | Mar 29

## Rethink Takeout: Expanding reusable packaging on Uber...