# Exhibit E

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JESUS M. CHRISTIAN, Individually and as Personal Representative of the Estate of CARLOS ENRIQUE CHRISTIAN REY, Deceased, et al.,<br><br>Plaintiffs<br><br>v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>Defendants. | CASE NO. 24-cv-304 |

## DECLARATION OF KATIE J. WELLS

I, Katie J. Wells, am a citizen of the United States and a resident of the District of Columbia. I am over the age of 18 and am competent to testify as to the matters set forth in this declaration. I make this declaration upon personal knowledge and belief, and hereby depose as follows:

1. I am a geographer who studies urban change. I received my PhD in Geography from the Maxwell School at Syracuse University. I am currently a postdoctoral Fritz Fellow with Georgetown University's Tech & Society Initiative.[1]

2. I study how technology affects the way we live in cities, and especially how we govern them. I design and conduct qualitative research projects about the gig economy.

---

[1] https://techandsociety.georgetown.edu/profiles/katie-wells/

1

3. For the last eight years, my research has focused extensively on Uber Technologies LLC and its presence in the District of Columbia. I have published three refereed academic articles[2], two Georgetown University reports[3], and eight non-refereed op-eds and other pieces of public scholarship about Uber's operations in D.C.[4] For this work, I have been awarded roughly $342,000 in competitive research grants, a Georgetown University Faculty & Staff Career Champion Award in 2022, and recognition for the most innovative article published in 2021 in the academic journal, *Environment and Planning A: Space and Economy.*

4. Together with coauthors Dr. Kafui Attoh and Dr. Declan Cullen, I wrote a book, *Disrupting D.C.: The Rise of Uber and the Fall of the City*. Our book was published in August 2023 by Princeton University Press.[5] This book was recognized by the *L.A. Times* as a Best Tech Book of 2023.[6] This book was also awarded the PROSE

---

[2] Wells, K. J., Attoh, K., & Cullen, D. (2021). "Just-in-Place" labor: Driver organizing in the Uber workplace. *Environment and Planning A: Economy and Space*, *53*(2), 315-331; Attoh, K., Wells, K., & Cullen, D. (2019). "We're building their data": Labor, alienation, and idiocy in the smart city. *Environment and Planning D: Society and Space*, *37*(6), 1007-1024; and Attoh, K., Wells, K., & Cullen, D. (forthcoming) "The Work of Waiting." *Journal of Ethnic and Migration Studies.*

[3] 2023, April. *The Instant Delivery Workplace in D.C.* A report for Georgetown University. https://beeckcenter.georgetown.edu/report/dc-instant-delivery-workplace; 2019, April. *The Uber Workplace*. A report for Georgetown University's Kalmanovitz Initiative for Labor and the Working Poor. http://lwp.georgetown.edu/wp-content/uploads/Uber-Workplace.pdf

[4] Forthcoming. "Uber's Urban Politics," *The New York Review of Books*; 2023, October 31. "When Uber Comes to Town." *Dissent Magazine.* https://www.dissentmagazine.org/online_articles/when-uber-came-to-town/; 2023, August. "Uber's View of Urban Life." *Ideas for Princeton University Press.* https://press.princeton.edu/ideas/ubers-view-of-urban-life; 2023, May. Op-ed: "Tax Rideshare Companies on Downtown Trips, and Use the Revenue to Fund Better Public Transit." 730DC. https://medium.com/seventhirty-dc/op-ed-tax-rideshare-companies-on-downtown-trips-and-use-the-revenue-to-fund-better-transit-9381183e342f; 2022, October 24. With Isabella Stratta. "What Delivery Drivers Need from D.C. Council." 730DC. https://medium.com/seventhirty-dc/what-delivery-drivers-need-bdc0f7d17973; 2020, May 12. "Shifting Gears: How Uber Became an Unchecked Regulatory Power in Washington, D.C." An invited piece for Data & Society's Medium blog, Points. https://points.datasociety.net/shifting-gears-42ae36d31087; 2018, December 28. "A Death in Transit: Debt and Despair Fuel a Suicide Crisis in the Taxi Industry." CityLab. https://www.citylab.com/perspective/2018/12/2018-ideas-david-zipper-stephen-goldsmith-sarah-deer-okereke/578605/; 2018, August 31. With Declan Cullen and Kafui Attoh. "Taking Back the Wheel." *Dissent*. https://www.dissentmagazine.org/online_articles/uber-flying-car-silicon-valley-labor-technology-future-politics

[5] https://press.princeton.edu/books/hardcover/9780691249759/disrupting-dc

[6] *L.A. Times*: "10 Best Tech Books of 2023." (22 December 2023) https://www.latimes.com/business/technology/story/2023-12-22/column-the-best-tech-books-of-2023

    Award in Cultural Anthropology and Sociology by the American Association of Publishers.[7]

5. I have discussed the real-time impacts of my research about Uber's operations in more than 100 media stories in *The Washington Post*, NPR, ABC National News, CBC News, Bloomberg, CNN, and *The San Francisco Chronicle*, among others. My studies have also been cited by *Axios*, *USA Today*, *Politico*, *Business Insider*, a Seattle Municipal ordinance, an amicus brief for the Supreme Court of Pennsylvania, and an amicus brief for the Supreme Court of California. One of my public reports, *The Uber Workplace in D.C.* (2019), was released at the John Wilson Building with opening remarks by D.C. Council Chairman Phil Mendelson. At the launch for my most recent report, *The Instant Delivery Workplace in D.C.* (2023), D.C. Councilmember Charles Allen announced that he hoped to implement some of my proposed policies.

6. I have testified about my research into Uber's operations for the U.S. Congress (April 2024: "Unlocking Opportunity: Allowing Independent Contractors to Access Benefits," Hearing before U.S. House of Representatives Committee on Education and the Workforce Subcommittee on Workforce Protections) as well as for the D.C. Council (October 2022: D.C. Council hearing for the Fair Meals Delivery Act; June 2023: D.C. Council hearing for the Workers and Restaurants are Priorities Act).

---

[7] Anderson P (5 March 2024) "AAP's PROSE Awards Announce 2024 Category Winners." *Publishing Perspectives*. https://publishingperspectives.com/2024/03/the-aaps-prose-awards-2024-category-winners/

7. Since 2017, I have given 66 lectures about Uber's operations for a range of academic and non-academic institutions, including, most recently, Cornell University (2024), University of Toronto (2024), New York University (2023), Rutgers University (2023), Harvard Law School (2023), City University of New York (2023), University of Maryland Baltimore County (2023), American University (2023), George Washington University (2023), George Mason University (2023), and Illinois State University (2023).

8. Currently, I am a co-Principal Investigator of the Fairwork project, a collaborative project, based at the University of Oxford, which researches app-based companies in 38 countries.[8] I am also serving multi-year terms as an Editorial Board Member of two academic journals (*Platforms & Society* and *Urban Geography*), an external assessor for grant proposals to the Urban Studies Foundation, and a member of a working group on labor misclassification for the D.C. Office of the Attorney General.

9. I have been retained as an expert by the law firm of Levy Firestone Muse LLP. I am submitting this declaration regarding the claims against Uber, as set forth in the above-captioned case.

10. I offer the following opinions on the basis of my research and empirical findings.

11. I do not know anything about the circumstances of the collision itself, or the liability of the Uber driver.

---

[8] https://fair.work/en/fw/about/people/dr-katie-j-wells/

12. Numerous peer-reviewed academic studies indicate increased road usage and vehicle miles traveled when Uber enters and operates in a city.[9] However, Uber, in the District of Columbia and other cities, has successfully kept confidential key details about the nature of its business in the city, including information that would inform assessments about the impact of Uber ride-hailing and UberEats delivery services on the number of vehicular fatalities and injuries.

13. In 2014, Uber successfully lobbied for a law in Washington, D.C. that divested the city of regulatory powers by stipulating several kinds of oversight that the government cannot exercise. D.C. law specifically prohibits the D.C. Department of For-Hire Vehicles from requiring a digital dispatch company such as Uber to produce a list or inventory of vehicles or operators affiliated with the service.

14. What is most notable about Uber's efforts to shield its performance, presence and actions in the District of Columbia is a clause in the legislation that makes data about ride-hailing exempt from the D.C. Freedom of Information Act (FOIA). Thus, Uber is able to hide such matters as number of riders, number of auto collisions, traffic infractions, complaints of unsafe driving, and speeding tickets.

15. As journalists, policy makers, and researchers have found, documenting even the most basic information about the effects of Uber on U.S. cities, including the District of Columbia, is difficult if not impossible.[10]

---

[9] See: Henao, A., & Marshall, W. E. (2019). The impact of ride-hailing on vehicle miles traveled. *Transportation*, *46*(6), 2173-2194; Schaller, B. (2021). Can sharing a ride make for less traffic? Evidence from Uber and Lyft and implications for cities. *Transport policy*, *102*, 1-10.

[10] See: Ongweso E (2020 July 30): "Gig economy researchers want corporations to stop influencing research." *VICE*. https://www.vice.com/en_us/article/935z7y/gig-economy-researchers-want-corporations-to-stop-influencing-research

16. In addition, Uber policies can disincentivize drivers to report traffic accidents to insurers, public authorities, and the company itself, further limiting any accurate research into Uber's safety. Uber has been found to penalize drivers for disrupted or incomplete rides as well as poor ratings from passengers. Uber has also been found to penalize drivers after drivers report physical assaults or verbal abuses by passengers.[11] These penalties include fewer rides, lower-paying rides, fewer bonuses or incentives, a decreased ability to schedule shifts in advance, or even "deactivation" (i.e., firing).

17. Uber drivers do not know how Uber assigns ride offers. Uber uses an unpredictable, automated system to allocate work and compensate workers. Two workers standing side-by-side will be offered different pay for the exact same job. Yet workers do not have access to information about how work allocations or pay decisions are made and cannot contest them. This personalized pay system, which Uber CEO Dara Khosrowshahi finally acknowledged this year, allocates work and driver pay according to "behavioral patterns" of individual drivers.[12]

18. Uber has a consistent policy of secrecy and deception.

    a. For example, Uber had a multi-year practice of using an internal application known as "Greyball" to trick domestic and international authorities in jurisdictions where Uber was disfavored or banned.[13] Uber used multiple

---

[11] See: Rideshare Drivers United and Asian Law Caucus (2023) *Fired By An App*. https://www.advancingjustice-alc.org/media/Fired-by-an-App-February-2023.pdf
[12] See: Wray B (2024 February 13) "Uber Boss Makes Shocking Admission Over 'Algorithmic Wage Discrimination.'" Novara Media. https://novaramedia.com/2024/02/13/uber-boss-makes-shocking-admission-over-algorithmic-wage-discrimination/
[13] See: Isaac M (2017 March 3) "How Uber Deceives the Authorities Worldwide," *New York Times*. https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html

       techniques, including credit card investigations, to identify suspected law enforcement officers using the app. It would then present the suspected individuals with a fake version of the app to make it appear that Uber's services were unavailable.

    b. In another example, senior executives at Uber ordered the use of a computer "kill switch" that would block authorities from accessing the company's main systems and data.[14] This "kill switch" was utilized by Uber staff multiple times during raids and investigations.

19. Uber's policies of secrecy and nondisclosure limit the research of academics and harms public transparency, including efforts to evaluate Uber's impact on public safety, in the District of Columbia.

20. Uber uses taxpayer funded roads, and should provide the information and data that would help journalists, policy makers, and researchers evaluate the effects of the company's operations on public roads and the users of those roads.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 24 April 2024

_Katie J. Wells_
Katie J. Wells

---

[14] See: Davies R and Goodley S (2022 July 10) "Uber bosses told staff to use 'kill switch' during raids to stop police seeing data." *The Guardian*. https://www.theguardian.com/news/2022/jul/10/uber-bosses-told-staff-use-kill-switch-raids-stop-police-seeing-data